## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

LILLIAN BERNIER,

Plaintiff,

v.

TURBOCAM, INC., HEALTH PLANS,
INC., & HARVARD PILGRIM HEALTH
CARE OF NEW ENGLAND, INC.

Defendants.

Civil Action No. 1:23-cv-00523-LM-AJ

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TURBOCAM, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT

### INTRODUCTION

The Plaintiff Lillian Bernier is an employee of the Defendant Turbocam, Inc. ("Turbocam"). She is also a transgender woman, which means that, although her birth sex is male, she has a female gender identity. Lillian has been diagnosed with gender dysphoria, a serious medical condition that typically arises when a transgender person cannot live consistent with her gender identity. Fortunately, gender dysphoria can be ameliorated with medical treatment that includes changes in gender expression and role, hormone therapy, and surgeries to change primary or secondary sex characteristics. Collectively, these treatments are referred to as gender transition. Lillian participates and pays into Turbocam's self-funded health benefits plan, but the plan categorically excludes all treatment for gender dysphoria or "which, as their objective, change the person's sex."

Lillian brings this case to challenge the lawfulness of such an exclusion, which directly targets medical care needed only by transgender people. She asserts claims against Turbocam for

1

discrimination on the basis of sex under Title VII (Count I) and New Hampshire law (Count II); gender identity under New Hampshire law (Count III); and disability under the Americans with Disabilities Act (ADA) (Count IV) and New Hampshire law (Count V).[1]

The Complaint easily states a claim under Title VII and parallel state statutes. The application of controlling Supreme Court precedent establishes that an employer's facial exclusion of gender transition medical care in its self-funded health plan is sex discrimination. *See Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), discussed *infra*. Federal court decisions both before and after *Bostock* have also concluded that exclusions like the one at issue here violate Title VII.[2] Turbocam ignores *Bostock* and substantial federal district court precedent, instead relying on assertions that misunderstand and distort established principles of antidiscrimination law. Turbocam's only point with respect to Plaintiff's disability discrimination claims is that she has not sufficiently pled that gender dysphoria results from a "physical impairment" as that term is used in the statutory definition of disability. That argument is easily undercut by the specificity of the allegations. *See infra*. The motion to dismiss should be denied.

## STATEMENT OF FACTS

The Complaint alleges the following facts relevant to the Defendant Turbocam:

### A.      Gender Dysphoria and its Treatment.

*Gender identity* is a person's innate and immutable internal sense of their sex. Compl. ¶ 22, ECF No. 1. A transgender person is someone who has a gender identity not typically associated

---

[1] The Complaint also names defendants Health Plans, Inc. and Harvard Pilgrim Health Care of New England, Inc. alleging discrimination in violation of Section 1557 of the Affordable Care Act. These defendants have not moved to dismiss these claims and have filed an Answer. ECF No. 20.

[2] Turbocam's motion to dismiss relies on its arguments with respect to Title VII to challenge the Plaintiff's state law sex discrimination claim. It does not address the Plaintiff's claim of gender identity discrimination under RSA 354-A.

with their birth sex. *Id*. at ¶ 23. For example, a transgender woman is a woman whose birth sex is male, but who has a female gender identity. *Id*. at ¶ 24.

*Gender dysphoria* is a serious medical condition. *Id*. at ¶¶ 26, 31. It has a physiological and biological etiology, and it is caused by an atypical interaction of sex hormones and the brain. *Id*. at ¶¶ 26, 28, 69. Gender dysphoria is the diagnosis for the distress experienced by a transgender person if they cannot live consistent with their gender identity. *Id*. at ¶ 25. The diagnostic criteria are set forth in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition. *Id*. at ¶ 27.

*Gender transition* is the process that a transgender person goes through to live consistent with their gender identity. *Id*. at ¶ 32. Medical treatment for gender dysphoria involves an individually tailored approach to gender transition. *Id*. at ¶ 38. Only transgender people go through gender transition. *Id*. at ¶ 33.

Gender transition treatment follows authoritative standards of care published by the World Professional Association for Transgender Health ("WPATH") that are endorsed by major mainstream medical organizations. *Id*. at ¶¶ 34-38. Gender transition medical care includes components of changes in gender expression and role, hormone therapy to feminize or masculinize the body, and surgeries to change primary or secondary sex characteristics. *Id*. at ¶ 38.

> **B.     Lillian Bernier's Employment and the Impact of Turbocam's Categorical Exclusion of Treatment of Gender Dysphoria in its Self-Funded Health Benefits Plan.**

Lillian Bernier is a transgender woman. Compl. ¶¶ 1, 43, ECF No. 1. She has been diagnosed with gender dysphoria. *Id*. She has begun and continues to need medically recommended treatment to alleviate symptoms of gender dysphoria, including gender transition surgeries. *Id*. at ¶ 46. She has been an employee of Turbocam since 2019. *Id*. at ¶ 39. Lillian is

eligible for and pays into Turobcam's self-funded health benefits plan. *Id*. at ¶ 52. Turbocam's self-funded health benefits plan categorically excludes all treatment for gender dysphoria, including all treatments "which, as their objective, change [a] person's sex." *Id*. at ¶ 48. As a direct result of Turbocam's exclusion of gender transition medical care, Lillian has paid out-of-pocket for some medically necessary treatments and has had to forego scheduling medically necessary gender transition surgery recommended by her providers as essential to her treatment plan. *Id*. at ¶ 50.

## STANDARD OF REVIEW

A defendant moving to dismiss a complaint pursuant to Rule 12(b)(6) has the burden of demonstrating that the complaint lacks "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. This court must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the [plaintiff]'s favor." *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011) (citing *SEC v. Tambone*, 597 F.3d 436, 441 (1st Cir. 2010)). Once a plaintiff has put forth "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Iqbal*, 556 U.S. at 679. To succeed on a motion to dismiss, the defendant must show that the plaintiff's assertions fall short of establishing at least one "element necessary to sustain recovery under some actionable legal theory." *Centro Médico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005) (internal citation omitted).

**ARGUMENT**

**I.      THE COURT SHOULD DENY THE MOTION TO DISMISS BECAUSE A CHALLENGE TO THE CATEGORICAL EXCLUSION OF MEDICAL TREATMENT FOR GENDER TRANSITION IN AN EMPLOYER-FUNDED HEALTH BENEFITS PLAN STATES A CLAIM FOR SEX DISCRIMINATION IN VIOLATION OF TITLE VII.**

The exclusion in Turbocam's self-funded health benefits plan (the "Exclusion") that is at the core of this discrimination case provides:

> The following are excluded from Covered Services and no benefits shall be paid for . . . Gender dysphoria treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy, and related preoperative and postoperative procedures, which, as their objective, *change the person's sex* and any related complications.

Compl. ¶ 48, ECF No. 1 (emphasis added).

**A.      The Reasoning In *Bostock* Establishes The Viability Of The Plaintiff's Claim.**

In *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020), the United States Supreme Court affirmed that an employer who discriminates based on the transgender status of an employee is engaging in sex discrimination in violation of Title VII.[3] As the Court explained, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id*. at 1741-42 ("[T]ransgender status [is] inextricably bound up with sex . . . because to discriminate on th[is] ground[] requires an employer to intentionally treat individual employees differently because of their sex."). The Court reasoned that discriminating against a person who has changed, or seeks to change, their birth sex is plainly sex discrimination. *Id*. at

---

[3] Title VII prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment[] because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). *See also Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) ("Health insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment.'" (quoting 42 U.S.C. § 2000e-2(a)(1))).

1746 ("By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today.").

*Bostock*'s reasoning squarely applies to the Exclusion at issue here. The Exclusion's language prohibiting coverage of medical treatments that "as their objective, change the person's sex" parallels *Bostock*'s description of unlawful sex discrimination against "persons with one sex identified at birth and another today." *Id*. In fact, the Exclusion's language, "change the person's sex," defines the class of transgender people; *i.e.*, individuals whose gender identity is not aligned with their birth sex. Compl. ¶ 23, ECF No. 1. Further, excluding coverage for gender dysphoria is plainly impermissible transgender status discrimination because gender transition, the only recognized treatment for gender dysphoria, is the process a transgender person goes through to live consistent with their gender identity, and only transgender people need medical treatment for gender dysphoria. *Id*. at ¶¶ 32-34.

Here, Lillian seeks "gender dysphoria treatment" to "change her sex" because she is a transgender woman. Had she been born female, she would not be impacted by the Exclusion. The Exclusion subjects Lillian to different "terms, conditions, or privileges of employment" because of her sex.

**B.      Federal Courts Before And After Bostock Have Consistently Ruled That Categorical Exclusions Of Gender Transition Medical Care Violate Title VII's Prohibition Of Sex Discrimination.**

Turbocam's Memorandum of Law also fails to mention any of the highly persuasive court decisions holding that similar exclusions of gender transition medical care violate Title VII. For example, in *Kadel v. Folwell*, a North Carolina federal court awarded summary judgment on a plaintiff's Title VII claim because the plaintiff, a transgender woman, "was denied coverage because of her sex." 620 F.Supp.3d 339, 386 (M.D.N.C. 2022), *sua sponte reh'g en banc*, No. 22-

1721 (4th Cir. argued Sept. 21, 2023) (Title VII ruling not appealed). The court applied *Bostock* to arrive at its decision, reasoning:

> [A] straightforward application of the but-for test supports that [the plaintiff]'s birth-assigned sex was a but-for cause of her injury. [The plaintiff] received hormone treatments and surgery that aligned her physiology more closely with that of a stereotypical woman. Because [the plaintiff] was identified as a male at birth, the Plan and its administrators considered these treatments to be "leading to or in connection with sex changes or modifications and related care." If she was not assigned the sex of male at birth, then the treatments would not "change" or "modify" her sex, and they would not fall within the exclusion.

*Id.* at 387 (record citation omitted).[4]

Kadel's holding that the prohibition on medical coverage for treatments "leading to or in connection with sex changes," *Kadel*, 620 F.Supp.3d at 387 (record citation omitted), applies equally to Turbocam's prohibition of coverage for medical treatments that "change [a] person's sex." Compl. ¶ 48, ECF No. 1. In both cases, the plaintiff's sex is a but-for cause of the decision to exclude health coverage for the medically necessary treatment.

In another recent decision, *Lange v. Houston Cnty., Georgia*, the court reviewed an exclusion for "sex change surgery" and found that it violates Title VII because "[t]he undisputed, ultimate point is that the [e]xclusion applies only to transgender members, and it applies to [the plaintiff] because she is transgender." 608 F.Supp.3d 1340, 1358 (M.D. Ga. 2022) ("Ignoring *Bostock* doesn't make it go away."). Here, the Exclusion is also inescapably sex discrimination under a straightforward application of *Bostock*.

---

[4] The court reached same conclusion through a sex stereotyping analysis, reasoning that "the Plan overtly discriminates against members for 'failing to conform to the sex stereotype propagated by the [Plan]'" by "prohibit[ing] coverage for treatments that 'change or modify' physiology to conflict with assigned sex." *Kadel*, 620 F.Supp.3d at 376 (quoting *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 608 (4th Cir. 2020)).

Pre-dating *Bostock*, a federal court in Arizona applied a similar rationale to invalidating a

health benefits exclusion under Title VII:

> The sex characteristic is inseparable from transgender identity: had Plaintiff been born a male, rather than a female, he would not suffer from gender dysphoria and would not be seeking gender reassignment surgery. . . .
>
> Defendants assert that the[y] must engage in line-drawing in order to contain health care costs. This may be so, but such line drawing, when it results in unjustified disparate treatment or impact based on sex or gender, violates Title VII. . . . The Plan's disparate treatment of Plaintiff's medical needs—its exclusion of coverage for gender reassignment surgery—potentially qualifies as sex discrimination because it negatively impacts those, and only those, who do not conform to the gender identity typically associated with the sex they were assigned at birth.
>
> . . . Therefore, as a practical matter, the exclusion singles out transgender individuals for different treatment.

*Toomey v. Arizona*, No. 19-cv-35, 2019 U.S. Dist. LEXIS 219781, at *16 (D. Ariz. Dec. 20, 2019)

(awarding preliminary injunction against public university system employer on Title VII claim)

(consent decree approved on Sept. 28, 2023).[5]

**C.      Turbocam Ignores The Controlling Legal Precedent And Instead Distorts Basic Principles Of Anti-Discrimination Law.**

Turbocam does not even give a nod to the applicable Supreme Court precedent or the

substantial federal case law on all fours with the issues presented in this case. Instead, Turbocam

---

[5] *See also Fletcher v. Alaska*, 443 F.Supp.3d 1024, 1030 (D. Alaska 2020) (exclusion is "discrimination because of sex and makes defendant's formal policy . . . facially discriminatory"); *Boyden v. Conlin,* 341 F.Supp.3d 979, 997 (W.D. Wis. 2018) ("[T]he Exclusion on its face treats transgender individuals differently on the basis of sex, thus triggering the protections of Title VII and the ACA's anti-discrimination provision."). Still other federal courts have found that similar exclusions violate Section 1557 of the Affordable Care Act, which incorporates the prohibition against sex discrimination in Title IX. *E.g.*, *C.P. Blue Cross Blue Shield*, 2022 U.S. Dist. LEXIS 227832, at *16 (W.D. Wash. Dec. 19, 2022) (awarding summary judgment because "the administration of the Exclusion based on transgender status was discrimination 'on the basis [of] sex' contrary to Section 1557" of the Affordable Care Act); *Tovar v. Essentia Health*, 342 F.Supp.3d 947, 953 (D. Minn. 2018) (denying defendants' motion to dismiss claim that denial of coverage for gender transition medical care violates Section 1557's prohibition of sex discrimination).

offers three hollow arguments that do not come close to warranting dismissal of the Complaint. First, Turbocam argues that the Exclusion "applies neutrally to either sex and does not discriminate 'because of sex.'" Def.'s Mem. in Supp. of Mot. to Dismiss 5, ECF No. 21-1. This argument relies on a fundamental misunderstanding of Title VII's prohibition against sex discrimination. As the Supreme Court clearly explained in *Bostock*: "Title VII's plain terms and our precedents don't care if an employer treats men and women comparably as groups." 140 S.Ct. at 1748. The Court emphasized that the "focus should be on individuals, not groups," *id.* at 1740, and reasoned that "an employer who fires both lesbians and gay men," just as an employer who discriminates against both transgender men and transgender women, "doesn't diminish but doubles its liability." *Id*. at 1748.

Second, Turbocam asserts that the discriminatory exclusion "is just one of over 50 different services and treatments excluded from the Plan," implying that the Exclusion at issue in this case cannot be sex-based discrimination. Def.'s Mem. in Supp. of Mot. to Dismiss 7, ECF No. 21-1. This argument ignores the fact that sex discrimination is apparent on the face of the Exclusion. Turbocam fails to cite any case law to support its argument that the presence of other exclusions cures the discriminatory language of the Exclusion at issue here, which is unsurprising because the argument flies in the face of Title VII and all other nondiscrimination protections. Race-based exclusions in a zoning code, for example, are impermissibly discriminatory,[6] regardless of whether that zoning code imposes setback requirements, building size limitations, or other restrictions. As the Court explained in *Bostock*, "nothing in Title VII turns on the employer's labels or any further intentions (or motivations) for its conduct beyond sex discrimination." 140 S.Ct. at 1745-46.

---

[6] *Buchanan v. Warley*, 245 U.S. 60 (1917).

Third, Turbocam argues that the First Circuit's decision in *Frith v. Whole Foods Mkt., Inc.*, 38 F.4th 263 (1st Cir. 2022), requires dismissal of the Complaint. Def.'s Mem. in Supp. of Mot. to Dismiss 5-7, ECF No. 21-1. *Frith* is wholly inapposite because that case is about the sufficiency of the allegations and the plausibility of inferences from the Complaint, but this case is a direct evidence case where discrimination is evident on the face of the Exclusion. The Complaint in *Frith* alleged pretextual justifications for discriminatory enforcement of a facially neutral policy. The plaintiffs alleged that a nondiscriminatory dress code policy was enforced in a discriminatory manner vis-à-vis face masks at the onset of the coronavirus pandemic. *Id*. at 267-68. The plaintiffs inferred, and asked the court to infer, that the enforcement of the dress code policy to disallow "Black Lives Matter" messages was motivated by improper racial discrimination. *Id*. at 274-75. The Court of Appeals ruled that the allegations did not support a plausible inference of discrimination because an obvious commonsense inference explained the shift in enforcement: "At that time, the coronavirus pandemic had created the conditions for employees to easily and in a highly visible fashion display non-company messages at work." *Id*. at 274.

Here, the plain text of Turbocam's Exclusion constitutes direct evidence of discrimination because the plaintiff is denied coverage for medical treatment to "change [her] sex," foreclosing Turbocam's argument that the Complaint fails to support a plausible inference of discrimination.[7] Here, unlike *Frith*, the Complaint does not ask this Court to make any inference about Turbocam's

---

[7] Turbocam's only proffered justification for the Exclusion, "cost savings," is irrelevant in a direct evidence case. Even if this Court could ignore the direct evidence of discrimination alleged in the Complaint in favor of a justification proposed in a motion to dismiss, cost savings cannot ever excuse a discriminatory employment policy. "[N]either Congress nor the courts have recognized [a cost justification] defense under Title VII." *City of L.A. Dep't of Water & Power v. Manhart*, 435 U.S. 702, 717 (1978). *See also Newport News*, 462 U.S. at 685 n.26 ("[N]o [cost] justification is recognized under Title VII once discrimination has been shown.").

motive for denying the plaintiff coverage for medical care that she needs. It is enough that Exclusion's plain text discriminates against the plaintiff because of sex.

**D.      Even If The Court Does Not View The Exclusion As Direct Evidence Of Facial Discrimination, In Spite Of Its Plain Language, The Allegations In The Complaint Are More Than Sufficient To Establish A Reasonable Inference Of Discriminatory Impact And Intent.**

Even if the Court disagrees that the text of the Exclusion is direct evidence of facial discrimination, the allegations in the Complaint are still sufficient to state a claim for unlawful discrimination because the allegations establish a reasonable inference that Turbocam intended to deprive Lillian of health benefits for gender transition-related care because she is transgender.

The allegations establish that the Exclusion disproportionately—in fact, exclusively, impacts transgender people and only transgender people. In addition, the allegations readily establish an inference that Turbocam intended to classify transgender employees for different health benefits because the Plan "categorically excludes coverage of *any* treatment for gender dysphoria or gender transition-related care." Compl. ¶ 1, ECF No. 1. Further, the Exclusion operates by denying medical treatment when the purpose or objective is to change a person's sex, which creates an inference that the Plan denies transgender people coverage for treatment provided to others. Turbocam's intent to discriminate is also apparent because it had notice of the impact of the Exclusion on the Lillian and chose not to amend it. Lillian began her gender transition while being employed at Turbocam. *Id.* at ¶ 45. With this knowledge, "Turbocam and its attorneys have stated to Lillian that Turbocam will continue to maintain the Exclusion." *Id.* at ¶ 49. These allegations are more than sufficient to establish a plausible inference that Turbocam designed and maintained a health benefits plan that impacts the availability of medical care for transgender employees, that it did so with knowledge that it impacted the Plaintiff, and that its intent was to deprive her of benefits available to other employees.

In sum, the Plaintiff has established that the Exclusion is facial discrimination that deprives her of a benefit that all other employees are entitled to and that the reason she is denied coverage for medically necessary care is because she is a transgender woman. Alternatively, the factual content of the Complaint is more than sufficient to allow the reasonable inference that the Exclusion is discriminatory.

## II. TURBOCAM'S ASSERTION THAT THE PLAINTIFF HAS NOT SUFFICIENTLY PLED THE "PHYSICAL IMPAIRMENT" ELEMENT OF THE DEFINITION OF DISABILITY UNDER THE AMERICANS WITH DISABILITIES ACT IS FLATLY INCORRECT.

Turbocam's sole point with respect to the Plaintiff's claims for disability discrimination is that Lillian "has not pled any facts indicating that her gender dysphoria diagnosis resulted from a physical impairment." Def.'s Mem. in Supp. of Mot. to Dismiss 8-9, ECF No. 21-1 ("Nowhere in the Complaint . . . does Bernier allege that her gender dysphoria resulted from or was caused by a physical impairment.").[8]

Turbocam's assertion is patently false. *See* Compl. ¶ 69, ECF No. 1 ("Gender dysphoria is a physiological condition that affects many bodily systems, such as the endocrine system, including because it is caused by an atypical interaction of sex hormones and the brain."); *id*. at ¶ 28 ("[G]ender dysphoria has a physiological and biological etiology."); *id*. at ¶ 29 ("Gender dysphoria results from physical or physiological 'impairments' within the meaning of the

---

[8] Turbocam references an ADA provision that excludes "gender identity disorders not resulting from physical impairments" from the definition of covered disabilities. Def.'s Mem. in Supp. of Mot. to Dismiss 8, ECF No. 21-1 (citing 42 U.S.C. § 12211(b)(1)). Turbocam does not argue, however, that gender dysphoria falls within this exclusion and that question is not before this Court. Regardless, highly persuasive case law supports the conclusion that gender dysphoria is a protected health condition under the ADA. *See, e.g.*, *Williams v. Kincaid*, 45 F.4th 759, 769 (4th Cir. 2022), *cert. denied*, 143 S.Ct. 2414 (2023) ("[N]othing in the ADA, then or now, compels the conclusion that gender dysphoria constitutes a 'gender identity disorder' excluded from ADA protection.").

Americans with Disabilities Act."). *See also id*. at ¶ 72 ("Lillian's gender dysphoria substantially limits one or more of her major life activities, as defined in the Americans with Disabilities Act, including reproduction and caring for one's self and the operation of the endocrine and reproductive functions."). These allegations are pled more than sufficiently to bring them squarely within the applicable regulatory definitions of these terms. *See* 28 C.F.R. § 35.108(b)(1)(i) ("*Physical or mental impairment* means . . . [a]ny physiological disorder or condition . . . affecting one or more body systems, such as: neurological, . . . reproductive, . . . and endocrine") (emphasis in original); 28 C.F.R. § 35.108(c)(1) ("*Major life activities* include . . . [c]aring for oneself . . . [and] [t]he operation of a *major bodily function*, such as the functions of the . . . neurological, . . . endocrine, . . . and reproductive systems.") (emphasis in original).[9]

The plaintiff has alleged that her gender dysphoria is a physical impairment limiting major life activities and is therefore entitled to the protection of the ADA. Turbocam's argument to the contrary ignores the many facts detailed in the Complaint that support her claim.

### CONCLUSION

For the foregoing reasons, the plaintiff Lillian Bernier respectfully requests that the Court deny Turbocam, Inc.'s Motion to Dismiss Plaintiff's Complaint.

---

[9] Reproduction is also a major life activity under the ADA. *See Bragdon v. Abbott*, 118 S.Ct. 2196 (1998).

Date: April 5, 2024

Respectfully submitted,
Lillian Bernier
By her attorneys,

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@glad.org
bklein@glad.org

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

*/s/ Chris Erchull*
Chris Erchull

14