# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

LILLIAN BERNIER,

      Plaintiff,

v.                                 Civil Action No. 1:23-cv-00523-LM-AJ

TURBOCAM, INC.,

      Defendant.

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## HER MOTION FOR SUMMARY JUDGMENT
## [***REDACTED PUBLIC VERSION***]

1

Plaintiff Lillian Bernier respectfully submits this memorandum of law in support of her motion for summary judgment.

## INTRODUCTION

Lillian Bernier is a lifelong New Hampshire resident. In high school, Lillian participated in a vocational welding and machining program, and now she works nights as a machine operator at a manufacturing facility. Like so many other people, Lillian relies on her job to pay her bills and provide food and shelter for her family. Additionally, like the majority of Americans, Lillian and her family rely for their medical care on our country's system of employer-sponsored health benefits.

Lillian's employer, Turbocam, Inc. ("Turbocam"), provides health benefits through a self-funded plan as part of its compensation package for employees. Turbocam has complete control over what is covered in its health benefits plan, including the authority to exclude coverage, to add coverage, or to make exceptions to the plan's terms. Lillian has gender dysphoria and requires treatment. Turbocam's self-funded health plan excludes all coverage for treatment of gender dysphoria. Through direct evidence in this case, Turbocam admits that it maintains the exclusion because it disapproves of transgender people like Lillian. *See* Statement of Facts, *infra*, § III; Arg., § II(B). As a result of the exclusion, Lillian has delayed obtaining critical medical care she needs, and she has paid out of pocket for other care. She experiences distress related to gender dysphoria that is inadequately treated.

Lillian moves for summary judgment on Count I (Title VII) of her Complaint because Title VII prohibits an employer from treating an employee adversely because she is transgender. *See Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) and Arg. § II, *infra.* She also moves for summary judgment on Count IV (Americans with Disabilities Act) of her Complaint, because the sole reason for denying Lillian coverage for treatment of gender dysphoria is Turbocam's adverse

view of transgender people and opposition to medical care that enables a person to live in a sex different from their birth sex. *See* Arg., § III, *infra*.[1] Turbocam asserts that it is entitled to an exemption from the requirement of equal opportunity under the Religious Freedom Restoration Act ("RFRA"). *See* 42 U.S.C. § 2000bb, *et seq*. Turbocam's defense fails. RFRA does not apply to litigation between private parties. *See* Arg., § IV. Lillian should prevail on her claims because federal nondiscrimination protections are designed precisely to eradicate workplace discrimination to ensure that people are not treated adversely by their employers because of characteristics like being transgender and suffering from gender dysphoria.

## STATEMENT OF FACTS

### I.    The Parties

Plaintiff Lillian Bernier is a 34-year-old transgender woman. SOF[2] ¶¶ 1, 4. Lillian has gender dysphoria. SOF ¶ 2. She lives as a woman in all aspects of her life. SOF ¶ 3. Born and raised in Exeter, New Hampshire, Lillian has been employed continuously by the defendant, Turbocam, since June 3, 2019. SOF ¶¶ 5, 9. She has been promoted twice and recently began a new role as a TAE Machine Operator. SOF ¶¶ 7–9.

Founded in 1987, Turbocam is a manufacturer of flow path components for the aerospace and turbo machinery industries located in Barrington, New Hampshire, with approximately 600 employees and annual revenues ranging from $100 to $150 million. SOF ¶¶ 10–14. Marian Noronha is the President and a Director of Turbocam. SOF ¶ 15. Turbocam asserts that it "exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting

---

[1] Lillian does not intend to pursue her state law claims (Counts II, III, and IV) and is prepared to enter into a stipulation of dismissal as to those counts. Count VI against a separate defendant was previously dismissed. ECF No. 51.

[2] Citations are to Plaintiff's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("SOF").

Christian service to God and people." SOF ¶ 16. Its mission statement further provides that "we hold ourselves accountable to God's law expressed in the Bible." SOF ¶ 16.

## II.    Transgender People and Gender Dysphoria

At birth, infants are classified as male or female. SOF ¶ 17. This classification is the person's birth sex. SOF ¶ 17. Most people live in their birth sex. SOF ¶ 18. An individual who cannot live and function in their birth sex is transgender. SOF ¶ 19. A transgender woman is an individual whose birth sex was male but who cannot live and function in her birth sex. SOF ¶ 20.

Gender dysphoria is a medical diagnosis characterized by clinically significant distress or impairment in functioning, which results when a person cannot live and function in their birth sex. SOF ¶ 21. Gender dysphoria is an established and recognized diagnosis in the field of medicine. SOF ¶ 22. The diagnostic criteria for gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5-TR"), an authoritative source in the field of medicine and psychology. SOF ¶ 23.

Gender dysphoria requires treatment. SOF ¶ 24. Hormones and various surgical treatments are recognized and accepted as medical interventions for gender dysphoria, including by established medical and mental health organizations. SOF ¶ 25. For a transgender woman with gender dysphoria, the goal of medical interventions is to change her primary and secondary sex characteristics so that she can live and function as a woman. SOF ¶ 26. These treatments include hormone therapy and surgical treatments. SOF ¶¶ 27–33. The purpose of these treatments is to bring a transgender woman's body and hormone levels into alignment with a sex different than her birth sex. SOF ¶¶ 29, 33. Once she begins feminizing hormone therapy, a transgender woman typically needs to continue the therapy for the rest of her life. SOF ¶¶ 34–35.

### III.    The Turbocam Health Plan

Turbocam offers health benefits to permanent employees working 25 hours or more per week. SOF ¶ 36. In 2020, during the first year of Lillian's employment at Turbocam, the company offered health benefits to employees through a fully insured health coverage plan offered by Harvard Pilgrim Healthcare Insurance Company. SOF ¶ 37. That plan covered a range of "Transgender Health Services." SOF ¶ 41. In January 2021, Turbocam switched its employee health benefits to an employer self-funded plan ("Turbocam Health Plan"). SOF ¶ 42. As a self-funded plan, Turbocam has the sole responsibility for the risk of loss and pays the costs of covered benefits from money that includes company funds and employee contributions. SOF ¶ 44. Turbocam has authority over the coverage in the Turbocam Health Plan. SOF ¶ 49. It can direct the exclusion of benefits, remove an exclusion, and grant an exception to an employee under the plan. SOF ¶ 49. The Turbocam Health Plan contains a categorical exclusion of all treatment for gender dysphoria, including counseling, hormone therapy, surgery and "related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications." (the "Exclusion"). SOF ¶ 50.

Turbocam maintains the Exclusion—and refuses to eliminate it—based on the beliefs of Turbocam's leadership that "male and female" are "immutable" and that efforts to change sexes do not "hono[r] God." SOF ¶¶ 51–53, 60; Noronha Decl., ECF No. 42-3 ¶ 14. Mr. Noronha testified that Turbocam objects to covering gender dysphoria because of his and his wife's religious beliefs that an individual should not "erase" their sex. SOF ¶ 56. Mr. Noronha further testified that he does not recognize Lillian as a woman. SOF ¶ 58.

Under the Turbocam Plan, Health Plans, Inc. ("HPI")—a company owned by Harvard Pilgrim Health Care—is the claims administrator of the Turbocam Health Plan. SOF ¶¶ 45–46. Turbocam employees or their providers submit claims to HPI, which determines, based on information

from an employee's health care provider, whether a claim is payable. SOF ¶ 47. This means that Turbocam does not make coverage determinations itself and, instead, relies upon HPI to conduct "clinical reviews of medical necessity to meet certain criteria." SOF ¶¶ 61–64. HPI relies on clinical criteria for gender dysphoria treatment. SOF ¶¶ 64. Those criteria recognize that gender dysphoria is a diagnosis that requires medical treatment and that surgical and hormone treatments are medically necessary when applicable criteria are met. If the Turbocam Health Plan did not exclude gender dysphoria, HPI would rely on its existing clinical criteria that recognize gender dysphoria as a legitimate diagnosis and hormone and surgical treatments as necessary in cases where the criteria are met. SOF ¶¶ 65–68.

**IV.    Lillian's Gender Transition and Turbocam's Refusal to Remove the Exclusion.**

Lillian has known that she is female since she was 11 or 12 years old. SOF ¶ 69. For most of her life Lillian lived with this deeply buried secret, which led to deep feelings of distress, depression, and despair. SOF ¶ 70. In the fall of 2020, Lillian's distress reached a point where she realized that she had to live as a woman. SOF ¶ 71. Over the next months, Lillian began presenting herself as a woman publicly, changed her legal name to Lillian ███████████████, and updated her New Hampshire driver's license to reflect her name and that she is female. SOF ¶ 72.

Since the end of 2020, Lillian has ████████████████████████ ████████████████████████. SOF ¶¶ 73–76. She has ████████████████, SOF ¶ 97, ████████████████████, SOF ¶ 104. These treatments have reduced Lillian's feelings of distress, but they have not fully resolved those feelings. SOF ¶¶ 77–78; 106. Lillian ███████████████ but has been prevented from doing so due to the Exclusion. SOF ¶¶ 96, 112–114.

6

In early 2021, when Lillian told her employer that she is transgender and worked to update her name and sex on company records, Lillian also asked a representative of the Turbocam personnel department about coverage for her gender dysphoria treatment under the Turbocam Health Plan. SOF ¶¶ 79–85. Although the personnel department representative initially indicated that she thought gender dysphoria treatment would be covered, SOF ¶ 85, Lillian later called Harvard Pilgrim and learned that the Exclusion prevented her from receiving coverage for her gender dysphoria care under the Turbocam Health Plan. SOF ¶87. Due to the Exclusion, the Turbocam Health Plan has not and will not pay for the ███████████████████████████████████████ ████████ that Lillian needs to treat her gender dysphoria. SOF ¶¶ 92, 97–99, 104–06.

Over the course of several months, Lillian communicated with several members of the Turbocam personnel department to request an exception that would allow her to get coverage for her treatment and to ask that Turbocam remove the Exclusion from the Turbocam Health Plan. SOF ¶¶ 90–95, 101–03. All of Lillian's requests were denied, and the only reason given for maintaining the Exclusion was Turbocam's religious objection to providing coverage. SOF ¶¶ 60, 92, 95. Turbocam's refusal to remove the Exclusion has caused Lillian overwhelming anxiety and distress. SOF ¶¶ 110.

## V.    Turbocam's Tolerance of Health Insurance Coverage and Employee Practices that Violate Marian Noronha's Religious Beliefs about Biblical Teaching.

Although Marian Noronha considers it "important" that the Turbocam Health Plan be consistent with his religious beliefs, SOF ¶ 116, he nonetheless permits the plan to include coverage for multiple treatments that, he asserts, violate those beliefs. For example, the Turbocam Health Plan currently offers health benefits to the same-sex spouses of Turbocam employees, SOF ¶¶ 118, 121, but Mr. Noronha testified that doing so violates his religious beliefs to the extent that, if he were aware, he would consider shutting down the company, SOF ¶ 120. In addition, the Turbocam

Health Plan covers in vitro fertilization and stem cell transplants that Mr. Noronha testified conflict with his religious beliefs. SOF ¶¶ 122–29.

## ARGUMENT

### I.    Legal Standard.

Summary judgment is proper where the movant "shows that there is no genuine dispute as to any material fact and . . . is entitled to judgment as a matter of law." *MRFranchise, Inc. v. Stratford Ins. Co.*, 755 F. Supp. 3d 111, 116 (D.N.H. 2024) (quoting Fed. R. Civ. P. 56(a)). In reviewing the summary judgment record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. *Pleasantdale Condos., LLC v. Wakefield*, 37 F.4th 728, 733 (1st Cir. 2022). This Court need not consider factual disputes immaterial to the legal issues under review in ruling on a motion for summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) ("[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . .") (emphasis in original). Where, as here, the parties will each file cross-motions for summary judgment, the same standard applies. *Dixon-Tribou v. McDonough*, 86 F.4th 453, 458 (1st Cir. 2023); *see also Mandel v. Boston Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006) ("The presence of cross-motions for summary judgment neither dilutes nor distorts this standard of review."). Thus, this Court must "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *See Adria Int'l Grp., Inc. v. Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001).

### II.    The Exclusion of All Treatment for Gender Dysphoria in Turbocam's Self-Funded Health Benefits Plan Violates Title VII.

#### A.    *Bostock* Provides the Framework for the Analysis of Lillian's Title VII Claim.

Title VII prohibits an employer from discriminating against an individual employee "with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] . . .

sex . . . ." 42 U.S.C. § 2000e-2(a)(1). "Health insurance and other fringe benefits are 'compensa-

tion, terms, conditions, or privileges of employment.'" *Newport News Shipbuilding & Dry Dock

Co. v. EEOC*, 462 U.S. 669, 682 (1983) (quoting 42 U.S.C. § 2000e-2(a)(1)); *see also City of L.A.,

Dep't of Water & Power v. Manhart*, 435 U.S. 702, 710 (1978) ("[T]here is no reason to believe

that Congress intended a special definition of discrimination in the context of employee group

insurance coverage.").

    In *Bostock*, the Supreme Court resolved any doubt that an employer who treats an employee

adversely because of her transgender status violates Title VII's prohibition on sex discrimination.

590 U.S. at 660. The Court concluded that "transgender status [is] inextricably bound up with sex."

*Id*. at 660–61. The Court reasoned that "it is impossible to discriminate against a person for being

. . . transgender without discriminating against the individual based on sex," *id*. at 660, because

"[b]y discriminating against transgender persons, the employer unavoidably discriminates against

persons with one sex identified at birth and another today." *Id*. at 669.

    Here, the undisputed evidence demonstrates that Turbocam insists on maintaining the Ex-

clusion because its leadership objects to Lillian changing her birth sex to another sex, i.e., because

she is transgender. *See id*. at 658 ("[A]n employer who intentionally treats a person worse because

of sex . . . discriminates against that person in violation of Title VII . . . .").

### B.    Direct Evidence Demonstrates that Turbocam Excludes Treatment of Gender Dysphoria Because its Leadership Objection to Lillian Changing Her Sex.

    In this case, there is direct testimony that the motivation for maintaining the Exclusion is

discriminatory. "'[D]irect evidence' refers to a 'smoking gun' showing that the decision-maker

relied upon a protected characteristic in taking an employment action." *Joseph v. Old Dutch Mus-

tard*, 560 F. Supp. 3d 504, 510 (D.N.H. 2020) (quoting *PowerComm, LLC v. Holyoke Gas & Elec.

Dep't*, 657 F.3d 31, 35 (1st Cir. 2011)). A direct evidence case differs from a case where the plaintiff

proffers circumstantial evidence of discrimination, because, in a direct evidence case, the plaintiff is not asking the court to make any inference based on the evidence. *Cf. Comley v. Media Planning Grp.*, 108 F. Supp. 3d 6, 13 (D. Mass. 2015).

Turbocam's Director of Talent Development (its designated witness on the reason for the Exclusion under Fed. R. Civ. P. 30(b)(6)) testified that Turbocam retained the Exclusion because any "attempt to change" the sex of a man or woman violates the religious beliefs of Turbocam's President Marian Noronha. *See* SOF ¶¶ 51–52 & 51 n.9. Similarly, Turbocam's President testified that Turbocam denied Lillian's request to remove the Exclusion in its health plan because he and his wife believe that "male and female" are "immutable." *See* SOF ¶¶ 53–54. Mr. Noronha went further by emphasizing that he is opposed to "the use of Turbocam's resources, including in its health plan, to assist employees in erasing or obscuring their sex." SOF ¶ 55.

Turbocam admits that the Exclusion is based on an express intent to treat transgender employees differently because their leadership disapproves of transgender people.[3] As *Bostock* explained, the fact that an employer has additional reasons (in this case, religious beliefs) for adopting an expressly discriminatory policy is legally irrelevant.[4] *Bostock*, 590 U.S. at 671.

Further, the record shows that Turbocam's insistence on maintaining the Exclusion only arose in response to Lillian's gender transition and her request for medical care coverage. SOF

---

[3] As further evidence of Mr. Noronha's belief that a person cannot change their sex (i.e., be transgender), he testified that "Lillian Bernier is not a woman." SOF ¶ 58.

[4] Turbocam will assert in this case that its religious beliefs provide a defense to Title VII's nondiscrimination mandate. *See* Mem. of Law in Supp. of Turbocam's Mot. to Intervene, ECF No. 41-1 at 8. The plaintiff disagrees. Regardless, the question whether Turbocam has a legal defense to discrimination is entirely separate from whether Turbocam has engaged in employment discrimination because of an employee's sex. *See UAW v. Johnston Controls*, 499 U.S. 187, 199 (1991) ("[T]he absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect.").

¶¶ 88–95. In short, insisting on maintaining the Exclusion upon learning that it had a transgender employee is an adverse action against Lillian because she is transgender.[5]

Because the undisputed facts demonstrate that Turbocam discriminated against Lillian because of her sex, this court should enter summary judgment on her Title VII claim.

### III.    The Exclusion of All Treatment for Gender Dysphoria in Turbocam's Self-Funded Health Benefits Plan Violates the ADA.

Title I of the Americans with Disabilities Act ("ADA") prohibits employers from discriminating "against a qualified individual on the basis of disability in . . . employee compensation . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To prevail on summary judgment for a claim under the ADA, a plaintiff must establish that "(1) she was disabled within the meaning of the ADA, (2) she was a 'qualified individual,' and (3) the defendant took an adverse employment action against her on the basis of her disability." *Pena v. Honeywell Int'l, Inc.*, 923 F.3d 18, 27 (1st Cir. 2019) (citing 42 U.S.C. § 12112(a)).

#### A.    Gender Dysphoria is a Disability Under the ADA.

##### 1.    The Framework for Applying the ADA's Definition of Disability.

The ADA provides that "[t]he term 'disability' means, with respect to an individual":

(A)    a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)    a record of such impairment; or

(C)    being regarded as having such impairment . . . .

---

[5] The Supreme Court's recent decision in *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816, 222 L. Ed. 2d 136 (2025) is not applicable because this case is a statutory, not a constitutional claim, and in *Skrmetti*, the Court reaffirmed *Bostock*'s central holding. *Skrmetti*, 222 L. Ed. 2d at 156 ("'[F]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex.' . . . In such a case, the employer has penalized a member of one sex for a trait or action that it tolerates in members of the other.") (quoting *Bostock*, 590 U.S. at 662).

42 U.S.C. § 12102(1). As explained below, Congress intended that this definition be construed to cover a broad range of health conditions and not to be interpreted in an overly restrictive or hyper-technical way.

The definition of disability in the ADA first appeared in the Rehabilitation Act Amendments of 1974. Pub. L. No. 93-516, § 111, 88 Stat. 1617, 1619 (1974) (codified as amended at 29 U.S.C. § 705(9)). The first part of the three-part definition (i.e. "physical or mental impairment which substantially limits . . . major life activities") uses broad language flexible enough to reach a wide range of health problems. 88 Stat at 1619. In *School Board of Nassau County v. Arline*, the Supreme Court recognized that this definition was "broad" and encompassed more than "so-called 'traditional handicaps.'" 480 U.S. 273, 280 n.5 (1987) (internal citation omitted). In 1990, Congress enacted the ADA and re-enacted the Rehabilitation Act's definition of "handicap." Pub. L. No. 101-336, § 3, 104 Stat. 327, 329–30 (1990).

After Supreme Court decisions narrowed the ADA,[6] Congress, in 2008, passed the ADA Amendments Act ("ADAAA"). Pub. L. No. 110-325, 122 Stat. 3553 (2008). Congress's intent was to "convey that . . . the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, . . . [and] the question whether an individual's impairment is a disability under the ADA should not demand extensive analysis." *Id*. § 2(b)(5), 122 Stat. at 3554. Congress therefore directed that "[t]he definition of disability . . . shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act." 42 U.S.C. § 12102(4)(A). Congress also directed the EEOC to revise its regulations consistent with the ADAAA. ADAAA § 2(b)(6); *see*

---

[6] *See Sutton v. United Air Lines*, 527 U.S. 471 (1999); *Toyota Motor Mfg., Ky. v. Williams*, 534 U.S. 184 (2002).

*also* 29 CFR § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA.").

> ### 2.    Gender Dysphoria Easily Satisfies the Definition of Disability under the ADA.

Lillian's gender dysphoria is a "physiological disorder or condition . . . affecting [the] endocrine [system]," *see* 29 C.F.R. § 1630.2(h)(1), ██████████████████████████████



████████████████████. *See* SOF ¶ 27; Ettner Decl., Ex. 3 ¶¶ 14–17. Lillian's gender dysphoria ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. *See* SOF ¶¶ 27–29, 73–76. Lillian's gender dysphoria ██████████████████████████████████, "[a]ny mental or psychological disorder," *see* 29 C.F.R. § 1630.2(h)(2), ██████████████████████████████. *See* SOF ¶¶ 21–23, Ettner Decl., Ex. 3 ¶¶ 6–7.

In addition, Lillian's gender dysphoria substantially limits multiple major life activities.[7] Lillian's ██████████████████, which she already would have undergone but for the lack of coverage in Turbocam's health plan, SOF ¶ 96, will ██████████████████████████████, SOF ¶ 32, which is a substantial limitation on a major life activity under the ADA. *See Bragdon v. Abbott*, 524 U.S. 624, 639 (1998) ██████████████████████████████████████████. ██████.[8] Lillian is also substantially limited in the major life activity of caring for herself as a

---

[7] The findings and purposes of the ADAAA explicitly reject the notion that the words "substantially limits" "need to be interpreted strictly to create a demanding standard for qualifying as disabled." Pub. L. No. 110-325, § 2(b)(4), 122 Stat. 3553, 3554 (rejecting stricter standard announced in *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184 (2002)). *See, e.g., Rossman v. Nashoba Reg'l School* District, No. 3:21-cv-40042, 2024 U.S. Dist. LEXIS 154453, at *31 (D. Mass. Aug. 28, 2024) ("[T]he term 'substantially limits' is to be "construed broadly in favor of expansive coverage . . . .") (quoting 29 C.F.R. § 1630.2(j)(1)(i)).

[8] Lillian's treatment for gender dysphoria ██████████████████████████████████████████ ████████████████████████████████████████████. *See* 29 C.F.R. § 1630.2(j)(1)(ii).

result of ███████████████████████████████████████. *See* 42 U.S.C.

§ 12102(2)(A). Gender dysphoria is a life-altering diagnosis, the treatment for which has required

her to live as a woman in all aspects of her life ████████████████████████████████████

███████████████████. *See* SOF ¶¶ 3, 19–35, 71–78; s*ee also United States v. Happy Time*

*Day Care Ctr.*, 6 F. Supp. 2d 1073, 1080–81 (W.D. Wis. 1998) (describing the lifelong need for

medical care for HIV as a "major life activity" under the ADA).[9] Finally, as described above,

Lillian is substantially limited ████████████████████████████████████████████████

████████████████████. *See* 42 U.S.C. § 12102(2)(B).

In addition, Lillian's diagnosis of gender dysphoria satisfies the second option for defining

disability: requiring a "record of [her] impairment." *See* SOF ¶ 2. And under the third option,

Congress clarified in the ADAAA that a plaintiff need only demonstrate adverse action on the basis

of an impairment. *See* 42 U.S.C. § 12102(3)(A) ("An individual meets the requirement of 'being

regarded as having such an impairment' if the individual establishes that he or she has been sub-

jected to an action prohibited under this Act because of an actual or perceived physical or mental

*impairment* whether or not the impairment limits or is perceived to limit a major life activity.")

(emphasis added).[10] Here, that adverse action is Turbocam's denial of health benefits for Lillian's

gender dysphoria.

---

[9] The ADA provides that "[t]he determination of whether an impairment substantially limits a ma-
jor life activity must be made without regard to mitigating measures such as … medication." 42
U.S.C. § 12102(4)(E)(i). Lillian's gender dysphoria prior to any medical intervention caused her
profound distress to such an extent that she sought and continues to require medical treatment.
SOF ¶¶ 71–73, 77–78. Further, Lillian continues to experience significant distress vis-à-vis her
body's masculine features. SOF ¶ 106. This easily constitutes a substantial limitation in the major
life activity of "caring for oneself," with or without regard to any mitigating measure. *See* 42
U.S.C. § 12102(2)(A).

[10] *See* Arg., § III(C), *infra*, for a discussion that Lillian has been subjected to an action prohibited
by the ADA.

**B.      Lillian is Qualified to Perform the Essential Functions of Her Job.**

Lillian has performed her job successfully at Turbocam since her employment began in 2019. She has been promoted twice, and she recently applied for and was hired into a different position in the company. SOF ¶¶ 7–9. It is beyond dispute that Lillian "can perform the essential functions of the employment position that [she] holds . . . ." 42 U.S.C. § 12111(8).

**C.      Turbocam Has Discriminated Against Lillian on the Basis of Her Disability.**

The ADA prohibits discrimination "on the basis of disability in regard to. . . employee compensation, . . . and other . . . privileges of employment." 42 U.S.C. § 12112(a). It would undermine Congress's directive that the ADA provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), to permit employers to base adverse employment decisions—here, an adverse decision relating to Lillian's compensation package, which includes health benefits—on a negative attitude or belief about a person's disability. *See, e.g., EEOC v. Steel Painters LLC*, 433 F. Supp. 3d 989, 1007–08 (E.D. Tex. 2020) (denying employer's summary judgment motion against employee's ADA claim because a jury could reasonably infer that the employer "held negative views of recovering drug addicts who used methadone"); *Gillen v. Fallon Ambulance Serv.*, 283 F.3d 11, 30–31 (1st Cir. 2002) (overturning grant of summary judgment where a factfinder could have concluded that employer based its hiring decisions "on an unfounded stereotype about the nature of [plaintiff's] impairment"); *Nedder v. Rivier Coll.*, 944 F. Supp. 111, 119 (D.N.H. 1996) (denying summary judgment where trier of fact could find that employer discriminated against plaintiff with obesity because it "believed that obese teachers are perceived by students as less disciplined and less intelligent and as making unsuitable role models"); *cf. Haney v. Pritzker*, 563 F. Supp. 3d 840, 861–62 (N.D. Ill. 2021) (holding that plaintiff with developmental disabilities plausibly alleged discrimination under Title II of the ADA for Illinois's closure of community programs based on stereotypes

15

about people with disabilities); *Arline*, 480 U.S. at 284 (emphasizing that "the basic purpose" of the nondiscrimination provision of the Rehabilitation Act "is to ensure that [disabled] individuals are not denied jobs or other benefits because of . . . prejudiced attitudes . . . .").

In this case, Turbocam provides its employees with health benefits under the Turbocam Health Plan as part of their employment compensation. The Turbocam Health Plan includes a range of standard medical benefits, including physician services and inpatient and outpatient surgery. SOF ¶ 43. As a self-funded plan, Turbocam has authority and control over all aspects of the plan; it decides what coverage is included or excluded. SOF ¶ 44. Notwithstanding the physician, hospital and surgical services covered under the plan, Turbocam included and insists on maintaining an exclusion of all treatment for gender dysphoria solely on the basis of its negative attitudes and beliefs about treatment for gender dysphoria—specifically its objection to an employee altering her sex. *See* SOF ¶¶ 53–57. The uncontroverted evidence here demonstrates that the sole reason for denying Lillian coverage for surgical care for her gender dysphoria is Turbocam's adverse view of transgender people and opposition to treatment for gender dysphoria that enables a person to live in a sex different from their birth sex. The ADA was intended to eradicate discrimination that is solely based on prejudicial views of a disability.

### D.    This Court Should Reject Any Assertion that the ADA Excludes Protections for Gender Dysphoria.

Lillian Bernier's ADA claim based on gender dysphoria is not foreclosed because the statute excludes "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1) (the "GIDs Exclusion"). Any argument for precluding Lillian's claim based on the GIDs Exclusion finds no support in the text of the ADA, disregards the plain language of the statute, and, therefore, is not a reasonable interpretation of the ADA. But even if it were, such an

interpretation violates constitutional guarantees of equal protection and should be avoided under basic principles of statutory interpretation.

This Court should follow the persuasive analysis of the Fourth Circuit in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), *cert. denied,* 143 S. Ct. 2414 (2023), the only Court of Appeals to address this issue, and the numerous District Courts (*see* note 8, *infra*) that have concluded that gender dysphoria is not a "gender identity disorder." The Court in *Williams* began by looking at the meaning of the ADA's terms at the time of its enactment—as required by *Bostock*—and noting that because the ADAAA directed courts to construe the definition of disability broadly, "courts must construe the ADA's exclusions narrowly." *Williams*, 45 F.4th at 766–67.

The text of the ADA does not mention gender dysphoria at all. *Id*. at 766. But, in 1990, the medical community recognized a class of disorders known as "gender identity disorders." *Id.* at 767 (citing the Diagnostic and Statistical Manual of the American Psychiatric Association (3d ed. Rev. 1987) (the "DSM-III")). According to the DSM-III, the "'essential feature' of a 'gender identity disorder' was 'an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity.'" *Id*. (quoting the DSM-III). In other words, with gender identity disorder, the "clinical problem was the discordant gender identity," which "marked being transgender as a mental illness." *Id.* at 767 (quoting *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 611 (4th Cir. 2020)). In 2013, however, "advances in medical understanding led the [APA] in 2013 to remove 'gender identity disorders' from the most recent DSM (5th ed. 2013) ["DSM-5"]" and "ad[d] the diagnosis of 'gender dysphoria,' which did not exist as a diagnosis in 1990." *Id*. The Court concluded that there was a "meaningful," "not just semantic," and "dramati[c]" difference between the definitions of the two terms. *Id.* "Rather than focusing exclusively on a person's gender identity, the DSM-5 defines 'gender dysphoria' as the '*clinically significant distress*' felt

by some of those who experience an 'incongruence between their gender identity and their assigned sex.'" *Id*. (citing DSM-5 at 451–53) (emphasis in original); *see also* Ettner Decl., <u>Ex. 3</u> ¶¶ 22–24 (explaining the history of the different diagnoses in the DSM from DSM-III in 1980 to DSM-5 in 2013).

> The *Williams* Court concluded that:

> In sum, the APA's removal of the "gender identity disorder" diagnosis and the addition of the "gender dysphoria" diagnosis to the DSM-5 reflected a significant shift in medical understanding. The obsolete diagnosis focused solely on cross-gender identification; the modern one on clinically significant distress. The DSM-5 itself emphasizes this distinction, explaining that the gender dysphoria diagnosis "focuses on dysphoria as the clinical problem, not identity per se." DSM-5 at 451. Put simply, while the older DSM pathologized the very existence of transgender people, the recent DSM-5's diagnosis of gender dysphoria takes as a given that being transgender is not a disability and affirms that a transgender person's medical needs are just as deserving of treatment and protection as anyone else's.

*Id*. at 769; *see also id.* at 769–70 (noting that "nothing in the ADA . . . compels the conclusion that gender dysphoria constitutes a 'gender identity disorder'" and declining to adopt an "unnecessarily restrictive" interpretation that would rewrite the statute). A substantial number of district courts before and after *Williams* have also concluded that gender dysphoria is not a gender identity disorder.[11]

---

[11] *See, e.g.*, *Doe v. Ga. Dep't of Corr*., 730 F. Supp. 3d 1327, 1348 (N.D. Ga. 2024) (citing *Williams* and concluding that gender dysphoria is not a gender identity disorder); *Guthrie v. Noel*, No. 1:20-cv-2351, 2023 U.S. Dist. LEXIS 161325, at *32 (M.D. Pa. Sept. 11, 2023), *report and recommendation adopted*, 2023 U.S. Dist. LEXIS 217454 (M.D. Pa. Sept. 29, 2023) (same); *Kozak v. CSX Transp., Inc*., 20-cv-184S, 2023 U.S. Dist. LEXIS 133299, at *13–17 (W.D.N.Y. Aug. 1, 2023) (discussing multiple legal bases for the conclusion that gender dysphoria is not a gender identity disorder); *Doe v. Mass. Dep't of Corr.*, No. 17-cv-12255, 2018 U.S. Dist. LEXIS 99925, at *17–18 (D. Mass. June 14, 2018) ("In contrast to DSM-IV, which had defined 'gender identity disorder' as characterized by a 'strong and persistent cross gender-identification' and a 'persistent discomfort' with one's sex or 'sense of inappropriateness' in a given gender role, the diagnosis of GD in DSM-V requires attendant disabling physical symptoms, in addition to manifestations of clinically significant emotional distress."); *Blatt v. Cabela's Retail, Inc.*, No. 5:14-cv-4822, 2017 U.S. Dist. LEXIS 75665, at *6–9 (E.D. Pa. May 18, 2017) (adopting interpretation that "gender dysphoria . . . goes beyond merely identifying with a different gender and is characterized by clinically

In addition, even if the Court were to disregard the significant differences between gender identity disorder and gender dysphoria, and determine that the two are somehow the same, gender dysphoria would still not be within the exclusion because it "result[s] from [a] physical impairmen[t]." 42 U.S.C. § 12211(b)(1). Gender dysphoria is plainly "physical." Lillian ████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████. *See* Bernier Decl., <u>Ex. 1</u> ¶¶ 27, 32 (███████████████████████████████████████████ ████████████████); Ettner Decl., <u>Ex. 3</u> ¶ 13 ("For a transgender woman with gender dysphoria, a key goal of medical interventions is to change her primary and secondary sex characteristics so that she can live and function as a woman."); *see also* Arg. § III(A)(2), *supra* (describing medical intervention to address ██████████████████████████).

An interpretation of the ADA that excludes gender dysphoria would give rise to a serious constitutional question, which courts have an obligation to avoid. *See Williams*, 45 F.4th at 772. As the Court in *Williams* noted, "[o]ne need not look too closely to find evidence of discriminatory animus toward transgender people in the enactment of" the GIDs Exclusion. *Id*. The Court noted the grouping of "gender identity disorders" with pedophilia, exhibitionism, and voyeurism "implicitly 'brands all [transgender people] as [equivalent to] criminals." *Id.* at 772–73 (alterations in original) (quoting *Lawrence v. Texas*, 539 U.S. 558, 581 (2003) (O'Connor, J., concurring in the judgment)). The Court also pointed to the "moral judgment" and animus reflected in the ADA's legislative history. *Id.* at 773. As the Court noted, the text and legislative history of the ADA reflect impermissible animus similar to the state constitutional amendment at issue in *Romer v. Evans*. 517 U.S. 620, 623 (1996). That case addressed Amendment 2 to the Colorado Constitution which,

---

significant stress and other impairments that may be disabling.").

like the exclusion of gender dysphoria from the ADA, "'withdraws from [one group], but no others, specific legal protection from the injuries caused by discrimination.'" *Williams*, 45 F.4th at 773 (alterations in original) (quoting *Romer*, 517 U.S. at 627).[12]

Because the undisputed facts demonstrate that Turbocam discriminated against Lillian Bernier solely because of its negative beliefs about gender dysphoria, this court should grant summary judgment for Lillian on her ADA claim.

## IV.    Turbocam Has No Defense Under RFRA Because RFRA Does Not Apply to Civil Disputes Between Private Parties.

RFRA is not a defense to Lillian's claims under Title VII or the ADA because RFRA cannot be raised in litigation between private parties. RFRA provides that

> Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except . . . if it demonstrates that application of the burden to the person . . . (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

42 USC § 2000bb-1(a)–(b). Turbocam asserts that it is a closely held corporation owned and controlled by Marian Noronha[13] and can raise RFRA as a defense to Lillian's Title VII and ADA claims.

Three of the four federal Courts of Appeals to address the issue have held that RFRA can only be raised when the federal government is a party to a dispute. *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010); *Listecki v. Off. Comm. of Unsecured*

---

[12] *See Mass. DOC*, 2018 U.S. Dist. LEXIS 99925, at *6 (construing ADA to protect gender dysphoria to avoid constitutional question); *Blatt*, 2017 U.S. Dist. LEXIS 75665, at *4 (same); *see also Castle v. Cobb Cnty.*, No. 1:19-cv-1406, 2022 U.S. Dist. LEXIS 89743, at *14 & n.13 (N.D. Ga. May 18, 2022) (construing Rehabilitation Act to protect gender dysphoria); *Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 134 (E.D. Pa. 2020) (citing favorably to *Blatt* and *Mass. DOC* in favor of avoidance).

[13] Turbocam has the burden of proof to establish this fact.

*Creditors*, 780 F.3d 731, 736 (7th Cir. 2015); *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 834–43 (9th Cir. 1999). The only Court of Appeals to reach the contrary conclusion has since cast doubt on its holding. *Rweyemamu v. Cote*, 520 F.3d 198, 203–04 & n.2 (2d Cir. 2008) (referencing *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006)) (stating "we do not understand how [RFRA] can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue").[14]

In reaching their conclusion, these Courts of Appeals have pointed to the text of the statute, which allows "appropriate relief *against a government*." 42 U.S.C. § 2000bb-1(c) (emphasis added). RFRA defines "government" to include only a branch, department, agency, instrumentality, or official (or other person acting under color of law) of the United States, a State, or a subdivision of a State. *Id.* § 2000bb-2(1). In *Listecki*, the Seventh Circuit emphasized that "[t]he relief is clearly and unequivocally limited to that from the 'government.' If the government is not a party,

---

[14] Numerous District Courts across the country have taken the majority view as well. *E.g.*, *Zinski v. Liberty Univ., Inc.,* 2025 U.S. Dist. LEXIS 31362, at *56 (W.D. Va. Feb. 21, 2025), *appeal docketed,* No. 25-1228 (4th Cir. Mar. 11, 2025); *Menk v. Mitre Corp.*, 713 F. Supp. 3d 113, 183 (D. Md. 2024); *Ratliff v. Wycliffe Assocs., Inc.*, No. 6:22-cv-1185, 2023 U.S. Dist. LEXIS 92811, at *17 (M.D. Fla. May 26, 2023); *Ference v. Roman Cath. Diocese of Greenburg*, No. 22-cv-797, 2023 U.S. Dist. LEXIS 8416, at *18 (W.D. Pa. Jan. 18, 2023); *Carrier v. Ravi Zacharias Int'l Ministries, Inc.*, No. 1:21-cv-3161, 2023 U.S. Dist. LEXIS 35487, at *14 (N.D. Ga. Mar. 3, 2023); *Clark v. Newman Univ., Inc*., No. 19-cv-1033, 2022 U.S. Dist. LEXIS 164360, at *37 (D. Kan. Sept. 12, 2022); *Doe v. Cath. Relief Servs.,* 618 F. Supp. 3d 244, 254 (D. Md. 2022), *appeal docketed,* No. 25-1569 (4th Cir. May 21, 2025); *Billard v. Charlotte Cath. High Sch.*, No. 3:17-cv-11, 2021 U.S. Dist. LEXIS 167418, at *49 (W.D.N.C. Sept. 3, 2021), *rev'd on other grounds*, 101 F.4th 316 (4th Cir. 2024); *C.P. v. Blue Cross Blue Shield of Ill.*, 536 F. Supp. 3d 791, 797 (W.D. Wash. 2021), *appeal docketed,* No. 23-4331 (9th Cir. argued Jan. 15, 2025); *Van Stry v. McCrea*, No. 2:19-cv-104, 2020 U.S. Dist. LEXIS 62338, at *19 (E.D. Tex. Apr. 9, 2020); *Goodman v. Archbishop Curley High Sch., Inc.*, 149 F. Supp. 3d 577, 588–89 (D. Md. 2016); *Mathis v. Christian Heating & Air Conditioning, Inc.*, 158 F. Supp. 3d 317, 328 (E.D. Pa. 2016); *Boggan v. Miss. Conf. of the United Methodist Church*, 433 F. Supp. 2d 762, 766–67 (S.D. Miss. 2006), *aff'd*, 222 F. App'x 352 (5th Cir. 2007), *cert denied*, 552 U.S. 813 (2007); *see also Hammons v. Univ. of Md. Med. Sys. Corp.*, 649 F. Supp. 3d 104, 127 (D. Md. 2023) (finding that defendant was a state actor but that if it "were not a state actor . . . it could not assert RFRA in a case brought by a private party").

no one can provide the appropriate relief." 780 F.3d at 737. Lillian is a private party, not acting under color of law, and the government is not a party to this action, so RFRA provides no defense for Turbocam.

Permitting a private defendant to invoke RFRA as a defense to a civil rights enforcement action brought by a private plaintiff would effectively require that private parties step into the shoes of the government and litigate complex constitutional questions concerning the application of federal law. RFRA imposes a burden upon the government to show that a challenged law is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(b)(2) ("*Government* may substantially burden a person's exercise of religion only if *it* demonstrates" narrow tailoring) (emphasis added). When the government is not a party, it cannot meet this burden. *See McGill*, 617 F.3d at 410 ("Where, as here, the government is not a party, it cannot go forward with any evidence.") (alterations omitted) (quoting *Hankins*, 441 F.3d at 114–15 (Sotomayor, J., dissenting))).

Congress did not impose on private plaintiffs seeking to vindicate their own civil rights the burden to defend the tailoring of a federal statute. Instead, Congress imposed that burden only on "the government" responsible for enforcing the laws. 42 U.S.C. § 2000bb-2(1). There is no "affirmative indication" in the statute "that Congress . . . intended for every private entity to 'be dragooned into [defending] federal law.'" *Sutton*, 192 F.3d at 839 (alterations in original) (quoting *Printz v. United States*, 521 U.S. 898, 928 (1997)). Requiring private parties to defend Congress's legislative choices under the RFRA standard—or requiring government participation— would distort the statute and raise serious separation-of-powers concerns. *Hankins*, 441 F.3d at 114 n.8 (Sotomayor, J., dissenting) ("Absent a clear statement that Congress intended such a result, it is not the role of this Court to mandate such widespread and automatic federal intervention in

lawsuits between private parties."). This Court should join the overwhelming majority of federal courts and conclude that RFRA was never intended as a defense to federal claims by a private plaintiff against a private defendant.

## **CONCLUSION**

For the foregoing reasons, this court should grant summary judgment in favor of plaintiff Lillian Bernier on Count I (Title VII) and Count IV (ADA).

Respectfully submitted,
Lillian Bernier

By her attorneys,

Date: July 25, 2025

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

*/s/ Chris Erchull*

Date: July 25, 2025

Chris Erchull