**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

LILLIAN BERNIER,

       Plaintiff,

v.                                                              Civil Action No. 1:23-cv-00523-LM-AJ

TURBOCAM, INC.,

       Defendant.

**PLAINTIFF LILLIAN BERNIER'S STATEMENT OF UNDISPUTED MATERIAL**
**FACTS IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56 and LR 56, Plaintiff Lillian Bernier submits the following

statement of undisputed material facts in support of her motion for summary judgment.

**I.    <u>The Parties</u>**

1.    Plaintiff Lillian Bernier is a transgender woman. Declaration of Lillian Bernier

("Bernier Decl.")[1] ¶ 1.

2.    Lillian has gender dysphoria. Bernier Decl., <u>Ex. 1</u> at ¶¶ 1, 23.

3.    Lillian lives as a woman in all aspects of her life. Bernier Decl., <u>Ex. 1</u> at ¶ 10.

4.    Lillian is 34 years old. Bernier Decl., <u>Ex. 1</u> at ¶ 1.

5.    Lillian was born and raised in Exeter, New Hampshire. She graduated from

Exeter High School in 2009, where she participated in a vocational welding and machining

program at the Seacoast School of Technology. Bernier Decl., <u>Ex. 1</u> at ¶ 2.

---

[1] The Declaration of Lillian Bernier is attached as <u>Exhibit 1</u> to the accompanying Declaration of
Attorney Chris Erchull.

6.      After graduating from high school, Lillian worked in a number of jobs in the Seacoast region of New Hampshire, including approximately seven years in various retail and management positions at Town Fair Tire. Bernier Decl., Ex. 1 at ¶ 4.

7.      In 2019, Lillian applied for a position as a CNC Mill Operator at Turbocam, Inc. ("Turbocam"). Bernier Decl., Ex. 1 at ¶ 6.

8.      Turbocam hired Lillian as a CNC Mill Operator, and she began work on June 3, 2019. Bernier Decl., Ex. 1 at ¶ 7.

9.      Lillian has worked at Turbocam continuously since June 3, 2019, and has been promoted twice, first to a Level I Machine Operator and then to a Level II Machine Operator. Recently, Lillian began a new role at Turbocam as a TAE Machine Operator. Lillian has always worked the third shift (11:00 p.m. to 7:00 a.m.). Bernier Decl., Ex. 1 at ¶ 7.

10.     Defendant Turbocam was founded in 1987. Deposition of Marian Noronha ("Noronha Dep.")[2] 11.

11.     Turbocam is a manufacturer of flow path components for the aerospace and turbo machinery industries. Noronha Dep., Ex. 2 at 11.

12.     Over the past five years, Turbocam's annual revenues have ranged from 100 to 150 million dollars. Noronha Dep., Ex. 2 at 14.

13.     Turbocam is located in Barrington, New Hampshire. It also has United States locations in Charleston, South Carolina and Chandler, Arizona. Noronha Dep., Ex. 2 at 14–15.

14.     Turbocam has approximately 600 employees. Noronha Dep., Ex. 2 at 15.

---

[2] Excerpted pages from the deposition transcript of Marian Noronha are attached as Exhibit 2 to the accompanying Declaration of Attorney Chris Erchull.

15.     Marian Noronha is the President and a Director of Turbocam. Noronha Dep., <u>Ex. 2</u> at 25.

16.     Turbocam has a mission statement that provides, in part, that it "exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting Christian service to God and people." The mission statement further provides that "we hold ourselves accountable to God's law expressed in the Bible." Declaration of Marian Noronha ("Noronha Decl."), ECF No. 42-3 ¶ 3.

**II.    <u>Transgender People and Gender Dysphoria</u>**

17.     At birth, infants are classified as male or female. This classification is the person's birth sex. Declaration of Randi Ettner, Ph.D. ("Ettner Decl.")[3] ¶ 4.

18.     Most people live in their birth sex. Ettner Decl., <u>Ex. 3</u> at ¶ 4.

19.     An individual who cannot live and function in their birth sex is transgender. Ettner Decl., <u>Ex. 3</u> at ¶ 5.

20.     A transgender woman is an individual whose birth sex was male but who cannot live and function in her birth sex. Ettner Decl., <u>Ex. 3</u> at ¶ 12.

21.     Gender dysphoria is a medical diagnosis characterized by clinically significant distress or impairment in functioning, which results when a person cannot live and function in their birth sex. Ettner Decl., <u>Ex. 3</u> at ¶ 6.

22.     Gender dysphoria is an established and recognized diagnosis in the field of medicine. Ettner Decl., <u>Ex. 3</u> at ¶ 7.

---

[3] The Declaration of Randi Ettner, Ph.D., is attached as <u>Exhibit 3</u> to the accompanying Declaration of Attorney Chris Erchull.

23.     The diagnostic criteria for gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5-TR"), an authoritative source in the field of medicine and psychology. Ettner Decl., Ex. 3 at ¶ 8–9.

24.     Gender dysphoria requires treatment. Ettner Decl., Ex. 3 at ¶ 10.

25.     Hormones and various surgical treatments are recognized and accepted as medical interventions for gender dysphoria, including by established medical and mental health organizations. Ettner Decl., Ex. 3 at ¶ 11.

26.     For a transgender woman with gender dysphoria, the goal of medical interventions is to change her primary and secondary sex characteristics so that she can live and function as a woman. Ettner Decl., Ex. 3 at ¶ 13.

27.     An adult with gender dysphoria does not produce hormones at the level consistent with the sex that is different from their birth sex. Ettner Decl., Ex. 3 at ¶ 14.

28.     An adult transgender woman who is not on medication or who has not had surgery does not have hormones in the typical female range. Ettner Decl., Ex. 3 at ¶ 15.

29.     The purpose of feminizing hormone therapy as a treatment for a transgender woman with gender dysphoria is to correct this hormonal inconsistency by bringing her hormone levels into the typical female range. Ettner Decl., Ex. 3 at ¶ 17.

30.     Feminizing hormone therapy affects the endocrine system by suppressing testosterone production and increasing levels of estrogen. Ettner Decl., Ex. 3 at ¶ 18.

31.     Vaginoplasty surgery as treatment for gender dysphoria includes orchiectomy. Ettner Decl., Ex. 3 at ¶ 19.

32.     Orchiectomy is the surgical removal of the testes, which effectively halts reproductive function and reduces endogenous testosterone to the typical female range. Ettner Decl., Ex. 3 at ¶ 19.

33.     The purpose of vaginoplasty surgery as a treatment for a transgender woman with gender dysphoria is to alter her body to bring it into alignment with a sex different from her birth sex. Ettner Decl., Ex. 3 at ¶ 20.

34.     An adult transgender woman with gender dysphoria who is on feminizing hormone therapy as a treatment for gender dysphoria typically requires such treatment for the remainder of her life. Ettner Decl., Ex. 3 at ¶ 21.

35.     Further, an adult transgender woman who has had an orchiectomy necessarily requires treatment with feminizing hormone therapy for the rest of her life. Ettner Decl., Ex. 3 at ¶ 21.

### III.     The Turbocam Health Plan

36.     Turbocam offers health benefits to permanent employees working 25 hours or more per week. Deposition of Peter Hanson ("Hanson Dep.")[4] 36–37.

37.     Prior to 2021, Turbocam offered health benefits to employees through a fully insured health coverage plan offered by Harvard Pilgrim Healthcare Insurance Company ("Harvard Pilgrim Plan"). Hanson Dep., Ex. 4 at 63, 75.

---

[4] Excerpted pages from the deposition transcript of Peter Hanson are attached as Exhibit 4 to the accompanying Declaration of Attorney Chris Erchull. Mr. Hanson has been the Director of Talent Development at Turbocam since 2018 and has been employed in Turbocam's personnel department since 2012. Hanson Dep., Ex. 4 at 7, 13, 20–21. Mr. Hanson was Turbocam's designee pursuant to Fed. R. Civ. P. 30(b)(6) to provide testimony about Turbocam's employee health benefits plans from 2015 to present, among other subjects. Defendant Turbocam, Inc.'s Objections to Plaintiff's 30(b)(6) Deposition Topics are attached as Exhibit 5 to the accompanying Declaration of Attorney Chris Erchull.

38.    Turbocam paid a monthly premium to Harvard Pilgrim, which paid the claims for employees' healthcare costs covered under the plan. Hanson Dep., Ex. 4 at 39.

39.    It was important to Turbocam that the Harvard Pilgrim Plan aligned with its mission and religious convictions. Hanson Dep., Ex. 4 at 72–73.

40.    It was Turbocam's practice to review the Harvard Pilgrim Plan documents each year to ensure that the covered benefits aligned with Turbocam's mission. Hanson Dep., Ex. 4 at 73–75.

41.    Turbocam's health benefits coverage under its Harvard Pilgrim Plan for the year 2020 covered "Transgender Health Services" including medically necessary surgery, related physician and behavioral health visits, and outpatient prescription drugs subject to limited exclusions. Harvard Pilgrim Benefit Handbook for Employer Group Plan (Jan. 1, 2020)[5] 35, 41–42.

42.    Beginning in January 2021, Turbocam switched its employee health benefits to an employer self-funded plan ("Turbocam Health Plan"). Deposition of Darika Marino ("Marino Dep.")[6] 13, 19, 84; *see also* Turbocam, Inc. Employee Group Medical Plan (H.S.A. PPO Plan) (Jan. 1, 2021).[7]

---

[5] Excerpted pages of the 2020 Harvard Pilgrim Plan are attached as Exhibit 6 to the accompanying Declaration of Attorney Chris Erchull.

[6] Excerpted pages from the deposition transcript of Darika Marino are attached as Exhibit 7 to the accompanying Declaration of Attorney Chris Erchull. Ms. Marino is a Senior Benefits Specialist at Turbocam. She has been in that position for seven years and has been employed in Turbocam's personnel department for 18 years. Marino Dep., Ex. 7 at 8–10, 13.

[7] Excerpted pages of the Turbocam Health Plan are attached as Exhibit 8 to the accompanying Declaration of Attorney Chris Erchull.

43.     The Turbocam Health Plan covers a range of standard medical benefits including physician hospital and office visits, inpatient and outpatient surgery, and inpatient hospital services. *See generally* Turbocam Health Plan, Ex. 8 at 32–51.

44.     Under the Turbocam Health Plan, Turbocam has the sole responsibility for the risk of loss and pays the costs of covered benefits from money that includes company funds and employee contributions. Hanson Dep., Ex. 4 at 38–42.

45.     Health Plans, Inc. ("HPI") is the claims administrator of the Turbocam Health Plan. Hanson Dep., Ex. 4 at 44.

46.     HPI is owned by Harvard Pilgrim Health Care.[8]

47.     Turbocam employees or their providers submit claims to HPI, which determines, based on information from an employee's health care provider, whether a claim is payable. Hanson Dep., Ex. 4 at 47–49.

48.     It was important to Turbocam that the new Turbocam Health Plan "mimi[c]" the coverage of the Harvard Pilgrim Plan to ensure, as Mr. Hanson explained, "that it was in alignment with our mission and our—the religious conviction associated with it . . . ." Hanson Dep., Ex. 4 at 72–73.

49.     Turbocam has authority over the coverage in the Turbocam Health Plan. It can direct the exclusion of benefits under the Turbocam Health Plan. It also has authority to remove an exclusion under the Turbocam Health Plan and to grant exceptions to employees under the Turbocam Health Plan. Hanson Dep., Ex. 4 at 64–65; Marino Dep., Ex. 7 at 30–31, 53–54.

---

[8] A page from HPI's website noting that is attached as Exhibit 9 to the accompanying Declaration of Attorney Chris Erchull.

50.    Since its inception in January 2021, the Turbocam Health Plan has contained an exclusion for: "Gender dysphoria treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy, and related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications" (the "Exclusion"). Turbocam Health Plan, Ex. 8 at 54.

51.    Mr. Hanson testified that Turbocam maintains the Exclusion, and refused to eliminate it, because "[i]t would be against our—the religious convictions of Turbocam to cover it." Hanson Dep., Ex. 4 at 120.[9]

52.    Mr. Hanson further testified that covering treatment of gender dysphoria is not in alignment with Turbocam's mission because "man is created in the image of God and men and women—men and women—and any—any attempt to change would not be—honoring God." Hanson Dep., Ex. 4 at 123.

53.    Mr. Noronha also testified that the reason that Turbocam objects to covering gender dysphoria in the Turbocam Health Plan is because of his and his wife's religious beliefs. Noronha Dep., Ex. 2 at 134.

54.    Mr. Noronha explained that the reason for the Exclusion in the Turbocam Health Plan is because it is the view of Mr. Noronha and his wife that "male and female" are "immutable." Noronha Decl., ECF No. 42-3 ¶ 14; *see also* Noronha Dep., Ex. 2 at 130–33 (agreeing that paragraph 14 of his declaration is a complete and accurate statement of the reason that Turbocam objects to providing treatment for gender dysphoria in the Turbocam Health Plan).

---

[9] Mr. Hanson was Turbocam's designee pursuant to Fed. R. Civ. P. 30(b)(6) to provide testimony on behalf of the corporation about "[a]ny and all reasons that Defendant Turbocam, Inc. excluded coverage of any or all treatment of gender dysphoria in any of its self-funded health plans." Ex. 5, No. 4.

55.     Mr. Noronha further explained that Turbocam maintains the Exclusion in the Turbocam Health Plan because "God will not allow the use of Turbocam's resources, including its health plan, to assist employees in erasing or obscuring their sex." Noronha Decl., ECF No. 42-3 ¶ 14.

56.     Mr. Noronha's view that an individual should not "erase" their sex is not limited to medical treatment. He stated that an individual's sex should not be erased in "any other way." Noronha Decl., ECF No. 42-3 ¶ 14.

57.     Mr. Noronha testified that "I will not use the word 'health' in all of these, what you call treatment for gender dysphoria." Noronha Dep., Ex. 2 at 143.

58.     Mr. Noronha testified that "Lillian Bernier is not a woman." Noronha Dep., Ex. 2 at 66; *see also id*. at 63.

59.     Throughout his deposition, Mr. Noronha repeatedly refused to refer to Lillian with female pronouns, even after being informed that she uses female pronouns. *E.g.*, Noronha Dep., Ex. 2 at 12, 18, 46, 54, 56, 63, 115, 117 (referring to Lillian using "he," "him," or "his"); *id.* at 54 (discussing Lillian's use of female pronouns).

60.     Turbocam's mission and the religious values of the company are the only stated reasons that Turbocam objects to covering treatment for gender dysphoria in the Turbocam Health Plan. Hanson Dep., Ex. 4 at 128; Noronha Dep., Ex. 2 at 132–34.

61.     No Turbocam employee has expertise in or has assessed the risk or efficacy of any medical treatment. Hanson Dep., Ex. 4 at 48–49; Marino Dep., Ex. 7 at 46–48.

62.     Turbocam has not hired a consultant to assess the efficacy or risk of any medical treatment. Marino Dep., Ex. 7 at 48.

63.     Rather, Turbocam relies upon HPI to conduct "clinical reviews of medical necessity to meet certain criteria." Marino Dep., Ex. 7 at 49.

64.     HPI relies upon and uses guidelines and clinical criteria to review claims for medical services by Turbocam employees. Declaration of Dianne Oldach ("Oldach Decl.")[10], ¶¶ 3–4.

65.     If the Turbocam Health Plan did not exclude treatment for gender dysphoria, HPI would rely upon its guidelines and clinical criteria to review and evaluate requests for treatment of gender dysphoria under the Turbocam Health Plan. Oldach Decl., Ex. 11 at ¶¶ 4, 8.

66.     When processing claims, HPI utilizes clinical criteria and guidelines created by its third-party vendor to determine if established clinical criteria are met for medical and surgical gender dysphoria treatments. Oldach Decl., Ex. 11 at ¶8; *see also* 2025 Guidelines and Clinical Criteria—Vaginoplasty for Gender Affirmation Surgery, 2025 Guidelines and Clinical Criteria—Orchiectomy for Gender Affirmation Surgery, 2025 Guidelines and Clinical Criteria—Breast Augmentation for Gender Affirmation Surgery ("Clinical Criteria").[11] The criteria are the same for all covered surgical treatments for gender dysphoria. Clinical Criteria 3, 12, 22.

67.     The Clinical Criteria used by HPI cover 26 surgeries for Gender Dysphoria. *E.g.*, Ex. 12, Clinical Criteria 3, 12, 22.

_____

[10] The declaration of Dianne Oldach is attached as Exhibit 11 to the accompanying Declaration of Attorney Chris Erchull.

[11] The 2025 guidelines and clinical criteria for these three treatments are attached as Exhibit 12 to the accompanying Declaration of Attorney Chris Erchull. Pursuant to a subpoena, HPI produced all clinical criteria and guideline documents for treatment for gender dysphoria since 2020. Oldach Decl. ¶ 6. Plaintiff references three illustrative guidelines here. All HPI guidelines for treatment of gender dysphoria since 2020 recognize gender dysphoria as a diagnosis requiring treatment and establish clinical criteria for various medical and surgical treatments. Additional documents can be brought to the Court's attention if necessary.

68.     HPI's clinical criteria for surgery for gender dysphoria include satisfaction of the diagnostic criteria for gender dysphoria, fulfillment of the prerequisite conditions for surgery (e.g., a referral letter from a qualified health care provider; the absence of any other psychiatric disorder), and completion of more than six months of cross-sex hormone therapy. *E.g.*, Clinical Criteria, Ex. 12 at 1–2, 10–11, 19–21.

**IV.    Lillian's Gender Transition and Turbocam's Refusal to Remove the Exclusion.**

69.     Growing up, Lillian always knew that she was different. She has known that she is female since she was 11 or 12 years old. Lillian tried to explain this to her parents, who told her it was a phase she would grow out of. Lillian knew it wasn't a phase. Bernier Decl., Ex. 1 at ¶ 3.

70.     For most of her life Lillian lived with this deeply buried secret, which led to deep feelings of distress, depression, and despair. Bernier Decl., Ex. 1 at ¶ 3.

71.     In the fall of 2020, approximately one and one-half years after beginning her employment at Turbocam, Lillian's distress reached a point where she realized that she had to live as a woman. Bernier Decl., Ex. 1 at ¶ 8.

72.     Over the next months, Lillian began presenting herself as a woman publicly, changed her legal name to Lillian, initiated feminizing hormone therapy, and updated her New Hampshire driver's license to reflect her name and that she is female. For the first time in her life, Lillian felt hope and optimism that she could be at peace with herself. Bernier Decl., Ex. 1 at ¶¶ 8, 10.

73.     Towards the end of 2020, Lillian sought medical treatment to aid her gender transition. Bernier Decl., Ex. 1 at ¶ 11.

74.     Lillian was prescribed feminizing hormones (Estradiol) and androgen suppressing medication (Spironolactone). Bernier Decl., Ex. 1 at ¶ 11.

11

75.    Since that time, Lillian has continued hormone therapy with her primary care provider at Elliott Pediatrics and Primary Care. Bernier Decl., Ex. 1 at ¶ 11.

76.    Lillian Bernier will need to be on feminizing hormone therapy for the remainder of her life. Bernier Decl., Ex. 1 at ¶ 30.

77.    Estradiol and Spironolactone have reduced Lillian's feelings of distress and prevented her body from experiencing the effects of the endogenous hormones that her body continues to produce. Bernier Decl., Ex. 1 at ¶ 12.

78.    Those medications, however, have not fully resolved Lillian's gender-related distress. Bernier Decl., Ex. 1 at ¶ 12.

79.    In March 2021, Lillian submitted her certificate of legal name change to Turbocam's personnel department. Bernier Decl., Ex. 1 at ¶ 13.

80.    Lillian met with Julie Oakley, who was the personnel representative for her department, and worked with her to update Lillian's name and sex on employee records at Turbocam to reflect that she is a woman. Bernier Decl., Ex. 1 at ¶ 13.

81.    At that time, Lillian told Ms. Oakley that she had started hormone therapy and planned to have gender transition surgery at the end of the year. Bernier Decl., Ex. 1 at ¶ 13.

82.    Ms. Oakley communicated this to Mr. Hanson. Email from Julie Oakley to Pete Hanson (Mar. 15, 2021);[12] Email from Julie Oakley to Darika Marino and Pete Hanson (Mar. 15, 2021).[13]

83.    Lillian's health insurance card in 2021 indicated the names of both HPI and Harvard Pilgrim Health Care. Bernier Decl., Ex. 1 at ¶ 16.

---

[12] This email is attached as Exhibit 13 to the accompanying Declaration of Attorney Chris Erchull.

[13] This email is attached as Exhibit 14 to the accompanying Declaration of Attorney Chris Erchull.

84.    In March 2021 Lillian asked Ms. Oakley whether the Turbocam Health Plan would cover medical care associated with Lillian's gender transition. Bernier Decl., Ex. 1 at ¶ 13.

85.    In March 2021 Ms. Oakley told Lillian that the Turbocam's health benefits would probably cover medical care for her gender transition. Bernier Decl., Ex. 1 at ¶ 13.

86.    In 2021 Lillian scheduled a consultation for vaginoplasty at Boston Medical Center. Bernier Decl., Ex. 1 at ¶ 15.

87.    In October 2021, Lillian called the Harvard Pilgrim Health Care number on her insurance card. At that time, Lillian learned for the first time about the Exclusion in the 2021 Turbocam Health Plan. Bernier Decl., Ex. 1 at ¶ 16.

88.    Turbocam had not initially requested that the Turbocam Health Plan exclude treatment for gender dysphoria. "Rather, when converting from the fully insured Harvard Pilgrim plan to the HPI self-funded plan in 2021, Turbocam simply used the wording provided by HPI in the generic/standard plan document they provided." Defendant Turbocam, Inc.'s Answers to Plaintiff Lillian Bernier's First Set of Interrogatories,[14] Answer to Interrogatory No. 13.

89.    Nonetheless, as outlined below, Turbocam has insisted on maintaining the Exclusion and has rejected Lillian's requests to remove it.

90.    On October 21, Lillian emailed the personnel department at Turbocam to inquire about the change to a self-funded plan. Bernier Decl., Ex. 1 at ¶ 17; Email from Lillian Bernier to Peter Hanson (Oct. 21, 2021).[15]

91.    Lillian asked if the Turbocam Health Plan could be "tweak[ed]" to enable coverage of gender transition medical care for her. Bernier Decl., Ex. 1 at ¶ 17; see also Ex. 15.

---

[14] Defendant Turbocam, Inc.'s Answers to Plaintiff Lillian Bernier's First Set of Interrogatories are attached as Exhibit 10 to the accompanying Declaration of Attorney Chris Erchull.

[15] This email is attached as Exhibit 15 to the accompanying Declaration of Attorney Chris Erchull.

13

92.     On October 25, 2021, Mr. Hanson communicated by email to Lillian that coverage for any treatment of gender dysphoria was excluded from the Turbocam Health Plan. Email from Peter Hanson to Lillian Bernier (Oct. 25, 2021).[16]

93.     In November 2021, Lillian emailed Maya Jiman, who had replaced Ms. Oakley as her personnel representative, to ask if Turbocam would make an exception to the Exclusion to enable Lillian to obtain gender transition surgery. Bernier Decl., Ex. 1 at ¶ 18; *see also* Email from Lillian Bernier to Maya Jiman (Nov. 17, 2021).[17]

94.     When Lillian did not receive a response, she followed up by email with Pete Hanson reiterating her request for an exception to the Exclusion. Bernier Decl., Ex. 1 at ¶ 18; Email exchange between Lillian Bernier and Peter Hanson (Dec. 6, 2021).[18]

95.     On December 6, 2021, Mr. Hanson replied that: "At this point, we are not changing the plan design or making an exception. While we do review the plan each year I suspect we won't be removing it from the exclusions list in the near future." Bernier Decl., Ex. 1 at ¶ 19; *see also* Ex. 18.

96.     Lillian canceled her appointment for a surgical consultation at Boston Medical Center because she had been told that the Turbocam Health Plan would not cover gender transition surgery and she could not afford to pay out of pocket. Bernier Decl., Ex. 1 at ¶ 20.

97.     In March 2022, Lillian sought mental health counseling for gender dysphoria with a licensed clinical social worker. Bernier Decl., Ex. 1 at ¶ 21.

---

[16] This email is attached as Exhibit 16 to the accompanying Declaration of Attorney Chris Erchull.

[17] This email is attached as Exhibit 17 to the accompanying Declaration of Attorney Chris Erchull.

[18] This email exchange is attached as Exhibit 18 to the accompanying Declaration of Attorney Chris Erchull.

98.     Lillian inquired with Turbocam's personnel department whether her therapy was covered under the Turbocam Health Plan. Bernier Decl., <u>Ex. 1</u> at ¶ 21.

99.     On March 29, 2022, Lillian received an email from Ms. Marino, Turbocam's benefits specialist, informing her that the Turbocam Health Plan would not cover her therapy because it was subject to the Exclusion. Bernier Decl., <u>Ex. 1</u> at ¶ 21; *see also* Email from Darika Marino to Lillian Bernier (Mar. 29, 2022). [19]

100.    As a result, Lillian paid out of pocket for mental health counseling with Ms. Wotherspoon. Bernier Decl., <u>Ex. 1</u> at ¶ 22.

101.    On March 30, 2022, Lillian met with Ms. Jiman and Mr. Hanson, at their request, to discuss her gender transition. Bernier Decl., <u>Ex. 1</u> at ¶ 25.

102.    At the meeting, Lillian again requested that Turbocam remove the Exclusion. Bernier Decl., <u>Ex. 1</u> at ¶ 25.

103.    The Exclusion remains in the Turbocam Health Plan. Bernier Decl., <u>Ex. 1</u> at ¶ 25.

104.    On November 8, 2022, Lillian underwent breast augmentation surgery at the Elliot 1-Day Surgery & Endoscopy Center. Bernier Decl., <u>Ex. 1</u> at ¶ 26.

105.    Lillian underwent the surgery to further alleviate the distress that she was experiencing due to gender dysphoria and to make her body more feminine. Bernier Decl., <u>Ex. 1</u> at ¶ 26.

106.    Although this surgery reduced Lillian's distress, she continues to feel stress, anxiety, and depression because of her body's masculine features. Bernier Decl., <u>Ex. 1</u> at ¶ 27.

107.    On April 13, 2022, Mr. Hanson requested a meeting with Doug Patteson, Turbocam's Chief Financial Officer, as well as Mr. Noronha and Ms. Marino to "discuss our

---

[19] This email is attached as <u>Exhibit 19</u> to the accompanying Declaration of Attorney Chris Erchull.

current medical plans in relation to coverage for gender transition and/or gender dysphoria." Email from Peter Hanson to Marian Noronha, Doug Patteson, and Darika Marino (Apr. 13, 2022).[20]

108.    Mr. Hanson could not recall a discussion about removing the Exclusion at this meeting, and Mr. Noronha and Ms. Marino testified that they had no recollection at all of any topics discussed at the meeting. Noronha Dep., Ex. 2 at 120–21; Hanson Dep., Ex. 4 at 135–39; Marino Dep., Ex. 7 at 102–03.

109.    Regardless of what was discussed at the meeting, the Exclusion remains in the Turbocam Health Plan. Bernier Decl., Ex. 1 at ¶ 25.

110.    Learning that Turbocam has insisted on maintaining the Exclusion has felt to Lillian like a shot to the gut. When she learned of the exclusion, she experienced overwhelming anxiety and no longer had any sense of how her transition was going to happen. She felt that she had started but was being blocked from completing the transition that was so essential for her. In addition, Lillian had taken the leap to live publicly as a woman in anticipation that she was on schedule to complete her transition. Bernier Decl., Ex. 1 at ¶ 28.

111.    Lillian continues to experience distress due her body's masculine features. *See* Bernier Decl., Ex. 1 at ¶ 32.

112.    Lillian Bernier intends to get a vaginoplasty, including orchiectomy, as treatment for her gender dysphoria. Bernier Decl., Ex. 1 at ¶ 30.

113.    Lillian has recently been evaluated by another provider for vaginoplasty and facial feminization surgery. Bernier Decl., Ex. 1 at ¶ 33.

---

[20] This email is attached as Exhibit 20 to the accompanying Declaration of Attorney Chris Erchull.

114.     If the exclusion were not in place, Lillian would be able to submit requests for preauthorization for gender transition surgery and have those requests evaluated for coverage under HPI's clinical criteria guidelines. But, because of the exclusion, Lillian does not have the opportunity to go through the regular claims process. Bernier Decl., Ex. 1 at ¶ 29; *see also* Oldach Decl., Ex. 11 at ¶ 8.

115.     Lillian Bernier's current and future medical treatments limit and make more difficult and complex any decisions she will make now or in the future about whether and how to conceive children. Bernier Decl., Ex. 1 at ¶ 30.

## V.     Turbocam's Tolerance of Health Benefits Coverage and Employee Practices that Violate Marian Noronha's Religious Beliefs about Biblical Teachings

116.     It is important to Mr. Noronha that the treatments covered by the Turbocam Health Plan be consistent with his religious beliefs as expressed in and informed by the Bible. Noronha Dep., Ex. 2 at 84.

117.     Marriage between two people of the same sex violates Marian Noronha's religious convictions as expressed in and informed by the Bible. Noronha Dep., Ex. 2 at 81.

118.     The Turbocam Health Plan offers health benefits to spouses of employees. Noronha Dep., Ex. 2 at 85; Marino Dep., Ex. 7 at 32.

119.     At his deposition, Mr. Noronha did not know whether the Turbocam Health Plan offers coverage to the same-sex spouse of any employee. Noronha Dep., Ex. 2 at 85–86.

120.     Mr. Noronha testified, however, that the provision of health benefits to the same-sex spouse of an employee would violate his religious belief and, in fact, if the law required Turbocam to offer such a benefit "[he] might shut down the company" because he "created a company . . .  to honor God." Noronha Dep., Ex. 2 at 87.

121.    In fact, Turbocam has employees whose same-sex spouses are members of the Turbocam Health Plan, and Turbocam pays for medical benefits for those spouses. Marino Dep., Ex. 7 at 66.

122.    Turbocam provides coverage for in vitro fertilization ("IVF") under the Turbocam Health Plan. Marino Dep., Ex. 7 at 75–76.

123.    Mr. Noronha is aware that IVF necessarily involves the creation of multiple embryos, of which few are implanted, and many are discarded. Noronha Dep., Ex. 2 at 96–97.

124.    The process of creating an embryo and discarding it violates Mr. Noronha's religious beliefs. Noronha Dep., Ex. 2 at 96.

125.    Yet, when asked whether Turbocam's coverage of in vitro fertilization that destroys and embryo would violate his religious beliefs, Mr. Noronha answered: "I haven't settled that question" and it might depend on the number of spare embryos created. Noronha Dep., Ex. 2 at 96–98.

126.    Stem cell transplants are covered under Turbocam's self-funded health benefits plan. Marino Dep., Ex. 7 at 75.

127.    Mr. Noronha's understanding is that "not all" stem cell transplants result in the destruction of an embryo, but "[o]nly some" do. Noronha Dep, Ex. 2 at 93–94.

128.    The Turbocam Health Plan does not limit coverage for stem cell transplants to only procedures not resulting in the destruction of an embryo. Ex. 8 at 24, 40–41.

129.    Mr. Noronha testified that the coverage in Turbocam's self-funded health benefits plan of stem cell transplants of the type that resulted in the destruction of an embryo would violate his religious convictions as expressed in and informed by the Bible. Noronha Dep., Ex. 2 at 95.

Respectfully submitted,
Lillian Bernier

By her attorneys,

Date: July 31, 2025                          */s/ Chris Erchull*

Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org


## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

                                             */s/ Chris Erchull*
Date: July 31, 2025                          Chris Erchull