# **<u>EXHIBIT 2</u>**

Excerpts from the Deposition Transcript of
Marian Noronha

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF NEW HAMPSHIRE

 3              Civil Action No. 1:23-cv-00523-LM-AJ

 4

 5      - - - - - - - - - - - - - - - - x

 6      LILLIAN BERNIER,                    :

 7                   Plaintiff,             :

 8          v.                              :

 9      TURBOCAM, INC.,                      :

10                   Defendant.             :

11      - - - - - - - - - - - - - - - - x

12

13                 DEPOSITION OF MARIAN NORONHA

14

15                 Tuesday, April 15, 2025

16                      10:02 a.m.

17

18                    HOMEWOOD SUITES

19                  1000 Perimeter Road

20             Manchester, New Hampshire 03103

21

22

23

24      Stenographically Reported By:

25      DEANNA J. DEAN, LCR, RDR, CRR
```

Transcript of Marian Noronha
Conducted on April 15, 2025                                      11

```
1        Q.   Who is responsible for preparing the

2    proposal that you say yes or no to with respect to

3    health benefits?

4        A.   Pete Hanson, assisted by Darika.

5        Q.   And when you say "Darika," do you mean

6    Darika Marino?

7        A.   Yes.

8        Q.   When was Turbocam Inc. founded?

9        A.   Approximately April 1987.

10       Q.   And currently -- let's take the last five

11   years -- what business is Turbocam Inc. in?

12       A.   Manufacturing of flow path components.

13   F-l-o-w, p-a-t-h, c-o-m-p-o-n-e-n-t-s.

14       Q.   What are flow path components?

15       A.   I thought you'd ask.  That's why I spelled

16   it out for you.

17            There are many piece of machinery where

18   air or fluids flow through a system.  We make the

19   parts where the flow passes through.

20       Q.   Who are those parts sold to?  What kind of

21   customers or clients do you sell flow path

22   components to?

23       A.   Aerospace.  Turbo machinery.  That's the

24   two major categories.

25       Q.   Do you know whether the plaintiff in this
```

Transcript of Marian Noronha
Conducted on April 15, 2025                                    12

1   case, Lillian Bernier's, job is involved in the

2   manufacture of flow path components?

3       A.   Yes and no.  Because that is the general

4   end product, the answer's yes.  But he is not a

5   machinist.  He is an operator of machinery.

6       Q.   So it's the machine that makes the

7   product?

8       A.   Correct.

9       Q.   And Lillian Bernier operates one of the

10  machines that's involved in making flow path

11  components?

12      A.   He is an operator on one of the

13  machines -- I'd say one or more -- of the milling

14  machines only.

15      Q.   Can you give me just a -- some examples of

16  actual companies who purchase flow path components

17  from Turbocam, just so I can kind of understand

18  your customer base?

19          ATTORNEY MINICH:  Objection.

20          Are you referring to by name of customers?

21          ATTORNEY KLEIN:  Yeah.

22          ATTORNEY MINICH:  Objection.

23      A.   I don't think I should give that to you.

24  That's a customer list, which is confidential.

25          ATTORNEY KLEIN:  Bethany, are you

Transcript of Marian Noronha
Conducted on April 15, 2025                14

```
1        A.    Daikin, D-a-i-k-i-n.   Danfoss,

2    D-a-n-f-o-s-s.

3              Is that adequate?

4        Q.    Sure.

5              What business is Cummins Inc. in?

6        A.    They make engines.

7        Q.    Okay.   And what business is Daikin in?

8        A.    Say again?

9              Oh, Daikin.   Air conditioning.

10       Q.    Okay.   And what about Danfoss?

11       A.    Also air conditioning.

12       Q.    What are Turbocam Inc.'s annual revenues,

13   if you can give me the range for the past five

14   years?

15             ATTORNEY MINICH:   Objection.

16       A.    Actually, Bernier already has information

17   on this because we present it openly.

18             ATTORNEY MINICH:   So to the extent you

19      know, you've got to answer.

20       A.    Right.   It's between, in the last five

21   years, 100 to 150 million.

22       Q.    Did Turbocam Inc. operate in -- well,

23   where is Turbocam Inc. located?

24       A.    In Barrington, New Hampshire.

25       Q.    Does Turbocam Inc. have any other
```

Transcript of Marian Noronha
Conducted on April 15, 2025                                    15

1    locations?

2        A.    Charleston, South Carolina.    Chandler,

3    Arizona.    Dover, New Hampshire.

4              No.    Actually, it's not in Dover, New

5    Hampshire.    I gave the name of Dover, New

6    Hampshire, and it's not in Dover, New Hampshire.

7        Q.    Does Turbocam Inc. have any other

8    locations that you haven't indicated yet?

9        A.    No.

10       Q.    How many employees does Turbocam Inc.

11   have?

12       A.    Approximately 600.

13       Q.    Are all of those 600 employees located in

14   the United States, then?

15       A.    Yes.

16       Q.    Okay.    Does Turbocam Inc. receive any

17   federal funding?

18       A.    No.

19       Q.    Have you ever had a contract with the

20   federal government?

21       A.    Not directly.

22       Q.    Okay.    Have you had a contract -- have you

23   had a contract with the federal government

24   indirectly, as you've described?

25       A.    Yes.

Transcript of Marian Noronha
Conducted on April 15, 2025                     18

```
1        A.   Yes.
2        Q.   Okay.  And you signed the document on
3   behalf of Turbocam.  Is that correct?
4        A.   Yes.
5        Q.   Now, if you look at -- it's not paginated,
6   but after the signature and certificate of service,
7   there's an ownership chart.
8             Do you see that document?
9        A.   Yes.
10       Q.   The document indicates a corporate entity
11  called Turbocam Automated Production Systems?
12       A.   Yes.
13       Q.   What is that corporation?
14       A.   That is the corporation in which Bernier
15  works.  His paycheck comes from Turbocam Inc.
16            You're confused.
17       Q.   Well, I'm getting ready to ask you a
18  question.
19       A.   Okay.
20       Q.   So Turbocam Inc. is Bernier's employer.
21  Is that correct?
22       A.   Off record, correct.
23       Q.   All right.  What is the relationship
24  between Turbocam Inc. and Turbocam Automated
25  Production Systems?
```

Transcript of Marian Noronha
Conducted on April 15, 2025                    25

1      A.    Scratch that.

2            I am the owner -- I'm not sure if I'm

3   saying it technically correct.  I believe I am the

4   owner of a trust which owns the 200 voting shares

5   of Turbocam Inc.

6      Q.    Okay.

7      A.    And my wife owns the trust that contains

8   9800 nonvoting shares of Turbocam Inc.

9      Q.    Are you also an officer of Turbocam Inc.?

10     A.    Yes.

11     Q.    And what offices do you hold?

12     A.    President.

13     Q.    Are you also a board member?

14     A.    I'm a director.

15     Q.    Now, I think you've said a little bit in

16  your declaration that you were educated in India.

17  Is that correct?

18     A.    Yes.

19     Q.    And what education did you receive in

20  India?

21     A.    Can you be more specific?

22     Q.    Did you attend college in India?

23     A.    Yes.

24     Q.    All right.  And what college?

25     A.    St. Xavier's College in Bombay.

1  other Turbocam employees?

2      A.   It's a good technical question.  10,000

3  minus 1 is 9999, which is a reduction from 10,000.

4      Q.   All right.  So you believe that ordering

5  diabetes medications for one employee reduced

6  everybody else's healthcare cost?

7      A.   Yes, and I made it -- I made it available

8  to all employees.  In a public setting, I showed

9  the difference in cost.

10     Q.   Okay.  And what was the difference in cost

11 to Lillian Bernier --

12     A.   Oh.

13     Q.   Okay?

14          -- as a result of your ordering diabetes

15 medications for one employee last year?

16     A.   I have no idea of where Lillian Bernier

17 buys his medicines.  I have no idea of where he

18 gets his insurance.  I do not know if he's covered

19 by our plan.

20     Q.   What is the evidence -- well, strike that.

21          How much -- give me a dollar amount -- did

22 your buying diabetes medication for one person last

23 year reduce the standard contribution for a single

24 plan of a Turbocam employee?

25     A.   My contribution was in the range of $6,000

Transcript of Marian Noronha
Conducted on April 15, 2025                    54

```
1        A.   I don't know.

2        Q.   Are you aware that Lillian Bernier, the

3   plaintiff in this case, is a transgender woman?

4        A.   I don't know.

5        Q.   You don't know if Lillian Bernier is a

6   transgender woman?

7        A.   Correct.

8        Q.   Okay.  Why do you refer to Lillian Bernier

9   using male pronouns?

10       A.   The person called Lillian Bernier was

11  Robert Bernier when I talked to him last, and I

12  have not talked to him since.  I know that he has

13  changed his name.

14       Q.   If I told you here today that Lillian

15  Bernier is a transgender woman who uses female

16  pronouns, would you refer to Lillian Bernier using

17  female pronouns?

18            ATTORNEY MINICH:  Objection.

19       A.   I will use the word "Bernier."

20       Q.   Why would you use the word "Bernier"?

21       A.   Because that is the name of the employee.

22       Q.   Do you typically refer to employees by

23  their last name?

24       A.   Sometimes.

25       Q.   All right.  Are there employees who you
```

1    A.    Yes.

2    Q.    All right.  And what was that occasion?

3    A.    His interview.

4    Q.    Okay.  And was that the only occasion?

5    A.    He spoke to me on another occasion, but I

6  did not speak to him.

7    Q.    And when was that?

8    A.    It's between the third week of January and

9  the second week of February of 2021.

10    Q.    And what were the circumstances of that

11  interaction?

12    A.    I was sitting down.  He came and I thought

13  he had -- he was kneeling next to me on one knee.

14  It was at a company meeting.  That's why I know the

15  dates.  And he said, "I'm completely in support of

16  what you are doing."

17    Q.    Who do you believe this person was?

18    A.    At that time, Robert Bernier.

19    Q.    And what did you take "I'm completely in

20  support of what you are doing" to mean?

21    A.    I do not know.

22    Q.    Was that the only thing?

23    A.    Can you repeat your question.

24    Q.    My question was, what did you understand,

25  or did you have any understanding of what was meant

Transcript of Marian Noronha
Conducted on April 15, 2025                                    63

```
1    men.
2         Q.   And you do not regard Lillian Bernier as a
3    woman.  Is that correct?
4         A.   Correct.
5         Q.   All right.  And so why is it dependent
6    upon whether other people objected?
7         A.   Because it is a private space for women.
8    If other women object, then he should not be in
9    that space.
10        Q.   Would it violate your religious beliefs if
11   the personnel staff at your company, Turbocam Inc.,
12   had affirmatively made a decision that Lillian
13   Bernier could use the woman's -- the women's rest
14   room?
15             ATTORNEY MINICH:  Objection.
16             When you say "personnel staff," are you
17        referring to the human resources department?
18             ATTORNEY KLEIN:  Yes.
19             THE WITNESS:  We don't call it "human
20        resources" in the company.
21        Q.   You understand what I mean.  Right?
22   Talent development?
23             What do you call it?
24        A.   Personnel.
25        Q.   Personnel.  Okay.  So let me ask the
```

Transcript of Marian Noronha
Conducted on April 15, 2025                    66

1      A.    The question -- my answer has been if the

2  women who are meant to use that room are

3  inconvenienced, then I would object.

4      Q.    Is it your position that Lillian Bernier

5  is not a person who is meant to use the women's

6  room?

7           ATTORNEY MINICH:   Objection.

8      A.    Lillian Bernier is not a woman, and that

9  place is meant as a private place for women.

10     Q.    And your statement that Lillian Bernier is

11  not a woman is based on your religious beliefs.

12  Correct?

13     A.    Correct.

14     Q.    But it would only violate your

15  religious -- well, strike that.

16          It would only violate your religious

17  beliefs for Lillian Bernier to use the women's room

18  if another employee objected.  Am I understanding

19  you correctly?

20     A.    If another woman who is entitled to use

21  that space is inconvenienced.

22     Q.    And under those circumstances, Lillian

23  Bernier's using the women's room would violate your

24  religious beliefs?

25          ATTORNEY MINICH:   Objection.

Transcript of Marian Noronha
Conducted on April 15, 2025                                    81

1      Q.   Does marriage between two people of the

2  same sex violate your religious convictions as

3  expressed in and informed by the Bible?

4      A.   Yes.

5      Q.   Does divorce violate your religious

6  convictions as expressed in and informed by the

7  Bible?

8      A.   Yes.

9      Q.   Does sex prior to marriage violate your

10 religious convictions as expressed in and informed

11 by the Bible?

12     A.   Yes.

13     Q.   Does sex outside of the marital

14 relationship violate your religious convictions as

15 expressed in and informed by the Bible?

16     A.   Yes.

17     Q.   Does sex between two men violate your

18 religious convictions as expressed in and informed

19 by the Bible?

20     A.   Yes.

21     Q.   I'm sorry?

22     A.   Yes.  Yes.  I thought you asked that

23 question before.

24     Q.   Actually, the question before -- so let's

25 be clear, is -- the question before, unless I

Transcript of Marian Noronha
Conducted on April 15, 2025                                    84

1    HSA PPO plan, which is Bates stamp numbers 0001 to

2    0130 of documents produced to us by your counsel.

3            Do you recognize this document?

4        A.   No.

5        Q.   Okay.  Are you aware that Turbocam has a

6    self-funded employer health benefit plan?

7        A.   Yes.

8        Q.   Okay.  Do you have any reason to doubt

9    that this is what has been produced to us by your

10   lawyers is the Turbocam self-funded health benefits

11   plan?

12       A.   Unless you snuck it out there and

13   kidnapped somebody, no.

14       Q.   Okay.

15            Is it important to you that the health

16   coverage permitted by Turbocam self-funded employer

17   health benefits plan is consistent with your

18   religious convictions as expressed in and informed

19   by the Bible?

20       A.   Thank you.  Yes.

21       Q.   Now, can you please take a look at page 7

22   of the plan, which is Bates No. 0027.

23            Do you see on page 7 -- well, let me see.

24   There's a definition of "eligible dependent"?

25       A.   Yes.

Transcript of Marian Noronha
Conducted on April 15, 2025                                85

1      Q.   All right.  And do you see that under

2    "eligible dependent," one of the eligible

3    dependents under the plan is an employee spouse?

4    Is that correct?

5      A.   Yes.

6      Q.   Can you please read the two paragraphs --

7    strike that.

8           Can you please read the definition of an

9    employee spouse on page 7 of the Turbocam

10   self-funded health benefits plan.

11     A.   Do you want me to read aloud?

12     Q.   To yourself.  To yourself.

13     A.   Okay.

14     Q.   And let me know when you've finished.

15     A.   Both paragraphs?

16     Q.   The full number 1, employee spouse.

17     A.   [Reviewing document.]

18          Okay.

19     Q.   All right.

20     A.   I've never read this before.

21     Q.   Okay.  Is it your understanding that

22   Turbocam offers health benefits not just to the

23   employee but also to the employee's spouse?

24     A.   Yes.

25     Q.   All right.  Does Turbocam offer spousal

Transcript of Marian Noronha
Conducted on April 15, 2025                                86

1    health insurance benefits under its plan to the

2    same sex spouse of an employee?

3        A.    I don't know.

4        Q.    Okay.  Would offering health insurance to

5    the spouse of an employee who is in a same-sex

6    marriage violate your religious beliefs?

7        A.    Can you state your question again?

8        Q.    Yes.

9              Would offering spousal health insurance to

10   the -- to an employee and the employee's spouse who

11   are in a same-sex marriage violate your religious

12   beliefs?

13       A.    It's a case of it would violate my -- my

14   religious beliefs, but it might be a state law.

15   And I don't know how we have handled it in the

16   past, and I don't know if we have any such cases in

17   the company.

18       Q.    Okay.  Well, let me ask you first, putting

19   aside any state law, does providing health

20   insurance benefits to an employee and their

21   same-sex spouse by virtue of being in a same-sex

22   marriage violate your religious beliefs?

23       A.    Yes.

24       Q.    Okay.  Now, you indicated -- I think in

25   your answer you said it might violate your

Transcript of Marian Noronha
Conducted on April 15, 2025                    87

1    religious beliefs, but there might be a state law,

2    or might be a law that requires that.

3              Is that your understanding?

4        A.   Yes.  Yes.

5        Q.   All right.  And if the law -- well --

6        A.   Take the time.  It's okay.

7        Q.   Thank you.  I certainly try to.

8              If there were a law that required an

9    employer like Turbocam to provide same-sex spousal

10   health insurance benefits, that would violate your

11   religious beliefs as well.  Correct?

12       A.   Yes.

13       Q.   All right.  Would you comply with the law?

14       A.   I might shut down the company.

15       Q.   Okay.  So you would shut down the company

16   before you would provide same-sex spousal health

17   insurance benefits?

18              ATTORNEY MINICH:  Objection.

19       A.   Again -- again, I need to know the

20   context, the state, the country, the exact law, to

21   see if the mission can be upheld in that state, in

22   that country, before I make the decision.

23              But I created a company and wrote the

24   mission to state why we exist as a company:  to

25   honor God, create wealth for our employees, and

Transcript of Marian Noronha
Conducted on April 15, 2025                    93

1   this.

2       Q.   Okay.  If I can -- oh, I just lost my

3   page.

4            Okay.  Could you please look at page 24 of

5   the handbook, which is Bates 0044.  Do you see in

6   the column on the left that Turbocam covers and

7   pays for stem cell transplants?

8            Do you see that?

9       A.   Yes.

10      Q.   Does covering and paying for stem cell

11  transplants violate your religious convictions as

12  expressed in and informed by the Bible?

13      A.   No.

14      Q.   And why is that?

15      A.   It's part of the process of healing.

16      Q.   Part of the process of healing?

17      A.   Healing.

18      Q.   Okay.

19           Now, you are aware, are you not, that a

20  stem cell transplant involves harvesting embryonic

21  stem cells from an early-stage embryo, requiring

22  the destruction of that embryo?

23           ATTORNEY MINICH:  Objection.

24      A.   Not all stem cells.

25      Q.   Okay.

Transcript of Marian Noronha
Conducted on April 15, 2025                                      94

1         A.    Not all stem cells.

2         Q.    Okay.

3         A.    Only some.

4         Q.    Is there anything in Turbocam's health

5    plan that limits the type of stem cell transplant

6    that's covered?

7         A.    Frankly, I haven't read this book before.

8    I haven't seen this book before.  I'm not familiar

9    with what's in this book.  I endeavor to spend

10   under one hour a year on medical insurance.

11        Q.    I understand.  But --

12        A.    It would -- it would depend on the

13   people -- now, I only know two people who have gone

14   through this treatment, and both of them are very

15   mature people who I would trust their judgment on

16   it.

17        Q.    When you say "very mature," do you mean --

18   what do you mean?

19        A.    They're grown-ups.  They're mature in

20   their thinking.  And they have spent -- they both

21   spent something like seven months in isolation as

22   part of a stem cell treatment.  I have no doubt

23   that both of them would have rejected the killing

24   of an embryonic -- a fetus to save their lives.

25        Q.    I'm sorry.  Would have what?

Transcript of Marian Noronha
Conducted on April 15, 2025                    95

1       A.   I'm convinced -- I know both these people

2   would have objected to using embryonic stem cells.

3   I even put this into the category of -- okay.

4   Nothing more to add.

5       Q.   Okay.  Were those people employee -- the

6   people that you talked about who had stem cell

7   transplants, were those Turbocam employees?

8       A.   One was.

9       Q.   All right.  And when was that transplant?

10      A.   2008.

11      Q.   2008.

12           So that was not part of Turbocam's

13  self-funded health benefits plan?

14      A.   No.  No.

15      Q.   And the other person was not a Turbocam

16  employee?

17      A.   Correct.

18      Q.   All right.  Now, if, in fact, Turbocam

19  covered stem cell transplants that were of the type

20  that resulted in the destruction of an embryo,

21  would that violate your religious convictions as

22  expressed in and informed by the Bible?

23      A.   Yes.

24      Q.   Okay.

25           Does in vitro fertilization, IVF, violate

Transcript of Marian Noronha
Conducted on April 15, 2025                               96

1    your religious convictions as expressed in and

2    informed by the Bible?

3        A.    No.

4        Q.    And why not?

5        A.    It does not kill a zygote.

6        Q.    Are you aware that in vitro fertilization

7    necessarily involves the creation of multiple

8    embryos of which few are implanted and many are

9    discarded?

10            ATTORNEY MINICH:  Objection.

11       A.    Yes.

12       Q.    All right.  And would the process of

13   creating an embryo and discarding it violate your

14   religious beliefs?

15       A.    Yes.

16            You need to deliver the punch line now.

17   Go ahead.

18       Q.    Well, my question to you, right, as you

19   probably know, is, if, in fact, Turbocam was paying

20   for in vitro fertilization process which resulted

21   in the destruction --

22       A.    Yes.

23       Q.    -- of embryos, why does that not violate

24   your religious beliefs?

25            ATTORNEY MINICH:  Objection.

Transcript of Marian Noronha
Conducted on April 15, 2025                                    97

1          A.    It's a good question.  I haven't settled

2    that question.

3          Q.    You haven't settled that question?

4          A.    Yeah.

5          Q.    Okay.  But you agree that IVF results in

6    the destruction --

7          A.    Yes.

8          Q.    -- of embryos?

9          A.    Yes.  That's why I told you to deliver the

10   punch line.

11         Q.    And if I --

12         A.    It is an ethical issue that has not been

13   resolved.  I believe the Catholic church has banned

14   it.

15         Q.    Well, I'm asking you about your beliefs.

16         A.    I haven't settled it.

17         Q.    Okay.

18         A.    It also depends on -- so it is still

19   hypothetical.  This is still a hypothetical

20   question, that you are asking the question.

21         Q.    Well, what factors might it depend on?

22         A.    The number, if there are spare embryos

23   created.

24         Q.    Okay.  And assume there are.

25               ATTORNEY MINICH:  Objection.

Transcript of Marian Noronha
Conducted on April 15, 2025                    98

1        A.    That's an assumption.

2        Q.    Well, do you agree that in vitro

3    fertilization results in the destruction of some

4    embryos?

5              ATTORNEY MINICH:   Objection.

6        A.    No.

7        Q.    Okay.  Do you agree --

8        A.    It could -- I think if you said "may."

9        Q.    All right.

10             So if, in fact, there were an in vitro

11   fertilization procedure that did, in fact, result

12   in the destruction of some embryos --

13       A.    That did not, you said.

14             That did or did not?

15       Q.    That did.

16       A.    That did.

17       Q.    Let me rephrase the question.

18       A.    Okay.

19       Q.    If, in fact, Turbocam covered and paid for

20   an in vitro fertilization procedure that resulted

21   in the destruction of some embryos, would that

22   violate your religious beliefs?

23             ATTORNEY MINICH:   Objection.

24       A.    I'll have to think about it.

25       Q.    What factors would be important in

Transcript of Marian Noronha
Conducted on April 15, 2025                     115

1       Q.    Any other jobs?

2       A.    I'd have to think about it.

3       Q.    Do you know what Lillian Bernier's job is

4   at Turbocam?

5       A.    He is an operator.

6       Q.    And when you say "he," why are you saying

7   "he"?

8       A.    Okay.  Bernier is an operator.

9       Q.    Okay.  And would that job involve any

10  fumes at any time?

11      A.    Don't think so.  There are men and women

12  who do the job.

13      Q.    Now, in paragraph 14 of your affidavit,

14  which is Exhibit 2, you also say, We hold to

15  traditional teachings -- traditional Biblical

16  teachings about sexual expression.

17            Do you see that?

18      A.    Yes.

19      Q.    Have any teachings about sexual

20  expression, Biblical teachings about sexual

21  expression, informed the way you run Turbocam?

22      A.    I'd have to think about that one.

23      Q.    Okay.  Can you tell me, in that paragraph,

24  in that sentence I just quoted, where you used the

25  term "sexual expression" in paragraph 14 of your

Transcript of Marian Noronha
Conducted on April 15, 2025                    117

1       Q.    I'm sorry.  What?

2       A.    "You ought to know about this."

3       Q.    I'm asking you these questions.

4       A.    No.  This is what I was told:  "You ought

5  to know about this."

6       Q.    Oh, I see.  I understand.  Getting a

7  little tired.  Okay.

8             And who told you this?

9       A.    Pete Hanson.

10      Q.    Did you ever have any conversation with

11 Julie Oakley about Lillian Bernier?

12      A.    No.

13      Q.    So when Pete Hanson spoke to you, what did

14 he say and what did he explain to you?

15      A.    He said that a woman -- there was a guy

16 who wanted to change his name.

17      Q.    Did Pete say what the person wanted to

18 change their name to?

19      A.    Yes.  I didn't remember it at the time.

20      Q.    But he explained to you --

21      A.    I just didn't know who the person was.

22      Q.    Okay.  And based on your conversation with

23 Pete, did you have an understanding of why he was

24 telling you this?

25      A.    He was in denial.  Bernier was in denial.

1    what happened in those days.

2        Q.    Okay.

3            After that first discussion with Pete

4    Hanson that you just described, did you -- did

5    anybody else bring anything else to your attention

6    at any time with respect to the employee Lillian

7    Bernier?

8        A.    No.

9            ATTORNEY MINICH:  Objection.

10       Q.    Not to this day?

11       A.    Oh.  No.  You asked at that time.

12       Q.    Okay.  Subsequent to that conversation,

13    when was the next time somebody at Turbocam brought

14    a matter to your attention related to Lillian

15    Bernier?

16       A.    I think October '22.

17            ATTORNEY KLEIN:  Can I get this marked as

18      Exhibit 3.

19            This is document 1274.

20            ATTORNEY MINICH:  Is it 3 or 4?

21            ATTORNEY KLEIN:  Oh, sorry.  It's 4.

22            (Noronha Exhibit 4 is marked for

23            identification.)

24       Q.    Mr. Noronha, I'm showing you what has been

25    marked as Exhibit 4, which is an email to several

1   people, including you, dated April 13, 2022.  And

2   it says, from Pete, "I would like to connect our

3   current medical plans in relation to coverage to

4   gender transition and/or gender dysphoria."

5            Do you recall attending the meeting that

6   was requested in this email?

7        A.   I don't.

8        Q.   You have no recollection of this meeting?

9        A.   No.

10       Q.   Okay.  Now, did could you please look

11   at --

12            ATTORNEY KLEIN:  Actually, could we take

13       like a 3- to 5-minute break?

14            ATTORNEY MINICH:  Sure.

15                (Recess taken from 2:51 p.m.

16                to 3:00 p.m.)

17   BY ATTORNEY KLEIN:

18       Q.   Back on the record.

19            One thing I just want to go back to

20   something that we were talking about at the very

21   beginning of the deposition around Turbocam

22   switching to a self-funded health benefits plan.

23       A.   Mm-hmm.

24       Q.   What -- do you have an understanding of

25   what a self-funded employer health benefits plan

1  to say I would have been quite clear that we are

2  going to take it out.  We're not going to put it

3  back in.

4       Q.   Okay.  So is it accurate to say that you

5  have an objection to covering treatment of gender

6  dysphoria such as gender reassignment surgery and

7  hormone therapy in your -- in Turbocam's

8  self-funded health benefits plan?

9            ATTORNEY MINICH:  Objection.

10           You can answer.

11      A.   Can you reframe the question?

12      Q.   Yeah.

13           Is it accurate to say that you have an

14  objection to covering medical treatment for gender

15  dysphoria such as gender reassignment surgery or

16  hormone therapy in Turbocam's self-funded health

17  benefits plan?

18           ATTORNEY MINICH:  Objection.

19      A.   Yes.

20      Q.   Okay.  Can I draw your attention again to

21  your affidavit or your declaration, which is

22  Exhibit 2, and to paragraph 14, which says -- well,

23  in paragraph 12, it says, "According to the

24  American Psychological Association, the

25  psychological condition known as 'gender dysphoria'

Transcript of Marian Noronha
Conducted on April 15, 2025                                131

1    is a distressing discordance between a person's

2    biological sex and sense of 'gender identity.'"

3            Do you see that paragraph in your

4    affidavit?

5        A.    Mm-hmm.

6        Q.    Did you write that?

7        A.    No.  Someone else wrote it.  I agreed with

8    it.

9        Q.    Okay.  In the next sentence, you note,

10   "Turbocam's health plan contains an exclusion that

11   precludes coverage for 'gender dysphoria treatment,

12   including but not limited to counseling, gender

13   reassignment surgery, or hormone therapy and

14   related preoperative and postoperative procedures

15   which, as their objective, change the person's sex

16   and any related complications.'"

17           Do you see that in paragraph 13?

18       A.    Yes.

19       Q.    At the time that you prepared your

20   affidavit, were you aware of the exclusion of

21   gender dysphoria treatment in Turbocam's health

22   plan?

23       A.    Yes.

24       Q.    Okay.  And then in the next paragraph,

25   paragraph 14, you say, "Suzie's and my Christian

Transcript of Marian Noronha
Conducted on April 15, 2025                    132

1    faith and religious convictions preclude us from

2    providing these interventions in Turbocam's health

3    plan."

4        A.    Mm-hmm.

5        Q.    Does paragraph 14 reflect the reasons that

6    you object to covering treatment of gender

7    dysphoria in Turbocam's health plan?

8        A.    Yes.

9        Q.    Can you read paragraph 14 of your

10   affidavit in its entirety and let me know when

11   you've finished reading it.

12            ATTORNEY MINICH:  You can read it to

13      yourself and just let him know when you're done.

14       A.    Yes.

15       Q.    Is paragraph 14 a complete and accurate

16   statement of the reason that Turbocam objects to

17   providing treatment for gender dysphoria in its

18   health plan?

19            ATTORNEY MINICH:  Objection.

20       A.    I could write another book on it.

21       Q.    I'm asking you to answer my question.

22       A.    Yes.  Your question is it entirety, and my

23   answer that I could write another book on it.  In

24   other words, I could write much more about it.

25       Q.    About the religious basis --

Transcript of Marian Noronha
Conducted on April 15, 2025                              133

1      A.    Yes.

2      Q.    -- for not covering gender dysphoria?

3      A.    Yes.

4      Q.    Okay.  What more would you say?

5      A.    I'd have to think about it.  I'm not going

6  to write a book without thinking.

7      Q.    Okay.

8      A.    But there's a lot more to be said about

9  it.

10      Q.    About the religious basis for excluding

11  the treatment --

12      A.    Yes.

13      Q.    -- of gender dysphoria?

14      A.    Yes.  Yes.

15      Q.    Okay.

16      A.    On the subject on gender, on the subject

17  of exactly what it says here:  Man created -- "God

18  created man in his own image, male and female,

19  equal in dignity and value.  We believe that these

20  together these" -- "that we believe that, together,

21  these two ... immutable and complementary sexes

22  reflect the image, nature, and glory of God."

23          That's about two chapters' worth.

24      Q.    Okay.

25      A.    That's a very concise statement.  It could

Transcript of Marian Noronha
Conducted on April 15, 2025                    134

1   be expanded exceedingly.  So if you ask me is this

2   all that is to be said, no, it's not all that is to

3   be said.

4        Q.   Okay.

5             It's correct -- is it accurate to say,

6   though, that Turbocam objects to --

7        A.   Yes.

8             Finish your sentence.

9             ATTORNEY MINICH:  Wait.

10       Q.   Is it accurate to say that Turbocam

11   objects to providing treatment for gender dysphoria

12   in its health plan because it violates the

13   religious convictions of you and your wife, and is

14   contrary to the teachings of the Bible?

15       A.   Including the last part of the sentence:

16   "Which, as their objective, change a person's sex

17   and any related complications."

18       Q.   Yeah.  But my question is the reason --

19   the reason that Turbocam objects to treating --

20   providing coverage for gender dysphoria treatment

21   or any medical treatment that, as the exclusion

22   puts it, "change the person's sex and any related

23   complications," is due to the religious beliefs of

24   you and your wife?

25       A.   Thank you.  Yes.

Transcript of Marian Noronha
Conducted on April 15, 2025                      143

1      A.   A lot of what you described you used the

2   word "health," and I object to be -- to the use of

3   the word "health."   I will not use the word

4   "health" in all of these, what you call treatments

5   for gender dysphoria.

6           So if it is for health purposes, I support

7   it.  For what amounts to plastic surgery and which

8   I don't believe is health, I would object to it.

9      Q.   Okay.

10          Prior to learning about Lillian Bernier,

11  have you ever heard the term "gender dysphoria" as

12  a medical diagnosis?

13     A.   I heard of it.

14     Q.   What did you understand -- well, strike

15  that.

16          At the time that you learned that Lillian

17  Bernier -- well, sorry.  It's getting too late in

18  the day.

19          Did you understand at some point in time

20  that Lillian Bernier had been diagnosed with gender

21  dysphoria?

22          ATTORNEY MINICH:  Objection.

23     A.   Bernier made a claim to that extent.

24     Q.   Okay.  At the time that you learned that

25  Bernier indicated she had been diagnosed with