# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LILLIAN BERNIER,<br>Plaintiff,<br><br>v.<br><br>TURBOCAM, INC., HEALTH PLANS, INC., &<br>HARVARD PILGRIM HEALTH CARE OF<br>NEW ENGLAND, INC.<br>Defendants. | Civ. No. 1:23-cv-00523-LM-AJ |

## STATEMENT OF INTEREST OF THE UNITED STATES

### I. INTRODUCTION

The United States respectfully submits this Statement of Interest to express its views on the proper application of the Americans with Disabilities Act (ADA) 42 U.S.C. § 12101; Title VII of the Civil Rights Act (Title VII), 42 U.S.C. § 2000e-2(a)(1); and the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb. The United States asserts that a closely held private company may exclude gender dysphoria from employee insurance coverage without violating these federal laws.

### II. INTEREST OF THE UNITED STATES

The United States submits this Statement of Interest pursuant to 28 U.S.C. § 517, which permits the Attorney General to attend to the interests of the United States in any case pending in federal court. Congress charged the Department of Justice with enforcing and implementing Titles II and III of the ADA, 42 U.S.C. §§ 12131-34, 12181-89, Title VII, and RFRA.

The United States has a strong interest in supporting the proper and uniform application of federal discrimination laws, and in furthering Congress's intent to create "clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities," and to

reserve a "central role" for the federal government in enforcing such laws. *See* 42 U.S.C. §§ 12101(b)(2)-(3), 2000e-6.

Finally, the United States has a strong interest in consistently and appropriately interpreting and enforcing RFRA, which restricts the government from substantially burdening the free exercise of religion. 42 U.S.C. § 2000bb-1.[1]

In sum, the United States submits this Statement to express to this Court the government's determination based on the statutes that gender dysphoria procedures are not covered by the ADA or Title VII, and to alert the court to the religious rights, and legal and factual controversies surrounding the Plaintiff's claims. *See Arizona v. City and Cty. of San Francisco*, 596 U.S. 763, 765 (2022) (Roberts, C.J., concurring) (explaining that "[a] new administration is of course as a general matter entitled" to change its legal positions).[2]

### III.  BACKGROUND

Plaintiff's Complaint, Dkt. No. 1 (Complaint), alleges that Plaintiff is a male who identifies as a woman, diagnosed with gender dysphoria, who has been denied "medically necessary" "standard of care treatments." Complaint at 1. Plaintiff further asserts that "[g]ender dysphoria results from a physical or physiological 'impairments' within the meaning of the Americans with Disabilities Act." Complaint at 5. Plaintiff's employer, Defendant Turbocam, Inc., is a small, closely held, private company that was founded with a religious mission. Declaration of Marian Noronha, Dkt. No. 42-3, at ¶ 3. Plaintiff alleges that the Defendant's exclusion of sex-trait modification interventions from the employer's self-funded health insurance plan discriminates

---

[1] Plaintiff also asserts state law claims, but the United States takes no position on those claims.
[2] *See also* Exec. Order No. 14168, *Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government*, 90 Fed. Reg. 8615 (Jan. 20, 2025) ("It is the policy of the United States to recognize two sexes, male and female. These sexes are not changeable and are grounded in fundamental and incontrovertible reality.").

because of sex and disability and therefore violates:

1. The Americans with Disabilities Act (ADA), and

2. Title VII of the Civil Rights Act of 1964 (Title VII).[3]

Plaintiff Lillian Bernier's Motion for Summary Judgment, Dkt. No. 64 (MSJ); Plaintiff's Memorandum of Law in Support of her Motion for Summary Judgment, Dkt. No. 64-1 (MSJ Memo). Plaintiff asks the Court for declaratory, injunctive, and monetary relief, which will force Defendants to provide medical coverage for gender dysphoria. Complaint at 13. Plaintiff's claims implicate the proper interpretation of the ADA's exclusion for gender identity disorders and the application of the Religious Freedom Restoration Act (RFRA) to the ADA and other health coverage laws cited by Plaintiff. This Statement of Interest provides the United States' view of those provisions. The United States further summarizes the factual allegations on which this Statement of Interest relies in the discussion below.[4]

## IV. **DISCUSSION**

Federal anti-discrimination laws and regulations do not require the provision of, or confer a right to, medical coverage of procedures to address a gender dysphoria diagnosis. And, even if a cited federal law applied, RFRA protects a closely held, private employer from having to comply with such a law if doing so would impose a substantial burden upon that employer's religious liberties.

---

[3] The plaintiff also originally alleged that the employer's self-funded health insurance plan violates Section 1557 of the Affordable Care Act (ACA), but this count was dismissed by stipulation and thus is excluded from this Statement of Interest.

[4] The facts plausibly alleged in the Complaint are assumed to be true for purposes of evaluating Defendants' motions to dismiss, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001), and therefore also for this Statement of Interest.

**A. Gender Dysphoria Is Not a Disability under the ADA.**

The ADA's protections are limited to disabilities as Congress defined them in 1990 (and later clarified by the ADA Amendments Act of 2008). 42 U.S.C. § 12102(1)(A). The ADA specifically excludes from its definition of "disability" "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." 42 U.S.C. § 12211(b)(1) (GID exclusion).

Gender dysphoria not resulting from a physical impairment is a "gender identity disorder" subject to the ADA's GID exclusion, and thus not a protected disability under the ADA. Plaintiff does not even allege specific facts indicating that plaintiff's gender dysphoria resulted from a specified physical impairment. Because the ADA does not define "gender identity disorders," the phrase must be given its ordinary public meaning at the time of the statute's enactment. *See Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018). Plaintiff relies on the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (DSM), a publication classifying mental disorders that is periodically revised. Complaint at 4; s*ee Hall v. Florida*, 572 U.S. 701, 704 (2014) (recognizing DSM as a text used by psychiatrists and experts). To understand the meaning of "gender identity disorders" when the ADA was passed, it is thus informative to look at the DSM edition then in use: the third, revised, edition or DSM-III-R. *See Williams v. Kincaid*, 45 F.4th 759, 767 (4th Cir. 2022) (relying on the version of the DSM in use when the ADA was passed to construe "gender identity disorders"), *cert. denied*, 143 S. Ct. 2414 (2023).

In 1990, the DSM-III-R identified "the essential feature" of all gender identity disorders as "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 71 (3rd ed. rev. 1987). The DSM-III-R also explained that while "some forms of gender identity disturbance are on a continuum," even "mild" cases involve feeling "discomfort and a sense of

inappropriateness about the assigned sex." *Id.* Indeed, the DSM-III-R's first "diagnostic criteria" for gender identity disorder is "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." *Id.* at 77; *see also Williams*, 45 F.4th at 782 (Quattlebaum, J., dissenting in relevant part).

Plaintiff has allegedly felt distressed and struggled with self-acceptance. Complaint at 7. These alleged symptoms reflect the diagnostic criteria existent when Congress legislated the ADA's GID exclusion: "persistent or recurrent discomfort and a sense of inappropriateness about one's assigned sex." Thus, Plaintiff's allegations fit squarely within the DSM-III-R's description of, and diagnostic criteria for, gender identity disorders. In other words, when the ADA was enacted, gender identity disorder would have been ordinarily understood to include what Plaintiff alleges to be gender dysphoria.

The DSM-III-R is one of many sources confirming that the ordinary meaning of "gender identity disorder" in 1990 encompassed Plaintiff's allegations. Various other medical publications and dictionaries support the conclusion that, since 1990, "gender identity disorder" has consistently been understood to include "distress and discomfort from identifying as a gender different from the gender assigned at birth." *See Williams*, 45 F.4th at 783 (Quattlebaum, J. dissenting) (collecting sources); *see also Kincaid v. Williams*, 143 S.Ct. 2414, 2417 (2023) (Alito, J. dissenting from denial of certiorari) ("[B]*oth* gender identity disorder and gender dysphoria have long been identified by 'persistent or recurrent discomfort' in connection with 'one's assigned sex.'").

ADA Section 12211(b)(1)'s use of the plural "gender identity disorders," is also telling. While the DSM-III-R identified several specific gender identity disorders, it also included a category of "Gender Identity Disorder Not Otherwise Specified." DSM-R-III at 77-78. Even

5

though "gender dysphoria," as Plaintiff alleges, is newer than the ADA or a diagnosis that was not commonly used in 1990, it is clearly a condition involving discomfort or distress involving discrepancy between Plaintiff's gender identity and sex. And although the condition additionally must be associated with "clinically significant distress or impairment in social, occupational, or other important areas of functioning," DSM-5 TR, such distress or impairment typically does not result from a physical impairment.[5] And unless it is the result of a physical impairment, the ADA's GID exclusion applies. *See Williams*, 45 F.4th at 784 (Quattlebaum, J. dissenting); *see also Kincaid*, 143 S.Ct. at 2417 (Alito, J. dissenting) (noting that the "broad brush used by Congress" in crafting the language of Section 12211(b)(1) suggests an intent to "prohibit the ADA's application to conditions that are sufficiently similar to the more specific categories of conditions" identified).

Based on the above reasoning, many federal courts have rightfully concluded that gender dysphoria is subject to the ADA's GID exclusion. *See, e.g.*, *Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 754 (S.D. Ohio 2018) (surveying cases and finding that "[t]he majority of federal cases have concluded" that the ADA excludes from its protection "both disabling and non-disabling gender identity disorders that do not result from a physical impairment"); *Duncan v. Jack Henry Assoc., Inc.*, 617 F. Supp. 3d 1011, 1056-57 (W.D. Mo. 2022) (concluding that

---

[5] This conclusion is reinforced by the fact that everyone today who is diagnosed with gender dysphoria would have been diagnosed with gender identity disorder. Put differently, gender dysphoria is a clear subset of those with gender identity disorder—i.e., though not everyone who was diagnosed with gender identity disorder would have been diagnosed with gender dysphoria, everyone who is diagnosed with gender dysphoria would have been diagnosed with gender identity disorder. Thus, if an individual with gender dysphoria today walked into a doctor's office at the time of the ADA's enactment, the individual would have been diagnosed with gender identity disorder. And contra Plaintiffs, new medical views cannot nullify or change the ordinary public meaning of the ADA. *Cf. Otto v. City of Boca Raton*, 981 F.3d 854, 869 (11th Cir. 2020) ("Although we have no reason to doubt that these groups are composed of educated men and women acting in good faith, their institutional positions cannot define the boundaries of constitutional rights").

ADA's exclusion of gender identity disorders "encompass[ed] Plaintiff's diagnosis of gender dysphoria"); *Lange v. Houston Cty.*, 608 F. Supp. 3d 1340, 1361-63 (M.D. Ga. 2022) (holding that gender dysphoria not resulting from physical impairment is subject to the GID exclusion); *Doe v. Northrop Grumman Sys. Corp.*, 418 F. Supp. 3d 921, 930 (N.D. Ala. 2019) (same); *but see*, *Williams*, 45 F.4th at 769 (asserting that gender dysphoria is a more modern concept and is not excluded by the ADA gender identity exclusion).[6]

This Court should therefore adhere to the plain meaning of the ADA's statutory text and conclude that Plaintiff's gender dysphoria is not a covered disability.[7]

### B. Distinctions Based on Medical Procedure or Diagnosis Are Not Prohibited by Title VII of the Civil Rights Act of 1964.

Plaintiff argues that the exclusion of gender dysphoria procedures from the Turbocam employer healthcare plan is also discrimination "because of . . . sex" in violation of Title VII of the Civil Rights Act of 1964. Complaint at 9; MSJ Memo at 8. Plaintiff relies on *Bostock v.*

---

[6] The Fourth Circuit reached a conflicting result. *Williams*, 45 F.4th at 769. The United States notes however that the decision was flawed. Instead of adhering to the plain meaning of the ADA's statutory text and DSM-III-R language, the Fourth Circuit focused on the "significant clinical distress" necessary for the diagnosis of gender dysphoria, and because gender dysphoria is a "clinical problem," the Fourth Circuit reasoned, it is not an identity disorder. *Id.* The reasoning makes little sense because the diagnosis of gender dysphoria is predicated on "[a] marked incongruence between one's experienced/expressed gender and assigned gender of at least 6 months duration," as manifested by at least two of six criteria that relate to such incongruence. *See* DSM-5 TR (Criteria for Gender Dysphoria). As the dissenting judge in *Williams* rightly pointed out, the majority opinion's "lingual gymnastics" could not change the fact that the gender dysphoria alleged by Williams, like the gender dysphoria here alleged by Plaintiff, "falls comfortably with[in] the meaning of the phrase 'gender identity disorders'" as it is used in the ADA's GID exclusion. *Williams*, 45 F.4th at 787 (Quattlebaum, J., dissenting). *See also Kincaid*, 143 S.Ct. at 2417 (Alito, J., dissenting from denial of certiorari) (noting that "several aspects of the Fourth Circuit's reasoning [in *Williams*] are troubling").

[7] If any doubt remains that gender dysphoria is excluded by the ADA, the catch-all phase "other sexual behavior disorders" eliminates it. 42 U.S.C. §12211(b). "This final catch-all category suggests that Congress sought to prohibit the ADA's application to conditions that are sufficiently similar to the more specific categories of conditions that precede." *Kincaid*, 143 S. Ct. at 2417 (Alito, J., dissenting from denial of certiorari).

*Clayton County*, 590 U.S. 644 (2020), which held that employment termination based on trans-identification was adverse employment action "because of . . . sex" in violation of Title VII. MSJ Memo at 9 (citing *Bostock*, 590 U.S. at 660).

In *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), the Supreme Court clarified however that exclusions based on medical conditions are not necessarily discriminatory actions taken "because … of sex." *Id*. at 1829. When the government prohibits a category of medical procedures, sex is not the "but for" cause for the exclusion. Rather, the government's decision is based on its views regarding the medical procedure, not the sex of the patient. The decision is therefore only subject to rational basis scrutiny. *Id.*

In this case, the plan exclusion states, "The following are excluded from Covered services and no benefits shall be paid for: Gender dysphoria treatment, including but not limited to counseling, gender reassignment surgery or hormone therapy, and related preoperative and postoperative procedures, which, as their object, change the person's sex and any related complications." Complaint at 7. This case is thus similar to *Skrmetti*. Accordingly, the Court should find that the Turbocam insurance policy exclusion does not violate Title VII.

C.     **The Religious Freedom Restoration Act Protects Defendants from Having to Violate their Sincerely Held Religious Beliefs by Requiring Coverage for Gender Dysphoria Procedures.**

The parties' federal claims and defenses are subject to the Religious Freedom Restoration Act (RFRA). 42 U.S.C. § 2000bb. RFRA bars the federal government from "substantially burden[ing] a person's exercise of religion even if the burden results from a rule of general applicability, except . . ." if the government demonstrates that applying the burden, "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 200bb-1. RFRA thus requires

strict scrutiny when applying a federal law that may substantially burden a person's religious rights. *Id.* The United States takes no position as to how the RFRA test should ultimately be resolved in this case, because the analysis requires a more complete factual record when applying the statute's balancing test. The United States has an interest, however, in making sure RFRA is enforced consistently and appropriately on an issue of public importance. The United States therefore offers its views regarding the proper application of the statute.

First, RFRA provides a defense when the government imposes a substantial burden upon a defendant's religious liberties. Plaintiff asserts that RFRA does not apply to a lawsuit between private parties and restricts only the direct actions of the federal government. MSJ Memo at 20. This argument conflates federal rights, standing, and remedies law to produce a result which is inconsistent with RFRA's purpose. RFRA was enacted to prevent the government from substantially burdening religious liberties even with laws of general application. 42 U.S.C. § 2000. Here, Plaintiff asks a federal court to impose a federal injunction, based on federal laws that are enforceable by either the federal government or a private plaintiff. Just because this case was brought by a private litigant does not alter the impact of imposing a federal requirement upon a private, closely held, religious corporation.

When applying RFRA in this situation, the United States suggests that the Court first determine if federal law requires the relief requested by Plaintiff. The United States has already indicated that the ADA and Title VII exclude gender dysphoria not caused by a physical impairment. If federal law does not require coverage for gender dysphoria procedures, then Plaintiff has no claim, and the Court does not need to address a RFRA defense.

If the Court concludes that federal law may require coverage, then the employer may invoke RFRA as a defense and the Court should assess whether granting relief will substantially

burden the employer's recognized religious rights. The fact that this case is between two private parties should not itself be determinative. While there is a narrow split among the Circuits, at least one court has held that RFRA applies even in a suit between private parties if one of the parties invokes a federal law that substantially burdens the other parties' First Amendment, religious rights. *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006), *but see Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736 (7th Cir. 2015); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010). While two other courts did not embrace this broad holding, those cases involved different fact scenarios and legal frameworks for analyzing a RFRA argument. In both *Listecki* and *General Conference*, the laws in question (trademark and bankruptcy) were neutral on their face, with no targeting or substantial policy impact on a recognized religious right. In comparison, this case is closer to the *Hankins* scenario, which involved forcing a party to accommodate a litigant's choices at the expense of the party's conscientious religious views. When analyzing RFRA, the issue is not just whether someone has a religious objection to a law, it is whether enforcing that law imposes a substantial burden on a sincere expression of a First Amendment right. There is no reason to believe that the *Listecki* or *General Conference* Courts would have applied their analysis involving a facially neutral law to other contexts involving a government-imposed burden that directly conflicts with a party's religious practices.

Second, the Court will need to apply RFRA's strict scrutiny test, weighing the interests involved and considering less restrictive alternatives before imposing a burden on the exercise of religious rights. *Burwell v. Hobby Lobby Stores, Inc.* (*Hobby Lobby*), 573 U.S. 682 (2014); *Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania,* 591 U.S. 657 (2020) (upholding federal exemption for contraception coverage under the ACA); *see also, Zubik v. Burwell*, 578

10

U.S. 403 (2016) (remanding cases involving religious institutions challenging ACA contraception mandate).[8] Accordingly, if the Court does reach the religious liberty issues, the Court should find that RFRA does apply as a defense in this case.

## V. CONCLUSION

The plain text of the ADA precludes coverage of gender dysphoria unless it results from a physical impairment, and Title VII's ban on sex discrimination does not cover exclusions of medical procedures. In addition, the Religious Freedom Restoration Act protects a closely held private company from a substantial burden upon its religious rights, which may include a right not to provide coverage for gender dysphoria procedures that violate the company's religious values. The United States respectfully requests that the Court consider its Statement of Interest in this litigation.

---

[8] *Hobby Lobby* and its progeny also address whether a closely held private company with a religious mission has the same RFRA protection as a natural person. The Supreme Court held that RFRA *does* protect such closely held private companies.

DATE: August 15, 2025

For the United States of America:

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

JESUS A. OSETE
Principal Deputy Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

ANDREW DARLINGTON
Chief, Special Litigation Section

KERRY KRENTLER DEAN
Deputy Chief, Special Litigation Section

CHRISTOPHER N. CHENG
Trial Attorney
Civil Rights Division
U.S. Department of Justice
150 M Street, N.E.
Washington, D.C. 20002
(PA #69066)
christopher.cheng@usdoj.gov
(202) 353-5012


ERIN CREEGAN
United States Attorney
District of New Hampshire

*s/ Raphael Katz*
RAPHAEL KATZ
Assistant United States Attorney
NY Bar No. 4371688
District of New Hampshire
United States Attorney's Office
53 Pleasant Street, 4th Floor
Concord, NH 03301
(603) 225-1552
raphael.katz@usdoj.gov