# IN THE UNITED STATES DISTRICT COURT FOR THE
# DISTRICT OF NEW HAMPSHIRE

LILLIAN BERNIER

      *Plaintiff*,

v.

TURBOCAM, INC.,

      *Defendant*.

CA No. 1:23-cv-00523-LM-AJ

---

**MEMORANDUM OF LAW IN SUPPORT OF TURBOCAM'S
MOTION TO EXCLUDE TESTIMONY OF RANDI ETTNER, PH.D**

---

James R. Conde*
D.C. Bar No. 1031694
BOYDEN GRAY PLLC
800 Connecticut Avenue NW,
Suite 900
Washington, DC 20006
Telephone: (202) 955-0620
jconde@boydengray.com

Bethany P. Minich
N.H. Bar No. 265413
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940
Telephone: (781) 309-1500
minich@litchfieldcavo.com

Roger L. Byron*
Texas State Bar No. 2462643
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: (972) 941-4444
rbyron@firstliberty.org

***Counsel for Defendant***
*Turbocam, Inc.*

*Admitted Pro Hac Vice

1

# MEMORANDUM OF LAW IN SUPPORT OF
# MOTION TO EXCLUDE TESTIMONY OF RANDI ETTNER, PH.D

Plaintiff Lillian Bernier identified and disclosed an expert report from psychologist Randi Ettner, Ph.D., to support the contentions that her gender dysphoria is a physiological condition that results from a physical impairment, and that hormonal and surgical treatments, including those treatments Bernier has received or wants to receive, are medically necessary to treat Bernier's gender dysphoria. *See* Bernier's Mem. of Law in Supp. of Summ. J. at 5–6, 8–11, 13, 15–16, 19 ("Bernier MSJ"), Dkt. 66-1.

The Court should exclude Ettner's opinions on these topics because she is unqualified to offer them and because they are unreliable and irrelevant under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). Ettner is not a medical doctor, does not practice medicine, and has no medical training. Nor has she conducted original research on the physiological or biological basis for gender dysphoria. Ettner also has never examined Bernier, met Bernier, or even spoken with Bernier. Ettner thus cannot offer reliable expert opinions on whether gender dysphoria, generally, has a physiological or biological origin; whether Bernier's gender dysphoria, specifically, is a physiological condition that results from a physical impairment; or whether any particular medical treatments are necessary to treat Bernier's dysphoria. Moreover, Ettner's biological theory of gender dysphoria and general opinions on medical treatment are irrelevant, since her theory does not attribute gender dysphoria to any "physical impairment" and Ettner does not provide an individualized assessment of Bernier that would allow application of her general opinions.

## BACKGROUND

Bernier is an employee of Turbocam who identifies as transgender. Compl. ¶¶ 19, 24, Dkt. 1. Bernier sued Turbocam, claiming that Turbocam violated state and federal employment

law by applying a provision in Bernier's employer-sponsored healthcare plan that excludes coverage for gender dysphoria treatment.[1] Compl. ¶¶ 59–84.

Ettner is a clinical and forensic psychologist who opined that "gender identity is biologically based" and that gender dysphoria "has a physiological and biological etiology." Ex. A, Ettner Report ¶ 17. Ettner further opined that gender dysphoria "can be ameliorated or cured through medical treatment" consistent with the World Professional Association for Transgender Health's Standards of Care and that surgery and other treatments "are not cosmetic or optional when undertaken as treatment for gender dysphoria." *Id.* ¶¶ 24, 33. Ettner also opined that estrogen therapy, like that "Bernier is treated with," and the vaginoplasty, which Bernier "intends to undergo," can be "medically necessary" in "individualized" cases. *Id.* ¶¶ 31–32, 35–37.

## LEGAL STANDARD

"Under Rule 702 of the Federal Rules of Evidence, it is the responsibility of the trial judge to ensure that an expert is sufficiently qualified to provide expert testimony that is relevant to the task at hand and to ensure that the testimony rests on a reliable basis." *Beaudette v. Louisville Ladder, Inc.*, 462 F.3d 22, 25 (1st Cir. 2006). Rule 702 thus establishes a three-part test governing the admissibility of expert testimony, which the testimony's proponent must establish by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

First, an individual must be "qualified … by knowledge, skill, experience, training, or education" to offer expert testimony. Fed. R. Evid. 702 (emphasis added). "An expert's specialized knowledge on one subject does not qualify him to testify on a different subject." *Bourne v. Town of Madison*, Civ. No. 05-cv-365, 2007 WL 1447672, at *4 (D.N.H. May 9, 2007). And a "lack of relevant knowledge and experience" is clear grounds for excluding expert testimony. *See Wilson*

---

[1] Bernier has voluntarily dismissed the state law claims. *See* Dkt. 68.

*v. Bradlees of New England, Inc.*, 250 F.3d 10, 18 (1st Cir. 2001). Second, the testimony must be reliable. "Reliability is a flexible inquiry" focused not only on the "expert's methodology," but also on whether there is a "link between the universe of pertinent facts and [the expert's] conclusions." *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 98 (1st Cir. 2020). Third, the testimony must be relevant. "[E]xpert testimony must be relevant not only in the sense that all evidence must be relevant, *see* Fed. R. Evid. 402, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue." *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).

## ARGUMENT

Ettner's testimony related to the biological and physiological origins of gender dysphoria and the medical necessity of particular treatments for Bernier should be excluded because it fails all three requirements under Rule 702: (1) Ettner is unqualified to offer the testimony, (2) the testimony is unreliable, and (3) the testimony is irrelevant.

**I.    Ettner Is Unqualified To Opine on a Purported Biological Basis for Gender Dysphoria or the Medical Necessity of Treatments for Bernier**

Ettner is "qualified" as an expert if her "educational and professional background," "experience," or other training enables her "to proffer an expert" assessment of the topic. *United States v. Jordan*, 813 F.3d 442, 445–46 (1st Cir. 2016). Ettner is a psychologist who has worked with individuals with gender dysphoria. Ex. A, Ettner Report ¶¶ 1–2; Ex. B, Ettner Dep. 7:22–25, 8:1–4, 17:11–18. But Ettner's "specialized knowledge on [the *psychology* of gender dysphoria] does not qualify h[er] to testify on a different subject"—the purported *physiological or biological origins* of gender dysphoria or the medical necessity of particular treatments for Bernier. *Bourne*, 2007 WL 1447672, at *4.

Ettner is not a medical doctor, does not practice medicine, and has no medical training.

Ex. B, Ettner Dep. 17:5–10. She does not (and may not) prescribe hormonal interventions for or perform surgery on individuals with gender dysphoria. *Id.* at 17:11–18. She is also not a biologist, physiologist, neurologist, psychiatrist, endocrinologist, or epidemiologist. *Id.* at 16:17–25, 17:1–4, 19–21. She has not done any original research on the physiological or biological origins of gender dysphoria. *See* Ex. C, Ettner CV at 8–11. She claims no specialized training or personal research experience on whether gender dysphoria, in general or in a particular individual, has a biological or physiological basis or arises from a physical impairment.

A "proffered expert physician need not be a specialist in a particular medical discipline to render expert testimony relating to that discipline." *Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion*, 345 F.3d 15, 24 (1st Cir. 2003). But it isn't merely that Ettner's "medical speciality was something other than" neurology, endocrinology, or human development, *id.* at 25, specialties that might provide some competency to determine whether medical treatment is needed or expert knowledge for Ettner's claim that gender dysphoria "evolves as a result of the interaction of the developing brain and sex hormones," Ex. A, Ettner Report ¶ 20. It's that Ettner *has no medical specialty* at all, or even a bachelor's degree in biology. Just as an endocrinologist "is not qualified to opine on the deficiencies of the [Diagnostic and Statistical Manual of Mental Disorders] and the American Psychological [Association] because he is not a mental health professional," *Kadel v. Folwell*, 620 F. Supp. 3d 339, 365 (M.D.N.C. 2022), *aff'd*, 100 F.4th 122, 158–59 (4th Cir. 2024), *vacated on other grounds*, No. 24-99, 2025 WL 1787687 (U.S. June 30, 2025) (mem.), Ettner is not qualified to opine on the physiological or biological basis for gender dysphoria, or the medical necessity of particular treatments for Bernier, because she is not a physician and does not have any other relevant specialized training. *See also, e.g.*, *Zellers v. NexTech Ne., LLC*, 533 Fed. App'x 192, 197 (4th Cir. 2013) (neurologist who lacked "specialized

training in the field of toxicology" was not qualified to testify that plaintiff's injuries were caused by toxic exposure).

Nor does Ettner's clinical and forensic experience make up for her lack of medical expertise. As a psychologist, Ettner studies the "cognitive, emotional, and social processes and behavior" of adult and adolescent patients to understand their psychological, mental, or emotional health. Bureau of Lab. Stat., *Occupational Outlook Handbook: Psychologists*, https://www.bls.gov/ooh/life-physical-and-social-science/psychologists.htm (last updated Apr. 18, 2025). But an understanding of the *psychological and emotional* context of gender dysphoria in *adults and adolescents* does not qualify someone to determine the necessity for medical treatment or determine the *physiological or biological* processes *in utero* that may contribute to gender dysphoria. *See* Ex. A, Ettner Report ¶¶ 19–20 (opining that "intrauterine" processes and "fetal" developments play a role in later gender dysphoria). The same goes for Ettner's editorial work and contributions to academic literature, *id.* ¶ 2, which don't provide Ettner personal expertise or experience in determining in utero physiological origins of gender dysphoria or the need for medical treatment.

The sole basis for Ettner's opinion on the physiological or biological basis for gender dysphoria is her "communications and interactions with other clinicians and leading experts" and her understanding of "the medical and research literature." *Id.* ¶ 5. But "[a] scientist, however well credentialed [s]he may be, is not permitted to be the mouthpiece of a scientist in a different specialty. That would not be responsible science." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). And "[m]erely reading literature in a scientific field does not qualify a witness—even an educated witness—as an expert." *Kadel*, 620 F. Supp. 3d at 364. Thus "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review."

*McConnie-Navarro v. Centro de Fertilidad del Caribe, Inc.*, Civ. No. 01-1977, 2007 WL 7652299, at *13 (D.P.R. May 31, 2007) (collecting cases). Such suspicion is fully warranted here, as Ettner's description of the relevant medical literature is outdated, incomplete, and misleading. *See infra* Part II.

Ettner's education, training, and experience as a clinical psychologist do not qualify her to opine on the physiological or biological basis for gender dysphoria or the medical necessity of particular treatments for Bernier. Because she "lack[s] [the] relevant knowledge and experience," *Wilson*, 250 F.3d at 18, her opinions on those topics should be excluded.

## II. Ettner's Testimony Is Unreliable

The reliability requirement "ensure[s] that [the] proposed expert testimony imparts 'scientific knowledge' rather than guesswork." *Ruiz-Troche*, 161 F.3d at 81. To admit testimony, the Court must conclude not only that the expert used reliable "methodology," but also that "the data offered … provides adequate support" for the "expert's bottom-line opinions." *Id.* Because Ettner's methodology is unreliable and her conclusions on the physiological or biological basis of gender dysphoria are not supported by the data she cites, *see* Ex. A, Ettner Report ¶¶ 17–21, neither consideration is satisfied.

### A. Ettner's Methodology Is Unreliable

Ettner has no medical training and does not conduct medical research, and so she relies on published studies to theorize a purported biological basis for gender dysphoria. *See* Ex. A, Ettner Report ¶¶ 17–21 (citing published reports). Although "a literature review can be an appropriate part of a method of determining general causation" for a medical condition, the "literature review must still be performed appropriately." *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472 (M.D.N.C. 2006). Ettner's reliance on an ad hoc and cherry-picked selection of outdated and weak publications falls far short of this standard.

Throughout her report, Ettner relies on old studies that examine small populations using subjective methods, while she ignores newer studies that examine larger populations using robust methods that arrive at opposite conclusions. *See* Ex. D, Weiss Decl. ¶¶ 43–47. For example, Ettner claims that "scientific investigation has found a co-occurrence of gender dysphoria in families," citing as support three outdated studies, the most recent published a dozen years ago. Ex. A, Ettner Report ¶ 18.[2] And those reports studied small—sometimes *tiny*—populations. The earliest, published by Green a quarter century ago, described only nine instances in which gender-related conditions occurred in "siblings or parent-child pairs." Ex. G, Green at 500.[3] The next oldest, published by Gómez-Gil et al. fifteen years ago, identified only "12 pairs of transsexual non-twin siblings" from among 995 transgender individuals examined. Ex. F, Gómez-Gil et al. at 546. And the most recent, published by Diamond twelve years ago, reported on only 22 sets of transgender twins, identified from 112 sets with at least one transgender twin. Ex. E, Diamond at 26–27. The small number of transgender relatives these studies identified—and the small samples from which Green and Diamond drew—inherently limits the certainty with which any conclusions can be drawn. Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* 243 (3d ed. 2011) ("increasing the size of the sample will reduce the level of random error"); *see also* Ex. D, Weiss Decl. ¶ 44.

Moreover, the methodologies of the studies that Ettner cites are far from robust and have a

---

[2] Citing Ex. E, Milton Diamond, *Transsexuality Among Twins: Identity Concordance, Transition, Rearing, and Orientation*, 14 Int'l J. Transgenderism 24 (2013); Ex. F, Esther Gómez-Gil et al., *Familiarity of Gender Identity Disorder in Non-Twin Siblings*, 39 Archives of Sexual Behav. 546 (2010); Ex. G, Richard Green, *Family Cooccurrence of 'Gender Dysphoria': Ten Sibling or Parent-Child Pairs*, 29 Archives of Sexual Behav. 499 (2000).

[3] Green apparently initially reported on 10 familial pairs, but one pair was retracted from the study "for legal reasons." Ex. G, Green at 503.

high risk of bias. Diamond's analysis included self-reported survey results from subjectively selected sets of twins and ad hoc data provided by colleagues.[4] The lack of objective metrics and selection techniques increases the risk of bias. The potential for bias in Diamond's data is further heightened because "many respondents chose not to answer some questions," and so some of Diamond's analyses included data from only one twin, and "[m]ost often it was the twin that had transitioned that responded for both." Ex. E, Diamond at 26. Green performed no analysis at all, merely providing "brief vignettes"—one or two paragraph narrative descriptions—of individuals the author or his colleagues encountered at a gender-identity clinic. Ex. G, Green at 500. Indeed, Green didn't even interview every subject he describes, instead relying upon information "obtained from a patient about a family member or from patient charts." *Id.* Diamond's and Green's anecdotal studies are thus far from the rigorous "scientific investigation[s]" that Ettner claims. Ex. A, Ettner Report ¶ 18.

Reliance on outdated, small, and weak studies might be understandable (if still unwise) if larger, more robust studies were not available. But better studies are available, and Ettner ignores them. For example, a 2022 study by Karamanis et al. examined a much larger cohort of transgender individuals using objective methods that are less susceptible to bias.[5] *See* Ex. D, Weiss Decl. ¶ 46. Mining data from Swedish patient registries, Karamanis et al. identified 2,592 individuals with gender dysphoria, 1,536 of whom had at least one full sibling, yielding 2601 sibling pairs among which there were 67 sets of twins. Ex. H, Karamanis et al. at 2–3. But "[n]o same-sex twins … with [gender dysphoria] were identified," casting doubt on any genetic origin. *Id.* at 3.

---

[4] Ex. E, Diamond at 25–26 (identifying "43 sets of twins from available sources," i.e., published reports, and another 69 sets by advertising on "Internet websites" and from referrals by "colleagues or others who knew of our interest").

[5] Ex. H, Georgios Karamanis et al., *Gender Dysphoria in Twins: A Register-based Population Study*, 12 Sci. Reps., art. no. 13439 (2022).

Ettner similarly relies on old, isolated data when claiming that transgender men and women "have different brain composition" than non-transgender men and women. Ex. A, Ettner Report ¶ 17. For support, Ettner cites four observational studies, the most recent published in 2012. *Id.* But she ignores a 2021 systematic review that "analyzed 39 studies on gender identity" published through 2021 (including several that Ettner cites) and which concluded that "[d]ue to conflicting results, it was … not possible to identify specific brain features which consistently differ between cisgender and transgender … groups."[6] "[S]ystematic reviews of observational studies" provide stronger medical evidence than "single observational studies." *Reference Manual on Scientific Evidence*, *supra*, at 723. Yet Ettner ignores the former and relies on the latter, presumably because the isolated observational studies Ettner cherry-picked support her preferred position while the systematic review does not. *See* Ex. D, Weiss Decl. ¶ 47

Ettner makes a similarly flawed choice by relying on the same four, outdated observational studies to assert that "[t]here is now a *scientific consensus* that gender identity is biologically based." Ex. A, Ettner Report ¶ 17 (emphasis added). Ettner ignores a comprehensive 2021 review from the Endocrine Society that concluded that "while associations between gender identity, neuroanatomic, genetic, and hormone levels exist, a clear causative biological underpinning of gender identity *remains to be demonstrated*."[7] *See* Ex. D, Weiss Decl. ¶¶ 47, 51.

"Courts have consistently excluded expert testimony that 'cherry-picks' relevant data because such an approach does not reflect scientific knowledge, is not derived by the scientific

---

[6] Ex. I, Alberto Frigerio et al., *Structural, Functional, and Metabolic Brain Differences as a Function of Gender Identity or Sexual Orientation: A Systematic Review of the Human Neuroimaging Literature*, 50 Archives of Sexual Behav. 3329, 3329, 3347 (2021).

[7] Ex. J, Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, 42 Endocrine Revs. 219, 226 (2021) (emphasis added).

method, and is not 'good science.'" *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 892 F.3d 624, 634 (4th Cir. 2018) (cleaned up); *see also, e.g.*, *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d. 1166, 1176 (N.D. Cal. 2007) (excluding testimony where expert "cherry-pick[ed] observational studies that support his conclusion and reject[ed] or ignor[ed] the great weight of the evidence that contradicts his conclusion"). Ettner's cherry-picked literature review—which selectively relies on outdated studies examining small populations using weak methods, while ignoring more recent, larger, and more robust studies and systematic reviews that contradict her conclusions—is not "good science" and not reliable methodology.

### B. Ettner's Conclusions Are Unsupported

Not only does Ettner rely on weak, cherry-picked studies, she misstates or exaggerates their findings. The Court need not—and should not—"admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Ettner's failure to accurately represent the literature she cites undermines the reliability of her opinion on the physiological and biological basis for gender dysphoria.

For example, Ettner states that "Gomez-Gill [sic] et al. concluded that the probability of a sibling of a transgender individual also being transgender was *5 times higher* than someone in the general population." Ex. A, Ettner Report ¶ 18 (emphasis added). But that conclusion is not supported by the study. Indeed, the authors expressly declined to provide a specific numeric comparison like the one Ettner claims. Ex. F, Gómez-Gil at 549, n.3 ("Statistical comparison of [the] two proportions [i.e., the estimated prevalence of transsexualism in siblings of transsexuals and the expected prevalence of transsexuals in the general population] was not performed because of the low prevalence data in the general population."). Ettner had no explanation for her

misstatement. *See* Ex. B, Ettner Dep. 77:13–82:22.

Ettner also cites Diamond when stating that "in identical twins, there was a very high likelihood (33%) of both twins being transgender, even when reared apart, demonstrating the role of genetics in the development of gender dysphoria." Ex. A, Ettner Report ¶ 18. But Ettner's statistic is misleading, since it relates only Diamond's results for *male* identical twins; for *female* identical twins—which made up nearly half of the identical twin pairs in the study—Diamond found that the likelihood of both twins being transgender was much smaller (less than 23%).[8] *See* Ex. B, Ettner Dep. 83:18–86:3 (acknowledging the difference). Ettner's indication that Diamond found a "a very high likelihood" of transgender twins "even when reared apart," Ex. A, Ettner Report ¶ 18, is also misleading. Diamond describes *only two* pairs of twins separated before puberty (and so "reared apart"), a sample so small that even Diamond doesn't claim to draw any conclusion from it.[9] Ettner admitted at deposition that the "reared alone" observation isn't a finding of Diamond's study, but merely "supplemental and interesting information," Ex. B, Ettner Dep. 86:4–87:13, 88:7–90:4, confirming that her report's characterization is misleading.

Ettner also presents as medical fact suppositions that her sources acknowledge are hypothetical theory. For example, Ettner quotes three studies from 2009 to 2011 to support her assertion that "[i]t is now believed that Gender Dysphoria evolves as a result of the interaction of

---

[8] Ex. E, Diamond at 26–27 ("13 of 39 male MZ [monozygotic, or identical] twin pairs (33.3%) were found to be concordant for transsexual identity and eight of [35] (22.8%) female MZ twins were found concordant"); *id.* at 28, tbl. 5 (data).

[9] Ex. E, Diamond at 27 (a third twin pair was separated at age 14, too late to be considered "reared apart"); *id.* at 34 (noting only that the "pairs of reared-apart twins found in this study" were consistent with reports of "the stronger role genetics plays relative to the environment," but making no claim about the likelihood that twins reared apart are transgender).

the developing brain and sex hormones." Ex. A, Ettner Report ¶ 20. But the oldest of these, published by Hare et al. in 2009, stresses the conjectural nature of its proposal.[10] The next oldest, published by Garcia-Falgueras and Swaab in 2010, acknowledges that its proposed biological mechanism is merely a "theory."[11] And the most recent, published by Bao and Swaab in 2011, largely repeats (sometimes verbatim) the same "theory" that Swaab published with Garcia-Falgueras one year earlier.[12] Moreover, the 2021 Endocrine Society review that Ettner ignores makes clear that the biological "theory" postulated by Ettner's preferred studies has not gained the consensus Ettner claims. As the Endocrine Society review candidly states, it is still "unknown if the choice to function in society in male, female, or other role(s) is … affected by biological factors." Ex. J, Bhargava et al. at 227.

Because Ettner misstates and exaggerates the findings of the studies she cites, her opinion on the physiological and biological basis for gender dysphoria is unreliable and should be excluded.

### C.  Ettner Has No Basis for Offering Expert Opinions About Bernier

At the end of her report, Ettner opines on "The Impact of Gender Dysphoria on the Plaintiff's Life," explaining Bernier's current and desired treatments and describing those

---

[10] Ex. K, Lauren Hare et al., *Androgen Receptor Repeat Length Polymorphism Associated with Male-to-Female Transsexualism*, 65 Biological Psychiatry 93, 95 (2009) ("It is *possible* that a decrease in testosterone levels in the brain during development *might* result in incomplete masculinization of the brain in male-to-female transsexuals, resulting in a more feminized brain and a female gender identity." (emphasis added)).

[11] Ex. L, Alicia Garcia-Falgueras & Dick F. Swaab, *Sexual Hormones and the Brain: An Essential Alliance for Sexual Identity and Sexual Orientation*, 17 Pediatric Neuroendocrinology 22, 28 (2010).

[12] Ex. M, Ai-Min Bao & Dick F. Swaab, *Sexual Differentiation of the Human Brain: Relation to Gender Identity, Sexual Orientation and Neuropsychiatric Disorders*, 32 Frontiers in Neuroendocrinology 214, 217 (2011).

treatments' effects. *See* Ex. A, Ettner Report ¶¶ 34–36. It is unclear whether Ettner is testifying that those treatments actually do, or will, affect Bernier in the indicated ways, and that those treatments are, or hypothetically could be, medically necessary for Bernier's dysphoria. To the extent Ettner's statements are construed as opining on Bernier's experience of gender dysphoria and the medical necessity of any particular treatment for Bernier, they should be excluded because Ettner has no reliable basis for opining on Bernier.

Ettner is not a medical practitioner of any kind and lacks any medical training. *See supra* Part I. She has never examined, met, or spoken with Bernier. Ex. B, Ettner Dep. 23:23–24:5. Nor has she reviewed Bernier's medical records or spoken with Bernier's medical providers. *Id.* at 24:6–11, 95:7–9. Instead, Ettner relied on information conveyed to her by Bernier's attorneys. *Id.* at 61:20–62:6. Selective, secondhand information from non-specialists with a strong interest in a particular outcome doesn't provide a "reliable foundation," *Daubert*, 509 U.S. at 597, for making the highly "individualized" assessment that Ettner claims are necessary for diagnosing a person with gender dysphoria. Ex. A, Ettner Report ¶ 31. Indeed, Ettner acknowledged that she "wouldn't be able to opine on anything that pertains directly to the Plaintiff in this case, who [Ettner] ha[s] not consulted with, nor read her medical records." Ex. B, Ettner Dep. 95:10–25; *see also id.* at 96:13–98:24.

Ettner thus has no reliable basis for opining on whether Bernier's gender dysphoria results from a physical impairment or can be traced to a particular physiological or biological process or feature. *See* Bernier MSJ at 13, 19. Ettner also cannot reliably know whether the "estrogen therapy" with which Bernier has been "treated" has been beneficial, is "stabilizing [Bernier's] brain chemistry and neuroreceptor functions," or affecting Bernier's "[i]mmunological function," "[g]astrointestinal health," or "[c]ardiovascular health." Ex. A, Ettner Report ¶ 35. Nor can Ettner

reliably opine on whether Bernier will "require lifelong hormonal support," or whether the "vaginoplasty" that "Bernier intends to undergo" is medically necessary for Bernier. *Id.* ¶¶ 35–36. Any opinion Ettner offers as to Bernier's specific circumstances is "wholly speculative" and should be excluded. *Carrelo v. Advanced Neuromodulation Sys., Inc.*, 777 F. Supp. 2d 315, 319 (D.P.R. 2011).

### III. Ettner's Testimony Is Irrelevant

To be admissible, expert testimony must also be relevant. Fed. R. Evid. 702. A "valid scientific connection to the pertinent inquiry" is thus "a precondition to admissibility." *Daubert*, 509 U.S. at 592. The "pertinent inquir[ies]" in this suit are (1) whether Bernier's gender dysphoria is a "physiological … condition" that results from a "physical impairment," as that term is used in the Americans with Disabilities Act ("ADA"), *see* Bernier MSJ at 13, 19, and (2) whether various treatments—including feminizing hormones and surgeries—are medically necessary to treat Bernier, *see id.* at 5–6, 8–11, 15–16 (arguing Turbocam's health plan is discriminatory because it excludes "medically necessary" treatment on the basis of transgender status and disability). Because Ettner's opinions do not have a "valid scientific connection" to either question, they are irrelevant under Rule 702.

First, although Ettner opines that gender dysphoria "has a physiological and biological etiology" that can be traced to "the interaction of the developing brain and sex hormones" in utero, Ex. A, Ettner Report ¶¶ 17–21, she does not connect her hypothesized in utero "interaction[s]" to any "physical impairment" that causes gender dysphoria, generally, or Bernier's dysphoria, specifically. Accordingly, Ettner's testimony is not relevant to whether Bernier's gender dysphoria is a "gender identity disorder[] … *resulting from physical impairments*" that may be protected under the ADA. 42 U.S.C. § 12211(b)(1) (emphasis added). Under the relevant regulation, a "[p]hysical … impairment" is "[a]ny physiological disorder or condition, cosmetic disfigurement,

or anatomical loss affecting one or more body systems ….” 29 C.F.R. § 1630.2(h)(1). Ettner does not identify a "physiological disorder or condition"—like an organ dysfunction, a developmental abnormality, or genetic anomaly—that results from her theorized biological "processes" during fetal development and that leads to gender dysphoria. *See* Ex. A, Ettner Report ¶ 20 (citation omitted). Indeed, Ettner acknowledges that there is no clinical physical test or imaging technique for identifying a "physical impairment" that establishes a person as having gender dysphoria. Ex. B, Ettner Dep. 29:5–32:8. Because Ettner provides no "valid scientific connection" between the biological processes she theorizes and a physical impairment that causes gender dysphoria, her opinion on the purported biological basis for dysphoria is irrelevant. *Daubert*, 509 U.S. at 592.

Second, Ettner acknowledges that determining medically necessary treatment for gender dysphoria requires an "individualized" assessment, and that not all transgender individuals require hormone therapy or surgery. Ex. A, Ettner Report ¶ 31; *see also* Ex. B, Ettner Dep. 42:2–7. But Ettner has not performed an individualized assessment of Bernier. Nor could she have, as she is not a medical doctor, does not practice medicine, has no medical training, does not (and may not) prescribe hormonal interventions for or perform surgery on individuals with gender dysphoria, has never examined, met, or even spoken with Bernier, or comprehensively reviewed Bernier's medical records. *See supra* Parts I, II.C. Accordingly, Ettner's general statements about treatments that may be helpful for some individuals with gender dysphoria shed no light on whether any particular treatment is "medically necessary"—or even potentially beneficial—for Bernier.

## CONCLUSION

For the foregoing reasons, the Court should exclude Ettner's opinions on a purported physiological or biological basis for gender dysphoria and whether any hormonal or surgical treatment, including those treatments Bernier has received or wants to receive, are medically necessary to treat Bernier's gender dysphoria.

<table>
<tr><td></td><td>Respectfully Submitted,</td></tr>
<tr><td></td><td>Defendant, Turbocam, Inc.<br>By its attorneys,</td></tr>
<tr><td></td><td>/s/ Bethany P. Minich</td></tr>
<tr><td>James R. Conde*<br>D.C. Bar No. 1031694<br>BOYDEN GRAY PLLC<br>800 Connecticut Avenue NW,<br>Suite 900<br>Washington, DC 20006<br>Telephone: (202) 955-0620<br>jconde@boydengray.com</td><td>Bethany P. Minich<br>N.H. Bar No. 265413<br>LITCHFIELD CAVO LLP<br>6 Kimball Lane, Suite 200<br>Lynnfield, MA 01940<br>Telephone: (781) 309-1500<br>minich@litchfieldcavo.com</td></tr>
<tr><td></td><td>Roger L. Byron*<br>Texas State Bar No. 2462643<br>FIRST LIBERTY INSTITUTE<br>2001 West Plano Parkway, Suite 1600<br>Plano, Texas 75075<br>Telephone: (972) 941-4444<br>rbyron@firstliberty.org</td></tr>
</table>

\* Admitted Pro Hac Vice

Dated: August 25, 2025

## CERTIFICATE OF SERVICE

I, Bethany P, Minich, hereby certify that on August 25, 2025, the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/Bethany P. Minich*
Bethany P. Minich