**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE**

LILLIAN BERNIER

     *Plaintiff,*

 v.

TURBOCAM, INC.,

     *Defendant.*

Civil Action No. 1:23-cv-00523-LM-AJ

---

**MEMORANDUM OF LAW IN SUPPORT OF TURBOCAM, INC.'S
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT
AND CROSS-MOTION FOR SUMMARY JUDGMENT**

---

James R. Conde*
D.C. Bar No. 1031694
BOYDEN GRAY PLLC
800 Connecticut Avenue NW,
Suite 900
Washington, DC 20006
Telephone: (202) 955-0620
jconde@boydengray.com

Bethany P. Minich
N.H. Bar No. 265413
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940
Telephone: (781) 309-1500
minich@litchfieldcavo.com

Roger L. Byron*
Texas State Bar No. 24062643
rbyron@firstliberty.org
Telephone: (972) 941-4444
E. Cliff Martin**
Texas State Bar No. 24127208
cmartin@firstliberty.org
Telephone: (469) 440-7590
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075

 * *Pro hac vice*
 ** *Pro hac vice* motion pending

***Counsel for Defendant***
*Turbocam, Inc.*

August 25, 2025

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

I.     The Noronhas' Religious Business and Health-Benefits Plan ............................ 2

II.    Bernier's Transition ............................................................................................ 3

LEGAL STANDARD ....................................................................................................... 4

ARGUMENT .................................................................................................................... 5

I.     Bernier Cannot Show Sex Discrimination ......................................................... 5

       A.     *Skrmetti* Controls Bernier's Claim ......................................................... 6

       B.     Bernier Cannot Show Differential Treatment Because of Sex .............. 9

       C.     Turbocam's Religious Beliefs Are Not Sex Discrimination ................ 12

II.    Bernier Cannot Show Disability Discrimination ............................................. 15

       A.     Bernier's Gender Dysphoria Is Expressly Excluded from the Act ...... 16

       B.     Bernier Has Not Shown a "Disability" ................................................ 29

       C.     Turbocam's Health-Benefits Plan Does Not Discriminate Based on Disability .. 31

III.   Bernier's Claims Are Barred by the Religious Freedom Restoration Act ....... 32

       A.     RFRA Applies to this Case ................................................................... 33

       B.     Bernier's Requested Relief Would Substantially Burden Turbocam's Free Exercise ........................................................................................ 38

       C.     Bernier Cannot Satisfy Strict Scrutiny ................................................ 40

IV.    Bernier's Claims Are Barred by the Free Exercise Clause .............................. 46

V.     Bernier's Claims Are Barred by the Free Speech Clause ................................. 48

CONCLUSION ............................................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*303 Creative LLC v. Elenis*,
    600 U.S. 570 (2023)........................................................................................................13, 14

*Bostock v. Clayton County*,
    590 U.S. 644 (2020)..............................................................5, 7, 8, 9, 10, 14, 32, 33, 35

*Braidwood Mgmt., Inc. v. EEOC*,
    70 F.4th 914 (5th Cir. 2023) ...........................................................................................39, 40

*Brandt by & through Brandt v. Griffin*,
    No. 23-2681, 2025 WL 2317546 (8th Cir. Aug. 12, 2025) .......................................................8

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993)...................................................................................................................11

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014)................................................................................................38, 39, 40, 43

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993)........................................................................................................39, 41, 42

*City of Boerne v. Flores*,
    521 U.S. 507 (1997).................................................................................................................39

*Clifford F. MacEvoy Co. v. United States*,
    322 U.S. 102 (1944).................................................................................................................26

*Collier v. City of Chicopee*,
    158 F.3d 601 (1st Cir. 1998)....................................................................................................25

*Does 1-6 v. Mills*,
    16 F.4th 20 (1st Cir. 2021)......................................................................................................46

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988).................................................................................................................15

*Employment Division v. Smith*,
    494 U.S. 872 (1990).........................................................................................................33, 46

*Feliciano de la Cruz v. El Conquistador Resort & Country Club*,
    218 F.3d 1 (1st Cir. 2000)........................................................................................................12

*Ford v. Schering-Plough Corp.*,
    145 F.3d 601 (3d Cir. 1998) .................................................................................31

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
    805 F.3d 322 (1st Cir. 2015) ...............................................................................22

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021) ...........................................................38, 39, 40, 42, 46

*Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*,
    617 F.3d 402 (6th Cir. 2010) ..............................................................................33

*Gen. Elec. Co. v. Gilbert*,
    429 U.S. 125 (1976) ...........................................................................................11

*George v. McDonough*,
    596 U.S. 740 (2022) ...........................................................................................16

*Gibson v. Collier*,
    920 F.3d 212 (5th Cir. 2019) ..............................................................................13

*Gonzales v. Carhart*,
    550 U.S. 124 (2007) ...........................................................................................28

*Hankins v. Lyght*,
    441 F.3d 96 (2d Cir. 2006) ...............................................33, 34, 35, 36, 37

*Heckler v. Mathews*,
    465 U.S. 728 (1984) ...........................................................................................44

*Holt v. Hobbs*,
    574 U.S. 352 (2015) ...........................................32, 35, 40, 43, 44, 45

*Hornof v. United States*,
    107 F.4th 46 (1st Cir. 2024) ................................................................................29

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ...........................................................................................14

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW
    v. Johnson Controls, Inc.*, 499 U.S. 187 (1991) ........................................6

*Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*,
    585 U.S. 878 (2018) ...........................................................................................48

*Johnson v. Fresh Mark, Inc.*,
    337 F. Supp. 2d 996 (N.D. Ohio 2003) ..............................................................19

*Kennedy v. Bremerton Sch. Dist.*,
    597 U.S. 507 (2022)................................................................................46

*Kincaid v. Williams*,
    143 S. Ct. 2414 (2023)............................................................................23

*Kluge v. Brownsburg Cmty. Sch. Corp.*,
    No. 24-1942, 2025 WL 2218112 (7th Cir. Aug. 5, 2025) ......................13

*Kosereis v. Rhode Island*,
    331 F.3d 207 (1st Cir. 2003)......................................................................9

*Kosilek v. Spencer*,
    774 F.3d 63 (1st Cir. 2014)......................................................................13

*Lange v. Houston County*,
    101 F.4th 793 (11th Cir. 2024) ............................................................9, 11

*Listecki v. Off. Comm. of Unsecured Creditors*,
    780 F.3d 731 (7th Cir. 2015) ..............................................................33, 35

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)............................................................................39, 41

*Lowe v. Mills*,
    68 F.4th 706 (1st Cir. 2023)......................................................................46

*Lugar v. Edmondson Oil Co.*,
    457 U.S. 922 (1982)..................................................................................37

*Mahmoud v. Taylor*,
    145 S. Ct. 2332 (2025)..............................................................................41

*Mass. Bd. of Ret. v. Murgia*,
    427 U.S. 307 (1976)..................................................................................27

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018)..................................................................................15

*Matal v. Tam*,
    582 U.S. 218 (2017)..................................................................................37

*McDaniel v. Paty*,
    435 U.S. 618 (1978)..................................................................................34

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986)....................................................................................14

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ............................................................................14

*Mullane v. DOJ*,
    113 F.4th 123 (1st Cir. 2024) ..........................................................................6, 9

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .........................................................................................34

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) .....................................................................................14, 48

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*,
    462 U.S. 669 (1983) ...........................................................................................5

*Ondo v. Cleveland*,
    795 F.3d 597 (6th Cir. 2015) ............................................................................27

*Our Lady of Guadalupe Sch. v. Morrissey-Berru*,
    591 U.S. 732 (2020) .............................................................................32, 35, 45

*Pelletier v. Fleet Fin. Grp., Inc.*,
    Nos. Civ. 99-245-B & 99-CV-146-PH (D.N.H. Sept. 19, 2000) ......................31

*Ramos v. Louisiana*,
    590 U.S. 83 (2020) ..............................................................................................9

*Ramos-Echevarria v. Pichis, Inc.*,
    659 F.3d 182 (1st Cir. 2011) ............................................................................30

*Ricci v. DeStefano*,
    557 U.S. 557 (2009) ............................................................................................5

*Romer v. Evans*,
    517 U.S. 620 (1996) ..........................................................................................27

*Rweyemamu v. Cole*,
    520 F.3d 198 (2d Cir. 2008) .............................................................................33

*Sirva Relocation, LLC v. Richie*,
    794 F.3d 185 (1st Cir. 2015) ............................................................................31

*Tandon v. Newsom*,
    593 U.S. 61 (2021) ...........................................................................43, 45, 46, 47, 48

*Tandon v. Newsom*,
    992 F.3d 916 (9th Cir. 2021) ............................................................................45

*Tanzin v. Tanvir*,
    592 U.S. 43 (2020).................................................................................36, 37

*Tovar v. Essentia Health*,
    857 F.3d 771 (8th Cir. 2017) ................................................................10

*Tower v. Glover*,
    467 U.S. 914 (1984).............................................................................37

*Trump v. Hawaii*,
    585 U.S. 667 (2018).............................................................................28

*United States v. Skrmetti*,
    145 S. Ct. 1816 (2025)..........................................3, 4, 5, 6, 7, 8, 11, 12, 13, 27

*United States v. Varner*,
    948 F.3d 250 (5th Cir. 2020) ...............................................................3

*United States v. Virginia*,
    518 U.S. 515 (1996).............................................................................13

*Vélez-Ramírez v. Puerto Rico through Sec'y of Just.*,
    827 F.3d 154 (1st Cir. 2016) ...............................................................15

*W. Va. State Bd. of Educ. v. Barnette*,
    319 U.S. 624 (1943).............................................................................15

*Weyer v. Twentieth Century Fox Film Corp.*,
    198 F.3d 1104 (9th Cir. 2000) .............................................................31

*Williams v. Kincaid*,
    45 F.4th 759 (4th Cir. 2022) ...............................................23, 24, 25, 26, 27

*Williams v. Kincaid*,
    50 F.4th 429 (4th Cir. 2022) ...............................................................23, 24

*Williams v. Taylor*,
    529 U.S. 362 (2000).............................................................................22, 26

*Wis. Cent. Ltd. v. United States*,
    585 U.S. 274 (2018).............................................................................16, 19

*Witham v. Brigham & Women's Hosp., Inc.*,
    No. Civ. 00-268-M, 2001 WL 586717 (D.N.H. May 31, 2001).............................31

**Statutes & Constitutional Provisions**

5 U.S.C. § 551(1) .................................................................................36

29 U.S.C. § 1185b ................................................................................................10, 44

42 U.S.C. § 1981a ..........................................................................................................38

42 U.S.C. § 1983 ............................................................................................................37

42 U.S.C. § 2000-e5(f) ..................................................................................................38

42 U.S.C. § 2000bb .......................................................................................................33

42 U.S.C. § 2000bb-1(a)–(b) ...................................................................................32, 35

42 U.S.C. § 2000bb-1(b) ...............................................................................................39

42 U.S.C. § 2000bb-1(c) ..........................................................................................33, 36

42 U.S.C. § 2000bb-2(1) ..........................................................................................35, 37

42 U.S.C. § 2000bb-3 ....................................................................................................35

42 U.S.C. § 2000bb-3(a) ...............................................................................................33

42 U.S.C. § 2000cc-3(g) ...........................................................................................33, 35

42 U.S.C. § 2000e-1(b) .................................................................................................41

42 U.S.C. § 2000e-2 ......................................................................................................10

42 U.S.C. § 2000e-2(i) ..................................................................................................41

42 U.S.C. § 2000e-2(a) .............................................................................................12, 40

42 U.S.C. § 2000e-2(a)(1) ...............................................................................................5

42 U.S.C. § 2000e-2(e)(1) .............................................................................................42

42 U.S.C. § 2000e-5(f)(1) .............................................................................................36

42 U.S.C. § 2000e-5(g) .................................................................................................38

42 U.S.C. § 2000e-6 ......................................................................................................38

42 U.S.C. § 2000e(b) .....................................................................................................41

42 U.S.C. §§ 2000e(b), 12111(5)(A) ............................................................................41

42 U.S.C. § 2000e(k) .....................................................................................................11

42 U.S.C. § 12101(b)(1) ................................................................................................28

42 U.S.C. § 12102(1) ........................................................................................28, 29

42 U.S.C. § 12102(1)(A)...........................................................................15, 28, 29

42 U.S.C. § 12102(1)(B).....................................................................................30

42 U.S.C. § 12102(1)(C).....................................................................................30

42 U.S.C. § 12102(3)(A).....................................................................................30

42 U.S.C. § 12102(4)(A).....................................................................................16

42 U.S.C. § 12102(4)(E)(i)..................................................................................29

42 U.S.C. § 12111(5)(B)(i)..................................................................................41

42 U.S.C. § 12111(5)(B)(ii).................................................................................41

42 U.S.C. § 12112(a) ................................................................................15, 30, 40

42 U.S.C. § 12112(b)(5)(A).................................................................................28

42 U.S.C. § 12113(a) ...........................................................................................42

42 U.S.C. § 12117(a) ...........................................................................................38

42 U.S.C. § 12211(b)....................................................................................27, 41

42 U.S.C. § 12211(b)(1) .....................................16, 19, 20, 21, 22, 24, 26, 27

42 U.S.C. § 18022 ...............................................................................................10

42 U.S.C. § 18031(d)(3)(B) ................................................................................42

U.S. Const. amend. I ...........................................................................................34

**Other Authorities**

29 C.F.R. § 1601.28 ............................................................................................36

29 C.F.R. § 1630.2(h)(1)......................................................................................20

29 C.F.R. § 1630.2(j)(1)(ii)..................................................................................30

CMS Decision Memo, CAG #00446N (Aug. 30, 2016),
    https://perma.cc/R2ME-YQRA .......................................................................42

*Discrimination*, Webster's New International Dictionary (2d ed. 1954).........................9

*Patient Protection and Affordable Care Act; Marketplace Integrity and
Affordability*, 90 Fed. Reg. 27,074 (June 25, 2025)...............................................................42

Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides a Defense
in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343 (2013) ..................................................33, 37

*Small Business and Entrepreneurship*, Small Bus. & Entrepreneurship Council,
https://perma.cc/MU32-NZ44...............................................................................................41

Turbocam Int'l, *About*, https://www.turbocam.com/about/.........................................................2

## INTRODUCTION

This case involves a recurring societal conflict between two very different views of human sexuality and ethical medicine. On the one hand, the Plaintiff Lillian (formerly Robert) Bernier is transgender. Bernier is represented by the advocacy group GLBTQ Legal Advocates & Defenders ("GLAD"). Bernier and GLAD believe that sex is "assigned" at birth and may conflict with an individual's true "gender identity." In their view, "gender-affirming care"—counseling, hormones, and surgeries that aim to align an individual's behavior and appearance with the individual's asserted gender identity—are ethical, good, and even medically imperative. Defendant Turbocam, on the other hand, is a closely held corporation owned and controlled by Marian and Suzie Noronha, a devout Christian couple. The Noronhas hold traditional Christian views on matters of sexuality and healthcare. They believe that sex is not just rooted in biology but ordained and given by God, that so-called "gender-affirming care" is immoral and harmful, and that it would be sinful to assist Bernier in obscuring and denying her male sex.

Because of the Noronhas' religious beliefs, Turbocam refused to change its health-benefits plan to cover Bernier's gender-affirming care. Invoking federal protections against sex and disability discrimination, Bernier brings this suit to force Turbocam to foot the bill for gender-affirming care, including a penile-inversion vaginoplasty that will remove Bernier's male organs, with life-altering consequences—and force untenable burdens on the religious convictions and consciences of the Noronhas.

The laws that Bernier invokes, however, do not vest federal courts with ecclesiastical jurisdiction to punish traditional Christian religious beliefs or decree minimum essential health benefits in employer-sponsored plans. Rather, these laws are about something far more pedestrian: employment discrimination. And on that score, Bernier's claims fall woefully short. Bernier fails to show any differential treatment based on sex or disability in Turbocam's health-benefits plan.

1

Bernier has access to the same plan on the same terms as everyone else: male or female, "cisgender" or transgender, able or disabled. Bernier wants *more generous coverage*, but federal non-discrimination laws don't require that. Holding otherwise would transform these disparate-treatment laws into coverage mandates, overhauling requirements for employer health plans, which are common across religious employers such as Turbocam. More than that, ruling for Bernier would require disregarding recent and controlling Supreme Court precedent, blue-penciling statutory exclusions applicable to Bernier, ignoring the protections of the Religious Freedom Restoration Act, and violating the First Amendment several times over. The Court should decline Bernier's invitation to transmogrify federal discrimination laws into gender-affirming care mandates and anti-Christian censorship tools.

## BACKGROUND

### I.    The Noronhas' Religious Business and Health-Benefits Plan

Turbocam, Inc. is a closely held family business owned by Marian and Suzie Noronha. Defendant Turbocam's Counterstatement of Undisputed Material Facts ("DSOF") ¶¶ 40–41, 43. The Noronhas are committed evangelical Christians and Members of the New Frontiers Church and operate Turbocam according to their Christian principles. DSOF ¶¶ 42, 44–49, 51. According to its mission statement, "Turbocam exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting Christian service to God and people.… As we interact with our customers, suppliers, and employees we hold ourselves accountable to God's law expressed in the Bible." DSOF ¶ 45; *see also* Turbocam Int'l, *About*, https://www.turbocam.com/about/ (last visited Aug. 21. 2025). As part of their Christian faith, the Noronhas, like many other Christians, believe that sex is ordained by God and should not be erased or obscured. DSOF ¶ 50. They further believe that they must run their business in accordance with their Christian faith. DSOF ¶ 44–49, 51. As part of their faith, they believe that it would be sinful to use

Turbocam's resources to assist employees in denying, erasing, or obscuring their God-given sex. DSOF ¶¶ 50–51.

Turbocam offers all full-time employees the same preferred-provider organization health-benefits plan. Plaintiff Bernier's Statement of Undisputed Material Facts ("PSOF") ¶ 42. Since January 1, 2021, Turbocam has operated a self-funded plan. PSOF ¶ 42; DSOF ¶ 52. Under a self-funded plan, Turbocam "pays the cost of covered benefits" and bears "the risk of loss." PSOF ¶ 44. Harvard Pilgrim Inc. ("HPI") is Turbocam's third-party claims administrator for the plan. PSOF ¶¶ 45–46. As third-party administrator, HPI determines employee eligibility for coverage and processes claims and reimbursements under the plan. PSOF ¶ 47.

Turbocam's health-benefits plan contains 52 exclusions. DSOF ¶ 55. The exclusion giving rise to this lawsuit provides:

> Gender dysphoria treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy, and related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications.

PSOF ¶ 50. The exclusion means that Turbocam's health-benefits plan does not cover what proponents call "gender-affirming care." *But cf. United States v. Skrmetti*, 145 S. Ct. 1816, 1841 (2025) (Thomas, J., concurring) ("But, that 'sanitized description' obscures the nature of the medical interventions at issue.").

## II.  Bernier's Transition

Bernier has worked for Turbocam since 2019. PSOF ¶¶ 8–9. Bernier is male. DSOF ¶ 60.[1] In February of 2021, Bernier changed her name from Robert to Lillian Bernier. DSOF ¶¶ 62–63.

---

[1] Turbocam uses the pronouns selected by Bernier without waiving any rights or arguments. *See United States v. Varner*, 948 F.3d 250, 255–56 (5th Cir. 2020) ("[N]o authority supports the proposition that we may require litigants, judges, court personnel, or anyone else to refer to gender-dysphoric litigants with pronouns matching their subjective gender identity.").

Turbocam accommodated Bernier's name change. PSOF ¶ 80; DSOF ¶ 66. Bernier also told Turbocam that she had started hormone therapy and wanted to have gender-affirming surgery by the end of the year. PSOF ¶ 81. Later that year, however, Bernier learned about the exclusion for gender-affirming care and requested an exception or change so she could have Turbocam pay for the surgery. PSOF ¶¶ 91–95.

Specifically, Bernier wants Turbocam to cover a male-to-female vaginoplasty. PSOF ¶¶ 112–13. Although there is no standard of care for this surgical procedure, the most common method is a penile-inversion vaginoplasty, which involves a penectomy (surgical removal of the penis), orchiectomy (surgical removal of the testicles), shortening the urethra, and the use of the scrotal skin to create a pseudovagina. DSOF ¶¶ 84–85; *Skrmetti*, 145 S. Ct. at 1843 (Thomas, J., concurring). Turbocam, however, declined to give Bernier an exception or to modify the plan because paying for this kind of intervention would violate the Noronhas' Christian faith. DSOF ¶¶ 50–51, 58, 97. Bernier also asked about gender-affirming counseling. PSOF ¶¶ 97–98. Turbocam told Bernier that pursuant to the exclusion, therapy would be covered for other diagnostic codes, but not for gender dysphoria. DSOF ¶ 89; PSOF ¶ 99.

Notwithstanding Turbocam's differences with Bernier over the scope of the health-benefits plan, Turbocam has always treated Bernier with dignity. DSOF ¶¶ 66–71. Turbocam also recently awarded Bernier a new position. PSOF ¶ 9.

## LEGAL STANDARD

Bernier correctly describes the legal standard for summary judgment. *See* Bernier's Mem. of Law in Supp. of Summ. J. at 8 ("Bernier MSJ"), Dkt. 66-1.

**ARGUMENT**

## I.    Bernier Cannot Show Sex Discrimination

Title VII makes it unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin." 42 U.S.C. § 2000e-2(a)(1) (emphasis added). Turbocam's health-benefits plan is a term of employment. *See Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983). Title VII, however, doesn't mandate healthcare coverage. Rather, Title VII simply prohibits treating an employee differently because of "a discriminatory intent or motive"—race, color, religion, sex, or national origin. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).

Here, the question is whether Turbocam treated Bernier differently *because* of Bernier's biological sex. *See Bostock v. Clayton County*, 590 U.S. 644, 655 (2020) ("[W]e proceed on the assumption that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female."); *id.* at 686 (Alito, J., dissenting) (explaining that "in 1964, it was as clear as clear could be that this meant discrimination because of the genetic and anatomical characteristics that men and women have at the time of birth"). In particular, the question is whether by excluding gender-affirming care from the plan, Turbocam discriminates on the basis of Bernier's sex.

The answer is no. Bernier's discrimination claim is foreclosed by Supreme Court precedent. *United States v. Skrmetti*, 145 S. Ct. 1816, compels the conclusion that Turbocam's exclusion for gender-affirming care doesn't discriminate based on Bernier's sex, but based on her medical diagnosis (gender dysphoria) and type of treatment (gender-affirming care). Bernier doesn't argue otherwise, conceding the point.

Bernier's invocation of *Bostock* doesn't help. As *Skrmetti* confirms, this case is nothing like *Bostock*. Unlike the funeral home in *Bostock*, which fired an employee simply for being transgender, Turbocam's health-benefits plan treats Bernier the same as every other employee: Bernier has access to the same plan as any male or female employee, transgender or not. What Bernier therefore seeks is not the same coverage, but *additional* coverage offered to no other employee: coverage for gender-affirming care to treat gender dysphoria. But Title VII forbids disparate treatment; it doesn't compel preferred treatment. Bernier's Title VII claim therefore fails as a matter of law.

### A. *Skrmetti* Controls Bernier's Claim

First, it is important to note what Bernier *does not* argue. Bernier doesn't argue that Turbocam's plan *facially* discriminates based on Bernier's "sex." *See Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."). Bernier doesn't even make a "veiled reference" to this argument, so the argument is forfeited. *See Mullane v. DOJ*, 113 F.4th 123, 132 (1st Cir. 2024). Moreover, a facial challenge to the exclusion is foreclosed by *Skrmetti*.

*Skrmetti* involved a Tennessee law, SB1, "banning the use of certain medical procedures for treating transgender minors." 145 S. Ct. at 1826. Specifically, SB1 banned the use of hormones and surgery to treat gender dysphoria or gender-identity disorders, but not to treat conditions such as "a minor's congenital defect, precocious (or early) puberty, disease, or physical injury." *Id.* Tennessee was motivated, in part, by the goal of "'encouraging minors to appreciate,' rather than 'become disdainful of,' their sex." *Id.* (quoting Tenn. Code Ann. § 68-33-101(m)). The statute

subjected persons violating these prohibitions to serious penalties. *Id.* at 1827. The plaintiffs argued that the statute violated the Equal Protection Clause because its prohibition "turns on sex," and so discriminates based on sex and transgender status. *Id.* at 1827, 1830. Specifically, the plaintiffs argued that under the law a male "cannot receive puberty blockers or estrogen to live and present as a female, but an adolescent whose biological sex is female can," such that "SB1 prohibits certain treatments for minors of one sex while allowing those same treatments for minors of the opposite sex." *Id.* at 1830.

The Supreme Court roundly rejected this same-treatment fallacy, observing that it would "contort the meaning of the term 'medical treatment.'" *Id.* The Court explained, "[n]otably absent from th[is] framing is a key aspect of any medical treatment: the underlying medical concern the treatment is intended to address." *Id.* Medical drugs or procedures are indicated for a particular therapeutic purpose: "the diseases or conditions that they treat, prevent, mitigate, diagnose, or cure." *Id.* "For the term 'medical treatment' to make sense …, it must necessarily encompass both a given drug and the specific indication for which it is being administered." *Id.* "When properly understood from the perspective of the indications that puberty blockers and hormones treat," the Supreme Court held, "SB1 clearly does not classify on the basis of sex." *Id.*

The plaintiffs in *Skrmetti* nonetheless pointed to *Bostock*, arguing that "*Bostock*'s reasoning" means SB1 discriminates on the basis of sex. *Id.* at 1834. But the Court disagreed, concluding that *Bostock* "does not alter [its] analysis." *Id.* Although there was no need to "consider[] whether *Bostock*'s reasoning reaches beyond the Title VII context," the Court held that even "[u]nder the reasoning of *Bostock*" SB1 didn't discriminate on the basis of sex or transgender status. *Id.*

Correctly so. In *Bostock*, "[t]he only question before" the Court was whether firing an employee "simply for being" transgender violates Title VII. *Bostock*, 590 U.S. at 681. The answer

was yes, but the reason was formalistic. For purposes of employment, the Court said, a transgender employee is "to the employer's mind, materially identical in all respects" to an employee of the opposite sex, so when an employer intentionally fires an employee for being transgender, the employer necessarily takes the employee's sex into account. *Id.* at 659–60. That was so because "changing the employee's sex would have yielded a different choice by the employer." *Id.*

But the same logic didn't apply to the Tennessee law. The dissent argued, for example, that under SB1 a female diagnosed with facial hair growth (hirsutism) could be given hormones to suppress hair growth, but a male diagnosed with gender dysphoria could not be given hormones to suppress hair growth for gender transition; sex, the dissent argued, was thus at least one but-for reason for the denial. *Skrmetti*, 145 S. Ct. at 1835 (discussing the dissent). The majority rejected this false equivalency: unlike in *Bostock*, changing the sex of the employee doesn't change the determinative trait—i.e., it doesn't change the diagnosis—so *Bostock* doesn't apply. *Id.*

By repudiating the relevance of *Bostock*'s logic to diagnoses-based distinctions, *Skrmetti* forecloses Bernier's claim of sex discrimination. That is why Bernier buries *Skrmetti* in a footnote and dismisses it as a case about a "constitutional claim." Bernier MSJ at 11 n.5. *Skrmetti* did involve a constitutional claim, but that's irrelevant. *Skrmetti* applied "the logic of *Bostock*" and held that logic doesn't establish sex-based discrimination when there is a change in a medical "diagnosis," such as swapping gender dysphoria for hirsutism. *Skrmetti*, 145 S. Ct. at 1834–35. Other courts have held the same. *See Brandt by & through Brandt v. Griffin*, No. 23-2681, 2025 WL 2317546, at *4 (8th Cir. Aug. 12, 2025) ("This court need not decide whether *Bostock*'s reasoning applies in Equal Protection Clause cases because applying *Bostock*'s reasoning does not change the outcome of this case.").

"In the American system of *stare decisis*, the result and the reasoning each independently have precedential force, and courts are therefore bound to follow both the result and the reasoning of a prior decision." *Ramos v. Louisiana*, 590 U.S. 83, 125 n.6 (2020) (Kavanaugh, J., concurring in part). That is particularly true for district courts, as "vertical *stare decisis* is absolute." *Id.* at 124 n.5. As discussed below, Bernier has access to the same health-benefits plan as every other employee and cannot show discrimination under *Bostock* without relying on the same-treatment fallacy or swapping a different medical diagnosis for gender dysphoria, which *Skrmetti* roundly rejected. *See infra* Part I.B; *accord Lange v. Houston County*, 101 F.4th 793, 805–06 (11th Cir.) (Brasher, J, dissenting), *reh'g en banc granted, opinion vacated*, 110 F.4th 1254 (2024). Bernier's sex discrimination claim therefore fails.

### B.  Bernier Cannot Show Differential Treatment Because of Sex

Bernier argues that Turbocam's refusal to pay for her gender-affirming care shows that Turbocam discriminated against Bernier for being transgender. This argument fails as a matter of law and undisputed fact. No reasonable jury could find sex discrimination here, because there is none.

To support a disparate-treatment claim under Title VII, Bernier must point to some other employee that was treated differently in the terms of employment. *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003); *see also Discrimination*, Webster's New International Dictionary 745 (2d ed. 1954) ("To make a difference in treatment or favor (of one as compared with others)."). Bernier points to no such employee, forfeiting any argument of differential treatment. *Mullane*, 113 F.4th at 132. Bernier's claim thus fails Title VII's "simple test": if there's no differential treatment, there's no liability. *Bostock*, 590 U.S. at 664.

Nor could Bernier prove differential treatment if she tried. Bernier has access to the same health-benefits plan options on the same terms as every other Turbocam employee, male or female,

"cisgender" or transgender. What Bernier wants is *more favorable coverage* from Turbocam, and thus a more generous plan, not *the same coverage* as other employees. But unlike, say, the Afford-able Care Act, Title VII doesn't compel any minimal level of healthcare coverage. *Compare, e.g.*, 42 U.S.C. § 2000e-2, *with id.* § 18022 (essential-health benefit requirements for state exchange plans); 29 U.S.C. § 1185b (requirement to cover post-mastectomy breast reconstructions in group health plans, such as Turbocam's).

*Bostock*'s logic also confirms that Turbocam is not treating Bernier differently, but the same as similarly situated employees.

*First*, under *Bostock*, firing a male who identifies as a woman for being transgender dis-criminates based on sex because changing the employee's sex changes the result: if the employee were female, the employee's gender identity (woman) would align with the employee's sex (fe-male), and the employer would not fire her. Because the result is different, firing the male em-ployee for being transgender violates Title VII. *Bostock*, 590 U.S. at 659–60. For a *Bostock* anal-ysis here, Bernier, as a male, has to be compared to a female that is otherwise "to the employer's mind, materially identical in all respects." *Id.* Under Turbocam's plan, a female employee seeking the same health-benefits coverage to pay for a gender transition would be treated the same as Bernier.[2] Thus unlike in *Bostock*, for both Bernier and the similarly situated employee of the op-posite sex, Turbocam's answer would be the same: no coverage. This comparison disproves any differential treatment based on sex, as opposed to diagnosis.

---

[2] It is no answer to say that a "cisgender" female employee would not request the same coverage. A female employee may want the same coverage to cover a gender-dysphoric dependent's transi-tion. Title VII, of course, protects employees, not dependents. *Tovar v. Essentia Health*, 857 F.3d 771, 775 (8th Cir. 2017). But the point remains. The employees differ in their sex, and want the same coverage, but Turbocam's answer is the same.

*Second*, Bernier cannot prevail under *Bostock* because Bernier cannot show differential treatment without relying on the same-treatment fallacy or switching diagnoses, which *Skrmetti* expressly rejects. *Skrmetti* explicitly address—and rejects—the false equivalency of gender-affirming estrogen therapy in males with other uses of estrogen in females meant to address different medical conditions. *Skrmetti*, 145 S. Ct. at 1835. And for good reason: as the Supreme Court explained, a medical treatment can't be divorced from the "underlying medical concern the treatment is intended to address." *Id.* at 1830. Hormones applied for gender-affirming purposes in males address a far different concern than hormone treatments for females, and carry different and serious risks and side-effects. DSOF ¶¶ 72–81. The same is true for the surgical procedures for which Bernier seeks coverage. PSOF ¶¶ 112–13; DSOF ¶¶ 82–85. A vaginoplasty to correct a congenital abnormality or address physical trauma in a biological female is not the same as a vaginoplasty to create a neovagina in a biological male; they entail very different surgical procedures and carry very different risks. DSOF ¶¶ 82–85. *Lange*, 101 F.4th at 802 (Brasher, J., dissenting) (explaining that "a natal man's 'vaginoplasty' will be very different from a natal woman's"). The same is true for other gender-affirming surgical procedures. Because these are not comparable surgeries or hormone therapies, providing coverage for one and not the other doesn't give rise to a plausible inference of differential treatment. *Skrmetti*, 145 S. Ct. at 1835.

Nor does it matter that only one sex can undergo an excluded (or included) procedure. Providing coverage for sex-specific treatment is generally not disparate treatment on the basis of sex. *See, e.g.*, *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 134 (1976) (superseded by amendment expressly prohibiting discrimination "on the basis of pregnancy, childbirth, or related medical conditions," 42 U.S.C. § 2000e(k)); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S.

263, 271 (1993). Turbocam's plan, for example, excludes erectile dysfunction treatment and elective abortion, DSOF ¶ 56, but neither exclusion is evidence of differential treatment against males or females.

Nor does the counseling exclusion for gender dysphoria discriminate because of sex. The exclusion applies regardless of the employee's sex. And, as Turbocam explained, Bernier may seek mental health counseling under a different diagnostic code, just not for gender dysphoria. DSOF ¶ 89. As in *Skrmetti*, this shows that Turbocam's plan discriminates, if at all, based on a psychological diagnosis, not based on sex. 145 S. Ct. at 1835. Finding discrimination here would therefore require swapping diagnoses from gender dysphoria to another diagnosis with a different etiology treated using a different kind of counseling, precisely the kind of reasoning that *Skrmetti* rejects. *Id.*

Because Bernier cannot show differential treatment based on sex, Turbocam is entitled to summary judgment on the Title VII claim.

### C. Turbocam's Religious Beliefs Are Not Sex Discrimination

According to Bernier, Marian Noronha's religious belief that human sexuality is fixed as male or female and ordained by God—a view shared for millennia by millions of Christians, as well as Jews and Muslims—is a "smoking gun" of sex discrimination, one that doesn't even require "the court to make any inference based on the evidence." Bernier MSJ at 9–10. This argument lacks a basis in law.

*First*, regardless of Turbocam's religious motives, Bernier fails to show differential treatment. *See supra* Part I.B. Title VII doesn't prohibit intentions or motives in the abstract, including motives related to human sexuality. It prohibits only motives that result in "discriminat[ion]" in the terms of employment, 42 U.S.C. § 2000e-2(a), and Bernier has not been subject to different employment terms. Bernier may disagree with Turbocam's religious beliefs, but "Title VII was

not designed to transform courts into super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 8 (1st Cir. 2000) (quotation marks omitted).

*Second*, nothing in the evidence shows that Turbocam was motivated by Bernier being transgender, but by Turbocam's religious and ethical opposition to gender-affirming care. *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 595 n.3 (2023) (opposing same-sex marriage is not opposing gay status). After all, not all transgender people have gender dysphoria or need counseling, hormones, and surgery to transition. DSOF ¶ 38. There is therefore a "lack of identity" between gender dysphoria and gender-affirming care, on the one hand, and transgender status, on the other. *Skermetti*, 145 S. Ct. at 1833.

Title VII does not compel employers' adherence to an orthodoxy about human sexuality, let alone to the controversial theory of "gender-affirming care." *Cf. id.* at 1849 (Thomas, J., concurring); *Kosilek v. Spencer*, 774 F.3d 63, 90 (1st Cir. 2014) (noting the debate); *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019) ("[T]he WPATH Standards of Care reflect not consensus, but merely one side in a sharply contested medical debate."). As Turbocam's owner Marian Noronha explained, Turbocam believes that gender-affirming care is not only sinful and unethical, but will harm Bernier. DSOF ¶¶ 50–51, 87. Bernier may disagree, but disagreement or error doesn't prove discrimination.

Bernier points to no evidence of invidious motives. In a footnote, Bernier cites Marian Noronha's statement during his deposition that "Lillian Bernier is not a woman" as "evidence of Mr. Noronha's belief that a person cannot change their sex." Bernier MSJ at 10 n.3. Marian Norohna's statement was made in the context of a question about allowing Bernier into a female restroom when females felt uncomfortable, and the answer merely reflects his religious belief that

sex is innate and permanent. *Cf. United States v. Virginia*, 518 U.S. 515, 533 (1996) (Ginsburg, J.) ("Physical differences between men and women … are enduring."). That belief is lawful. Indeed, Title VII protects these kinds of religious differences in the workplace. *Cf. Kluge v. Brownsburg Cmty. Sch. Corp.*, No. 24-1942, 2025 WL 2218112, at *1 (7th Cir. Aug. 5, 2025) (employers with policies against "misgendering" may owe a religious accommodation to religious employees).

Bernier has not alleged that Turbocam created a "hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). Far from it, Turbocam has sought to create a safe workplace for Bernier. Not only did Turbocam accept Bernier's name and pronouns change, but when another employee bothered Bernier, Turbocam's management reprimanded the employee and resolved the issue. DSOF ¶¶ 64–69. After that, Bernier could not recall issues with any Turbocam employee relating to her gender transition. DSOF ¶ 70. And far from penalizing Bernier, Turbocam recently awarded her a new position. PSOF ¶ 9. Turbocam values the welfare and dignity of all of its employees. DSOF ¶¶ 44–48, 64–69, 71. Nothing about Turbocam's conduct shows anything remotely resembling a hostile environment.

*Last*, Bernier's argument is inconsistent with the "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution" avowed by the *Bostock* majority. 590 U.S. at 681. Bernier's "smoking gun" directly targets a religious viewpoint, raising serious questions under the Free Speech and Free Exercise Clauses. Given the absence of differential treatment, punishment in this case would rest on "the very purpose of eliminating ideas," not on conduct. *303 Creative LLC*, 600 U.S. at 597 (cleaned up). It is well settled, however, that the government "may not compel affirmance of a belief with which the speaker disagrees." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 573 (1995). Turbocam's beliefs about sex are a matter of public controversy and thus protected even in a professional setting. *Nat'l*

*Inst. of Fam. & Life Advocs.* ("*NIFLA*") *v. Becerra*, 585 U.S. 755, 771 (2018); *cf. Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021) (transgender pronouns a matter of "controversy" protected by the First Amendment). That means that this Court may not, under the guise of antidiscrimination laws, "prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein," even if (and especially if) Turbocam's beliefs are offensive to some. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943); *see also Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). At the least as a matter of constitutional avoidance, this Court should decline Bernier's invitation to transform Title VII into a tool for suppressing disfavored views. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988).

## II.    Bernier Cannot Show Disability Discrimination

Enacted in 1990, the Americans with Disabilities Act ("ADA") prohibits a covered employer from discriminating against an employee "on the basis of disability." 42 U.S.C. § 12112(a). "To succeed on an ADA discrimination claim, a plaintiff must show that (1) she was disabled within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodation; and (3) the employer took an adverse employment action against her because of the alleged disability." *Vélez-Ramírez v. Puerto Rico through Sec'y of Just.*, 827 F.3d 154, 157 (1st Cir. 2016) (quotation marks omitted). The plaintiff bears the burden of proof. *Id.* at 157–58.

Turbocam is entitled to summary judgment because Bernier cannot show that she is "disabled within the meaning of the ADA" or that Turbocam "took an adverse employment action against her because of the alleged disability." *Id.* at 157. At a minimum, as explained below, there are genuine issues of material fact that preclude this Court from granting summary judgment for Bernier.

### A. Bernier's Gender Dysphoria Is Expressly Excluded from the Act

The ADA protects individuals with a "disability," defined by statute as "a physical or mental impairment that substantially limits one or more major life activities of such individual." 42 U.S.C. § 12102(1)(A). Although "disability" is generally "construed in favor of broad coverage of individuals," *id.* § 12102(4)(A), it is not boundless. Congress made clear that certain conditions—even if colloquially, or even medically, considered a "disability"—do not fall within the ADA's definition. Relevant here, Congress explained that "the term 'disability' shall not include … transsexualism, … gender identity disorders not resulting from physical impairments, or other sexual behavior disorders." *Id.* § 12211(b)(1). Because Bernier's gender dysphoria falls squarely within this exclusion, her ADA claim fails as a matter of law.

#### 1. Bernier's Gender Dysphoria Is Indistinguishable from "Transsexualism"

Bernier's gender dysphoria is indistinguishable from a diagnosis of "transsexualism," as that term was understood in the medical and psychiatric communities when the ADA was enacted, and so is expressly excluded from protection. 42 U.S.C. § 12211(b)(1). It is a fundamental canon of interpretation that courts must "interpret the words [of a statute] consistent with their ordinary meaning at the time Congress enacted" it. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). Further, when Congress uses a "term of art," such as a psychological diagnosis, courts apply that specialized meaning. *Cf. George v. McDonough*, 596 U.S. 740, 752 (2022).

When the ADA was enacted in 1990, the American Psychiatric Association ("APA") classified transsexualism as one of several "gender identity disorders." Ex. I, APA, *Diagnostic and Statistical Manual of Mental Disorders* 74 (3d ed. rev. 1987) (attached to Minich Decl.) ("DSM-III-R"). By the time Bernier sought treatment in 2020, the APA had stopped using the terms "transsexualism" and "gender identity disorders" and had replaced them with a diagnosis of "gender dysphoria." DSOF ¶¶ 17–20, 26–29, 36–37. But for adults seeking medical gender transition, the

1990 diagnostic criteria for transsexualism and the modern condition gender dysphoria substantially overlap, such that any adult diagnosed with gender dysphoria today seeking to transition would have been diagnosed with transsexualism at the time of enactment.

A diagnosis of transsexualism in 1990 required (1) a "[p]ersistent discomfort and sense of inappropriateness about one's assigned sex," and (2) a "[p]ersistent preoccupation … with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex." Ex. I, DSM-III-R at 76. A diagnosis of gender dysphoria today requires (1) "[a] marked incongruence between one's experienced/expressed gender and assigned gender" and (2) "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Ex. M, APA, *Diagnostic and Statistical Manual of Mental Disorders* 512–13 (5th ed. text rev. 2022) (attached to Minich Decl.) ("DSM-5-TR"); Ex. H, APA, *Diagnostic and Statistical Manual of Mental Disorders* 452–53 (5th ed. 2013) (attached to Minich Decl.) ("DSM-5"). The first criteria for gender dysphoria—the incongruence between experienced and assigned genders—must be "manifested by at least two of" six factors, which include (i) a "marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics," (ii) a "strong desire to be rid of one's primary and/or secondary sex characteristics," and (iii) a "strong desire for the primary and/or secondary sex characteristics of the other gender." Ex. M, DSM-5-TR at 512–13; Ex. H, DSM-5 at 452–53.

An adult seeking medical gender transition diagnosed today with gender dysphoria thus would have been diagnosed in 1990 with transsexualism, since the individual (1) experiences a marked incongruence between his or her experienced and assigned genders (i.e., a "sense of inappropriateness about one's assigned sex"); (2) has a strong desire to be rid of his or her sex characteristics and to have the sex characteristics of the other gender (i.e., a "[p]ersistent preoccupation

17

… with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex"); and (3) has clinically significant distress (i.e., "[p]ersistent discomfort"). Ex. I, DSM-III-R at 76; DSOF ¶¶ 18–20.

Indeed, the medical and psychiatric communities recognize the diagnostic overlap, relying on historic research on "transsexualism" to support modern theories of "gender dysphoria," as does Bernier's expert. *See, e.g.*, Ex. U, Ettner Report ¶ 17 (citing studies on the brain structure of "[t]ranssexuals" to support the premise that "[g]ender [d]ysphoria has a physiological and biological etiology"); *id.* ¶ 18 (citing studies on rates of transsexualism among twins to support the premise that there is "a co-occurrence of gender dysphoria in families"); *id.* ¶ 20 (citing a study on "Male-to-Female Transsexualism" to support the premise that "[g]ender [d]ysphoria evolves as a result of the interaction of the developing brain and sex hormones"); *id.* ¶ 31 (citing a study on "Male-to-Female Transsexuals" to support the premise that some surgical "procedures may be medically necessary to treat individualized cases of gender dysphoria").[3]

By Bernier's own account, she plainly satisfies the diagnostic criteria for "transsexualism" when the ADA was enacted. Bernier has (1) a "[p]ersistent discomfort and sense of inappropriateness about [her] assigned sex," Ex. I, DSM-III-R at 76; *see* Bernier MSJ at 6 (although Bernier was born male, she had "deep feelings of distress, depression, and despair" because she "has known that she is female since she was 11 or 12 years old"); DSOF ¶¶ 21, 30–31, 34, and (2) a "[p]ersistent preoccupation … with getting rid of [her] primary and secondary sex characteristics and acquiring the sex characteristics of the other sex," Ex. I, DSM-III-R at 76; *see* Bernier MSJ at

---

[3] Ex. U is attached to the declaration of Bethany Minich in support of Turbocam's opposition and cross-motion for summary judgment.

6 (Bernier "has been on feminizing hormone therapy" since 2020 to reduce her male sex charac-

teristics and increase her female sex characteristics, and Bernier "intends to have vaginoplasty" to

replace her male genitalia with the appearance of female genitalia); DSOF ¶ 22–23, 31, 90; PSOF

¶¶ 72, 75, 104–105, 112–13. In fact, her medical records state ███████████████████████

DSOF ¶ 25.

The APA's current diagnostic manual confirms Bernier's transsexualism. DSM-5-TR ex-

plains that "*[t]ransexual*, a historic term, denotes an individual who seeks, is undergoing, or has

undergone a social transition from male to female or female to male, which in many, but not all,

cases also involves a somatic transition by gender-affirming hormone treatment and genital, breast,

or other gender-affirming surgery," which exactly describes Bernier. Ex. M, DSM-5-TR at 512–

13; *see also* Ex. H, DSM-5 at 451 (including similar definition for "transsexual"); DSOF ¶¶ 21–

25, 30–34, 36–37, 90; PSOF ¶¶ 72, 75, 104–105, 112–13.

Transsexualism, by any other name, is just as excluded. Because Bernier's gender dyspho-

ria is indistinguishable from the diagnosis of transsexualism, it is not a "disability" under the ADA.

42 U.S.C. § 12211(b)(1). Moreover, because "the plain language of the statute indicates that trans-

sexualism is excluded from the definition of disability no matter how it is characterized, whether

as a physical impairment, a mental disorder, or some combination thereof," Bernier's condition is

not a protected disability, regardless of its cause (physiological, psychological, etc.). *Johnson v.

Fresh Mark, Inc.*, 337 F. Supp. 2d 996, 1001 (N.D. Ohio 2003) (dismissing ADA claim brought

by pre-surgical transsexual woman), *aff'd*, 98 F. App'x 461 (6th Cir. 2004).

**2.    *Bernier's Gender Dysphoria Is an Excluded Gender Identity Disorder***

Bernier's gender dysphoria is also excluded from the ADA because it is a "gender identity

disorder[]" that does "not result[] from physical impairments," as those disorders were understood

when the ADA was enacted. 42 U.S.C. § 12211(b)(1); *Wis. Cent. Ltd.*, 585 U.S. at 277.

The APA explained in 1987 that the "essential feature of [gender identity] disorders is an incongruence between assigned sex … and gender identity," which "is the sense of knowing to which sex one belongs" or the "private experience of gender role." Ex. I, DSM-III-R at 71; DSOF ¶ 19. Because this "essential feature" is also one of the two fundamental criteria for the modern diagnosis of gender dysphoria, gender dysphoria is, itself, a "gender identity disorder." *See* Ex. M, DSM-5-TR at 512 (listing the first criteria for gender dysphoria as a "marked incongruence between one's experienced/expressed gender and assigned gender"); Ex. H, DSM-5 at 352 (same). That a diagnosis of gender dysphoria *also* requires "clinically significant distress," Ex. M, DSM-5-TR at 513; Ex. H, DSM-5 at 453, doesn't make gender dysphoria any less of a gender identity disorder. Rather, it makes gender dysphoria a *subset* of all gender identity disorders—i.e., gender dysphoria includes those individuals with a gender identity disorder that *also* experience significant distress. DSOF ¶ 19.

An individual diagnosed with gender dysphoria today thus would have been considered to have a gender identity disorder, as that term was understood when the ADA was enacted. Indeed, Bernier's own expert admits that Bernier satisfies the criteria for a gender identity disorder as that term was understood by the psychological community shortly after the ADA's enactment. Ex. C, Ettner Dep. 53:6–18 (attached to Minich Decl.) (Q: In your view, if Lillian Bernier was assessed by a clinical psychologist … under the criteria of DSM-IV …, would Lillian Bernier be diagnosed with gender identity disorder? A. According to DSM-IV, … I assume that she would meet the criteria."); *see also* DSOF ¶ 25 (Bernier's medical records reflect ███████████████ ████████████████ ).

Gender identity disorders are not protected by the ADA unless they "result[] from physical impairments." 42 U.S.C. § 12211(b)(1). Regulations implementing the ADA explain that a "physical impairment" is "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems …." 29 C.F.R. § 1630.2(h)(1). For example, some individuals are born with or experience "somatic intersex conditions such as congenital development of ambiguous genitalia (e.g., clitoromegaly, micropenis), congenital disjunction of internal and external sex anatomy (e.g., complete androgen insensitivity syndrome), incomplete development of sex anatomy (e.g., gonadal agenesis), sex chromosome anomalies (e.g., Turner syndrome; Klinefelter syndrome), or disorders of gonadal development (e.g., ovotestes)." Ex. M, DSM-5-TR at 511. These so-called "[d]isorders of sex development" are "conditions of inborn somatic deviations of the reproductive tract from the norm and/or discrepancies among the biological indicators of male and female." Ex. H, DSM-5 at 451. That is, individuals with disorders of sex development possess identifiable physical characteristics that depart from the normal sex characteristics for males or females. As a result, they are physically impaired compared to a normally developed male or female, and any resultant gender identity disorder is covered under the ADA. 42 U.S.C. § 12211(b)(1). Those are the kinds of conditions that Congress had in mind when it qualified the term "gender identity disorders."

Bernier does not have a disorder of sex development or a physical intersex condition. DSOF ¶¶ 32–33. And despite her ipse dixit claim, Bernier has not identified a specific physical or biological disfunction, developmental abnormality, genetic anomaly, or other "physical impairment[]" that caused her dysphoria. Bernier MSJ at 19. Her gender dysphoria is therefore a "gender identity disorder[] not resulting from physical impairments" that is expressly excluded from the ADA. 42 U.S.C. § 12211(b)(1).

Bernier resists this inescapable conclusion by rewriting the statute, insisting that her condition is not excluded because "[g]ender dysphoria is plainly 'physical'" in some vague sense. Bernier MSJ at 19. But the criterion for coverage isn't that a gender identity disorder is "*physical*," but that the disorder "*result[s] from physical impairments*." 42 U.S.C. § 12211(b)(1) (emphasis added).

Bernier's gender dysphoria doesn't meet this standard. Bernier claims only that that she has sought treatments because her normal, healthy male endocrine system does not produce the hormones that she thinks she "needs" to feel female. Bernier MSJ at 13, 19. But a healthy male endocrine system is not a *physical impairment*. Accepting the normal function of a healthy endocrine system as a "physical impairment" makes a hash of the term and would swallow the exclusion. All gender identity disorders would "result[] from physical impairments," 42 U.S.C. § 12211(b)(1), since their "essential feature"—"an incongruence" between one's biological sex and one's experienced gender, Ex. I, DSM-III-TR at 71—necessarily means a mismatch between the hormones the body produces and the hormones an individual believes she needs. An interpretation, such as Bernier's, that nullifies the very provision it interprets cannot be the best reading. *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 805 F.3d 322, 346 n.40 (1st Cir. 2015) (Torruella, J., concurring) ("[I]t has long been established as a fundamental rule of statutory construction that lawmakers do not use terms in enactments that 'have no operation at all.'" (quoting *Marbury v. Madison*, 5 U.S. 137, 174 (1803)).

In contrast, giving "gender identity disorders not resulting from physical impairments," 42 U.S.C. § 12211(b)(1), its natural meaning—a gender identity disorder that is *not* the result of a disorder of sex development or similar identifiable physical disfunction, abnormality, or anomaly—"give[s] effect … to every clause and word" of the statute. *Williams v. Taylor*, 529 U.S. 362,

404 (2000) (cleaned up). A gender identity disorder that results from a disorder of sex development or similar identifiable physical source is thus protected under the ADA, while a gender identity disorder that results from any other cause, like Bernier's, is not. *Id.* When it enacted the exclusion, Congress did not ask Courts to resolve the mind-matter debate, but simply to ask whether the gender identity disorder results from a medically determinable physical condition.

### 3. Williams v. Kincaid *is Not Persuasive*

Bernier urges this Court to jettison this straightforward reading and adopt the Fourth Circuit's incoherent decision in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022). Bernier MSJ at 17–18. *Kincaid* is not binding here, and this Court should reject Bernier's invitation to follow the Fourth Circuit's flawed lead. As two Justices and six federal appellate judges have already pointed out, *Kincaid*'s faulty reasoning "effectively invalidated a major provision of the" ADA by judicial fiat. *Kincaid v. Williams*, 143 S. Ct. 2414, 2415 (2023) (Alito, J., dissenting from the denial of certiorari); *Williams v. Kincaid*, 50 F.4th 429, 431 (4th Cir. 2022) (Quattlebaum, J., dissenting from the denial of rehearing en banc) ("With the stroke of a pen, we have judicially modified the Americans with Disabilities Act in a way that ignores the law that Congress enacted and the President signed into law 32 years ago.").

In *Kincaid*, a male who identified as a woman claimed that the prison's treatment (e.g., housing the individual on the male side of the prison and using the pronoun "he") violated the ADA. 45 F.4th at 763–64, 774. On appeal from a district court order dismissing the complaint for failure to state a claim, a majority of the Fourth Circuit panel reversed, concluding that (i) the modern diagnosis of gender dysphoria is not a "gender identity disorder" under the ADA because gender dysphoria "concerns itself primarily with *distress* and other disabling symptoms, rather than simply being transgender," *id.* at 768–769; and, (ii) even if it were, the individual's allegations

that she "require[s] physical treatment" and that there is "medical and scientific research identify-ing possible physical bases of gender dysphoria" were sufficient "to raise 'the reasonable infer-ence' that [her] gender dysphoria results from a physical impairment," *id.* at 770–71.

Judge Quattlebaum dissented from the majority's ADA holding. *Id.* at 780–90 (Quattle-baum, J., concurring in part and dissenting in part). He explained that the majority's first conclu-sion was wrong because "[g]ender identity disorders, as understood in 1990, included distress and discomfort from identifying as a gender different from the gender assigned at birth." *Id.* at 783. And he criticized the majority's second conclusion because physical treatments aren't the same as "a pre-existing physical impairment" and because treating incongruence between assigned and experienced gender as a sufficient physical impairment "would read 'not resulting from physical impairments' out of the statute" since "[a]nyone with a gender identity disorder … was born with physical characteristics that differ from the gender with which they identify." *Id.* at 788. The peti-tion for rehearing en banc was narrowly denied by a vote of eight to six. *Kincaid*, 50 F.4th 429.

The *Kincaid* majority's reasoning is unpersuasive here for several reasons. *First*, *Kincaid* considered only the ADA exclusion for "gender identity disorders," and so says nothing about whether gender dysphoria in adults seeking medical treatments for gender transition is excluded because it is indistinguishable from "transsexualism." 42 U.S.C. § 12211(b)(1); *see supra* Part II.A.1.

*Second*, *Kincaid* was decided under the much lower burden of proof for a motion to dis-miss. The majority emphasized that its conclusions—particularly relative to whether gender dys-phoria results from a physical impairment—were made in light of the "generosity with which

complaints are to be reviewed." *Kincaid*, 45 F.4th at 769.[4] That analysis is of limited utility here, where the "considerably more stringent" summary judgment standard applies. *Collier v. City of Chicopee*, 158 F.3d 601, 603 (1st Cir. 1998).

*Third*, the majority's reasoning is irredeemably flawed. The majority mischaracterizes gender identity disorders as they were understood when the ADA was enacted, takes a logically inconsistent position, violates canons of statutory interpretation, and improperly invokes constitutional avoidance to gut a statute.

First, the majority asserts that the distinguishing feature of gender dysphoria is "*clinically significant* distress." *Kincaid*, 45 F.4th at 768. But as Judge Quattlebaum highlights, distress was characteristic of many gender identity disorders, as they were understood in 1990. *Id.* at 782–84 (Quattlebaum, J., dissenting in part and concurring in part). A diagnosis of transsexualism, classified as a gender identity disorder, required "[p]ersistent discomfort and sense of inappropriateness about one's assigned sex." Ex. I, DSM-III-R at 76; *see also supra* Part II.A.1. A diagnosis of "Gender Identity Disorder of Childhood" required "persistent and intense distress." Ex. I, DSM-III-R at 71. And a diagnosis of "Gender Identity Disorder of Adolescence or Adulthood, Non-transseexual Type" required "[p]ersistent or recurrent discomfort and sense of inappropriateness about one's assigned sex." Ex. I, DSM-III-R at 77. According to the APA, even "[w]hen gender

---

[4] *See also, e.g., Kincaid*, 45 F.4th at 769 (the "difference between 'gender identity disorders' and gender dysphoria … would be more than enough support to '*nudge [plaintiff's] claims' … 'across the line from conceivable to plausible*'" (emphasis added)); *id*. at 771 (plaintiff's "allegations *suffice to raise 'the reasonable inference*' that [her] gender dysphoria results from a physical impairment" (emphasis added) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *id.* ("emerging research renders the inference that gender dysphoria has a physical basis *sufficiently plausible to survive a motion to dismiss*" (emphasis added)); *id.* at 772 (observing that "courts must construe complaints 'liberally so as to do substantial justice'" and that under this standard, plaintiff's complaint "*permits the plausible inference* that her condition 'result[ed] from a physical impairment'" (emphasis added)).

identity disturbance is mild … discomfort and a sense of inappropriateness about the assigned sex are experienced." Ex. I, DSM-III-R at 71. The existence of "distress" thus cannot preclude a condition from being a "gender identity disorder."

Second, the *Kincaid* majority illogically concludes that because "a diagnosis of gender identity disorder" in 1990, alone, could not "sustain a diagnosis of gender dysphoria" today, gender dysphoria is not a gender identity disorder. 45 F.4th at 768–69. But that conflates a specific condition with its broader family or class. It's like saying that because a bird is not necessarily a canary, a canary is not a bird. That is obviously wrong. Just as birds are a class of animals, gender identity disorders are a class of diagnostic conditions. *See* Ex. I, DSM-III-R at 71–78 (describing gender identity disorders as a "subclass" and listing four conditions); 42 U.S.C. § 12211(b)(1) (using the plural "gender identity disorders"); *see also Kincaid*, 45 F.4th at 784 (Quattlebaum, J., dissenting in part and concurring in part). And just as canaries are a subset of all birds, the modern diagnosis of gender dysphoria is a subset of all gender identity disorders as understood in 1990. *See supra* Part II.A.2. The *Kincaid* majority acknowledges this taxonomy,[5] yet illogically refuses to accept the unavoidable consequence: gender dysphoria is *a* gender identity disorder. In effect, this reasoning empowers a court to eviscerate a statutory exclusion by changing a diagnostic label and rephrasing the criteria.

Third, the *Kincaid* majority violates important canons of statutory interpretation. In its zeal to "construe the ADA's exclusions narrowly" to effect Congress's policy that "'disability' … 'be construed in favor of broad coverage,'" 45 F.4th at 766 (quoting 42 U.S.C. § 12102(4)(A)), the majority "ignore[s] plain words of limitation" and allows "general language" to override "a matter

---

[5] *See, e.g.*, *Kincaid*, 45 F.4th at 768 ("for a subset of transgender people … the incongruence results in gender dysphoria" (cleaned up)).

specifically dealt with in another part of the same enactment," *Clifford F. MacEvoy Co. v. United States*, 322 U.S. 102, 107 (1944) (cleaned up). The majority also violates the "cardinal principle of statutory construction" to "give effect, if possible, to every clause and word of a statute," *Taylor*, 529 U.S. at 404 (quotation marks omitted), by reading "gender identity disorders" in § 12211(b)(1) as an effective null set. *See Kincaid*, 45 F.4th at 769; *see also supra* Part II.A.2.

Finally, the majority improperly invokes constitutional avoidance, citing "the Equal Protection Clause of the Fourteenth Amendment." *Kincaid*, 45 F.4th at 772. But as Judge Quattlebaum observed, "before the constitutional avoidance canon may be employed, a statute first must be ambiguous," and § 12211(b)(1) is unambiguous: transsexualism, *all of it*, is out, as are any gender identity disorders not resulting from a physical impairment. *Id.* at 786 (Quattlebaum, J., dissenting in part and concurring in part) (citing *Jennings v. Rodriquez*, 583 U.S. 281, 296 (2018)).

Even so, Congress's determination that certain gender identity disorders—including gender dysphoria—are not disabilities protected under the ADA does not violate equal protection. Employment benefits are not a fundamental right, and § 12211(b)(1) classifies based on medical diagnosis, which is not a suspect class, *cf. Skrmetti*, 145 S. Ct. at 1829,[6] and so is subject only to rational basis review, *Romer v. Evans*, 517 U.S. 620, 631 (1996). The *Kincaid* majority's analysis

---

[6] That the ADA classifies based on diagnosis, rather than transgender status, is underscored by the fact that not all transgender individuals will satisfy the diagnostic criteria, and that some transgender individuals, i.e., those whose "gender identity disorder result[s] from physical impairments," are covered by the ADA. 42 U.S.C. § 12211(b)(1); *Skrmetti*, 145 S. Ct. at 1833 (no discrimination on the basis of transgender status "where there is a 'lack of identity' between transgender status and the excluded medical diagnoses").

under heightened scrutiny, based on then-applicable Fourth Circuit precedent, is therefore inapposite. *See* 45 F.4th at 772.[7]

The ADA's exclusion for "transsexualism," "gender identity disorders not resulting from physical impairments," and other conditions, 42 U.S.C. § 12211(b), easily passes the "relatively relaxed" rational basis review standard. *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 314 (1976). The ADA balances Congress's desire to "eliminat[e] … discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), with the practical realities of living and working in a diverse and varied society. And so Congress limited the scope of its mandate, including narrowing the "accommodations" that employers must provide, *id.* § 12112(b)(5)(A) (requiring only "reasonable" accommodations that do not "impose an undue hardship on the operation of the business"), and circumscribing the range of conditions to which the ADA applies, *id.* § 12102(1)(A) (covering "physical or mental impairment[s] that *substantially limit[] one or more major life activities*" (emphasis added)). Section 12211(b)'s exclusion is another example of this tradeoff.

Congress may have thought it appropriate or prudent to exclude transsexualism and certain gender identity disorders for various reasons, including the unsettled understanding of their cause and treatment, which persists today. *See* Ex. B, Weiss Dec. ¶¶ 42–51, 63–67 (attached to Minich Decl.); *see also Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) (the government has "wide discretion to pass legislation in areas where there is medical and scientific uncertainty"). And even if the

---

[77] The First Circuit has never held that transgender individuals are a suspect class. Nor should this Court do so, particularly given that Bernier entirely fails to make such an argument. The Supreme Court "has repeatedly declined" to recognize new protected classes over the last four decades, *Ondo v. Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015), and multiple justices have concluded that transgender status is not a protected class, *Skrmetti*, 145 S.Ct. at 1851–55 (Barrett, J., concurring, joined by Justice Thomas); *id.* at 1860–67 (Alito, J., concurring in part and concurring in the judgment). In any event, § 12211(b)(1) does not classify based on transgender status. *See supra* note 66.

exclusion reflects a "moral judgment," Bernier MSJ at 19 (quoting *Kincaid*, 45 F.4th at 773), that does not make it unconstitutional. Laws inherently and necessarily reflect the values of the law-maker. For example, Title VII and the ADA reflect a moral disapproval of sex and disability discrimination in the workplace, respectively, but that does not make them unlawful. Congress is allowed to make value judgments, as long as in doing so it doesn't transgress any constitutional guarantee, which it hasn't here. Because the ADA's exclusion for transsexualism and certain gender identity disorders "can reasonably be understood to result from a justification independent of unconstitutional grounds," it satisfies rational basis review. *Trump v. Hawaii*, 585 U.S. 667, 705 (2018).

### B. Bernier Has Not Shown a "Disability"

Even aside from the exclusion, Bernier has not shown that her gender dysphoria otherwise qualifies as a "disability" under any of the three options provided in 42 U.S.C. § 12102(1). That section provides:

> The term "disability" means, with respect to an individual—
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment (as described in paragraph (3))

42 U.S.C. § 12102(1).

At least, a reasonable jury could conclude that Bernier doesn't have a disability, precluding summary judgment.

*First*, Bernier has not shown that her dysphoria "substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). Bernier claims that her "planned surgical treatment … will significantly impact her reproductive capacity," and that she is "substantially limited in the major life activity of caring for herself" because "the treatment [for her gender dysphoria] has required

her to live as a woman in all aspects of her life, undergo substantial medical treatment, and follow a lifelong medical protocol." Bernier MSJ at 13–14. But Bernier gets it backwards. To qualify as a disability, the *condition*, not the *treatment*, must be the source of the limitation. 42 U.S.C. § 12102(1)(A). If the "ameliorative effects" of treatments cannot be considered when assessing limitations, *id.* § 12102(4)(E)(i), the detrimental effects cannot be, either. Bernier has also not shown that she "is substantially limited in … the functioning of her endocrine system," Bernier MSJ at 14, as she has provided no evidence of any organ failure or disfunction that distinguishes her endocrine system operation from that of a healthy biological male. And Bernier's unsupported assertion that her "distress" "easily constitutes a substantial limitation in the major life activity of 'caring for oneself,'" Bernier MSJ at 14, n.9, is a "conclusory allegation" that this court "need not"—indeed cannot—"credit" at the summary judgment stage, *Hornof v. United States*, 107 F.4th 46, 56 (1st Cir. 2024) (cleaned up). Bernier does not explain, for example, how her distress "substantially limits [her] ability" to take care of herself "compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii) (defining "Substantially limits").

*Second*, Bernier has not shown "a record of [a qualifying] impairment." 42 U.S.C. § 12102(1)(B). Bernier's claimed "record" is a conclusory reference to her diagnosis of gender dysphoria, which, alone, does not establish a substantial limitation on a particular major life activity. Bernier MSJ at 14 (citing Bernier SOF ¶ 2, which in turn cites Bernier's Declaration ¶¶ 1, 23); *Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 187 (1st Cir. 2011) ("Evidence of a medical diagnosis of impairment, standing alone, is insufficient to prove a disability.").

*Third*, Bernier has not shown that she is "regarded as having [a qualifying] impairment," 42 U.S.C. § 12102(1)(C), by "establishing that … she has been subjected to an action prohibited under [the ADA] because of" her dysphoria, *id.* § 12102(3)(A). Bernier claims that her "adverse

action is Turbocam's denial of health benefits for [her] gender dysphoria." Bernier MSJ at 14. But Turbocam's health-benefits plan does not unlawfully discriminate. *See infra* Part II.C. Indeed, rather than being subject to "adverse" actions by Turbocam, Bernier was recently "hired into a different position in the company" that she applied for. Bernier MSJ at 15. She has not been subject to any prohibited action.

Because Bernier has not shown that she has a "disability" under the undisputed facts here, her ADA claim fails as a matter of law. At a minimum, this precludes granting summary judgment for Bernier.

### C.  Turbocam's Health-Benefits Plan Does Not Discriminate Based on Disability

Moreover, even if Bernier had shown that she has a disability under the ADA, she has not shown that Turbocam's health-benefits plan "discriminate[s] against [her] on the basis of [that] disability." 42 U.S.C. § 12112(a). "The ADA does not require equal coverage for every type of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA." *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 608 (3d Cir. 1998). "So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities." *Id.*

The First Circuit has not yet rejected Bernier's contrary theory. *See Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 199–200 (1st Cir. 2015) ("our prior opinions have left open the possibility that an ADA claim based on differential benefits may be viable. So, too, district courts in this circuit remain divided on the viability of such claims." (citations omitted)). But eight other circuits have, and this Court should follow that weight of authority. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1116 (9th Cir. 2000) (joining seven other circuits in concluding that Title I does not "prohibit [an employer] from offering as a fringe benefit an insurance policy that gives

different levels of benefits to those with different types of disabilities"); *see also Witham v. Brigham & Women's Hosp., Inc.*, No. Civ. 00-268-M, 2001 WL 586717, at *4 (D.N.H. May 31, 2001) ("ADA is not violated when … an employer offers its employees equal access to a[n] … insurance plan that provides different levels of benefits for" different disabilities); *Pelletier v. Fleet Fin. Grp., Inc.*, Nos. Civ. 99-245-B & 99-CV-146-PH, at *2–3 (D.N.H. Sept. 19, 2000) (same).

The ADA thus does not require Turbocam to offer a health-benefits plan that provides coverage for gender dysphoria. It requires only that Turbocam offer *the same health-benefits plan* to all employees, regardless of disability. Turbocam does so, and Bernier has not alleged otherwise. Bernier was offered the same health insurance options available to all other benefit-eligible Turbocam employees. DSOF ¶ 88. Bernier does not allege that any Turbocam employee receives a different plan than the plans she was offered, or that Turbocam has granted exceptions for special coverage to other employees like the one she sought. *See* Ex. F, Marino Dep. Tr. 53:18–56:15 (attached to Minich Decl.) (only exceptions granted have related to prescription drug access). Because Turbocam did not discriminate, Bernier's ADA claim fails as a matter of law.

## III. Bernier's Claims Are Barred by the Religious Freedom Restoration Act

Even if Bernier could show discrimination under Title VII or the ADA, the Religious Freedom Restoration Act of 1993 ("RFRA") bars her claims. The *Bostock* majority explained that antidiscrimination statutes coexist with a "deep[] concern[] with preserving the promise of the free exercise of religion enshrined in our Constitution; that guarantee lies at the heart of our pluralistic society." *Bostock*, 590 U.S. at 681. Consistent with that concern, RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless that burden is the "least restrictive means" of furthering a "compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). And "because RFRA operates

as a kind of super statute, displacing the normal operation of other federal laws, it might supersede Title VII's commands in appropriate cases." *Bostock*, 590 U.S. at 682. This is one of those cases.

## A. RFRA Applies to this Case

The First Amendment's Religion Clauses, which include free exercise, are a well recognized defense in lawsuits brought by private parties against private defendants under federal non-discrimination laws. *See, e.g.*, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732 (2020). "Congress enacted RFRA," however, "to provide *greater* protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 574 U.S. 352, 357 (2015) (emphasis added). RFRA, then, must apply as a defense to suits by private parties seeking to enforce federal non-discrimination laws in the place of the Equal Employment Opportunity Commission ("EEOC:). *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006) (Winter, J.);[8] *see also* Shruti Chaganti, *Why the Religious Freedom Restoration Act Provides a Defense in Suits by Private Plaintiffs*, 99 Va. L. Rev. 343 (2013); *but see Listecki v. Off. Comm. of Unsecured Creditors*, 780 F.3d 731, 736–37 (7th Cir. 2015) (disagreeing with the Second Circuit); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (same). Otherwise, RFRA would provide *less* protection than the First Amendment, in direct contravention of the Supreme Court's express and repeated pronouncements. *See also Bostock*, 590 U.S. at 682 (RFRA is a "super statute" that is a "step further" than the First Amendment).

RFRA's applicability here is made plain by RFRA's text. First, RFRA "applies to all Federal law, and the implementation of that law," so it applies to the enforcement of Title VII and the ADA without qualification. 42 U.S.C. § 2000bb-3(a). Second, RFRA provides that a defendant

---

[8] The Second Circuit has not cast doubt on *Hankins*. *Contra* Bernier MSJ at 21. *Rweyemamu v. Cole* sidestepped RFRA because the defendant had "waived a RFRA defense." 520 F.3d 198, 204 (2d Cir. 2008). Any criticism of *Hankins* in the *Rweyemamu* opinion is the purest dictum.

may "assert" RFRA as a "defense in a judicial proceeding" without limitation as to the plaintiff. *Id.* § 2000bb-1(c). That means *any* judicial proceeding, not just when an executive official or the United States is the nominal plaintiff. If there were doubt, moreover, RFRA must "be construed in favor of a broad protection of religious exercise," not against it. *Id.* § 2000cc-3(g). That resolves the question as a matter of text. *Hankins*, 441 F.3d at 103; *see also* Chaganti, *supra*, 99 Va. L. Rev. 343.

The express purpose of RFRA is in full support. RFRA was enacted to "restore the compelling interest test" of "*Sherbert v. Verner* … and *Wisconsin v. Yoder*" that was applied before *Employment Division v. Smith*, 494 U.S. 872 (1990), "and to guarantee its application *in all cases* where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb (emphasis added). Ignoring RFRA here would fail to restore the compelling-interest test "in all cases" and would not track pre-*Smith* law. The First Amendment's protection of religious exercise, after all, applies to all laws, even when enforced by private plaintiffs. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964); U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."). In *McDaniel v. Paty*, 435 U.S. 618 (1978), for example, the Supreme Court applied both *Sherbert* and *Yoder* to resolve a pre-*Smith* Free Exercise Clause defense in a private suit. *Id.* at 621. At issue was a state law that prohibited pastors from holding public office. *Id.* After citing *Sherbert* and *Yoder*, and recognizing that the government's interest was asserted to be "of the highest order," *id.* at 626, 628, the Court held that the law violated the defendant pastor's free exercise rights. *Id.* at 628–29. *Paty* demonstrates that a free exercise defense clearly was available in a private suit under *Sherbert* and *Yoder*. To give full effect to Congress's express intent to restore the pre-*Smith* standard to all cases, RFRA must be available as a defense in a private action.

The Court, however, "need not … decide whether the RFRA applies to a federal law enforceable only in private actions between private parties." *Hankins*, 441 F.3d at 103. Here, the Court need only hold that RFRA may be raised as a defense in suits brought under federal law "enforceable by the EEOC as well as private plaintiffs." *Id.* Surely "the substance of [a law's] prohibitions cannot change depending on whether it is enforced by the EEOC or an aggrieved private party." *Id.* As the EEOC could bring an action under Title VII and the ADA—it could, in fact, have brought this action—"no policy of either the RFRA or [Title VII or the ADA] should tempt a court to render a different decision on the merits" based solely on whether the government or a private party files the suit. *Id.*

*Bostock* supports this argument. There, the Court discussed the First Amendment's ministerial exception as one means of this preservation, *Bostock*, 590 U.S. at 682, a defense available to private defendants in a private action, *see, e.g.*, *Our Lady of Guadalupe*, 591 U.S. 732. The Court then highlighted RFRA and cited to 42 U.S.C. § 2000bb-3, which begins with the assurance that RFRA applies to "all Federal law" and applies to its "implementation" without qualification. If the First Amendment is a defense in a private suit under federal employment discrimination law, and RFRA is a super statute that is a step above the First Amendment and provides even greater protection, then RFRA must be available as a defense in a private action under federal employment discrimination law. Anything less undermines the Supreme Court's pronouncements of RFRA's immense effect, weight and authority. *See Bostock*, 590 U.S. at 681–82; *Holt*, 574 U.S. at 357.

Like Bernier, some courts have focused on RFRA's use of the word "Government" in its general prohibition, *see* 42 U.S.C. § 2000bb-1(a)–(b), to infer that RFRA "implicitly limit[s] its application to disputes in which the government is a party." *Hankins*, 441 F.3d at 114 (Sotomayor, J., dissenting); *see Listecki*, 780 F.3d at 736–37. As Bernier puts it, "[w]hen the government is not

a party, it cannot meet [its] burden." Bernier MSJ at 22. Under this theory, RFRA ceases to apply the moment EEOC issues a right-to-sue letter.

This implication is hard to square with the text or purpose of RFRA and with Congress's command that RFRA must "be construed in favor of a broad protection of religious exercise," not in favor of evasion of those protections. 42 U.S.C. § 2000cc-3(g). It also ignores that RFRA defines "government" expansively, to expressly cover legislatures, courts, and private persons, not just executive officials suing as parties. *Id.* § 2000bb-2(1) (defining "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States"). Thus, "Congress supplanted the ordinary meaning of 'government' with a different, express definition," and courts must follow that definition, not ordinary meaning. *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020). Congress knows how to limit federal statutes to executive officials and agencies, *see* 5 U.S.C. § 551(1), but RFRA instead defines government in the most capacious manner possible.

This case involves plenty of "government" as defined in RFRA. Here, Congress, a branch of government, enacted Title VII and the ADA, and Bernier asks this court, another branch, to impose a substantial burden on Turbocam's religious exercise. Further, EEOC *declined* to bring enforcement proceedings and subdelegated enforcement to Bernier through a right-to-sue letter. *See* 42 U.S.C. § 2000e-5(f)(1); 29 C.F.R. § 1601.28; Compl. ¶ 86, Dkt. 1. EEOC therefore had an opportunity to defend a compelling interest in forcing Turbocam to cover Bernier's gender-affirming care, but declined to do so, and has not intervened in support of Bernier.[9] If EEOC's decision to subdelegate enforcement to a private plaintiff prevents the government from meeting its burden

---

[9] Far from it, the United States has filed a statement of interest supporting Turbocam. Dkt. 70.

under RFRA, *see* Bernier MSJ at 22, then the logical inference should be that the government has failed to carry its burden, not that RFRA's protections are nullified and evaded.

Bernier also relies on a provision of RFRA providing that a court may award "appropriate relief *against a government*" to imply that relief is available *only* against a government. Bernier MSJ at 21 (quoting 42 U.S.C. § 2000bb-1(c)). But no such negative implication follows. This provision provides in full: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000bb-1(c). "[T]his language would seem most reasonably read as broadening, rather than narrowing, the rights of a party asserting the RFRA." *Hankins*, 441 F.3d at 103. Interpreting it to "permit[] the assertion of the RFRA as a defense only when relief is also sought against a governmental party" would require an "awkward" and "convoluted drawing of a hardly inevitable negative implication." *Id.* The phrase "and obtain appropriate relief against a government" was meant to expand judicial remedies by abrogating state sovereign immunity and authorizing money damages, not to constrict RFRA's scope. *Tanzin*, 592 U.S. at 51; Chaganti, *supra*, 99 Va. L. Rev. at 343.

Bernier's concern that requiring private plaintiffs to defend a federal law "would effectively require that private parties step into the shoes of the government and litigate complex constitutional questions concerning the application of federal law" is no more persuasive. Bernier MSJ at 22. Private parties routinely must do so when they seek to enforce federal statutes. *See, e.g.*, *Matal v. Tam*, 582 U.S. 218 (2017). Indeed, even in this case, Bernier is asking Turbocam to "step into the shoes of the government" to litigate the constitutionality of the ADA's exclusion for transsexualism and gender identity disorders. *See supra* Part II.A. Turbocam stands ready to meet that burden, and in our adversarial system, so should Bernier.

Moreover, by its terms RFRA applies expressly to some private parties, so Congress did not share Bernier's concern. Under RFRA, "government" includes any "person acting under color of law." 42 U.S.C. § 2000bb-2(1). That phrase borrows from 42 U.S.C. § 1983, and includes not just officers in an individual capacity but private persons who hold no office. *Tanzin*, 592 U.S. at 48; *see, e.g.*, *Tower v. Glover*, 467 U.S. 914, 920 (1984) (allegation of private person's conspiracy with government officials is sufficient to plead action under color of state law); *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 942 (1982) (joint participation). That disproves Bernier's claim that Congress could not have intended private parties to bear this burden. Bernier MSJ at 22.

## B. Bernier's Requested Relief Would Substantially Burden Turbocam's Free Exercise

Turbocam, a closely held corporation owned and controlled by the Noronhas, is a "person" protected by RFRA. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 719 (2014). RFRA (and the First Amendment) protects "not only belief and profession but the performance of (or abstention from) physical acts that are engaged in for religious reasons," including "[b]usiness practices that are compelled or limited by the tenets of a religious doctrine." *Hobby Lobby*, 573 U.S. at 710 (quotation marks omitted). Turbocam's health-benefits plan exclusion for gender-affirming care is just such a business practice, which Turbocam maintains due to its sincere religious beliefs. DSOF ¶¶ 44–45, 50–51, 87. Bernier admits as much. *See* Bernier MSJ at 5; PSOF ¶¶ 16, 51–53, 116, 120. Bernier claims that Title VII and the ADA compel Turbocam to pay for Bernier's gender-affirming care through its health plan. This would make Turbocam complicit in conduct that violates its religious beliefs and that the Noronhas consider sinful, "putting [Turbocam] to the choice of curtailing its mission or approving [medical treatments] inconsistent with its beliefs." *Fulton v. City of Philadelphia*, 593 U.S. 522, 532 (2021).

If the Court finds that Turbocam has violated Title VII or the ADA by maintaining its religiously motivated exclusion, the "consequences will be severe." *Hobby Lobby*, 573 U.S. at 720. It risks compensatory and punitive damages, 42 U.S.C. § 1981a, and injunctive relief forcing Turbocam's owners to violate their religious faith by covering gender-affirming care under penalty of contempt of court. *Id.* § 2000e-5(g).[10] The alternative would be for Turbocam to stop offering health insurance, impairing Turbocam's ability to care for its employees, fulfill its mission to create wealth for its employees, and retain a qualified workforce. DSOF ¶ 97. Moreover, by not offering health insurance, Turbocam would face fines of over $2,000 per employee each year, or $1.2 million dollars for approximately 600 employees. *Hobby Lobby*, 573 U.S. at 720–21; DSOF ¶ 98. And while "employers can deduct the cost of providing health insurance," they "apparently cannot deduct the amount of the penalty that they must pay if insurance is not provided." *Hobby Lobby*, 573 U.S. at 722 (citation omitted); DSOF ¶ 99.

The Court should have "little trouble" concluding that punishing Turbocam here is a substantial burden on its religious exercise. *Id.* at 719; *see also Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 938 (5th Cir. 2023); *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 693 (2020) (Alito, J., concurring); DSOF ¶¶ 97–100. If Title VII or the ADA required Turbocam to drop its exclusion and cover gender-affirming care, the laws would violate Turbocam's and the Noronhas' religious convictions. If "they d[id] not comply, they [would] pay a very heavy price." *Hobby Lobby*, 573 U.S. at 691. If that "do[es] not amount to a substantial burden, it is hard to see what would." *Id.*

---

[10] Turbocam may also risk further enforcement actions by the EEOC, other employees, and the U.S. Attorney General. 42 U.S.C. §§ 2000e-5(f), 2000e-6, 12117(a).

**C. Bernier Cannot Satisfy Strict Scrutiny**

Bernier thus bears the burden of showing that applying Title VII and the ADA to force Turbocam to cover gender-affirming care "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). "Put another way, so long as the government can achieve its interests in a manner that does not burden religion, it must do so." *Fulton*, 593 U.S. at 541. This standard "is not water[ed] … down but really means what it says," *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (quotation marks omitted), and has been called "the most demanding test known to constitutional law," *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Bernier cannot meet that burden here.

*No compelling interest.* Bernier's asserted government interest is the general prevention of discrimination in the workplace. *See* Bernier MSJ at 3 ("federal nondiscrimination protections are designed precisely to eradicate workplace discrimination … because of … being transgender and suffering from gender dysphoria"); 42 U.S.C. §§ 2000e-2(a), 12112(a). Strict scrutiny, however, "demands a more precise analysis" than this "high level of generality." *Fulton*, 593 U.S. at 541. As the Fifth Circuit has concluded, this "generalized interest in prohibiting all forms of sex discrimination" is insufficient. *Braidwood Mgmt.*, 70 F.4th at 939–40 ("EEOC fails to carry its burden. It does not show a compelling interest in denying Braidwood, individually, an exemption. The agency does not even attempt to argue the point outside of gesturing to a generalized interest in prohibiting all forms of sex discrimination in every potential case.").

To determine if the interest here is sufficiently compelling, the Court must "look to the marginal interest in enforcing" Title VII and the ADA "in th[is] case[]," not focus on "broadly framed interests." *Hobby Lobby*, 573 U.S. at 727; *see also Holt*, 574 U.S. at 363 (standard must be

"satisfied through application of the challenged law [to] the particular claimant whose sincere exercise of religion is being substantially burdened"). "Rather than rely on" such a "'broadly formulated interest[]'" like "ensuring equal treatment," the court "must 'scrutinize[] the asserted harm of'" allowing an exception for Turbocam's exclusion. *Fulton*, 593 U.S. at 541 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegeta*, 546 U.S. 418, 431 (2006)). "The question, then, is not whether the [government] has a compelling interest in enforcing its non-discrimination [laws] generally, but whether it has such an interest in" forcing Turbocam to cover gender-affirming care against its core religious beliefs. *Id.* "Once properly narrowed," Bernier's "asserted interest[]" is "insufficient." *Id.* Bernier "fails to show" that Turbocam's plan puts "at risk" the government's "goal[]" of preventing workplace discrimination. *Id.* at 541–42.

In *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, the Supreme Court explained that the existence of exceptions for secular conduct "producing substantial harm or alleged harm of the same sort" undermines the claim that a particular "interest" is compelling. 508 U.S. at 547. *Lukumi* involved city ordinances that restricted the killing of animals for sacrifice or ritual and restricted the slaughter of animals to certain areas within the city, but which exempted the slaughter of animals by a licensed establishment as well as the slaughter of a certain number of specific animals per week, among other things. *Id.* at 527–28. Citing the myriad exemptions for secular conduct, the Court found the city's claimed interest in "protecting the public health and preventing cruelty to animals" didn't meet the compelling interest standard. *Id*. at 543, 546–47.

This case is like *Lukumi*. The "system of exceptions" in Title VII and the ADA completely "undermine" any "contention that [they] can brook no departures." *Id.* at 542; *accord Mahmoud v. Taylor*, 145 S. Ct. 2332, 2362 (2025); *see also Little Sisters of the Poor*, 591 U.S. at 697–98 (Alito, J., concurring). Both Title VII and the ADA exempt every employer in the country with

41

fewer than fifteen employees. *See* 42 U.S.C. §§ 2000e(b), 12111(5)(A). That is 80% of all employers, employing tens of millions of individuals. *See Facts & Data on Small Business and Entrepreneurship*, Small Bus. & Entrepreneurship Council, https://perma.cc/MU32-NZ44 (visited July 31, 2024). Both Title VII and the ADA exempt every "bona fide private membership club" nationwide. *See* 42 U.S.C. §§ 2000e(b), 12111(5)(B)(ii). The ADA exempts all "Indian tribe[s]," *see id.* § 12111(5)(B)(i), while Title VII exempts discrimination favoring Indians for all employers "on or near an Indian reservation," *id.* § 2000e-2(i). Title VII exempts employers regarding U.S. citizens in foreign countries if Title VII violates the law of that country, *id.* § 2000e-1(b), while the ADA exempts from its protection a plethora of conditions and disorders. *See id.* § 12211(b). Title VII also provides a "bona fide occupational qualification" exemption, *id.* § 2000e-2(e)(1), and the ADA has a similar business necessity defense, *id.* § 12113(a).

Bernier "offers no compelling reason" why the government has "a particular interest" in forcing Turbocam to cover gender-affirming care while entirely exempting most employers nationwide—most of them secular—and allowing them to maintain the same coverage exclusion without consequence. *Fulton*, 593 U.S. at 542. As in *Lukumi*, both Title VII and the ADA fail to "restrict [secular] conduct [that produces] substantial harm or alleged harm of the same sort." *Lukumi*, 508 U.S. at 546–47. There can thus be no compelling interest in applying the laws here to force Turbocam to cover gender-affirming care. A law "cannot be regarded as protecting an interest of the highest order" where "it leaves appreciable damage to [the] supposedly vital interest unprohibited." *Id.* at 547 (quotation marks omitted). But that is exactly what Title VII and the ADA do through their myriad exceptions.

Furthermore, the federal government's conduct shows that providing coverage for gender-affirming care is not a compelling interest. The U.S Department of Health and Human Services

*prohibits* insurance exchanges from offering "sex-trait modifications" as an essential health benefit under the Affordable Care Act. *Patient Protection and Affordable Care Act; Marketplace Integrity and Affordability*, 90 Fed. Reg. 27,074, 27,152 (June 25, 2025) (45 C.F.R. §§ 156.115, 156.400).[11] It also does not cover gender-affirming surgeries under Medicare, because "there is not enough high quality evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria and whether patients most likely to benefit from these types of surgical intervention can be identified prospectively." CMS Decision Memo, CAG #00446N (Aug. 30, 2016), https://perma.cc/R2ME-YQRA. Furthermore, in the ADA, Congress has articulated an interest in excluding transsexualism and gender identity disorders not resulting from physical impairments. *See supra* Part II.A. Congress thus did not see a compelling interest in having employers pay for gender-affirming care.

    ***Not the least restrictive means.*** "The least-restrictive-means standard is exceptionally demanding," *Hobby Lobby*, 573 U.S. at 728, and Bernier fails to satisfy it. This standard "requires the government to show that measures less restrictive of the First Amendment activity could not address its interest." *Tandon v. Newsom*, 593 U.S. 61, 63 (2021) (per curiam). "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt*, 574 U.S. at 365.

    Less restrictive means abound here. As the Supreme Court determined when evaluating the Affordable Care Act under the least restrictive means standard, "[t]he most straightforward way" to further the government's interest "would be for the Government to assume the cost of" gender-

---

[11] Although classifying a treatment as an essential health benefit has fiscal consequences for federal tax credits, states are not prohibited from adding such treatments as "additional benefits" to their exchange plans. 42 U.S.C. § 18031(d)(3)(B).

affirming care. *Hobby Lobby*, 573 U.S. at 728. That "would certainly be less restrictive of [Turbocam's] religious liberty, and [Bernier] has not shown … that this is not a viable alternative." *Id.* Considering the small number of people who seek gender-affirming care, it "seems likely … that the cost of providing the [care] … would be minor when compared with the overall cost of [Title VII and the ADA]." *Id.* at 729. If Bernier is going to argue, as she must, that prohibiting Turbocam's exclusion to prevent alleged workplace discrimination "is a Government interest of the highest order, it is hard to understand [why the Government] cannot be required under RFRA to pay anything in order to achieve this important goal." *Id.*

Another alternative would be to level down, not up. Title VII and the ADA require equal treatment, so the Court could allow Turbocam to withdraw benefits rather than expand them. As the Supreme Court has explained, "when the 'right invoked is that to equal treatment,' the appropriate remedy is a mandate of equal treatment, a result that can be accomplished by withdrawal of benefits from the favored class as well as by extension of benefits to the excluded class." *Heckler v. Mathews*, 465 U.S. 728, 740 (1984). A less restrictive means would be to allow Turbocam to withdraw benefits from the plan so as to render it nondiscriminatory. So, for example, if covering a female vaginoplasty requires that Turbocam also cover a penile-inversion vaginoplasty to avoid discriminating under Title VII or the ADA, Turbocam should be allowed the opportunity to exclude female vaginoplasties.[12]

Other less restrictive alternatives are also available. Turbocam offers employees a cash incentive to opt out of the plan. DSOF ¶¶ 101–02. That would allow Bernier to purchase private insurance. Turbocam offered that cash bonus to Bernier, but Bernier rejected it. DSOF ¶¶ 103–05.

---

[12] The Court may have to grant other exemptions when withdrawing benefits would conflict with mandatory requirements. Turbocam, for example, must cover post-mastectomy breast reconstructions. 29 U.S.C. § 1185b.

Bernier has never explained why that would not be a less restrictive means of satisfying the government's interest in meeting Bernier's asserted medical needs, while respecting Turbocam's religious interest in not paying for gender-affirming care.

Moreover, the claim to least-restrictive means is considerably undermined when a less restrictive option is provided for comparable secular conduct. For example, in *Holt v. Hobbs*, a Muslim prisoner who sought to maintain a half-inch beard to comply with his religious beliefs challenged a prison's no-beard policy. 574 U.S. at 358–59. The Supreme Court held that the prison's blanket policy wasn't the least restrictive means of meeting its safety interests because the prison could "satisfy its security concerns by simply searching the petitioner's beard." *Id*. at 365. Indeed, the prison "already search[d] prisoners' hair and clothing" and "presumably examine[d] the ¼-inch beards of inmates" with medical issues that it allowed. *Id*. at 365. That the government's purported security objectives were "'not pursued with respect to analogous nonreligious conduct,'" suggested "that 'those interests could be achieved by narrower [policies] that burdened religion to a far lesser degree.'" *Id.* at 368. Similarly, in *Tandon v. Newsom*, to prevent transmission of the Covid-19 virus, the state of California placed restrictions on in-home religious meetings that it had not placed on comparable secular gatherings. 593 U.S. at 63–65; *Tandon v. Newsom*, 992 F.3d 916 (9th Cir. 2021). The Supreme Court held that strict scrutiny required the government "to explain why it could not safely permit at-home worshipers to gather in larger numbers while using [the same] precautions used in secular activities." *Tandon*, 593 U.S. at 64.

As discussed above, both Title VII and the ADA provide a less restrictive alternative to many employers by exempting them from the antidiscrimination mandates, allowing those employers to offer health-benefits plan with the same exclusion at issue in this case. As in *Holt* and

*Tandon*, that the laws offer a less restrictive alternative for "analogous nonreligious conduct" indicates that any interest "could be achieved by narrower [policies] that burdened religion to a far lesser degree." *Holt*, 574 U.S. at 368.

***

Forcing Turbocam to pay for gender-affirming care substantially burdens its religious exercise, does not further a compelling government interest, and is not the least restrictive means of doing so. RFRA therefore bars Bernier's Title VII and ADA claims.

## IV.    Bernier's Claims Are Barred by the Free Exercise Clause

Regardless, even if RFRA did not apply to private suits brought to enforce federal laws against discrimination, the Free Exercise Clause does. *See, e.g.*, *Our Lady of Guadalupe*, 591 U.S. at 736. Under *Employment Division v. Smith*,[13] a law that "burdens religion" but "is not neutral or generally applicable is subject to strict scrutiny." *Lowe v. Mills*, 68 F.4th 706, 714 (1st Cir. 2023). A court "may sustain it only if it is narrowly tailored to achieve a compelling governmental interest." *Does 1-6 v. Mills*, 16 F.4th 20, 29 (1st Cir. 2021).

As explained in Part III.B, *supra*, applying Title VII or the ADA to force Turbocam to cover gender-affirming care would place a tremendous burden on the Noronhas' religious exercise. To avoid strict scrutiny, Bernier must show that Title VII and the ADA are neutral and generally applicable. They are not.

---

[13] In *Employment Division v. Smith*, the Supreme Court held that laws that incidentally burden religion are not reviewed under strict scrutiny for purposes of the Free Exercise Clause so long as they are neutral and generally applicable. 494 U.S. at 878–882. Turbocam preserves the argument that *Smith* was wrong and should be overruled. *See Fulton*, 593 U.S. at 543 (Barrett, J., concurring) ("As a matter of text and structure, it is difficult to see why the Free Exercise Clause—lone among the First Amendment freedoms—offers nothing more than protection from discrimination.").

A law is "not neutral and generally applicable … whenever [it] treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the [law] at issue." *Id.* That is, courts must compare the "similar[ity]" of the "risks" to the asserted interest posed by the secular activity and the religious activity. *Id.* Any restrictions must be "applied in an evenhanded, across-the-board way." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 527 (2022). For example, in *Tandon*, the Supreme Court held that for purposes of public health risk, "hair salons, retail stores, personal care services, movie theaters" and other secular business that were exempt from California's Covid-19 restrictions were "comparable secular activities" to "at-home religious exercise[s]," such as Bible studies, that were subject to the restrictions. *Tandon*, 593 U.S. at 63. The state's "myriad exceptions and accommodations for [these] comparable [secular] activities" rendered the restrictions not generally applicable and "requir[ed] the application of strict scrutiny." *Id.* at 64–65.

*Tandon* undermines any claim to neutrality and general applicability of Title VII and the ADA. The government interest under Title VII and the ADA is prevention of workplace discrimination. Like the restrictions in *Tandon*, however, both Title VII and the ADA contain myriad exceptions for secular activities. *See supra* Part III.C. Those excepted activities, moreover, are not merely "comparable" to Turbocam's religious exercise, they are the same. Title VII and the ADA exempt every private club in the country and the vast majority of employers nationwide, among others, allowing those secular employers nationwide to offer the very same health-benefits plan that Turbocam offers.

Title VII and the ADA are "not neutral and generally applicable, and therefore trigger[] strict scrutiny" unless allowing most employers (and all private clubs) to exclude gender-affirming

care from their health-benefits plans "pose[s] a lesser risk" to preventing employment discrimina-

tion than allowing a single religious employer in New Hampshire to do the same. *Tandon*, 593

U.S. at 62–63. In fact, if "*any*" of the exceptions "could … present[] similar risks" of employment

discrimination, the laws are not neutral and generally applicable. *Id.* at 62 (quotation marks omit-

ted). Permitting most employers to maintain the exclusion does not pose a lesser risk than allowing

Turbocam to do so. If anything, the risk of workplace discrimination posed by the exceptions is

far greater. Indeed, under Bernier's reading, Title VII and the ADA would compel Turbocam to

violate a sincere religious belief held by the Noronhas while allowing myriad other employers to

offer the *same* health-benefits plan (and exclusion) for any secular purpose they choose. That is

textbook failure of general applicability. *Id.*

Because Title VII and the ADA are neither neutral nor generally applicable, strict scrutiny

applies. As Bernier cannot satisfy strict scrutiny, *see supra* Part III.C, Bernier's claims are barred

by the Free Exercise Clause.

## V.    Bernier's Claims Are Barred by the Free Speech Clause

Turbocam also cannot be forced to pay for gender-affirming counseling because such coun-

seling is controversial speech. *See NIFLA*, 585 U.S. at 771–72. "Because the compelled subsidi-

zation of private speech seriously impinges on First Amendment rights, it cannot be casually al-

lowed." *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 894 (2018).

At a minimum, Bernier would have to satisfy "exacting scrutiny" and show a compelling interest

"that cannot be achieved through means significantly less restrictive of associational freedoms."

*Id.* (quotation marks omitted). In this case, there is little daylight between strict scrutiny and ex-

acting scrutiny, so Bernier cannot satisfy this standard. *See supra* Part III.C.

## CONCLUSION

Title VII and the ADA are important laws, but they don't mandate coverage for gender-affirming care, nor do they proscribe Christian beliefs about the nature of human sexuality or the ethics of gender-affirming care. Turbocam is entitled to summary judgment. At a minimum, the Court should deny summary judgment to Bernier.

Respectfully Submitted,

Defendant, Turbocam, Inc.
By its attorneys,

James R. Conde*
D.C. Bar No. 1031694
BOYDEN GRAY PLLC
800 Connecticut Avenue NW,
Suite 900
Washington, DC 20006
Telephone: (202) 955-0620
jconde@boydengray.com

/s/ Bethany P. Minich
Bethany P. Minich
N.H. Bar No. 265413
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940
Telephone: (781) 309-1500
minich@litchfieldcavo.com

Roger L. Byron*
Texas State Bar No. 24062643
rbyron@firstliberty.org
Telephone: (972) 941-4444
E. Cliff Martin**
Texas State Bar No. 24127208
cmartin@firstliberty.org
Telephone: (469) 440-7590
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075

* Admitted Pro Hac Vice
** Pro Hac Vice Motion Pending

Dated: August 25, 2025

**CERTIFICATE OF SERVICE**

I, Bethany P. Minich, hereby certify that on August 25, 2025, the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Bethany P. Minich*
Bethany P. Minich