# Exhibit A

Excerpts from the Deposition of Lillian Bernier

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW HAMPSHIRE

3            Civil Action No. 1:23-cv-00523-LM-AJ

4

5    - - - - - - - - - - - - - - - - - x

6    LILLIAN BERNIER,                    :

7              Plaintiff,               :

8       v.                              :

9    TURBOCAM, INC.,                     :

10             Defendant.               :

11   - - - - - - - - - - - - - - - - - x

12

13            DEPOSITION OF LILLIAN BERNIER

14

15            Monday, April 28, 2025

16                 9:55 a.m.

17

18               WOLFEBORO INN

19             90 North Main Street

20         Wolfeboro, New Hampshire 03894

21

22

23

24   Stenographically Reported By:

25   DEANNA J. DEAN, LCR, RDR, CRR

Page 2

1                    A P P E A R A N C E S

2

3    Representing the Plaintiff:

4         GLBTQ LEGAL ADVOCATES & DEFENDERS

5              18 Tremont Street

6              Suite 950

7              Boston, MA 02108

8              (617) 426-1350

9         BY:  CHRIS ERCHULL, ESQ.

10             cerchull@glad.org

11        BY:  MICHAEL HALEY, ESQ.

12             mhaley@glad.org

13

14   Representing the Defendant:

15        LITCHFIELD CAVO LLP

16             6 Kimball Lane

17             Suite 200

18             Lynnfield, MA 01940-2682

19             (781) 309-1500

20        BY:  BETHANY P. MINICH, ESQ.

21             minich@litchfieldcavo.com

22

23

24

25

Page 3

1              A P P E A R A N C E S (cont'd.)

2

3   Representing the Defendant:

4       FIRST LIBERTY

5              2001 West Plano Parkway

6              Suite 1600

7              Plano, TX 75075

8              (469) 440-7590

9       BY:   ROGER BYRON, ESQ.

10             rbyron@firstliberty.org

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    understand it, just let me know.  Okay?

2        A.   Okay.

3        Q.   If you could do your best to keep all of

4    your answers audible so that the stenographer,

5    seated to your right, can take that down for the

6    transcript that's being created.  If you say

7    "uh-huh" or shake your head or use some other sort

8    of colloquialism that can't be taken down for the

9    record, I may just remind you from time to time

10   that you have to give a verbal response.

11       A.   Okay.

12       Q.   And I'm not trying to be rude.  I just

13   want to make sure we have a clear record.  Okay?

14       A.   Understood.

15       Q.   If you need to take a break, we can

16   certainly do that.  I'd just ask that you answer

17   any question that's been put before you before the

18   break is taken.  Okay?

19       A.   Okay.

20           ATTORNEY MINICH:  Same stipulations as the

21       other depositions?

22           ATTORNEY ERCHULL:  Yes.

23           ATTORNEY MINICH:  We'll reserve all

24       objections except as to the form of the question

25       and motions to strike until time of trial?

Page 10

```
 1            ATTORNEY ERCHULL:  Yes.
 2            ATTORNEY MINICH:  Okay.  And I assume the
 3       witness will read and sign?
 4            ATTORNEY ERCHULL:  Yes.
 5            ATTORNEY MINICH:  30 days, waive notary?
 6            ATTORNEY ERCHULL:  Yes.
 7            ATTORNEY MINICH:  Okay.
 8   BY ATTORNEY MINICH:
 9       Q.   All right.  Can you state your full name
10    for the record.
11       A.   Lillian Bernier.
12       Q.   Okay.  And have you ever gone by any other
13    names?
14       A.   Yes.  Robert Andre Bernier.
15       Q.   And when did that name change occur?
16       A.   February of 2021.
17       Q.   And was that a legal name change, meaning
18    that you filed papers?
19       A.   Yeah.  I went through the court, yeah.
20       Q.   And did you do that on your own or did you
21    have legal counsel?
22       A.   I did it on my own.
23       Q.   Can you tell us where you live today?
24       A.   152 Suncook Valley Road, Alton, New
25    Hampshire.
```

Page 11

1      Q.    And how long have you lived at that

2   address?

3      A.    I just moved there in December.

4      Q.    And who do you live with at that address?

5      A.    My two boys, Hunter and Jasper Bernier.

6      Q.    How old is Hunter?

7      A.    14, almost 15 years old.

8      Q.    And what about Jasper?

9      A.    He's 13.

10      Q.    Other than Hunter and Jasper, do you have

11   any other biological children?

12      A.    Yes.

13      Q.    And how many?

14      A.    Two.

15      Q.    And what are their ages?

16      A.    Their ages would be 12.

17      Q.    And as I understand it from reviewing your

18   medical records, you don't have custody of the two

19   children today?

20      A.    I don't.

21      Q.    Okay.  And they're both girls?

22      A.    Yes.

23      Q.    Okay.  And do you know where they reside

24   today?

25      A.    I do not.

Page 26

1     Q.   And did you go for an in-person interview?

2     A.   I did.

3     Q.   When you presented for an in-person

4   interview at Turbocam, if I have the dates

5   correctly, your name had not changed at that point.

6   Correct?

7     A.   Correct.

8     Q.   All right.  So you presented as Robert

9   Bernier?

10    A.   Correct.

11    Q.   Okay.

12         Other than meeting with Julie for the

13   interview, was anyone else present?

14    A.   Sam.  His last name starts with a K.  I

15   don't know how to pronounce it.

16    Q.   Okay.  It was Sam within the TAPS for the

17   mills, or is he within personnel?

18    A.   He's the actual mills, like, overall

19   supervisor.

20    Q.   Okay.  Is he still there today?

21    A.   Yes.

22    Q.   And do you report to him in any capacity

23   today?

24    A.   No.  I direct to my direct supervisor,

25   which is Charles Ireland.

Page 27

1    Q.   Do you recall discussing -- well, strike

2   that.

3         How long did the interview last?

4    A.   I can't remember.

5    Q.   Do you recall discussing benefits during

6   the course of the interview?

7    A.   I don't remember.  I know that I didn't

8   have the acceptance letter at the point of the

9   interview.  I didn't receive that for a couple

10  days.

11   Q.   Okay.  So after the interview, if I

12  understand your testimony, at some point you

13  received an offer letter?

14   A.   Yes.

15   Q.   Okay.  And that was offering you a

16  position as a CNC mill operator for the third

17  shift?

18   A.   Correct.

19   Q.   Do you recall what the rate of pay was at

20  the time?

21   A.   $14 an hour.

22   Q.   Did you accept the role?

23   A.   I did.

24   Q.   Do you recall what your start date was?

25   A.   June, or -- yeah.  June -- it was either

Page 28

1    the 3rd or the 9th.

2         Q.    That's 2019?

3         A.    Correct.

4         Q.    Okay.  And you said you were reporting to

5    Charles Ireland at the time?

6         A.    I was reporting to Sam for the first two

7    months, because I was training on third -- first

8    shift, before I moved to third.

9         Q.    All right.  So if I understand correctly,

10   the first two months you worked on the first shift

11   and trained under Sam?

12        A.    Correct.

13        Q.    Okay.

14        A.    Yeah.

15        Q.    And then switched over to the third shift?

16        A.    Yeah.  And then the supervisor then was a

17   gentleman named Barry.  I can't remember his last

18   name.

19        Q.    How long did you report to Barry for?

20        A.    Till he was terminated in early 2020.

21        Q.    Do you know the reason for his

22   termination?

23        A.    I always assumed it went along with the

24   furloughs the company had for COVID, because it

25   happened the day before.

Page 29

1      Q.    All right.  When you say you assume, did
2    anyone ever tell you the reason for his
3    termination?
4      A.    No.
5      Q.    What do you know about the furloughs at
6    Turbocam?
7      A.    What we were explained was, we could
8    continue operating as normal if we had less than a
9    certain number of employees.  So they furloughed --
10   I think it was about three or four people from
11   every shift.
12     Q.    So were there individuals on your
13   particular shift that were furloughed?
14     A.    Yes.
15     Q.    All right.  So after Barry was furloughed
16   or terminated, you began reporting to Charles
17   Ireland?
18     A.    Charles wasn't a supervisor yet.  I was --
19   we were reporting to Wayne Wright, the second-shift
20   supervisor.  He was there when we would show up,
21   and he would tell us what he expected throughout
22   the night.  And he's the one that approved our time
23   cards for that time.
24     Q.    How did the time cards work at Turbocam?
25   Is there a clock you punch in and out of?

Page 33

1    the same breath, it was almost brushed off.

2         Q.    What do you mean by that?

3         A.    He said that some people will engage in

4    prayer at the beginning of a shift.  He kind of

5    chuckled and said, "But not very many people do

6    it."

7         Q.    Did anyone tell you at the interview that

8    you would be required to participate or engage in

9    prayer?

10        A.    No.

11        Q.    As a new employee at Turbocam, would it be

12   fair to say that you were required to review and

13   complete paperwork?

14        A.    Yes.

15        Q.    So in addition to paperwork relative to

16   pay, were you presented with a copy of an employee

17   handbook?

18        A.    I don't recall.

19        Q.    Were you given a copy of the mission

20   statement that you described?

21        A.    I was.

22              (Bernier Exhibit 1 is marked for

23              identification.)

24        Q.    I've handed you what's been marked as

25   Exhibit No. 1, which is a copy of the Turbocam

Page 34

1   mission statement, which bears a Bates stamp of

2   TURBOCAM634.

3        A.    Mm-hmm.

4        Q.    Do you recognize this document?

5        A.    Yeah.

6        Q.    Okay.  And is this a copy of the mission

7   statement that was provided to you either at your

8   interview or at some time after you had been

9   extended an offer of employment?

10       A.    Yeah.

11       Q.    Okay.  And fair to say that you read the

12  mission statement and agreed to support and work

13  toward the mission of the company in your words and

14  actions for the duration of your employment?

15       A.    Yeah.

16       Q.    And that's signified by your signature at

17  the bottom?

18       A.    Correct.

19       Q.    Right.  Which is dated May 17th of 2019?

20       A.    Yeah.

21       Q.    Did you have any issues with signing off

22  on this mission statement at the time of hire?

23            ATTORNEY ERCHULL:  Objection.

24       A.    None that would make me not continue with

25  the employment.

Page 35

1      Q.    Had you spoken with anyone that worked at
2   Turbocam prior to executing the mission statement
3   about what it meant or how it was implemented?
4      A.    No.
5      Q.    And your uncle was working there at the
6   time of your hire?
7      A.    Correct.
8      Q.    Did you have any conversations with him
9   about Turbocam's mission statement and how it was
10  implemented?
11     A.    Nope.
12     Q.    Do you have any relation affiliations?
13  Are you a member of a church?
14     A.    I'm Catholic.
15     Q.    Are you a practicing Catholic?
16     A.    I don't go to church every Sunday, but I
17  still believe, and I do my best.
18          (Bernier Exhibit 2 is marked for
19          identification.)
20     Q.    I've just handed you what's been marked as
21  Exhibit No. 2, which is Bates stamped TURBOCAM0635.
22          Do you recognize this document?
23     A.    It kind of looks familiar.
24     Q.    I'll represent to you that on the face of
25  the document, it's entitled "Turbocam 'Honor

1      A.    Not to my knowledge, no.

2      Q.    To your knowledge, has Charles shared that

3  information or that conversation with anyone at

4  Turbocam at any time?

5      A.    Not to my knowledge, no.

6      Q.    Other than communicating with Charles in

7  late 2020 that you were thinking about

8  transitioning, do you recall discussing that with

9  anyone else at Turbocam during that same period?

10     A.    Around the same time as Charles?  No.

11     Q.    At any period after your initial

12 conversation with Charles, did you share that

13 information with anyone at Turbocam?

14     A.    Julie.

15     Q.    That would be Julie Oakley?

16     A.    Correct.

17     Q.    All right.  When did you and Julie Oakley

18 have a conversation about that?

19     A.    Late February to mid March, as I recall.

20     Q.    Did you seek Julie out to have that

21 conversation?

22     A.    I did, because that was around the time

23 that my legal name change had been approved.

24          (Bernier Exhibit 3 is marked for

25          identification.)

Page 52

```
 1      Q.   All right.  So I've put in front of you
 2   what's been marked as Exhibit 3.
 3           Do you recognize this document?
 4      A.   I do.
 5      Q.   Okay.  And this is titled "Certificate of
 6   Change of Name."  Is that correct?
 7      A.   Correct.
 8      Q.   All right.  And it signifies that on
 9   February 22nd that the name Robert Andre Bernier
10   was changed to Lillian Bernier?
11      A.   Correct.
12      Q.   Okay.  And is this the -- or -- strike
13   that.
14           Did you provide a copy of this certificate
15   of name change to Julie Oakley?
16      A.   I believe I did.
17           (Bernier Exhibit 4 is marked for
18           identification.)
19      Q.   I've just handed you what's been marked as
20   Exhibit No. 4, which is an email communication at
21   the bottom from yourself to Julie Oakley dated
22   March 14th of 2021.
23           You can take whatever time you need to
24   read that and just look up when you're done.
25           Okay.  Does this email refresh your
```

1    recollection as to when you first met with Julie

2    Oakley to discuss the name change?

3         A.    Yes.

4         Q.    Okay.  And according to your email, which

5    is dated Sunday, March 14th of 2021, you state

6    that -- or it appears that you met with her on last

7    Friday.  Do I have that correct?

8              Or at least the subject is "last Friday

9    meeting."

10        A.    Yeah.

11        Q.    Okay.  So would that mean March 12th of

12    2021, approximately?

13        A.    Probably.

14        Q.    Okay.  So if I understand correctly, you

15   had a conversation with Charles -- which you

16   believed to be a private conversation -- in late

17   2020, and then you had a conversation with Julie

18   Oakley on or about March 12th of 2021 where you

19   informed her of your name change?

20        A.    I don't recall exactly.

21        Q.    What do you not recall exactly about that?

22        A.    Exactly when the meeting happened and

23   word-for-word of what was discussed.

24        Q.    Okay.  So looking at Exhibit No. 3 for a

25   moment, which is the certificate of name change,

Page 54

1    would it be fair to say that you informed Julie

2    Oakley of your name change sometime between

3    February 23rd of 2021 and March 14th of 2021?

4        A.    Yes.

5        Q.    Okay.  All right.

6              The meeting that you had, was this an

7    in-person meeting?

8        A.    Yes.  I remember her coming back to the

9    building, and I met with her early on in the shift.

10       Q.    Okay.  Was this is a meeting you had

11   requested?

12       A.    No.  It had actually caught me by surprise

13   when I saw her that late in the evening, because I

14   never saw her that late in the evening.

15       Q.    Okay.  Where did you see her?

16       A.    She came up to the shop floor to get me.

17       Q.    Why?

18       A.    So we could have a sit-down and have a

19   conversation about any concerns that I may have had

20   with my transition.

21       Q.    All right.  So --

22       A.    I do remember that meeting with her.

23       Q.    Okay.  So had you brought your intentions

24   to transition to her attention or someone else's

25   attention prior to this?

Page 55

1    A.   As I recall, I'm pretty sure I brought it
2    directly to her.
3    Q.   Okay.  So is it possibly you sent her a
4    copy of the name change, and then she requested a
5    meeting with you to discuss?
6    A.   It's possible, yes.
7    Q.   Okay.  Was the certificate of name change
8    the first notice that you provided to anyone within
9    the personnel or human resources department at
10   Turbocam of your intention to transition?
11   A.   Yes.
12   Q.   Okay.  And so that would be sometime at
13   least after February 22nd of 2021?
14   A.   Correct.
15   Q.   Okay.  And in response to you providing
16   that information, Julie Oakley sought you out to
17   have a meeting to discuss that?
18   A.   Correct.
19   Q.   And so she waited until your shift started
20   at approximately 7:00 p.m. to have the dialogue?
21   A.   No.  We start work at about 11:00.
22   Q.   I'm sorry.  I apologize.  11 to 7.
23   A.   Yeah.
24   Q.   Okay.  So she was there at 11:00 p.m. so
25   she could have a conversation with you?

Page 56

1      A.    Correct.

2      Q.    And fair to say that her -- normally her

3   hours wouldn't keep her on the campus --

4      A.    Absolutely not, no.

5      Q.    -- until 11:00 p.m.?

6      A.    Yeah.

7      Q.    Okay.  All right.  And how did you and she

8   meet?  On the floor?  Or did you go to her office?

9      A.    She found me on the floor, because I

10  didn't know that she was going to be there that

11  evening.

12     Q.    Okay.  When you two had a conversation,

13  though, did you do that on the floor or did you go

14  somewhere else?

15     A.    We went to a private conference room.

16     Q.    Okay.  And how long did you and she meet

17  for?

18     A.    I don't remember exactly.

19     Q.    What did you discuss during the meeting?

20     A.    Mostly to confirm the name.  I had a

21  couple questions about how long it would take for

22  paperwork to be updated.  I think I had a couple

23  questions about if Harvard Pilgrim was indeed our

24  insurance company.  And I can't remember what else

25  that we talked about.

1       Q.   Did you and Julie discuss that at all?

2       A.   I think we did.  I remember her saying

3   something about -- about me being a good employee

4   and that she felt that I didn't have any reason for

5   concern.

6       Q.   You say you think you did.  Was it during

7   that initial conversation or at some other period

8   in time?

9       A.   I think I remember it having -- remember

10  having that conversation during that meeting.

11      Q.   Do you have a recollection of that?

12      A.   I don't recall exactly.

13      Q.   All right.  At some point after sending

14  this communication to Julie Oakley on March 14th of

15  2021, did she or someone else within the personnel

16  department inform you that the name change had gone

17  through in ADP?

18      A.   I can't remember if I was actually reached

19  out to about it.  I just know that about a week

20  later, I had a new security badge with the updated

21  name.

22      Q.   Did you receive, or -- strike that.

23           Do those security badges have photographs

24  on them?

25      A.   They do.

1        Q.    Did you receive a new photograph at some

2    point?

3        A.    I did.

4        Q.    After having that conversation with Julie

5    Oakley in or about March of 2021, did you have any

6    further conversations with Charles about your

7    decision to publicly transition?

8              ATTORNEY ERCHULL:   Objection.

9        A.    For publicly transitioning, no.  Because

10   by the name change, I was already out publicly.

11       Q.    Okay.  And that was a poor question.

12             So did you have any conversations after

13   speaking with Julie Oakley in or about March of

14   2021 with Charles about the name change and the

15   transition?

16       A.    Just to inform him that my name had

17   changed, and he said that he would use the correct

18   name and pronouns.

19       Q.    And did he do so?

20       A.    He did.

21       Q.    Did you have any difficulties with anyone

22   at Turbocam who did not use the correct name or

23   pronouns?

24       A.    Initially?

25       Q.    Sure.

1        A.    No.

2        Q.    Okay.  Over time, was there anyone that

3    did not use the correct name or pronouns?

4        A.    Yes.  Rather recently.  A woman named

5    Nancy.

6        Q.    When you say "rather recently," when did

7    that occur?

8        A.    I'd say it started in or about six months

9    to a year ago.

10       Q.    So sometime in 2024?

11       A.    Yes.

12       Q.    And do you work directly with Nancy?

13       A.    I'm in the same department, but I don't

14   see her very often throughout the night.

15       Q.    Is she on the third shift with you?

16       A.    Correct.

17       Q.    And can you tell me the occasions in which

18   Nancy, about six months ago, started using the

19   incorrect name or pronouns?

20       A.    I'm sorry.  What was that?

21       Q.    Sure.

22             Can you tell me the occasions that, in the

23   last six months, Nancy has used an incorrect name

24   or pronouns?

25       A.    I don't remember the exact instances.  I

1   19th of 2023 to see how things were going?

2        A.   Yes.

3        Q.   And you didn't respond to this

4   communication, it would appear.  Correct?

5        A.   Correct.

6        Q.   All right.  But Charles or Mr. Ireland

7   did?

8        A.   Yes.

9        Q.   All right.  And he notes that, and he says

10  you can correct me if he's wrong, but he has not

11  witnessed any more instances of Nancy misgendering

12  you?

13       A.   Correct.

14       Q.   Did you correct Charles at any point and

15  tell him that he was incorrect and that Nancy had

16  continued to do that?

17       A.   No.

18       Q.   All right.  And, in fact, it does say,

19  "Lil did respond to me earlier yesterday," and I

20  don't see the attachment, but he goes to say,

21  "Please let [me] know if anything changes."

22            Since October 20th of 2023, have you

23  informed Mr. Hanson of any further issues with

24  Nancy misgendering you?

25       A.   No, I have not.

Page 68

1       Q.    And has Nancy misgendered you at any point
2   since October 20th of 2023?
3       A.    I think she has once or twice, but she
4   corrected herself within the same statement.
5       Q.    And did you bring that forward to
6   Mr. Hanson or anyone else within the personnel
7   department?
8       A.    She corrected herself, so therefore I
9   didn't see a need to.
10      Q.    Other than Nancy, have there been any
11  other employees at Turbocam who have misgendered
12  you since your name change?
13      A.    No.
14      Q.    Have you ever been made to feel
15  uncomfortable by any employees at Turbocam since
16  the name change?
17            ATTORNEY ERCHULL:   Objection.
18      A.    Not that I recall.
19      Q.    I read somewhere that there was something
20  having to do with a bathroom.
21      A.    Oh.  Okay.
22            I went into the women's room, and a woman
23  who worked, I believe, in the lathe department on
24  third shift had made a remark.  I can't remember at
25  this point what she had said.

1    Q.   So she made a remark directly to you --

2    A.   Yes.

3    Q.   -- about your use of the women's bathroom?

4    A.   Correct.

5    Q.   Okay.  Did you bring that to Charles'

6    attention?

7    A.   No.  I wouldn't have.  Charles wasn't the

8    supervisor then.

9    Q.   This is before Charles was a supervisor?

10   A.   We were reporting to Wayne.  I blew the

11   comment off.  I didn't think anything of it.

12   Q.   So you didn't -- given that you didn't

13   tell Wayne at the time, would it be fair to say

14   that you didn't report that to Mr. Hanson or anyone

15   else within personnel?

16   A.   Correct.

17   Q.   Have you ever had any further interactions

18   with this woman?

19   A.   No.

20   Q.   Has anyone else said anything to you about

21   your use of the women's room at Turbocam?

22   A.   No.

23   Q.   After your meeting with Julie Oakley in or

24   about March of 2021, do you recall who you next

25   spoke to within the personnel department about your

1      A.    To my understanding, yes.  Because it

2  happened twice.

3      Q.    Okay.  But no one told you that the reason

4  for the EKG was because of your history of a right

5  bundle block?

6      A.    I always assumed that's what it was for.

7      Q.    Okay.  Did anyone tell you that there

8  could be some potential cardiac side effects from

9  the hormone replacement therapy?

10     A.    I believe I was informed of that at both

11 Planned Parenthood and at Eric Seneville's office.

12     Q.    That there could be?

13     A.    Yes.

14     Q.    All right.  And do you know what those

15 potential implications are?

16     A.    I can't remember.

17     Q.    Did Mr. Senneville have any medical

18 doctors come in to examine you or speak to you

19 before he prescribed the estrogen and testosterone

20 blocker?

21     A.    No.

22     Q.    Did Mr. Senneville continue with the same

23 dosage of testosterone blocker and estrogen that

24 you had been prescribed by Planned Parenthood?

25     A.    I think he changed it.  Just the estrogen,

Page 90

1  the estradiol.  I went from 4 milligrams a day to

2  6.

3       Q.   And after your initial visit with

4  Mr. Senneville when he performed an examination and

5  continued with the hormone replacement therapy, did

6  he discuss any type of assessment or diagnosis with

7  you?

8            ATTORNEY ERCHULL:  Objection.

9       A.   Directly, no.

10      Q.   Okay.  Have you ever heard him indicate

11  that his assessment was that it was that you were a

12  male-to-female transgender person?

13      A.   Yes.

14      Q.   Is that how you characterize yourself?

15      A.   Yes.

16      Q.   Are you familiar with the term "gender

17  identity"?

18      A.   Yes.

19      Q.   And what do you understand that term to

20  mean?

21      A.   How one identifies their gender, whether

22  it's the same as when they were born or if they're

23  changing it.

24      Q.   And you understand the term "birth sex"?

25      A.   Correct.

Page 91

1       Q.   And you understand that your birth sex was
2    male?
3       A.   Yes.
4       Q.   And would it be fair to say that your
5    gender identity does not match your birth sex?
6       A.   Correct.
7       Q.   And that you consider yourself to be a
8    transgender woman?
9       A.   Correct.
10           ATTORNEY ERCHULL:  Can I recommend we take
11       a break?  I want to give you time to finish your
12       line of questioning.
13           ATTORNEY MINICH:  No, that's fine.
14           How long do you guys want?
15           ATTORNEY ERCHULL:  I just want to take 5
16       or 10 minutes.  Is that okay?
17           ATTORNEY MINICH:  Yes.
18           THE WITNESS:  Okay.
19               (Recess taken from 11:48 a.m.
20               to 11:58 a.m.)
21    BY ATTORNEY MINICH:
22       Q.   Back on the record.
23           All right.  So before we took a break, we
24    were discussing some of the medical treatment you
25    had, and I had asked if you considered yourself to

Page 92

1  be a transgender woman, and you had answered

2  affirmatively.  Is that accurate?

3       A.   Yes.

4       Q.   Are you familiar with the term "gender

5  dysphoria"?

6       A.   Yes.

7       Q.   Okay.  And when did you first hear that

8  term?

9       A.   I can't remember when I first heard it.

10      Q.   What do you understand that to be?

11      A.   Gender dysphoria is the feeling that you

12  get from your birth sex or sex assigned at birth

13  not matching with the gender which you identify

14  with, and it is the struggle that you deal with

15  from the two not lining up, to my knowledge.

16      Q.   And what is your knowledge based on?

17      A.   What I've read.  What I've heard.  How I

18  understand or interpret words that I don't

19  understand.

20      Q.   Okay.  Do you know how gender dysphoria is

21  diagnosed?

22      A.   I don't know how it's diagnosed, no.

23      Q.   Do you know who is capable of making a

24  diagnosis of gender dysphoria?

25           ATTORNEY ERCHULL:  Objection.

1    provided, but I think I may have emailed her, like,

2    through that site.

3         Q.   Does she say that she's accepting new

4    patients?

5         A.   Yes.

6         Q.   And did she reach back out to you?

7         A.   Yes.

8         Q.   And was she, in fact, accepting new

9    patients?

10        A.   Correct.

11        Q.   And did she, in advance of your initial

12   meeting with her on March 30, 2022, did she ask to

13   receive copies of any medical records?

14        A.   No.

15        Q.   Have you ever provided Ms. Wotherspoon

16   with copies of your medical records from Elliot or

17   from Planned Parenthood?

18        A.   No.

19        Q.   Did she perform any blood work either at

20   the first visit or at any subsequent visits?

21        A.   No.

22        Q.   Did she refer you to any medical providers

23   to have any testing or imaging done of any kind?

24        A.   No.

25        Q.   Did you discuss with her at any point how

Page 98

```
1    it is that gender dysphoria is diagnosed?
2         A.    Not that I recall.
3         Q.    Do you recall when during the course of
4    your treatment with her she first diagnosed you
5    with gender dysphoria?
6               ATTORNEY ERCHULL:   Objection.
7         A.    I don't know exactly, no.
8         Q.    And she has not prescribed any medication
9    to you.  Correct?
10        A.    No.
11        Q.    All right.  So she's not overseeing the
12   hormone replacement therapy, for example?
13        A.    Nope.
14        Q.    Do you know if she's qualified to write
15   prescriptions for medications?
16        A.    I have no idea.
17        Q.    To your knowledge, has she diagnosed you
18   with any other conditions other than gender
19   dysphoria?
20        A.    To my knowledge, no.
21        Q.    If the medical records suggest that she's
22   also provided you with a diagnosis of having
23   generalized anxiety disorder, is that the first
24   time you're hearing of it?
25        A.    To my recollection, yes.
```

Page 99

1      Q.    Have you ever taken any medication for

2   anxiety?

3      A.    Not that I can remember.

4      Q.    And other than the estrogen supplement or

5   replacement therapy as well as the testosterone

6   blocker, are you taking any other medications

7   today?

8      A.    I take -- oh, God, I can't remember the

9   name of it.  It's a -- it's an antidepressant

10  medicine that is actually helping me to have more

11  energy throughout the day, to combat working third

12  shift.

13     Q.    You don't recall the name of it?

14     A.    Starts with a B-u.

15     Q.    I'm not going to -- I think I know what

16  you're talking about, but I'm not going to try to

17  pronounce it.

18     A.    I know I can't pronounce it.

19     Q.    Okay.  And who has prescribed that to you?

20     A.    Eric Senneville.

21     Q.    When did you last see Eric?

22     A.    Rather recently.  End of 2024?  End of

23  2024, I believe was the last time I was there.

24     Q.    Okay.  And what was that visit for?

25     A.    That was just a -- just a physical.

Page 100

1      Q.   And is Eric still monitoring the hormone
2    replacement therapy?
3      A.   He is.
4      Q.   Does he do blood work at each visit or in
5    some -- on some timeline to monitor that hormone
6    replacement therapy?
7      A.   Since I've seen him, I've done blood work
8    maybe once a year, I think.
9      Q.   As part of your annual physical?
10     A.   Yeah.  He usually says he's setting up
11    that I have to go down to the lab.
12     Q.   Okay.  The medical records that we have
13    last have you seeing him in March of 2023 for a
14    cough and some congestion.
15     A.   I've seen him since then.
16     Q.   You've seen him since?
17     A.   Yes.
18     Q.   And do you take the antidepressant
19    medicine daily?
20     A.   Yes.
21     Q.   All right.  And you stated that one of the
22    reasons that you take that medication is to provide
23    you with some additional energy to combat working
24    on the third shift?
25     A.   Yes.

Page 119

1   personnel department?

2          ATTORNEY ERCHULL:  Objection.

3      A.   I do not know if she signed anything.

4      Q.   Do you know where she's working today?

5      A.   I don't.

6      Q.   Do you know whether her background or

7   experience is in the field of human resources?

8      A.   I don't.

9      Q.   There was also a mention in the notes from

10  Ms. Wotherspoon about what she characterizes as

11  your belief that Turbocam changed from a

12  self-funded health insurance plan -- or changed to

13  a self-funded health insurance plan to deny you

14  coverage for surgery?

15     A.   Yes.

16     Q.   Is that your belief today?

17     A.   Yes.

18     Q.   And what do you base that belief on?

19     A.   Because I trust Julie, and when we talked,

20  she said I should be fine when it came to

21  insurance.  And then all of a sudden I am not fine

22  when I inquire about what the coverage actually is.

23  So I found it suspicious and coincidental.

24     Q.   All right.  The conversation that you had

25  with Julie about insurance was this in that --

1   between --

2       A.   The meeting that we had when we came in

3   late.

4       Q.   So sometime in March of 2021?

5       A.   Correct.

6       Q.   Okay.  And if I understand your testimony

7   correctly, that Julie said that you should be fine

8   with insurance.  Correct?

9       A.   Yes.  Because it was to my understanding

10  that we had Harvard Pilgrim, which does not have

11  any exclusions.

12      Q.   Did Julie make any affirmative statements

13  or representations that, in fact, any and all

14  treatment that you needed or sought to receive

15  would, in fact, be covered?

16      A.   I can't remember.

17      Q.   Do you have any written communications

18  from Julie Oakley or anyone else at Turbocam in

19  which they represented that any treatment for

20  gender dysphoria would be covered under the

21  employee health plan?

22      A.   No.

23      Q.   When Julie made that statement to you that

24  you should be fine with the insurance, did you ask

25  Julie to review the insurance plan to confirm that,

Page 121

1  in fact, that type of treatment would be covered?

2      A.   I did not.

3      Q.   Okay.  Did you yourself ask to receive a

4  copy of the plan at that point in March of 2021 to

5  see what coverages were available?

6      A.   I did not.

7      Q.   Do you know when Turbocam switched from a

8  fully funded health plan to a self-insured plan?

9      A.   I know it was around the same time that I

10 started my transition, like, socially.  But I don't

11 remember the exact date.

12     Q.   And when did you start your transition

13 socially?

14     A.   That would have been February of '21.

15          (Bernier Exhibit 7 is marked for

16          identification.)

17     Q.   I've just handed you what's been marked as

18 Exhibit No. 7, which is an email communication from

19 Darika Marino at Turbocam.  And I'll represent that

20 this was sent to all employees enrolled in

21 Turbocam's health insurance plan for 2021, and it's

22 dated December 23rd of 2020.

23          Do you recall receiving this

24 communication?

25     A.   I don't remember.

1    Q.    Would you agree that you would enrolled in

2  Turbocam's health insurance plan for 2021?

3    A.    Yes.

4    Q.    Okay.  And were you aware in December of

5  2020 that Turbocam's health plan was switching from

6  a fully funded to -- or fully insured -- to a

7  self-insured plan?

8    A.    I can't remember.

9    Q.    Okay.  Would you agree that the second

10  paragraph starts, and states, "As a reminder,

11  Turbocam's health plan is going from fully insured

12  to self-insured"?

13    A.    I'm sorry.  What was the question?

14    Q.    Sure.

15          Would you agree with me that the second

16  paragraph it starts off, or reads --

17    A.    Oh, okay.

18    Q.    -- "As a reminder, Turbocam's health plan

19  is going from fully insured to self-insured"?

20    A.    Yes.

21    Q.    When did you learn that -- or do you

22  recall when you first learned that the health plan

23  was going from fully insured to self-insured?

24    A.    That I learned would have been at the

25  meeting with Pete and Maya.

1       Q.    So you're saying sometime in 2021?

2       A.    Correct.

3       Q.    Okay.

4       A.    2022 was the meeting with Pete and Maya.

5       Q.    Okay.  All right.  Thank you for that.

6             Did you receive email communications to

7    your email account at Turbocam about benefits?

8             ATTORNEY ERCHULL:  Objection.

9       A.    I mean, we receive them every year to

10   remind us of our enrollment.

11      Q.    Okay.  So you do have an email account at

12   Turbocam?

13      A.    I do, yes.

14      Q.    And you've had one consistently since

15   hire?

16      A.    Yes.

17      Q.    And is that the email address that's

18   utilized by the personnel department to direct

19   communications to you about coverage for health

20   insurance?

21      A.    Yes.

22      Q.    Okay.  And so do you have any memory of

23   having received this communication in or about

24   December of 2020 about the change in the plan and

25   the benefits?

Page 128

1   Pilgrim.  Correct?

2        A.   Correct.

3        Q.   And that you say that you had just called

4   them to figure out exactly how the coverage would

5   work for surgeries that you were trying to plan,

6   and you were told that Turbocam has a self-funded

7   plan and that none of your transition is covered.

8             Did I read that correctly?

9        A.   Yes.

10       Q.   Okay.  And you say, essentially, Can I

11  tweak the plan or am I just screwed here?

12            Right?

13       A.   Right.

14       Q.   And fair to say that Mr. Hanson responded

15  to you the next day?

16       A.   Yes.

17       Q.   And informed you that, yes, Turbocam had

18  gone self-insured as of January 1st of 2021?

19       A.   Correct.

20       Q.   And that he was going to review the full

21  plan documents and get back to you?

22       A.   Correct.

23       Q.   Okay.  And he, in fact, got back to you

24  the following Monday.  Correct?

25       A.   Correct.

Page 129

1      Q.   All right.  And provided you with a list

2   of the exclusions from the plan?

3      A.   Correct.

4      Q.   All right.  Which he confirmed included an

5   exclusion for coverage for gender dysphoria.

6   Correct?

7      A.   Correct.

8      Q.   All right.  And he sent you a copy of

9   what's called medical limitations and exclusions?

10      A.   Yes.

11      Q.   Was that the first time you had seen a

12   copy of the list of exclusions under the

13   self-insured plan?

14      A.   Yes.

15      Q.   And was that the first time you had

16   requested information about what the self-insured

17   plan covered or did not cover?

18           ATTORNEY ERCHULL:  Objection.

19      A.   Yes.

20           THE WITNESS:  Sorry.

21      Q.   And Mr. Hanson provided some additional

22   information to you about the possibility of the

23   opt-out bonus as a means to obtain insurance

24   elsewhere that might provide for coverage?

25      A.   Yes.

1      Q.    Okay.  And he linked some websites to you

2  to allow for you to make inquiry or research those

3  other plans?

4      A.    Yes.

5      Q.    Okay.  In response to Mr. Hanson's

6  communication, did you research other plans?

7      A.    I clicked on the link, but I don't think I

8  really dove into it too much.  I started realizing

9  there's a lot of language there that I didn't

10  understand.

11      Q.    Did you ever look further into the

12  possibility of other plans on the open market as an

13  alternative to using Turbocam's self-funded plan?

14      A.    No.

15      Q.    Did you ever contact anyone at the New

16  Hampshire Department of Insurance or the New

17  Hampshire -- I guess it's New Hampshire Insurance

18  Department or New Hampshire Marketplace health

19  plans -- to inquire whether they could provide you

20  with any assistance to find a plan that might cover

21  the treatment you were seeking?

22      A.    No.

23      Q.    Did you make inquiry of anyone at the New

24  Hampshire Insurance Department as to the costs of

25  any alternative plans?

Page 131

1      A.    No.

2      Q.    Did you ask Mr. Hanson or anyone else

3   within the personnel department at Turbocam if they

4   could assist you in finding another policy outside

5   of Turbocam's self-funded plan?

6      A.    No.

7      Q.    At any point since October of 2021, have

8   you conducted any research as to any other plan

9   that you might utilize on the -- within the New

10  Hampshire Marketplace for alternative insurance?

11     A.    No.

12           ATTORNEY ERCHULL:  Can we take a break so

13     I can talk to my client?

14           ATTORNEY MINICH:  Sure.

15           ATTORNEY ERCHULL:  Okay.

16              (Recess taken from 1:01 p.m.

17              to 1:17 p.m.)

18           ATTORNEY MINICH:  Okay.  All set.

19           THE WITNESS:  I just wanted to clarify

20     something real quick.

21           ATTORNEY MINICH:  Sure.

22           THE WITNESS:  You had asked me if I had

23     done any research for outside insurance

24     companies.

25           ATTORNEY MINICH:  Mm-hmm.

1          THE WITNESS:  My attorneys helped me find
2      an insurance professional, and she's the one
3      that did all the work for looking at different
4      insurance companies.
5   BY ATTORNEY MINICH:
6      Q.    Did you have direct communication with
7   that individual?
8      A.    Yes.
9      Q.    And who is that?
10     A.    I can't remember her name.
11     Q.    When did that research take place?
12     A.    Late 2022, I think.
13     Q.    And did that individual provide you with a
14  spreadsheet or breakdown of some kind of the
15  company --
16     A.    We discussed also --
17     Q.    One second.
18     A.    Sorry.
19     Q.    Did that individual provide you with a
20  breakdown of the companies contacted, whether the
21  coverage was available, and the cost?
22     A.    We had talked about it over the phone.  I
23  wasn't provided like a spreadsheet or anything.
24     Q.    And do you recall what she told you?
25     A.    I can't remember exactly, no.

Page 133

1      Q.   Do you still have her contact information?

2      A.   I don't.  I can't even remember her name.

3  I'm sorry.

4      Q.   Did she indicate to you that there were no

5  insurance companies in the state of New Hampshire

6  that provided coverage for treatment for gender

7  dysphoria?

8      A.   No.  It was mostly cost that it broke

9  down.  We were going to stay with -- or I was going

10 to stay with the Turbocam-provided insurance.

11     Q.   Do you recall what the costs associated

12 with those plans were?

13     A.   I don't, no.

14     Q.   Would it have required you to pay more out

15 of pocket for health insurance than you did through

16 Turbocam?

17     A.   I believe it did.  I can't remember

18 exactly, though.

19     Q.   You've never seen any writings from that

20 individual or the organization that she works for

21 detailing which plans were reviewed and which costs

22 were associated with those?

23     A.   No.  It was just over-the-phone

24 conversations.

25          (Bernier Exhibit 9 is marked for

1          identification.)

2      Q.    I've handed you what's been marked as

3   Exhibit 9.  And I apologize; this one is on front

4   and back.

5          There is an email to you that starts at

6   the bottom of the first page, dated November 17th

7   of 2021, to Maya Jiman at Turbocam.

8          Do you see that?

9      A.    The one from her to me?

10     Q.    From you to her.  At the bottom of the

11  first page.

12     A.    Oh, okay.  Yeah.

13     Q.    That's dated November 17th of 2021?

14     A.    Yes.

15     Q.    Okay.  And you inquired initially about

16  whether it was possible for the insurance to make

17  an exception when it comes to your surgery?

18     A.    Yes.

19     Q.    And then you also noted at the bottom that

20  you found out there is just about no private

21  insurance in the state of New Hampshire that will

22  cover it?

23     A.    That's what I wrote.

24     Q.    Okay.  So does this refresh your

25  recollection that in or about November of 2021,

Page 135

1   that you had either reached out to this woman or

2   had done some independent research as to which

3   policies would or would not cover this type of

4   treatment?

5        A.   This would have been around when I was

6   talking to the other woman.

7        Q.   Okay.  Do you recall this woman telling

8   you that there were just about no private insurance

9   in the state of New Hampshire that covered this

10  type of treatment?

11       A.   No.

12       Q.   You don't recall her saying that?

13       A.   Like I said, I know it had more to do with

14  cost than coverage.

15       Q.   Okay.

16            (Bernier Exhibit 10 is marked for

17            identification.)

18       Q.   I've handed you what's been marked as

19  Exhibit No. 10, which is an email at the bottom

20  from yourself to Mr. Hanson dated December 6th of

21  2021.

22       A.   Yes.

23       Q.   Do you see that?

24       A.   Yes.

25       Q.   Okay.  And you are following up with him

                                        Page 136

1   about your inquiry that you had made to Maya.
2   Correct?
3        A.   Yes.
4        Q.   All right.  And the possibility of getting
5   an exception?
6        A.   Yes.
7        Q.   Okay.  And fair to say that Mr. Hanson
8   responded to you within a matter of hours, telling
9   you that at this point we're -- meaning Turbocam --
10  is not changing the plan design or making an
11  exception?
12       A.   Yes.
13       Q.   All right.  And he encourages you to
14  consider exploring options outside of Turbocam?
15       A.   Yes.
16       Q.   All right.  After receiving this
17  communication from Mr. Hanson on December 6th of
18  2021, did you do any additional research into
19  potential options outside of Turbocam?
20       A.   I can't remember how long I worked with
21  that other woman who was doing the research for me.
22       Q.   Okay.  Did Mr. Hanson or anyone else at
23  Turbocam provide you with the amount of the opt-out
24  bonus so that you could determine whether -- I
25  guess what the cost would be of these outside

Page 137

1    plans?

2        A.    Not that I received anything directly, no.

3        Q.    Did you ever inquire of anyone at Turbocam

4    as to what the opt-out bonus -- the amount of the

5    opt-out bonus?

6        A.    No.

7        Q.    So how were you able to determine through

8    this woman that you worked with that the cost of

9    the outside insurance was going to be higher?

10            ATTORNEY ERCHULL:  Objection to the extent

11        it calls for information covered by

12        attorney-client communications.

13        Q.    I don't want to know about -- none of my

14    conversations are seeking to elicit conversations

15    that you've had with counsel.

16        A.    Okay.  The woman and I went off of -- to

17    my understanding, how I understand insurance

18    talk -- is how much I was paying for the Turbocam

19    insurance.

20        Q.    Okay.  But you provided no other data to

21    her from Turbocam?

22        A.    No.  I didn't have any other data to give

23    her.

24        Q.    Okay.  And would it be fair to say that

25    you have continued to utilize Turbocam's health

Page 138

1    insurance plan through the present?

2         A.    Yes.

3         Q.    Okay.  You've not ever taken the opt-out

4    bonus?

5         A.    No.

6         Q.    In the notes from Ms. Wotherspoon, she

7    states at one point that during a conversation she

8    had with you that she says that you were written up

9    for breaking an excessive piece of equipment and

10   that no one else was.

11            Do you know what that's referring to?

12        A.    I don't know what she means by the "no one

13   else was."  But, yes, I was written up for breaking

14   a very expensive measuring piece of equipment.

15        Q.    Okay.  And did you feel that that -- that

16   the correction notice that issued, that that

17   somehow was tied to your request for health

18   insurance coverage?

19        A.    No.  That was a really expensive piece of

20   equipment.

21        Q.    Okay.  And you acknowledge that that was

22   something you had broken?

23        A.    Yes.

24        Q.    You didn't view that as retaliatory?

25        A.    No.

Page 143

1      A.   Yes.

2      Q.   And had you explained that to

3  Dr. Burdette?

4      A.   Yes.

5      Q.   Do you recall the cost of that treatment?

6      A.   I recall it being I believe just under

7  8,000.

8      Q.   And you paid that out of pocket?

9      A.   I used part of my HSA account, and the

10  rest of it -- the majority of it was paid in cash.

11          (Bernier Exhibit 11 is marked for

12          identification.)

13      Q.   I've just handed you what we've marked as

14  Exhibit No. 11, which is the initial disclosures

15  that were made by your counsel.

16          Have you ever seen this document before?

17      A.   I can't remember.

18      Q.   Okay.  I'm going to direct your attention

19  to the second page of the document, which has a

20  computation of each category of damages.

21          Do you see that language there, just above

22  the signature line?

23      A.   The -- where it like talks about -- where

24  everything is shifted over?

25      Q.   Yeah.

Page 144

1      A.    Okay.

2      Q.    So when it says, "In addition" -- it's

3  about four lines up from the bottom.  "In addition,

4  the following is a computation of each category of

5  damages."

6      A.    Okay.

7      Q.    And then there's an out-of-pocket cost for

8  the breast augmentation surgery, and that's 7,564.

9      A.    Mm-hmm.

10      Q.    And it states "receipt included."

11            Do you see that?

12      A.    Yes.

13      Q.    And this is an estimate for the services.

14  Correct?

15      A.    I believe that's actually how much I paid.

16      Q.    Okay.  But the -- what's called the

17  receipt is an estimate of what those fees are going

18  to be?

19      A.    Yeah.

20      Q.    Okay.  But you believe you paid $7,564?

21      A.    Yes.

22      Q.    And then there's also a line item there

23  for out-of-pocket costs for therapy related to

24  gender-affirming care?

25      A.    Mm-hmm.  Yes.

1    Q.   And that's for $6,080?

2    A.   Yes.

3    Q.   Okay.  And is that for the therapy with

4  Ms. Wotherspoon?

5    A.   For therapy, yeah.  So that would be with

6  Ms. Wotherspoon.

7    Q.   And did you pay out of pocket for the

8  treatment with her?

9    A.   That was with my HSA account.  Also, I

10  think one visit was done on my debit card.

11    Q.   Okay.  So -- but the monies in your HSA

12  account are monies that you put in there yourself.

13  Correct?

14    A.   Correct.  Yeah.  It comes out of my

15  paycheck.

16    Q.   Right.  So that's cash that you've

17  expended --

18    A.   Yes.

19    Q.   -- on that treatment.  Correct?

20    A.   Yep.

21    Q.   Okay.  Do you have any other out-of-pocket

22  expenses that you have incurred for treatment for

23  gender affirmation or gender dysphoria?

24    A.   My hormones are also paid with the HSA

25  card.

1           Did that occur?

2      A.    My ex-wife did.

3      Q.    Okay.  Did the -- did your boyfriend come

4  for that?

5      A.    We had an argument, and no, he did not.

6      Q.    Okay.  Are you and he still seeing each

7  other today?

8      A.    Nope.

9      Q.    Did he ever come and stay with you for a

10  period of time?

11     A.    No.  Not since we had started talking.

12     Q.    Ms. Wotherspoon made reference to setting

13  boundaries with a boyfriend in terms of stays.

14           Was that referring to him, if you know, or

15  someone else?

16     A.    That was the guy that my ex was seeing

17  while she was staying under my roof.

18     Q.    Was he also staying with you?

19     A.    He was trying to, but that was part of the

20  boundaries that I was trying to figure out how to

21  set them respectfully.

22     Q.    Going back to the opt-out bonus for a

23  moment, the records from Ms. Wotherspoon say that

24  or suggest that you had learned that the owner of

25  Turbocam did not want to give you the opt-out bonus

Page 148

1   because it would suggest that he is permitting

2   surgery.

3          Do you recall saying anything like that to

4   her?

5       A.   I don't recall saying it like that because

6   I don't know where I would have, like, learned it

7   from.

8       Q.   Okay.  So fair to say that no one has told

9   you that the owner of Turbocam did not want to

10  provide you with an opt-out bonus because it would

11  suggest that Turbocam was permitting or paying for

12  the surgery?

13      A.   Correct.

14      Q.   Are you familiar with the term "intersex"?

15      A.   I've heard it a few times.

16      Q.   Do you know what it means?

17      A.   Not really, no.

18      Q.   At birth, were you born with male

19  genitalia?

20      A.   Yes.

21      Q.   Did you also -- were you also born with

22  any, what could be construed to be female

23  genitalia?

24      A.   No.

25      Q.   Have you scheduled any further surgical

Page 149

1    procedures?

2         A.    Scheduled them?  No.

3         Q.    Have you received any consultations for

4    further surgery?

5         A.    Yes.

6         Q.    Ago I understand it from your therapy

7    records and I think you have in discovery

8    responses, your intention is to undergo a

9    vaginoplasty?

10        A.    Correct.

11        Q.    And are you also intending to undergo an

12   orc -- "orchetomy"?  "orchiectomy"?

13             Am I pronouncing it right?

14             ATTORNEY ERCHULL:  "Orchiectomy."

15        Q.    "Orchiectomy."

16        A.    What's that?

17        Q.    Where there's the removal of the genitals.

18        A.    Yeah.

19        Q.    Okay.  And there may be some combination

20   thereof.  I'm not clear.

21             But is that a procedure that you've

22   discussed with any professionals?

23        A.    Yes.

24        Q.    Okay.  And who have you discussed that

25   with?

Page 150

1      A.    Dr. Rumer.  She's in Pennsylvania.

2      Q.    Have you seen Dr. Rumer?

3      A.    Just phone consultation.

4      Q.    And when you say phone, is that over the

5  phone or was this like a telehealth visit over Zoom

6  or something?

7      A.    Just talking over the phone.

8      Q.    Okay.  And did you speak with Dr. Rumer

9  specifically or someone within her office?

10     A.    Both.  I talked with her and a -- she's

11 got these people that she assigns to each client.

12 It would be like the middleman between the client

13 and her.

14     Q.    Okay.

15           (Bernier Exhibit 12 is marked for

16           identification.)

17     Q.    Okay.  I'm showing you what's been marked

18 as Exhibit No. 12, which was produced by your

19 counsel in discovery.  It bears Bates stamp

20 BERNIER0548.

21     A.    Mm-hmm.

22     Q.    This appears to be -- I don't know if it's

23 a text message or like an instant messaging thing.

24     A.    That's a email on my phone.

25     Q.    Okay.  So this is just a screenshot of

1    rest room?

2         A.   Yes.

3         Q.   Okay.  And I'm going to direct you back to

4    the first page of Exhibit 13 where Mr. Hanson

5    responds the next morning.

6         A.   Yes.

7         Q.   Okay.  And he indicates or tells you that

8    the plan descriptions aren't thrown together, and

9    then makes inquiry about the bathroom and asks if

10   you would identify who it is if they could address

11   that concern.  Correct?

12        A.   Correct.

13        Q.   Right.  And fair to say that you, in your

14   communication at the top, did not identify who the

15   person was because you didn't want to make a big

16   deal about it?

17        A.   Correct.

18        Q.   Okay.  And Mr. Hanson suggests that you

19   guys schedule a time to sit down and talk?

20        A.   Yes.

21        Q.   Okay.  And is that the meeting that you

22   described earlier today where you met with

23   Mr. Hanson and with Maya?

24        A.   Yes.

25        Q.   Okay.  And that took place sometime in

Page 158

1   March of 2022?

2       A.   Yes.

3       Q.   Have you sought to have any therapy

4   covered under the existing Turbocam health

5   insurance policy?

6            ATTORNEY ERCHULL:   Objection.

7       A.   No.

8       Q.   Do you understand that if the therapy was

9   coded for something other than gender dysphoria

10  that there would be coverage?

11           ATTORNEY ERCHULL:   Objection.

12      A.   I don't know.

13      Q.   Have you inquired of Ms. Wotherspoon or

14  anyone else as to whether therapy for anxiety or

15  depression could be covered under the existing

16  health plan?

17           ATTORNEY ERCHULL:   Objection.

18      A.   I did not inquire with Ms. Wotherspoon,

19  no.

20      Q.   Okay.  What about with your primary care,

21  who you've described as being Mr. Senneville?

22           ATTORNEY ERCHULL:   Objection.

23      A.   No.

24      Q.   You're not currently receiving any

25  therapy.  Correct?

Page 159

1      A.    Correct.

2      Q.    And per the records, you last treated with

3   Ms. Wotherspoon just prior to the breast

4   augmentation in November of 2022?

5      A.    Correct.

6      Q.    Do you recall discussing anxiety with

7   Dr. Wotherspoon?

8      A.    I don't recall exactly.  I'd have to

9   reread the notes.

10      Q.    And have you looked into going back to her

11   or seeking therapy of any kind since October of

12   2022?

13      A.    No.

14      Q.    Do you feel that the people within the

15   personnel department at Turbocam have been

16   responsive to the requests that you've made for

17   information?

18      A.    Yes.

19      Q.    Do you have any medical training?

20      A.    No.

21      Q.    You're not a doctor; right?

22      A.    No.

23      Q.    In the complaint, you allege that gender

24   dysphoria is a highly treatable medical condition.

25            Are you aware of that allegation?

Page 160

1       A.    I don't remember making that statement

2   myself, no.

3       Q.    Do you know anything about whether or not

4   gender dysphoria is a highly treatable condition?

5       A.    I believe that it is, yes.

6       Q.    What do you base that belief on?

7       A.    The experience of other individuals who

8   have gotten the treatment and how they have felt

9   before and after, and how I have felt before

10  hormones and after hormones, and before the breast

11  augmentation and after the breast augmentation.

12      Q.    And are these people that you discussed it

13  with within the medical community or in online

14  forums?

15      A.    It's an online forum of transgender women

16  who have gone through the medical procedures.

17      Q.    Have any medical doctors told you that if

18  you were to have the two procedures that you are

19  hoping to have, that you would be treated?

20      A.    No.

21            (Bernier Exhibit 14 is marked for

22            identification.)

23      Q.    All right.  So I've handed you what's been

24  marked as Exhibit No. 14, which is a series of

25  policy statements, I'll call them, that were

1    Health or Eric Senneville; Dr. Burdette at Elliot

2    Plastic; Lisabeth Wotherspoon; Kathy Rumer; and

3    then you mentioned the consultation at the Boston

4    Medical Center?

5        A.    Correct.

6        Q.    Okay.  Are there any other providers that

7    are not listed in your answer to number 7?

8        A.    No.

9              ATTORNEY ERCHULL:  Objection.

10             THE WITNESS:  Sorry.

11       Q.    And by that, I mean are there any other

12   providers that you have consulted with or treated

13   with as a result of the gender dysphoria diagnosis

14   that are not listed in number 7?

15       A.    No.

16       Q.    Now, in number 8 you were asked to

17   describe medical treatment you've received due to

18   the diagnosis of gender dysphoria.  We had talked

19   about that.  Correct?

20       A.    Yes.

21       Q.    Can you tell me which doctors or providers

22   have told you that the treatment that you've

23   described in number 8 is medically necessary?

24       A.    I'm sorry.

25       Q.    Sure.

1      A.    I waited on it a little too long.

2      Q.    Okay.  So number 9 had asked you to

3  describe all past and future medically necessary

4  gender transition treatments, and you had referred

5  us back to number 8 and the medical records.

6            So I'm asking if you could identify which

7  doctors or providers have told you, for example,

8  that the hormone replacement therapy that you've

9  received is medically necessary.

10           ATTORNEY ERCHULL:  Objection.

11     A.    I can't remember if I've been told.

12     Q.    Okay.  What about the breast augmentation

13  surgery?  Has there been a particular provider that

14  has told you that that surgery was medically

15  necessary?

16           ATTORNEY ERCHULL:  Objection.

17     A.    No.

18     Q.    And the counseling that you received with

19  Dr. Wotherspoon, or Ms. Wotherspoon, have any

20  providers told you that that counseling was

21  medically necessary?

22           ATTORNEY ERCHULL:  Objection.

23     A.    Not that I remember.

24     Q.    At number 10, we had asked you to state

25  all facts to support your contention in the

1    complaint that the gender dysphoria diagnosis

2    substantially limits one or more of your major life

3    activities.

4         A.    Okay.

5         Q.    And in your response to that, in part, you

6    directed us to information contained in

7    Dr. Ettner's report.

8              Do you see that there at the bottom of

9    that paragraph?

10        A.    Yes.

11        Q.    Okay.  And you had not yet read

12   Dr. Ettner's report, to your recollection, before

13   today.  Correct?

14        A.    I don't remember.

15        Q.    Okay.  And you've not provided Dr. Ettner,

16   to your knowledge, with any medical records or

17   information regarding the care and treatment you've

18   received to date?

19        A.    I don't remember.

20        Q.    Turning to Question No. 11, which is

21   asking you to describe communications you had with

22   agents, servants, or employees of Turbocam

23   regarding the health plan benefits or the

24   exclusions, and there's quite a long answer there.

25              I'm going to direct you to page 6 in which

Page 177

```
 1        Q.    Okay.
 2        A.    No.  Being tired doesn't affect me eating.
 3        Q.    Is that a side effect from taking the
 4   hormone therapy?
 5        A.    Not to my knowledge.
 6        Q.    When you say irregular appetite, is that
 7   eating too much?  too little?
 8        A.    Yes.
 9        Q.    Both, or --
10        A.    Yes.
11        Q.    Okay.  And have you sought medical
12   treatment for that?
13        A.    No.
14        Q.    And you believe that that is as a result
15   of your inability to have the two surgeries that
16   you seek to have?
17        A.    Yes.
18        Q.    Have any medical doctors told you that
19   these symptoms that are listed in your answers to
20   number 15 are caused by your inability to have the
21   two surgical procedures you're hoping to have?
22        A.    No.
23        Q.    Can you tell me what activities of daily
24   living you've struggled with?
25              ATTORNEY ERCHULL:  Objection.
```

1      A.    Showering.  Getting dressed.  Spending

2  positive quality time with my kids.

3      Q.    And is that the showering and getting

4  dressed because of your view of your body image?

5      A.    Yes.

6      Q.    And how has your -- how has your gender

7  dysphoria impacted your ability to spend time with

8  your children?

9      A.    It impacts the ability to have positive

10  time with my children because if I'm feeling

11  depressed about the way my body still is, then I'm

12  not giving them full attention.

13      Q.    You mention in here difficulty focusing.

14  Is that for the same reasons you've just described?

15      A.    Yes.

16      Q.    Are you taking any medication to aid or

17  assist with your focus?

18      A.    No.

19      Q.    Have you discussed that with any medical

20  providers?

21      A.    No.

22      Q.    You go on to state anxiety attacks.  You

23  did -- or at least anxiety was mentioned in Ms.

24  Wotherspoon's records.

25      A.    Yeah.  Feeling anxious.

1      Q.   All right.  And you're not taking

2   medication for that?

3      A.   No.

4      Q.   And you're not treating with anyone for

5   anxiety?

6      A.   Huh?

7      Q.   You're not treating with anyone for

8   anxiety?

9      A.   No.

10      Q.   You've not discussed with Mr. Senneville

11   or anyone else whether that might be covered under

12   the health plan?

13      A.   I have not.

14      Q.   Depression is the next one, and you're you

15   said you're on an antidepressant currently?

16      A.   Yes.

17      Q.   Have you been diagnosed with depression?

18           ATTORNEY ERCHULL:  Objection.

19      A.   Not that I'm aware of.

20      Q.   Have you inquired of Mr. Senneville or

21   anyone else whether you might be able to receive

22   treatment or therapy for depression under the

23   current health plan?

24      A.   I have not talked to them about that.

25      Q.   The last one is PTSD reactions.  Can you

1  tell me what you mean by that?

2      A.   I can't, no.  I don't know how to --

3      Q.   Verbalize it?

4      A.   Yes.

5      Q.   Have you sought treatment with any

6  providers to discuss that?

7      A.   No.

8      Q.   Did you discuss that with Ms. Wotherspoon?

9      A.   I can't remember.  I'd have to go back and

10  reread her notes.

11      Q.   Okay.  You mention also in this paragraph,

12  or this answer, "bottling up emotions."

13           Would that be from the age of 11 or 12?

14      A.   Yes.

15      Q.   Okay.  So these are things that had

16  occurred over a significant period of time --

17      A.   Yes.

18      Q.   -- before you went to work for Turbocam?

19      A.   Yes.

20      Q.   You also note that you don't feel your

21  employer values you as much as it does other

22  employees.

23           What do you mean by that?

24      A.   As far as compensation goes, mostly.  I

25  put in the effort that I do, I put in more effort

1      Q.   Do you still have email that you received

2   from Lisa Brown?

3      A.   I've tried looking for them.  I can't find

4   them.

5      Q.   And you said that you had changed phones

6   at some point during that time that you were

7   communicating or sometime after you communicated

8   with Lisa Brown?

9      A.   Yeah.  About a year, year and a half ago,

10  I traded in my phone.

11     Q.   Okay.  And you no longer have access to

12  those text messages?

13     A.   No.

14     Q.   And you didn't print them?

15     A.   No.

16     Q.   Your visits with Ms. Wotherspoon, were

17  those all in person or were they telehealth visits?

18     A.   There was one telehealth.  If I remember

19  correctly, it's because she wasn't feeling well.

20     Q.   Okay.  And are you aware that the nurse

21  practitioner at Planned Parenthood included a

22  diagnosis for you of an unspecified endocrine

23  disorder?

24     A.   I don't know.

25     Q.   That was not discussed with you?

Page 186

1      A.    Not that I remember.

2      Q.    The procedure that you described having of

3    a vaginoplasty, did you discuss with Dr. Rumer what

4    that entails surgically?

5            ATTORNEY ERCHULL:  Objection.

6      A.    I don't recall.

7      Q.    Are you aware that someone whose birth sex

8    is female, that there may be occasions where a

9    vaginoplasty may be appropriate for them as well to

10   treat a medical condition?

11     A.    I've read that online, yes.

12     Q.    Okay.  And do you know whether that

13   procedure differs from the vaginoplasty that you've

14   contemplated having performed?

15           ATTORNEY ERCHULL:  Objection.

16     A.    Yes.

17     Q.    Yes, it does?

18     A.    Yes, it does.

19     Q.    Do you know how it differs?

20           ATTORNEY ERCHULL:  Objection.

21     A.    It -- it's a lot to describe.

22     Q.    Okay.

23     A.    Basically, it's a penile, like, inversion

24   and removing of the testicles and creating the

25   vagina cavity.

Page 187

1    Q.    That's the procedure for --

2    A.    The vaginoplasty.

3    Q.    That you would undergo?

4    A.    Yes.

5    Q.    Okay.  And what do you understand the

6    procedure to be for someone whose birth sex is

7    female who receives a vaginoplasty --

8           ATTORNEY ERCHULL:  Objection.

9    Q.    -- for other medical reasons?

10   A.    I -- I don't know.

11   Q.    Okay.

12          I'm going to show you a few -- copies of a

13   few progress notes, and I apologize.  I don't have

14   copies of these.  I just have a couple of quick

15   questions about them.

16          We can do it as one exhibit, if that makes

17   more sense, because it's going to be the same

18   question.

19          (Bernier Exhibit 18 is marked for

20          identification.)

21   Q.    Okay.  And just for the record, this is

22   BERNIER606 through --

23   A.    612.

24   Q.    612.  Thank you.

25          Okay.  If you look on the first page of

 1    Exhibit 18, there's section that is sort of blacked

 2    out and hash-tagged out, if you want to call it

 3    that.  Or two sections, I guess, on that first page

 4    there.

 5         A.    Okay.

 6         Q.    Do you know what information -- or maybe

 7    your counsel can answer, if this is attorney-client

 8    communications or why that information is redacted.

 9              ATTORNEY ERCHULL:  Yeah, I can answer and

10       say that I did those redactions and that my

11       client hasn't seen what's under them, has not

12       seen the records without the redactions.

13              And if you would like to go off the

14       record, I'm happy to have a conversation with

15       you about -- about those.

16              ATTORNEY MINICH:  Sure.

17                   (Recess taken from 3:05 p.m.

18                   to 3:07 p.m.)

19              ATTORNEY MINICH:  All right.  So we just

20       had a conversation off the record about Exhibit

21       No. 18 and certain redactions that are contained

22       within those therapy records.  And our position

23       is that, you know, we don't have any

24       documentation indicating what the redactions are

25       or why they were made.

```
 1          Counsel has represented that he will
 2     produce a privilege log of some kind,
 3     identifying what information was redacted, so
 4     that we can have a Rule 26 conference and confer
 5     with the magistrate on that issue if necessary.
 6     And while I don't anticipate the need to come
 7     back, I will suspend the deposition on the basis
 8     that I haven't had an opportunity to see what
 9     that says and therefore don't have the
10     opportunity to ask questions about it.
11          ATTORNEY ERCHULL:  We naturally object to
12     keeping the -- to keeping the deposition open,
13     but we understand your position.
14          ATTORNEY MINICH:  Great.  Thank you.
15 BY ATTORNEY MINICH:
16     Q.   Do you recall ever Mr. Senneville telling
17 you that he had diagnosed you as transsexual?
18     A.   No.  I don't recall.
19     Q.   That was never discussed with you?
20     A.   I don't -- I don't recall.
21     Q.   Okay.  We discussed at the very beginning
22 of the deposition Turbocam's mission statement.
23          Do you recall that?
24     A.   Yes.  Yes.
25     Q.   And you said you first were provided a
```

1    copy of that at your interview, and then during the

2    hiring process you were provided with a copy and

3    signed that?

4         A.    Yes.

5         Q.    We marked that as Exhibit No. 1.

6               What is your understanding of Turbocam's

7    mission?

8         A.    To make quality parts and to pursue

9    increasing positive surroundings for all employees,

10   in the name of God, I think.

11        Q.    Okay.  And what do you understand the

12   religious conviction of Turbocam or its principals

13   to be?

14        A.    I don't know.  I couldn't answer on their

15   behalf.

16        Q.    Do you understand Turbocam to be a

17   Christian-based organization?

18        A.    Yes.

19        Q.    And do you understand that the exclusion

20   for gender dysphoria that exists in the self-funded

21   plan is in keeping with Turbocam's mission

22   statement?

23               ATTORNEY ERCHULL:  Objection.

24        A.    No.

25        Q.    What do you understand it to be?

Page 191

1       A.    I don't understand it to be in any way
2   Christian or good faith because there is nothing in
3   the religion that says that it goes -- the religion
4   goes against being transgender.
5       Q.    Have you been told by anyone at Turbocam
6   that the exclusion for gender dysphoria treatment
7   within the self-funded plan has anything to do with
8   anything other than the mission statement?
9       A.    It has not been confirmed nor denied to
10  me.
11          ATTORNEY MINICH:  I think that is all.
12          Do you have any, Roger?
13          ATTORNEY BYRON:  Just a minute.
14      Q.    I think I had asked you this -- I believe
15  I asked you this, but just to confirm, did you ever
16  have any conversations with anyone at Planned
17  Parenthood about their diagnosis of gender identity
18  disorder?
19          ATTORNEY ERCHULL:  Objection.
20      A.    Not that I remember.
21      Q.    The Estrodil [phonetic] that you -- is
22  it --
23      A.    Estradiol.
24      Q.    Estradiol.  I'll get it one of these days.
25          Do you know whether that therapy has been