**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

LILLIAN BERNIER,

      Plaintiff,

v.                                                          Civil No. 1:23-cv-00523-LM-AJ

TURBOCAM, INC.,

      Defendant.

**MEMORANDUM OF LAW IN OPPOSITION TO TURBOCOM'S MOTION TO EXCLUDE TESTIMONY OF RANDI ETTNER, PH.D.**

## <u>INTRODUCTION</u>

Plaintiff Lillian Bernier challenges, as a violation of Title VII and the American with Disabilities Act ("ADA"), Defendant Turbocam, Inc.'s decision to maintain an exclusion for all treatment for gender dysphoria in its self-funded employee health benefits plan. The parties have filed cross-motions for summary judgment. Turbocam has moved to exclude the testimony of Plaintiff's expert, Randi Ettner, Ph.D., solely with respect to two opinions set forth in her expert report: Dr. Ettner's opinion "related to the biological and physiological origins of gender dysphoria," and with respect to the "medical necessity of particular treatments" for the Plaintiff. Def.'s Mem. of Law in Supp. of Mot. to Exclude Testimony of Randi Ettner, Ph.D. ("Def.'s Mem."), ECF No. 71-1 at 4. Dr. Ettner has not offered opinions on either of these points in her Declaration in support of Plaintiff's Motion for Summary Judgment, *see generally* Decl. of Randi Ettner, Ph.D. in Supp. of Pl.'s Mot. for Sum. J., ECF No. 67-4 ("Ettner Decl."), nor does the Plaintiff make any argument on summary judgment related to either of these two opinions.[1] Defendant's Motion to Exclude references Dr. Ettner's expert report, not her summary judgment declaration.

Even if Plaintiff's summary judgment argument were dependent upon these opinions, the First Circuit and this Court have repeatedly cautioned against the exclusion of testimony at the summary judgment stage because "courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record," and they must be "cautious" not to exclude evidence "without affording the proponent of the evidence adequate opportunity to defend

---

[1] As if to underscore the irrelevance of this dispute to the pending summary judgment motions, Defendant cites repeatedly in its motion to Dr. Ettner's expert report (which is not part of the summary judgment record) but never to her declaration (which is). The only relevance of evidence about the biological basis of gender dysphoria is the phrase "resulting from physical impairments." Plaintiff has not raised that issue on summary judgment. *See* Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Sum. J., ECF No. 66-1 at 19.

its admissibility." *Wood v. Medtronic Xomed*, Civ. No. 13-cv-090-LM, 2015 U.S. Dist. LEXIS 63300, at *10–11 (D.N.H. May 14, 2015) (citing *Cortes-Irizarry v. Corp. Insular de Seguros*, 111 F.3d 184, 188 (1st Cir. 1997)).

Defendant does not come close to meeting the standard for the exclusion of Dr. Ettner's testimony at the summary judgment or any other stage of this case. Defendant attempts to paint Dr. Ettner as a mere provider of psychological counseling to patients with gender dysphoria. While her over 35 years of experience treating more than 3,000 gender dysphoria patients is considerable, this oversimplification ignores Dr. Ettner's immense professional and research experience, including authorship of numerous medical texts and peer-reviewed articles on topic related to gender dysphoria and its treatment, her positions on the editorial boards of journals related to transgender health, her multidisciplinary collaborations with researchers studying gender dysphoria, her work developing standards of care for gender dysphoria treatment, and her expertise in research methodologies and analysis.[2] In fact, Dr. Ettner has authored chapters in multiple medical texts on the biological basis of gender dysphoria and directly participated in research on the subject. 2d Decl. of Randi Ettner, Ph.D. in Opp. to Def. Turbocam, Inc.'s Cross-Mot. for Sum. J. and Mot. to Exclude ("2d Ettner Decl."), Ex. 1 ¶¶ 5–7. Her experience dwarfs that of Defendant's expert, Dr. Daniel Weiss, who has neither researched nor published on gender dysphoria, including its biological etiology.[3]

Despite Dr. Ettner's considerable and direct experience, Defendant seeks to exclude her

---

[2] Ettner Decl., ECF No. 67-4 ¶¶ 1–3; *id.* Ex. A (Curriculum Vitae); 2d Ettner Decl., Ex. 1 ¶¶ 1–9.

[3] Dr. Weiss has never been an investigator of a clinical or research study on gender dysphoria, participated in a research study about gender dysphoria, published on the subject of gender dysphoria, been asked by a medical journal to peer review an article on gender dysphoria, presented at a medical conference on gender dysphoria, nor served on a professional committee related to gender dysphoria. Dep. of Daniel Weiss, M.D. ("Weiss Dep."), Ex. 2 at 15–20.

testimony on subjects unrelated to the pending summary judgment motion because she is not a medical doctor, because Defendant quibbles with Dr. Ettner's presentation of the findings of the studies she cites, and because she has not offered an opinion on Plaintiff's specific diagnosis or treatment. None of these reasons provide a basis to exclude Dr. Ettner's testimony, and this Court should deny Defendant's motion.

## <u>LEGAL STANDARD</u>

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if . . .

   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
   (b) the testimony is based on sufficient facts or data;
   (c) the testimony is the product of reliable principles and methods; and
   (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702. An expert witness's testimony may be challenged on the grounds that the witness is not qualified to give the opinion, the opinion is not based on specialized knowledge, the opinion is not reliable, or the opinion is not relevant. *Carrozza v. CVS Pharm., Inc.*, 992 F.3d 44, 56 (1st Cir. 2021); *Bogosian v. Mercedes-Benz of N. Am.*, 104 F.3d 472, 476 (1st Cir. 1997). The proponent of the expert witness bears the burden of showing that the testimony is admissible. *Martínez v. United States*, 33 F.4th 20, 24 (1st Cir. 2022) (citing *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 472–73 (1st Cir. 2016)).

Although a court may exclude expert testimony at the summary judgment phase, "courts will be hard-pressed in all but the most clearcut cases to gauge the reliability of expert proof on a truncated record." *Cortes-Irizarry*, 111 F.3d at 188; *accord Netherlands Ins. Co. v. HP, Inc.*, 646 F. Supp. 3d 139, 146 (D. Mass. 2022) (holding that "the Daubert regime should be employed only with great care and circumspection" at the summary judgment stage because "the summary

judgment process does not conform well to the discipline that Daubert imposes") (quoting *Cortes-Irizarry,* 111 F.3d at 188); *see also Crowley v. Perdue*, 318 F. Supp. 3d 277, 291 (D.D.C. 2018) ("Courts must proceed cautiously when deciding whether to exclude expert testimony at the summary judgment stage.") (internal quotation marks and brackets omitted) (quoting *Carmichael v. West,* Civ. No. 12-1969, 2015 U.S. Dist. LEXIS 193447, at *7 (D.D.C. Aug. 31, 2015)).

## ARGUMENT

### I.    Dr. Ettner is qualified to opine on the biological basis of gender dysphoria and the impact of gender dysphoria and its treatments.

Dr. Ettner far exceeds the minimum thresholds courts have established for expert witnesses because she has far more than "a meaningful threshold of expertise" on the opinions Defendant seeks to exclude. *See Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 78 (1st Cir. 2006) (quoting *Prado Alvarez v. R.J. Reynolds Tobacco Co., Inc.*, 405 F.3d 36, 40 (1st Cir. 2005)). Indeed, "courts consider an expert's 'full range of practical experience as well as academic or technical training.'" *Cohen v. Bos. Sci. Corp.,* No. 1:20-cv-943, 2024 U.S. Dist. LEXIS 53294, at *17 (D.N.H. Mar. 26, 2024) (quoting *Anderson v. Raymond Corp.*, 61 F.4th 505, 509 (7th Cir. 2023)).

Dr. Ettner has substantial experience in research methodology and scientific literature. 2d Ettner Decl., Ex. 1 ¶¶ 2–4. She has written medical texts on the subject of the biological basis of gender dysphoria and participated in research on the subject. 2d Ettner Decl., Ex. 1 ¶¶ 4–7. These qualifications alone are more than sufficient for the admissibility of her conclusions about the findings and scientific research on the biological basis of gender dysphoria. In addition, Dr. Ettner is qualified to opine on the impact of hormone treatment and other medical aspects of gender dysphoria based on her extensive participation with physicians, including endocrinologists, in the multidisciplinary care and management of patients with gender dysphoria. 2d Ettner Decl., Ex. 1 ¶¶ 8–9.

Dr. Ettner is more than qualified to offer opinions on the biological basis of gender dysphoria and its medical management. Defendant's assertion that Ettner cannot testify as an expert because she is not a medical doctor ignores her considerable experience and the numerous contrary decisions in this Circuit.[4] *See, e.g.*, *Wood,* 2015 U.S. Dist. LEXIS 63300, at *12–13  (concluding that electrical engineer with experience in medical devices was qualified to opine on the surgical implantation of catheters despite lacking a medical degree); *Cohen,* 2024 U.S. Dist. LEXIS 53249, at *19–20 (holding that the argument that an engineer could not provide medical opinions because he lacked a medical degree to be a "nonstarter"); *see also Allen v. Martin Surfacing*, 263 F.R.D. 47, 58 (D. Mass. 2009) (holding that an expert's lack of a medical degree was a factor a jury could take into account when deciding the weight of her opinion but not a basis to disqualify her as an expert).

The cases that Defendant cites to support its argument to the contrary are distinguishable. Testimony on the DSM and American Psychological Association by the endocrinologist in *Kadel v. Folwell* was not excluded solely because he was "not a mental health professional" as Defendant asserts in its brief. Def.'s Mem., ECF No. 71-1 at 5. Rather, this was one of many factors considered by the court, including that the proffered witness "has never diagnosed a patient with gender dysphoria, treated gender dysphoria, treated a transgender patient, conducted any original research about gender dysphoria diagnosis or its causes, or published any scientific, peer-reviewed literature on gender dysphoria." *Kadel v. Folwell*, 620 F. Supp. 3d 339, 364 (M.D.N.C. 2022), *aff'd* 100 F.4th 22 (4th Cir. 2024), *remanded on other grounds*, 145 S. Ct. 2838 (2025). Dr. Ettner has

---

[4] Defendant repeats multiple times that Dr. Ettner has "no medical training" without defining the term. *E.g.*, Def.'s Mem., ECF No. 71-1 at 2, 4, 7, 14. This allegation is only true if the court limits the definition to enrolling in a medical school course. In fact, Dr. Ettner has undergone formal training in the medical management of gender dysphoria in addition to her multidisciplinary care of her own patients. 2d Ettner Decl., Ex. 1 ¶¶ 8–9.

experience in each and every one of the areas found lacking in *Kadel*.[5] Similarly, the court in *Zellers* excluded the testimony of a neurologist not because she lacked a degree in toxicology but because she lacked any training or experience in toxicology whatsoever. *Zellers v. NexTech Northeast, LLC*, 533 Fed. Appx. 192, 197 (4th Cir. 2013) (per curiam).

## II.      Dr. Ettner's testimony is reliable.

Rule 702(c) requires that the expert's opinion "reflects a reliable application of the principles and methods." Fed. R. Evid. 702(c). This "necessitates an inquiry into the methodology and basis for an expert's opinion." *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012). Defendants do not assert and cannot assert that brain imaging studies, studies of twins, genetic analysis, and other scientific methods employed in the studies Ettner cites are not a reliable basis for studying the biological etiology of gender dysphoria. Nor do they argue that drawing conclusions by assessing peer-reviewed research is an unreliable method.[6] *See* Def.'s Mem., ECF No. 71-1 at 7 (citing *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F. Supp. 2d 465, 472 (M.D.N.C. 2006)). Synthesis of peer-reviewed literature, informed and bolstered by an expert's knowledge and experience, is a reliable methodology upon which to base an expert opinion. *B.D. v. Ayotte*, No. 21-cv-00004-PB, 2025 U.S. Dist. LEXIS 46610, at *41 (D.N.H. Mar. 14, 2025) (admitting testimony by an expert who "relied on his knowledge and experience, as well as a panoply of peer-reviewed articles, in reaching his conclusion"). Instead, Defendant's arguments amount to little more than

---

[5] Notably, like the excluded expert in *Kadel*, Defendant's expert, Dr. Daniel Weiss, has not conducted any studies on the biological or physiological basis of gender ideology and has no expertise or training in brain imaging, neurology, neurobiology, psychobiology, or genetics. Weiss Dep., Ex. 2 at 15–20.

[6] If that were the case, Defendant's own expert declaration—a review compiled by an expert who has not conducted original research and based upon reviews of studies employing methodologies with which he has no familiarity in fields where he lacks direct experience—would also fail the reliability requirement.

nitpicking discrete lines and statistics in Dr. Ettner's referenced studies while ignoring entirely the overall conclusions of those studies.

### A.    Dr. Ettner has demonstrated that her opinion is based on ample studies and research and has provided a well-reasoned analysis.

Dr. Ettner's expert report and Declarations establish that her opinions are based on a sound and careful analysis of peer-reviewed medical literature and that her opinions are supported by substantial scientific research. *See* 2d Ettner Decl., Ex. 1 ¶¶ 10–25. That is reliability. Defendant's quibbling with sample sizes or methodological limitations is based on a misunderstanding of Dr. Ettner's citation of particular studies and is not a reason to exclude an expert opinion.[7]

The processes of peer review and publication serve as indicia of the reliability of a study's methods. *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F. 3d 77, 84 (1st Cir. 1998). Any limitations to a study may be tested by the testimony of Defendant's own experts and through cross-examination, not through their exclusion. *United States v. Monteiro*, 407 F. Supp. 2d 351, 369 (D. Mass. 2006) (citing *Currier v. United Techs. Corp.*, 393 F.3d 246, 252 (1st Cir. 2004)). Even if there were anything to Defendant's criticism—and there is not—it at best, goes to the weight afforded to her testimony, not the reliability of her methodology.

As the First Circuit has explained, "Rule 702 does not demand that experts rely on all data

---

[7] For example, Defendants fault Dr. Ettner for citing an early study with a small sample size. Def.'s Mem., ECF No. 71-1 at 8 (discussing Richard Green, *Family Cooccurrence of 'Gender Dysphoria': Ten Sibling or Parent-Child Pairs*, 29 Archives of Sexual Behav. 499 (2000)). However, Dr. Ettner cites the study for its significance in the early research on biological etiology. "Subsequent studies have replicated and expanded these findings." 2d Ettner Decl. ¶ 14. Even if the Green study were a key point of Dr. Ettner's opinion, the sample size alone would not be a basis to disqualify her opinion for including it. *See Coster v. Amazon.com, Inc.*, No. 2:21-cv-693, 2025 U.S. Dist. LEXIS 138203, at *34 (W.D. Wash. July 1, 2025) (collecting cases and admitting expert report based in part on studies with small sample sizes); *Solar Sun Rings, Inc. v. Secard Pools*, No. EDCV14-2417, 2016 U.S. Dist. LEXIS 183968, at *12 (C.D. Cal. Jan. 20, 2016) (same). Moreover, some of the studies Defendant criticizes as having a small sample size in fact had a large sample size. 2d Ettner Decl., Ex. 1 ¶ 15 (discussing study of 995 transgender subjects).

that could be deemed relevant. It does not even require the expert to seek out the best possible source of relevant information." *Lawes v. CSA Architects & Eng'rs LLP*, 963 F.3d 72, 101 (1st Cir. 2020). "Even if the factual underpinnings of [the expert's] opinions could be viewed as weaker than they would have been had he considered the data the court focused on, 'that was a matter affecting the weight and credibility of [his] testimony,' not its admissibility." *Id.* at 102 (quoting *Payton v. Abbott Labs*, 780 F.2d 147, 156 (1st Cir. 1985)); *see also SonicSolutions Algae Control, LLC v. Diversified Power Int'l, LLC*, 722 F. Supp. 3d 16, 47–48 (D. Mass. 2024) ("Defendants' disagreements with [expert's] methodology focus on his use of certain underlying data without considering other potentially relevant data. These are arguments for the jury to consider when deliberating on the weight due [expert]'s opinion.") (citing *Pagliaroni v. Mastic Home Exteriors, Inc.*, No. 1:12-cv-10164, 2015 U.S. Dist. LEXIS 126543, at *8 (D. Mass. Sept. 22, 2025)).

   **B.**    **Defendant's criticism fixates on minutiae while ignoring the overwhelming conclusions of numerous studies.**

   Defendant devotes numerous pages of its memorandum to nitpick Dr. Ettner's analysis and characterization of individual statistics and lines from the studies she references in her report. For example, Defendant criticizes Dr. Ettner's statement about the increased probability of a sibling of a transgender individual also being transgender as expressed in the Gomez-Gil study. Def.'s Mem., ECF No. 71-1 at 11–12. This criticism ignores that the study found a 1 in 211 prevalence of gender dysphoria in siblings, which is dramatically higher than the 1 in 10,000 to 1 in 30,000 prevalence seen in the general population. 2d Ettner Decl., Ex. 1 ¶¶ 15–16. The researchers transparently disclosed the limitations in statistical comparisons while still finding that their results provided strong evidence for heritability. *Id.* ¶ 16.

   Next, Defendant faults Dr. Ettner's characterization of the Diamond study, Def.'s Mem., ECF No. 71-1 at 12. This study found that approximately 33% of studied transgender female

monozygotic (identical) twin pairs were concordant for transgender identity, while concordance among dizygotic (fraternal) twin pairs was "low or zero." 2d Ettner Decl., <u>Ex. 1</u> ¶ 18. That Dr. Ettner did not mention the approximately 23% concordance found by the same study among transgender male monozygotic twin pairs is immaterial. *Id.* Both the 33% and the 23% are dramatically higher than the "low or zero" concordance found among dizygotic twin pairs, thus supporting Dr. Ettner's ultimate conclusion that gender dysphoria has a biological basis. Milton Diamond, *Transsexuality Among Twins: Identity Concordance, Transition, Rearing, and Orientation,* 14 Int'l J. Transgend. 24, 27 (2013)*.* But, more significantly, the 2021 Endocrine Society review that Defendants cite on the very next page of their memorandum also supports Dr. Ettner's conclusion by finding that "monozygotic twins have a 39% concordance for gender dysphoria." Aditi Bhargava et al., *Considering Sex as a Biological Variable in Basic and Clinical Studies: An Endocrine Society Scientific Statement*, 42 Endocrine Revs. 219, 227 (2021).

Defendant's criticism of Dr. Ettner's reference to twins "reared apart" is similarly unavailing. *See* Def.'s Mem., ECF No. 71-1 at 12. As Dr. Ettner testified at her deposition, this study's discussion of twins reared apart is not a main point but a highly interesting point that reinforces the genetic basis of gender dysphoria. 2d Ettner Decl., <u>Ex. 1</u> ¶ 19. Defendant's expert ignores the significance of this study's finding that the high rate of concordance for gender dysphoria among monozygotic twins—even those raised apart—supports a conclusion that gender dysphoria is not caused by environmental factors. *Id.*

Similarly, Defendant challenges Dr. Ettner's conclusion that gender dysphoria is the result of the interaction of the developing brain and sex hormones, which she bases on the conclusions of three peer-reviewed studies. Def.'s Mem., ECF No. 71-1 at 12–13. Each of these studies concludes that gender dysphoria has a biological basis. Lauren Hare et al., *Androgen receptor repeat*

*length polymorphism associated with male-to-female transsexualism*, 65 Biol. Psychiatry 93, 96 (2009) ("[O]ur findings indicate a significant association between male-to-female transsexualism and the long polymorphism for the AR repeat. This finding links the androgen receptor and further implicates genes in the steroidogenesis pathway as playing a role in male-to-female transsexualism."); Alicia Garcia-Falgueras and Dick F. Swaab, *Sexual Hormones and the Brain: An Essential Alliance for Sexual Identity and Sexual Orientation*, 17 Endocrine Development: Pediatric Neuroendocrinology 22, 33 (Sandro Loche et al., eds., 2009) ("Our observations on reversed sex differences in the brains of transsexual people support the idea that transsexuality is based on an opposite sexual differentiation of (1) sexual organs during the first couple of months of pregnancy, and (2) the brain in the second half of pregnancy."); Ai-Min Bao & Dick F. Swaab, *Sexual differentiation of the human brain: Relation to gender identity, sexual orientation and neuropsychiatric disorders,* 32 Front. Neuroendocrinol. 214, 223 (2011) ("The human fetal brain develops into the male direction through a direct action of testosterone and in the female direction through the absence of such an action. Sexual differentiation of the genitals takes place before the sexual differentiation of the brain. The degree of genital masculinization does thus not necessarily reflect the degree of masculinization of the brain."). Without context, Defendant pulls from these three studies brief acknowledgements by their authors that, although their studies concluded that there is a biological basis for transgender identity, the precise mechanics of that basis require further study. Def.'s Mem., ECF No. 71-1 at 12–13. This does nothing to undermine these studies' ultimate conclusions or Dr. Ettner's characterizations of them.

### C. The studies that Defendant chastises Dr. Ettner for "ignoring" also support her conclusion.

Defendant criticizes Dr. Ettner's selection of studies as "cherry-picked" and faults her for not citing "better studies," but offers only a single example of a "larger, more robust" study that

she purportedly "ignore[d]." Def.'s Mot., ECF No. 71-1 at 9–10 (citing Georgios Karamanis et al.,

*Gender Dysphoria in Twins: A Register-based Population Study*, 12 Sci. Reps., art. no. 13439

(2022)). This study—which is also the only study referred to in the section of Dr. Weiss's report

on the biological basis of gender dysphoria—studied 2,592 individuals with gender dysphoria and

concluded that "familial factors, mainly confined to environmental influences during the intra-

uterine period, are more likely to explain the development of" gender dysphoria than genetics. Ka-

ramanis at 7. In other words, Defendant's lone "better" study also supports the conclusion that

gender dysphoria has a biological basis. *See* 2d Ettner Decl., Ex. 1 ¶ 20.

      Similarly, Defendant asserts that Dr. Ettner "ignored" a single, selectively quoted sentence

of a 40-page Endocrine Society review on sex differences in a variety of conditions, including

obesity, psychiatric conditions, and stress-based diseases. Def.'s Mem., ECF No. 71-1 at 13 (quot-

ing Bhargava at 227). In context, the article's acknowledgement of the uncertainty surrounding the

biological factors that influence gender cannot be read to mean that no such factors exist. Indeed,

the sentence is followed by two paragraphs with citations to nearly 20 studies exploring the nu-

merous biological ways in which transgender individuals differ from non-transgender individuals.

Bhargava at 227; *see also* 2d Ettner Decl., Ex. 1 ¶ 25.

## III.    As a general matter, Dr. Ettner can testify about gender dysphoria, its management, and its treatment.

      Plaintiff agrees that Dr. Ettner cannot offer an opinion that is based on an interview of

Lillian Bernier or a review of her medical records. Dr. Ettner has not done so in this case. In her

summary judgment declarations, Dr. Ettner only opines about gender dysphoria in general (e.g.,

the general impact of hormone therapy on the endocrine system) or opinions based on facts pro-

vided by counsel. Ettner Decl., ECF No. 67-4 ¶¶ 4–21. An expert may offer an opinion based on

facts provided by counsel.[8] Dr. Ettner has offered no opinion as to whether Lillian's gender dysphoria treatments are medically necessary because that is not a question before this court. Defendant has conceded that its claims administrator, HPI, Inc., makes determinations as to the medical necessity of any claims submitted under its self-funded employee health benefits plan. Def.'s Response to Pl.'s Statement of Undisputed Material Facts, ECF No. 77 ¶ 47. Instead, Dr. Ettner has offered her opinion on gender dysphoria, its characteristics, and the types of treatments generally available. As already explained, Dr. Ettner is more than qualified to offer such general opinions.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Defendant's motion.

---

[8] "[R]eliance on assumptions provided by counsel or other experts is not a bar to testimony." *United States ex rel. Jordan v. Northrop Grumman Corp.*, No. 95-cv-2985, 2003 U.S. Dist. LEXIS 29067, at *19–20 (C.D. Cal. Jan. 6, 2003) (citing *United States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984)); *accord Raab v. Wendel*, No. 16-cv-1396, 2017 U.S. Dist. LEXIS 217704, at *8 (E.D. Wis. Dec. 18, 2017) ("The use of counsel-provided assumptions is generally an appropriate and efficient means of narrowing the scope of the expert's analysis."); *ORP Surgical, LLP v. Howmedica Osteonics Corp.*, No. 20-cv-01450, 2021 U.S. Dist. LEXIS 218816, at *18 (D. Colo. Nov. 12, 2021) ("It is neither surprising nor a ground for exclusion of [an expert's testimony] testimony that [she] relied on or assumed the truth of information provided by . . . counsel."); *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 329 (D. Ariz. 2022) ("[R]eliance on assumptions provided by counsel ... is not a bar to [his] testimony.") (quoting *United States ex rel. Macias v. Pac. Health Corp.*, No. 12-cv-960, 2018 U.S. Dist. LEXIS 27891, at *12–13 (C.D. Cal. Feb. 20, 2018)).

Respectfully submitted,
Lillian Bernier

By her attorneys,

Date: October 8, 2025

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

*/s/ Chris Erchull*

Date: October 8, 2025                     Chris Erchull

13