# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

LILLIAN BERNIER

*Plaintiff,*

v.

TURBOCAM, INC.,

*Defendant.*

Civil Action No. 1:23-cv-00523-LM-AJ

---

**PLAINTIFF LILLIAN BERNIER'S REPLY TO TURBOCAM'S RESPONSES TO PLAINTIFF'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS, RESPONSE TO TURBOCAM'S CONCISE COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS, AND COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)*
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org

* Admitted *pro hac vice*

***Counsel for Plaintiff***
*Lillian Bernier*

Dated: October 8, 2025

# TABLE OF CONTENTS

**PLAINTIFF'S REPLY TO TURBOCAM'S RESPONSE TO LILLIAN BERNIER'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS** ..................................... 1

I.      The Parties ........................................................................................................ 1

II.     Transgender People and Gender Dysphoria ................................................... 4

III.    The Turbocam Health-Benefits Plan ............................................................. 8

IV.     Lillian's Gender Transition and Turbocam's Refusal to Remove the Exclusion. ............ 16

V.      Turbocam's Tolerance of Health Benefits Coverage and Employee Practices that Violate Marian Noronha's Religious Beliefs about Biblical Teachings ......................................... 26

**TURBOCAM'S CONCISE COUNTERSTATEMENT OF UNDISPUTED MATERIAL FACTS** ..................................................................................................... 31

I.      Sex, Gender, & Gender Identity ................................................................... 31

II.     Gender Identity Disorders ............................................................................ 34

III.    Turbocam's Religious Mission ..................................................................... 40

IV.     Turbocam's Employee Health-Benefits Plan ............................................... 44

V.      Bernier's Gender Transition ......................................................................... 45

VI.     Gender-Affirming Care ................................................................................ 47

VII.    Bernier's Equal Coverage ............................................................................ 53

VIII.   Turbocam's Burdens .................................................................................... 56

IX.     Bernier's Alternatives .................................................................................. 57

**PLAINTIFF LILLIAN BERNIER'S COUNTERSTATEMENT OF ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** ........................................................................................ 58

I.      Gender Dysphoria ........................................................................................ 58

II.     Turbocam's Opt-Out Bonus ......................................................................... 60

III.    Marian Noronha's Remarks About This Case at Turbocam's All-Staff Meetings ........... 62

IV.     Cost Was Not a Factor in Turbocam's Decision About Gender Dysphoria. .................... 64

**PLAINTIFF'S REPLY TO TURBOCAM'S RESPONSE TO
LILLIAN BERNIER'S CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS**

**Plaintiff's General Reply**

Plaintiff has provided her Reply to Defendant's Response where she believes that additional information will clarify for the court why the listed fact is not in dispute or to respond to an objection raised by Defendant. The lack of a Reply to a particular Response does not indicate that Plaintiff concedes that the fact is disputed or agrees with Defendant's Response. Rather, it indicates that Plaintiff believes no additional information is needed for the court to determine whether the fact is material and undisputed.

**I.    The Parties**

1.    Plaintiff Lillian Bernier is a transgender woman. Declaration of Lillian Bernier ("Bernier Decl.") ¶ 1.

**Response:** Undisputed to the extent "transgender woman" means a male who self-identifies as a woman.

2.    Lillian has gender dysphoria. Bernier Decl., Ex. 1 at ¶¶ 1, 23.

**Response:** Undisputed that Bernier has been diagnosed with gender dysphoria. Disputed that Bernier is impaired in social or occupational functions. Bernier Decl., Ex. 1 at ¶¶ 5, 7, 10.

**Plaintiff's Reply:** Response exceeds the scope of Plaintiff's undisputed fact. Defendant has no basis to dispute whether Lillian is impaired in social and occupation functions according to the diagnostic criteria for gender dysphoria. *See* Second Declaration of Randi Ettner, Ph.D. ("2d Ettner Decl.")[1] ¶ 31.

3.    Lillian lives as a woman in all aspects of her life. Bernier Decl., Ex. 1 at ¶ 10.

---

[1] The Second Declaration of Randi Ettner, Ph.D. is attached as Exhibit 21 to the accompanying Second Declaration of Attorney Chris Erchull.

**Response:** Disputed. Lillian has a male biology, including male reproductive organs. Bernier Decl., Ex. 1 at ¶¶ 1, 30; Ex. A, Bernier Dep. 91:1–3, 148:18–24.

**Plaintiff's Reply:** Response is irrelevant. Lillian uses a feminine name and pronouns, has updated her legal name and driver's license to reflect that she is a woman, Bernier Decl., Ex. 1 ¶ 10, presents as a woman in her attire and grooming, has updated her name and sex in Turbocam's employment records, Bernier Decl., Ex. 1 ¶ 13, is treated with feminizing hormones and has undergone mammoplasty to make her body more feminine, Bernier Decl., Ex. 1 ¶¶ 11, 26.

4.      Lillian is 34 years old. Bernier Decl., Ex. 1 at ¶ 1.

**Response:** Disputed. The supporting declaration says 32.

5.      Lillian was born and raised in Exeter, New Hampshire. She graduated from Exeter High School in 2009, where she participated in a vocational welding and machining program at the Seacoast School of Technology. Bernier Decl., Ex. 1 at ¶ 2.

**Response:** Undisputed.

6.      After graduating from high school, Lillian worked in a number of jobs in the Seacoast region of New Hampshire, including approximately seven years in various retail and management positions at Town Fair Tire. Bernier Decl., Ex. 1 at ¶ 4.

**Response:** Undisputed.

7.      In 2019, Lillian applied for a position as a CNC Mill Operator at Turbocam, Inc. ("Turbocam"). Bernier Decl., Ex. 1 at ¶ 6.

 **Response:** Undisputed.

8.      Turbocam hired Lillian as a CNC Mill Operator, and she began work on June 3, 2019. Bernier Decl., Ex. 1 at ¶ 7.

**Response:** Undisputed.

9.    Lillian has worked at Turbocam continuously since June 3, 2019, and has been promoted twice, first to a Level I Machine Operator and then to a Level II Machine Operator. Recently, Lillian began a new role at Turbocam as a TAE Machine Operator. Lillian has always worked the third shift (11:00 p.m. to 7:00 a.m.). Bernier Decl., Ex. 1 at ¶ 7.

**Response:** Disputed to the extent Bernier characterizes machine certification as a "promotion." Bernier has not been "promoted" while working at Turbocam. Otherwise undisputed.

10.    Defendant Turbocam was founded in 1987. Deposition of Marian Noronha ("Noronha Dep.").

**Response:** Undisputed.

11.    Turbocam is a manufacturer of flow path components for the aerospace and turbo machinery industries. Noronha Dep., Ex. 2 at 11.

**Response:** Undisputed.

12.    Over the past five years, Turbocam's annual revenues have ranged from 100 to 150 million dollars. Noronha Dep., Ex. 2 at 14.

**Response:** Turbocam objects on the ground of relevance and unfair prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

13.    Turbocam is located in Barrington, New Hampshire. It also has United States locations in Charleston, South Carolina and Chandler, Arizona. Noronha Dep., Ex. 2 at 14–15.

**Response:** Undisputed.

14.    Turbocam has approximately 600 employees. Noronha Dep., Ex. 2 at 15.

**Response:** Undisputed.

15.    Marian Noronha is the President and a Director of Turbocam. Noronha Dep., Ex. 2 at 25.

**Response:** Undisputed.

16.     Turbocam has a mission statement that provides, in part, that it "exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting Christian service to God and people." The mission statement further provides that "we hold ourselves accountable to God's law expressed in the Bible." Declaration of Marian Noronha ("Noronha Decl."), ECF No. 42-3 ¶ 3.

**Response:** Undisputed.

## II.    Transgender People and Gender Dysphoria

17.     At birth, infants are classified as male or female. This classification is the person's birth sex. Declaration of Randi Ettner, Ph.D. ("Ettner Decl.") ¶ 4.

**Response:** Undisputed to the extent "birth sex" means sex.

18.     Most people live in their birth sex. Ettner Decl., Ex. 3 at ¶ 4.

**Response:** Disputed to the extent it implies that males can become females and vice versa. Ex. B, Declaration of Daniels Weiss, M.D. ("Weiss Decl.") ¶ 17. Otherwise undisputed.

**Plaintiff's Reply:** Response is irrelevant. It is undisputed that Plaintiff is a transgender woman and has gender dysphoria. Responses to ¶¶ 1, 2; Plaintiff's Reply to ¶ 3.

19.     An individual who cannot live and function in their birth sex is transgender. Ettner Decl., Ex. 3 at ¶ 5.

**Response:** Disputed. Some transgender individuals live and function without a gender transition. Not all transgender individuals have gender dysphoria. Ex. C, Ettner Dep. 41:10–12. Bernier, for example, lived and functioned for "most of [Bernier's] life" as a male. Bernier Decl. ¶¶ 1, 3.

**Plaintiff's Reply:** Response is irrelevant. It is undisputed that Plaintiff is a transgender woman and has gender dysphoria. Responses to ¶¶ 1, 2.

20.    A transgender woman is an individual whose birth sex was male but who cannot live and function in her birth sex. Ettner Decl., Ex. 3 at ¶ 12.

**Response:** Disputed. Some males who identify as women may live and function without a gender transition. Not all transgender individuals even have gender dysphoria. Ex. C, Ettner Dep. 41:10–12. Bernier, for example, lived and functioned for "most of [Bernier's] life" as a male. Bernier Decl., Ex. 1 ¶¶ 1, 3. Otherwise undisputed.

**Plaintiff's Reply:** Response is irrelevant. It is undisputed that Plaintiff is a transgender woman and has gender dysphoria. Responses to ¶¶ 1, 2.

21.    Gender dysphoria is a medical diagnosis characterized by clinically significant distress or impairment in functioning, which results when a person cannot live and function in their birth sex. Ettner Decl., Ex. 3 at ¶ 6.

**Response:** Disputed. Gender dysphoria does not mean that a person cannot live and function without a gender transition. Ex. C, Ettner Dep. 42:2–7; Ex. B, Weiss Decl. ¶ 25. Otherwise undisputed.

**Plaintiff's Reply:** The citations to the Ettner Deposition and to the Weiss Declaration do not support the Response. Dr. Weiss's view that medical interventions for gender transition are not medically necessary is irrelevant. There is no issue in this case related to the medical necessity of gender dysphoria treatments.

22.    Gender dysphoria is an established and recognized diagnosis in the field of medicine. Ettner Decl., Ex. 3 at ¶ 7.

**Response:** Undisputed.

23.    The diagnostic criteria for gender dysphoria are set forth in the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association ("DSM-5-TR"), an

authoritative source in the field of medicine and psychology. Ettner Decl., <u>Ex. 3</u> at ¶ 8–9.

**Response:** Undisputed.

24.    Gender dysphoria requires treatment. Ettner Decl., <u>Ex. 3</u> at ¶ 10.

**Response:** Disputed. Gender dysphoria does not always require treatment. Ex. C, Ettner Dep. 42:2–7; Ex. B, Weiss Decl. ¶ 25.

**Plaintiff's Reply:** The citations to the Ettner Deposition and to the Weiss Declaration do not support the Response. Dr. Weiss's view that medical interventions for gender transition are not medically necessary is irrelevant. There is no issue in this case related to the medical necessity of gender dysphoria treatments.

25.    Hormones and various surgical treatments are recognized and accepted as medical interventions for gender dysphoria, including by established medical and mental health organizations. Ettner Decl., <u>Ex. 3</u> at ¶ 11.

**Response:** Undisputed that some established medical organizations recommend these treatments. Disputed to the extent Bernier seeks to imply that these interventions are medically necessary or safe and effective. Ex. B, Weiss Decl. ¶¶ 25, 52–67.

26.    For a transgender woman with gender dysphoria, the goal of medical interventions is to change her primary and secondary sex characteristics so that she can live and function as a woman. Ettner Decl., <u>Ex. 3</u> at ¶ 13.

**Response:** Turbocam objects on the ground of inadmissible expert opinion. Fed. R. Evid. 702. Undisputed that some interventions have this goal. Disputed that these interventions allow a male to live and function as a woman, or that they are medically necessary or safe and effective. Ex. B, Weiss Decl. ¶¶ 25, 52–67.

**Plaintiff's Reply:** This fact is supported by admissible expert testimony. Ettner Decl. ¶¶

1–3; Ettner 2d Decl. ¶¶ 1, 8–9.

27. An adult with gender dysphoria does not produce hormones at the level consistent with the sex that is different from their birth sex. Ettner Decl., <u>Ex. 3</u> at ¶ 14.

**Response:** Turbocam objects on the ground of confusion. Fed. R. Evid. 703. Otherwise undisputed to the extent this means that a male has different testosterone and estrogen hormone levels than a female. Ex. B, Weiss Decl. ¶ 53.

**Plaintiff's Reply:** This fact is supported by admissible expert testimony. Ettner Decl. ¶¶ 1–3; Ettner 2d Decl. ¶¶ 1, 8–9.

28. An adult transgender woman who is not on medication or who has not had surgery does not have hormones in the typical female range. Ettner Decl., <u>Ex. 3</u> at ¶ 15.

**Response:** Undisputed to the extent this means that a male has different testosterone and estrogen hormone levels than a female.

29. The purpose of feminizing hormone therapy as a treatment for a transgender woman with gender dysphoria is to correct this hormonal inconsistency by bringing her hormone levels into the typical female range. Ettner Decl., <u>Ex. 3</u> at ¶ 17.

**Response:** Undisputed to the extent this means that the purpose of gender-affirming hormone therapy in a male is to intentionally induce the diseased state of hyperestrogenemia by elevating estrogen hormones to supraphysiologic levels in order to match typical female levels. Ex. C, Ettner Dep. 101:7–102:6; Ex. B, Weiss Decl. ¶ 55.

30. Feminizing hormone therapy affects the endocrine system by suppressing testosterone production and increasing levels of estrogen. Ettner Decl., <u>Ex. 3</u> at ¶ 18.

**Response:** Undisputed.

31.    Vaginoplasty surgery as treatment for gender dysphoria includes orchiectomy. Ettner Decl., <u>Ex. 3</u> at ¶ 19.

**Response:** Undisputed.

32.    Orchiectomy is the surgical removal of the testes, which effectively halts reproductive function and reduces endogenous testosterone to the typical female range. Ettner Decl., <u>Ex. 3</u> at ¶ 19.

**Response:** Undisputed.

33.    The purpose of vaginoplasty surgery as a treatment for a transgender woman with gender dysphoria is to alter her body to bring it into alignment with a sex different from her birth sex. Ettner Decl., <u>Ex. 3</u> at ¶ 20.

**Response:** Undisputed to the extent "birth sex" means sex and "sex" means gender.

34.    An adult transgender woman with gender dysphoria who is on feminizing hormone therapy as a treatment for gender dysphoria typically requires such treatment for the remainder of her life. Ettner Decl., <u>Ex. 3</u> at ¶ 21.

**Response:** Disputed to the extent "requires" implies that hormone therapy is medically necessary. Ex. B, Weiss Decl. ¶¶ 25, 52, 54–55, 64–67; Ex. C, Ettner Dep. 42:2–4. Otherwise undisputed.

35.    Further, an adult transgender woman who has had an orchiectomy necessarily requires treatment with feminizing hormone therapy for the rest of her life. Ettner Decl., <u>Ex. 3</u> at 21.

**Response:** Disputed to the extent "requires" implies that hormone therapy is medically necessary. Ex. B, Weiss Decl. ¶¶ 25, 52, 54–55, 64–67; Ex. C, Ettner Dep. 42:2–4. Otherwise undisputed.

III.    **The Turbocam Health-Benefits Plan**

36.    Turbocam offers health benefits to permanent employees working 25 hours or more

per week. Deposition of Peter Hanson ("Hanson Dep.") 36–37.

**Response:** Undisputed.

37.    Prior to 2021, Turbocam offered health benefits to employees through a fully insured health coverage plan offered by Harvard Pilgrim Healthcare Insurance Company ("Harvard Pilgrim Plan"). Hanson Dep., Ex. 4 at 63, 75.

**Response:** Undisputed.

38.    Turbocam paid a monthly premium to Harvard Pilgrim, which paid the claims for employees' healthcare costs covered under the plan. Hanson Dep., Ex. 4 at 39.

**Response:** Undisputed.

39.    It was important to Turbocam that the Harvard Pilgrim Plan aligned with its mission and religious convictions. Hanson Dep., Ex. 4 at 72–73.

**Response:** Disputed that the Harvard Pilgrim Plan fully aligned with Turbocam's mission and religious convictions. Ex. D, Noronha Dep., at 126–28. Otherwise undisputed.

40.    It was Turbocam's practice to review the Harvard Pilgrim Plan documents each year to ensure that the covered benefits aligned with Turbocam's mission. Hanson Dep., Ex. 4 at 73–75.

**Response:** Undisputed that Turbocam reviewed the plan each year to ensure the exclusion of "voluntary termination of pregnancy," but disputed that Turbocam prior plans fully aligned with Turbocam's mission or that Turbocam was aware of coverage for gender transition treatments under the prior plans. Ex. E, Hanson Dep. at 74. As Turbocam explained, its review was limited because with "a fully-insured plan" you "have to accept what the carrier provides" and insurers resist "customizing" plans. *Id.* And "in some instances it … doesn't come up until it comes up." *Id.* Further, before Bernier, Turbocam never had a transgender employee request a change of name

let alone coverage for gender transition procedures, so Turbocam had no reason to anticipate such a request. Ex. F, Marino Dep. 60 (explaining that Turbocam never before had a request of name change from male to female; *see also* 36–37 (explaining that Turbocam reviewed prior plans to exclude abortion).

41.     Turbocam's health benefits coverage under its Harvard Pilgrim Plan for the year 2020 covered "Transgender Health Services" including medically necessary surgery, related physician and behavioral health visits, and outpatient prescription drugs subject to limited exclusions. Harvard Pilgrim Benefit Handbook for Employer Group Plan (Jan. 1, 2020) 35, 41–42.

**Response**: Undisputed.

42.     Beginning in January 2021, Turbocam switched its employee health benefits to an employer self-funded plan ("Turbocam Health Plan"). Deposition of Darika Marino ("Marino Dep.") 13, 19, 84; *see also* Turbocam, Inc. Employee Group Medical Plan (H.S.A. PPO Plan) (Jan. 1, 2021).

**Response**: Undisputed.

43.     The Turbocam Health Plan covers a range of standard medical benefits including physician hospital and office visits, inpatient and outpatient surgery, and inpatient hospital services. *See generally* Turbocam Health Plan, <u>Ex. 8</u> at 32–51.

**Response**: Undisputed.

44.     Under the Turbocam Health Plan, Turbocam has the sole responsibility for the risk of loss and pays the costs of covered benefits from money that includes company funds and employee contributions. Hanson Dep., <u>Ex. 4</u> at 38–42.

**Response**: Disputed insofar as Turbocam carries a reinsurance policy. Ex. E, Hanson Dep. 67:15–68:5; Noronha Decl. ¶ 11. Otherwise undisputed.

45.     Health Plans, Inc. ("HPI") is the claims administrator of the Turbocam Health Plan. Hanson Dep., <u>Ex. 4</u> at 44.

**Response:** Undisputed.

46.     HPI is owned by Harvard Pilgrim Health Care.

**Response:** Undisputed.

47.     Turbocam employees or their providers submit claims to HPI, which determines, based on information from an employee's health care provider, whether a claim is payable. Hanson Dep., <u>Ex. 4</u> at 47–49.

**Response:** Undisputed.

48.     It was important to Turbocam that the new Turbocam Health Plan "mimi[c]" the coverage of the Harvard Pilgrim Plan to ensure, as Mr. Hanson explained, "that it was in alignment with our mission and our—the religious conviction associated with it." Hanson Dep., <u>Ex. 4</u> at 72–73.

**Response:** Disputed that the Harvard Pilgrim Plan fully aligned with Turbocam's mission and religious convictions. Ex. D, Noronha Dep. 126–28. Turbocam's past reviews were focused on voluntary termination of pregnancy as the salient issue. Ex. F, Marino Dep. 60 (explaining that Turbocam never before had a request of name change from male to female; *see also id.* at 36–37 (explaining that Turbocam reviewed prior plans to exclude abortion). Otherwise undisputed.

49.     Turbocam has authority over the coverage in the Turbocam Health Plan. It can direct the exclusion of benefits under the Turbocam Health Plan. It also has authority to remove an exclusion under the Turbocam Health Plan and to grant exceptions to employees under the Turbocam Health Plan. Hanson Dep., <u>Ex. 4</u> at 64–65; Marino Dep., <u>Ex. 7</u> at 30–31, 53–54.

**Response:** Undisputed.

50.     Since its inception in January 2021, the Turbocam Health Plan has contained an exclusion for: "Gender dysphoria treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy, and related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications" (the "Exclusion"). Turbocam Health Plan, Ex. 8 at 54.

**Response:** Disputed that the exclusion as written in the Turbocam Health Plan contains a comma after the term "hormone therapy." Otherwise undisputed.

51.     Mr. Hanson testified that Turbocam maintains the Exclusion, and refused to eliminate it, because "[i]t would be against our—the religious convictions of Turbocam to cover it." Hanson Dep., Ex. 4 at 120.

**Response:** Undisputed.

52.     Mr. Hanson further testified that covering treatment of gender dysphoria is not in alignment with Turbocam's mission because "man is created in the image of God and men and women—men and women—and any—any attempt to change would not be—honoring God." Hanson Dep., Ex. 4 at 123.

**Response:** Undisputed.

53.     Mr. Noronha also testified that the reason that Turbocam objects to covering gender dysphoria in the Turbocam Health Plan is because of his and his wife's religious beliefs. Noronha Dep., Ex. 2 at 134.

**Response:** Undisputed.

54.     Mr. Noronha explained that the reason for the Exclusion in the Turbocam Health Plan is because it is the view of Mr. Noronha and his wife that "male and female" are "immutable."

Noronha Decl., ECF No. 42-3 ¶ 14; *see also* Noronha Dep., <u>Ex. 2</u> at 130–33 (agreeing that paragraph 14 of his declaration is a complete and accurate statement of the reason that Turbocam objects to providing treatment for gender dysphoria in the Turbocam Health Plan).

   **Response:** Undisputed.

   55.    Mr. Noronha further explained that Turbocam maintains the Exclusion in the Turbocam Health Plan because "God will not allow the use of Turbocam's resources, including its health plan, to assist employees in erasing or obscuring their sex." Noronha Decl., ECF No. 42-3 ¶ 14.

   **Response:** Undisputed.

   56.    Mr. Noronha's view that an individual should not "erase" their sex is not limited to medical treatment. He stated that an individual's sex should not be erased in "any other way." Noronha Decl., ECF No. 42-3 ¶ 14.

   **Response:** Undisputed.

   57.    Mr. Noronha testified that "I will not use the word 'health' in all of these, what you call treatment for gender dysphoria." Noronha Dep., <u>Ex. 2</u> at 143.

   **Response:** Undisputed.

   58.    Mr. Noronha testified that "Lillian Bernier is not a woman." Noronha Dep., <u>Ex. 2</u> at 66; *see also id.* at 63.

   **Response:** Undisputed, but lacks context. The statement was made in the conversation with Bernier's counsel about allowing Bernier into a women's restroom when females objected.

   59.    Throughout his deposition, Mr. Noronha repeatedly refused to refer to Lillian with female pronouns, even after being informed that she uses female pronouns. *E.g.*, Noronha Dep., <u>Ex. 2</u> at 12, 18, 46, 54, 56, 63, 115, 117 (referring to Lillian using "he," "him," or "his"); *id.* at 54

(discussing Lillian's use of female pronouns).

**Response:** Turbocam objects on the ground of relevance and unfair prejudice. Fed. R. Evid. 402, 403. Mr. Noronha testified that he does not object to using female pronouns to refer to Bernier. Ex. D, Noronha Dep. 59. Further, Mr. Noronha only interacted with Bernier prior to Bernier's transition, when Bernier went by the name Robert, and his use of male pronouns to refer to Bernier was unintentional. *Id.* at 54, 56.

**Plaintiff's Reply:** There is no support in the cited pages of Mr. Noronha's deposition for the claim that his repeated use of male pronouns to refer to Lillian was unintentional.

60.    Turbocam's mission and the religious values of the company are the only stated reasons that Turbocam objects to covering treatment for gender dysphoria in the Turbocam Health Plan. Hanson Dep., Ex. 4 at 128; Noronha Dep., Ex. 2 at 132–34.

**Response:** Undisputed.

61.    No Turbocam employee has expertise in or has assessed the risk or efficacy of any medical treatment. Hanson Dep., Ex. 4 at 48–49; Marino Dep., Ex. 7 at 46–48.

**Response:** Undisputed as to medical risk. Mr. Noronha has assessed the risk of violating his religious faith if Turbocam were to take a different course. Noronha Decl. ¶¶ 14–16.

62.    Turbocam has not hired a consultant to assess the efficacy or risk of any medical treatment. Marino Dep., Ex. 7 at 48.

**Response:** Disputed insofar as Turbocam has hired Dr. Daniel Weiss to assess the medical necessity of gender-affirming care to treat gender dysphoria. Otherwise undisputed as to medical risk. Mr. Noronha has assessed the risk of violating his religious faith if Turbocam were to take a different course. Noronha Decl. ¶¶ 14–16.

63.    Turbocam relies upon HPI to conduct "clinical reviews of medical necessity to meet

14

certain criteria." Marino Dep., Ex. 7 at 49.

**Response:** Undisputed.

64.    HPI relies upon and uses guidelines and clinical criteria to review claims for medical services by Turbocam employees. Declaration of Dianne Oldach ("Oldach Decl."), ¶¶ 3–4.

**Response:** Undisputed.

65.    If the Turbocam Health Plan did not exclude treatment for gender dysphoria, HPI would rely upon its guidelines and clinical criteria to review and evaluate requests for treatment of gender dysphoria under the Turbocam Health Plan. Oldach Decl., Ex. 11 at ¶¶ 4, 8.

**Response:** Undisputed.

66.    When processing claims, HPI utilizes clinical criteria and guidelines created by its third-party vendor to determine if established clinical criteria are met for medical and surgical gender dysphoria treatments. Oldach Decl., Ex. 11 at ¶8; *see also* 2025 Guidelines and Clinical Criteria—Vaginoplasty for Gender Affirmation Surgery, 2025 Guidelines and Clinical Criteria—Orchiectomy for Gender Affirmation Surgery, 2025 Guidelines and Clinical Criteria—Breast Augmentation for Gender Affirmation Surgery ("Clinical Criteria"). The criteria are the same for all covered surgical treatments for gender dysphoria. Clinical Criteria 3, 12, 22.

**Response:** Undisputed.

67.    The Clinical Criteria used by HPI cover 26 surgeries for Gender Dysphoria. *E.g.*, Ex. 12, Clinical Criteria 3, 12, 22.

**Response:** Undisputed.

68.    HPI's clinical criteria for surgery for gender dysphoria include satisfaction of the diagnostic criteria for gender dysphoria, fulfillment of the prerequisite conditions for surgery (e.g., a referral letter from a qualified health care provider; the absence of any other psychiatric disorder),

and completion of more than six months of cross-sex hormone therapy. *E.g.*, Clinical Criteria, <u>Ex. 12</u> at 1–2, 10–11, 19–21.

**Response:** Undisputed.

**IV.     Lillian's Gender Transition and Turbocam's Refusal to Remove the Exclusion.**

69.     Growing up, Lillian always knew that she was different. She has known that she is female since she was 11 or 12 years old. Lillian tried to explain this to her parents, who told her it was a phase she would grow out of. Lillian knew it wasn't a phase. Bernier Decl., <u>Ex. 1</u> at ¶ 3.

**Response:** Turbocam objects on the ground of relevance and undue prejudice. Fed R. Evid. 402, 403. What Bernier "knew" at 11 or 12 years, long before she was ever employed by Turbocam is immaterial to this case. Also disputed. Bernier lived as male until and did not publicly transition until around March 2021, raising questions of credibility for a trier of fact. Bernier Decl., <u>Ex. 1</u> at ¶ 13. Further, Bernier testified with respect to "gender identity" that a person can change gender, so Turbocam disputes any implication that gender identity cannot change. Ex. A, Bernier Dep. 90:16–23.

**Plaintiff's Reply:** The Response provides no basis to dispute the facts in this paragraph.

70.     For most of her life Lillian lived with this deeply buried secret, which led to deep feelings of distress, depression, and despair. Bernier Decl., <u>Ex. 1</u> at ¶ 3.

**Response:** Turbocam objects on the ground of relevance and undue prejudice. Fed R. Evid. 402, 403. What Bernier felt long before she was ever employed by Turbocam is immaterial to this case. Undisputed that Bernier's gender identity was a "deeply buried secret" unknown to Turbocam's personnel management until March 2021. Bernier Decl., <u>Ex. 1</u> at ¶ 13. Otherwise disputed. Bernier lived as male until he publicly transitioned around March 2021, raising questions of credibility for a trier of fact. Bernier Decl., <u>Ex. 1</u> at ¶ 13.

**Plaintiff's Reply:** The Response provides no basis to dispute the facts in this paragraph.

71.     In the fall of 2020, approximately one and one-half years after beginning her employment at Turbocam, Lillian's distress reached a point where she realized that she had to live as a woman. Bernier Decl., Ex. 1 at ¶ 8.

**Response:** Disputed to the extent it suggests a person can change their sex. Ex. B, Weiss Decl. ¶ 17. Otherwise undisputed.

72.     Over the next months, Lillian began presenting herself as a woman publicly, changed her legal name to Lillian, initiated feminizing hormone therapy, and updated her New Hampshire driver's license to reflect her name and that she is female. For the first time in her life, Lillian felt hope and optimism that she could be at peace with herself. Bernier Decl., Ex. 1 at ¶¶ 8, 10.

**Response:** Turbocam objects on the ground of relevance and undue prejudice. Fed R. Evid. 402, 403. Bernier's optimism is not relevant to questions of liability. Also disputed to the extent it suggests a person can change their sex. *See* Ex. B, Weiss Decl. ¶ 17. Otherwise undisputed.

73.     Towards the end of 2020, Lillian sought medical treatment to aid her gender transition. Bernier Decl., Ex. 1 at ¶ 11.

**Response:** Undisputed.

74.     Lillian was prescribed feminizing hormones (Estradiol) and androgen suppressing medication (Spironolactone). Bernier Decl., Ex. 1 at ¶ 11.

**Response:** Undisputed.

75.     Since that time, Lillian has continued hormone therapy with her primary care provider at Elliot Pediatrics and Primary Care. Bernier Decl., Ex. 1 at ¶ 11.

**Response:** Undisputed.

76.    Lillian Bernier will need to be on feminizing hormone therapy for the remainder of her life. Bernier Decl., Ex. 1 at ¶ 30.

**Response:** Disputed to the extent "need" implies that hormone therapy is medically necessary; Ex. B, Weiss Decl. ¶¶ 25, 52, 54–55, 64–67; Ex. C, Ettner Dep. 42:2–4.

**Plaintiff's Reply:** There is no issue in this case related to the medical necessity of gender dysphoria treatments.

77.    Estradiol and Spironolactone have reduced Lillian's feelings of distress and prevented her body from experiencing the effects of the endogenous hormones that her body continues to produce. Bernier Decl., Ex. 1 at ¶ 12.

**Response:** Turbocam objects on the ground that this testimony lacks foundation and contains impermissible lay opinion from a non-expert. Fed. R. Evid. 701. Turbocam also objects and grounds of relevance and prejudice because Bernier's feelings are not material. Fed. R. Evid. 402, 403. Also disputed. Bernier claims to continue feeling significant distress warranting a vaginoplasty to prevent Bernier from having healthy levels of male hormones. Bernier Decl., Ex. 1 at ¶¶ 15, 30, 32.

**Plaintiff's Reply:** Plaintiff is competent to observe and testify about her personal experience with gender dysphoria treatments and the impact of those treatments on her body. Further, the impact of Plaintiff's distress related to her gender dysphoria is relevant to her claim under the Americans with Disabilities Act. Defendant has no basis to dispute the impact of hormone treatments on Plaintiff or the necessity of any current or future treatments, nor is the medical necessity of any treatment relevant to this case.

78.    Those medications, however, have not fully resolved Lillian's gender-related distress. Bernier Decl., Ex. 1 at ¶ 12.

**Response:** Turbocam objects on the ground that this testimony lacks foundation and contains impermissible lay opinion from a non-expert. Fed. R. Evid. 701. Otherwise undisputed.

**Plaintiff's Reply:** See Plaintiff's Reply to the Response to paragraph 77.

79.    In March 2021, Lillian submitted her certificate of legal name change to Turbocam's personnel department. Bernier Decl., Ex. 1 at ¶ 13.

**Response:** Undisputed.

80.    Lillian met with Julie Oakley, who was the personnel representative for her department, and worked with her to update Lillian's name and sex on employee records at Turbocam to reflect that she is a woman. Bernier Decl., Ex. 1 at ¶ 13.

**Response:** Disputed to the extent it implied that Bernier changed her sex to female except as to anything other than payroll records. Ex. B, Weiss Decl. ¶ 17. Otherwise undisputed.

81.    At that time, Lillian told Ms. Oakley that she had started hormone therapy and planned to have gender transition surgery at the end of the year. Bernier Decl., Ex. 1 at ¶ 13.

**Response:** Undisputed.

82.    Ms. Oakley communicated this to Mr. Hanson. Email from Julie Oakley to Pete Hanson (Mar. 15, 2021); Email from Julie Oakley to Darika Marino and Pete Hanson (Mar. 15, 2021).

**Response:** Undisputed.

83.    Lillian's health insurance card in 2021 indicated the names of both HPI and Harvard Pilgrim Health Care. Bernier Decl., Ex. 1 at ¶ 16.

**Response:** Undisputed.

84.    In March 2021 Lillian asked Ms. Oakley whether the Turbocam Health Plan would cover medical care associated with Lillian's gender transition. Bernier Decl., Ex. 1 at ¶13.

**Response:** Undisputed.

85.    In March 2021 Ms. Oakley told Lillian that Turbocam's health benefits would probably cover medical care for her gender transition. Bernier Decl., <u>Ex. 1</u> at ¶ 13.

**Response:** Turbocam objects on the ground that this testimony is inadmissible hearsay. Fed. R. Evid. 801. Disputed. Bernier could not remember any affirmative statements from Ms. Oakley that gender dysphoria would be covered, nor did Bernier ask Ms. Oakley to confirm by reviewing the policy. Ex. A, Bernier Dep. 120:12–121:6.

86.    In 2021 Lillian scheduled a consultation for vaginoplasty at Boston Medical Center. Bernier Decl., <u>Ex. 1</u> at ¶ 15.

**Response:** Undisputed.

87.    In October 2021, Lillian called the Harvard Pilgrim Health Care number on her insurance card. At that time, Lillian learned for the first time about the Exclusion in the 2021 Turbocam Health Plan. Bernier Decl., <u>Ex. 1</u> at ¶ 16.

**Response:** Undisputed.

88.    Turbocam had not initially requested that the Turbocam Health Plan exclude treatment for gender dysphoria. "Rather, when converting from the fully insured Harvard Pilgrim plan to the HPI self-funded plan in 2021, Turbocam simply used the wording provided by HPI in the generic/standard plan document they provided." Defendant Turbocam, Inc.'s Answers to Plaintiff Lillian Bernier's First Set of Interrogatories, Answer to Interrogatory No. 13.

**Response:** Undisputed.

89.    Nonetheless, as outlined below, Turbocam has insisted on maintaining the Exclusion and has rejected Lillian's requests to remove it.

**Response:** Disputed that any initial unawareness of the exclusion by Turbocam affects

whether it aligns with Turbocam's mission and religious convictions, and disputed with respect to anything "outlined below." Otherwise undisputed.

90.　　On October 21, Lillian emailed the personnel department at Turbocam to inquire about the change to a self-funded plan. Bernier Decl., <u>Ex. 1</u> at ¶ 17; Email from Lillian Bernier to Peter Hanson (Oct. 21, 2021).

**Response:** Undisputed.

91.　　Lillian asked if the Turbocam Health Plan could be "tweak[ed]" to enable coverage of gender transition medical care for her. Bernier Decl., <u>Ex. 1</u> at ¶ 17; *see also* <u>Ex. 15</u>.

**Response:** Undisputed.

92.　　On October 25, 2021, Mr. Hanson communicated by email to Lillian that coverage for any treatment of gender dysphoria was excluded from the Turbocam Health Plan. Email from Peter Hanson to Lillian Bernier (Oct. 25, 2021).

**Response:** Undisputed.

93.　　In November 2021, Lillian emailed Maya Jiman, who had replaced Ms. Oakley as her personnel representative, to ask if Turbocam would make an exception to the Exclusion to enable Lillian to obtain gender transition surgery. Bernier Decl., <u>Ex. 1</u> at ¶ 18; *see also* Email from Lillian Bernier to Maya Jiman (Nov. 17, 2021).

**Response:** Undisputed.

94.　　When Lillian did not receive a response, she followed up by email with Pete Hanson reiterating her request for an exception to the Exclusion. Bernier Decl., <u>Ex. 1</u> at ¶ 18; Email exchange between Lillian Bernier and Peter Hanson (Dec. 6, 2021).

**Response:** Undisputed.

95.　　On December 6, 2021, Mr. Hanson replied that: "At this point, we are not changing the plan design or making an exception. While we do review the plan each year I suspect we won't

be removing it from the exclusions list in the near future." Bernier Decl., Ex. 1 at ¶ 19; *see also* Ex. 18.

**Response:** Undisputed.

96.    Lillian canceled her appointment for a surgical consultation at Boston Medical Center because she had been told that the Turbocam Health Plan would not cover gender transition surgery and she could not afford to pay out of pocket. Bernier Decl., Ex. 1 at ¶ 20.

**Response:** Turbocam objects to the statement that Bernier "could not afford to pay out of pocket" on the grounds of irrelevance and unfair prejudice. Fed. R. Evid. 402, 403. Disputed that Bernier "could not afford to pay out of pocket" because Bernier paid out of pocket for breast augmentation surgery in November 2022 and Bernier has not provided financial statements, raising questions of credibility for the trier of fact. Ex. A, Bernier Dep. 142:2–144:21. Undisputed that Bernier canceled an appointment.

**Plaintiff's Reply:** Defendant provides no basis to dispute Plaintiff's fact because whether Plaintiff was able to pay for a less expensive surgery at a different point in time does not undermine that she could not afford to pay out of pocket for the surgery referenced in this paragraph.

97.    In March 2022, Lillian sought mental health counseling for gender dysphoria with a licensed clinical social worker. Bernier Decl., Ex. 1 at ¶ 21.

**Response:** Undisputed.

98.    Lillian inquired with Turbocam's personnel department whether her therapy was covered under the Turbocam Health Plan. Bernier Decl., Ex. 1 at ¶ 21.

**Response:** Undisputed.

99.    On March 29, 2022, Lillian received an email from Ms. Marino, Turbocam's benefits specialist, informing her that the Turbocam Health Plan would not cover her therapy because it was subject to the Exclusion. Bernier Decl., Ex. 1 at ¶ 21; *see also* Email from Darika Marino

to Lillian Bernier (Mar. 29, 2022).

**Response:** Undisputed.

100.    As a result, Lillian paid out of pocket for mental health counseling with Ms. Wotherspoon. Bernier Decl., Ex. 1 at ¶ 22.

**Response:** Undisputed.

101.    On March 30, 2022, Lillian met with Ms. Jiman and Mr. Hanson, at their request, to discuss her gender transition. Bernier Decl., Ex. 1 at ¶ 25.

**Response:** Undisputed.

102.    At the meeting, Lillian again requested that Turbocam remove the Exclusion. Bernier Decl., Ex. 1 at ¶ 25.

**Response:** Undisputed.

103.    The Exclusion remains in the Turbocam Health Plan. Bernier Decl., Ex. 1 at ¶25.

**Response:** Undisputed.

104.    On November 8, 2022, Lillian underwent breast augmentation surgery at the Elliot 1-Day Surgery & Endoscopy Center. Bernier Decl., Ex. 1 at ¶ 26.

**Response:** Undisputed.

105.    Lillian underwent the surgery to further alleviate the distress that she was experiencing due to gender dysphoria and to make her body more feminine. Bernier Decl., Ex. 1 at ¶ 26.

**Response:** Undisputed.

106.    Although this surgery reduced Lillian's distress, she continues to feel stress, anxiety, and depression because of her body's masculine features. Bernier Decl., Ex. 1 at ¶ 27.

**Response:** Turbocam objects on the ground of relevance and undue prejudice. Fed R. Evid. 402, 403. Bernier's stress and anxiety is not relevant to liability. Turbocam also objects on

the ground that this testimony lacks foundation and contains impermissible lay opinion from a non-expert. Fed. R. Evid. 701. Also disputed. Bernier is not a doctor and has not been diagnosed with depression. Ex. A, Bernier Dep. 159:19–22, 179:17–19.

**Plaintiff's Reply:** See Plaintiff's Reply to the Response to paragraph 77.

107.    On April 13, 2022, Mr. Hanson requested a meeting with Doug Patteson, Turbo-cam's Chief Financial Officer, as well as Mr. Noronha and Ms. Marino to "discuss our current medical plans in relation to coverage for gender transition and/or gender dysphoria." Email from Peter Hanson to Marian Noronha, Doug Patteson, and Darika Marino (Apr. 13, 2022).

**Response:** Undisputed.

108.    Mr. Hanson could not recall a discussion about removing the Exclusion at this meet-ing, and Mr. Noronha and Ms. Marino testified that they had no recollection at all of any topics discussed at the meeting. Noronha Dep., Ex. 2 at 120–21; Hanson Dep., Ex. 4 at 135–39; Marino Dep., Ex. 7 at 102–03.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confu-sion. Fed. R. Evid. 402, 403. Otherwise undisputed.

109.    Regardless of what was discussed at the meeting, the Exclusion remains in the Tur-bocam Health Plan. Bernier Decl., Ex. 1 at ¶ 25.

**Response:** Turbocam objects on the ground of relevance, cumulative evidence, and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

110.    Learning that Turbocam has insisted on maintaining the Exclusion has felt to Lillian like a shot to the gut. When she learned of the exclusion, she experienced overwhelming anxiety and no longer had any sense of how her transition was going to happen. She felt that she had started but was being blocked from completing the transition that was so essential for her. In addition,

Lillian had taken the leap to live publicly as a woman in anticipation that she was on schedule to complete her transition. Bernier Decl., Ex. 1 at ¶ 28.

**Response:** Disputed. Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Turbocam further objects on the ground that this testimony lacks foundation and contains impermissible lay opinion from a non-expert. Fed. R. Evid. 701. Bernier is not a doctor and cannot recall a diagnosis or treatment for anxiety. Ex. A, Bernier Dep. 98:17–99:3, 159:6–13, 19–22, 179:1–13. This allegation also contains irrelevant characterizations.

**Plaintiff's Reply:** See Plaintiff's Reply to the Response to paragraph 77.

111.    Lillian continues to experience distress due her body's masculine features. *See* Bernier Decl., Ex. 1 at ¶ 32.

**Response:** Turbocam objects on the ground of relevance and undue prejudice. Fed R. Evid. 402, 403. Bernier's distress is not relevant to liability. Turbocam also objects to the extent that this testimony lacks foundation and contains impermissible lay opinion from a non-expert. Fed. R. Evid. 701. Otherwise undisputed.

**Plaintiff's Reply:** See Plaintiff's Reply to the Response to paragraph 77.

112.    Lillian Bernier intends to get a vaginoplasty, including orchiectomy, as treatment for her gender dysphoria. Bernier Decl., Ex. 1 at ¶ 30.

**Response:** Undisputed.

113.    Lillian has recently been evaluated by another provider for vaginoplasty and facial feminization surgery. Bernier Decl., Ex. 1 at ¶ 33.

**Response:** Undisputed.

114.    If the exclusion were not in place, Lillian would be able to submit requests for

preauthorization for gender transition surgery and have those requests evaluated for coverage under HPI's clinical criteria guidelines. But, because of the exclusion, Lillian does not have the opportunity to go through the regular claims process. Bernier Decl., <u>Ex. 1</u> at ¶ 29; *see also* Oldach Decl., <u>Ex. 11</u> at ¶ 8.

**Response:** Disputed to the extent it seeks to imply that Bernier would qualify to get coverage through the regular claims process. Otherwise undisputed.

115.    Lillian Bernier's current and future medical treatments limit and make more difficult and complex any decisions she will make now or in the future about whether and how to conceive children. Bernier Decl., Ex. 1 at ¶ 30.

**Response:** Disputed that Bernier is impaired in social or occupational functions. Bernier Decl., <u>Ex. 1</u> at ¶¶ 5, 7, 10. Turbocam further objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Bernier seeks treatment that will render her infertile, and any disability that arises from the coverage she seeks is not relevant to whether Bernier currently has a disability.

**Plaintiff's Reply:** Response asserts a legal conclusion. *See* Plaintiff Lillian Bernier's Opposition to Defendant Turbocam, Inc.'s Cross-Motion for Summary Judgment and Reply to Defendant Turbocam, Inc.'s Opposition to Plaintiff's Motion for Summary Judgment.

## V.    Turbocam's Tolerance of Health Benefits Coverage and Employee Practices that Violate Marian Noronha's Religious Beliefs about Biblical Teachings

116.    It is important to Mr. Noronha that the treatments covered by the Turbocam Health Plan be consistent with his religious beliefs as expressed in and informed by the Bible. Noronha Dep., <u>Ex. 2</u> at 84.

**Response:** Undisputed.

117.    Marriage between two people of the same sex violates Marian Noronha's religious

convictions as expressed in and informed by the Bible. Noronha Dep., Ex. 2 at 81.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Undisputed.

118.    The Turbocam Health Plan offers health benefits to spouses of employees. Noronha Dep., Ex. 2 at 85; Marino Dep., Ex. 7 at 32.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

119.    At his deposition, Mr. Noronha did not know whether the Turbocam Health Plan offers coverage to the same-sex spouse of any employee. Noronha Dep., Ex. 2 at 85–86.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

120.    Mr. Noronha testified, however, that the provision of health benefits to the same-sex spouse of an employee would violate his religious belief and, in fact, if the law required Turbocam to offer such a benefit "[he] might shut down the company" because he "created a company . . . to honor God." Noronha Dep., Ex. 2 at 87.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

121.    In fact, Turbocam has employees whose same-sex spouses are members of the Turbocam Health Plan, and Turbocam pays for medical benefits for those spouses. Marino Dep., Ex. 7 at 66.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

122.    Turbocam provides coverage for in vitro fertilization ("IVF") under the Turbocam

Health Plan. Marino Dep., Ex. 7 at 75–76.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

123.    Mr. Noronha is aware that IVF necessarily involves the creation of multiple embryos, of which few are implanted, and many are discarded. Noronha Dep., Ex. 2 at 96–97.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Also disputed. Mr. Noronha claimed that IVF doesn't "kill a zygote" and does not necessarily result in the destruction of an embryo. Ex. D, Noronha Dep. 96–98.

**Plaintiff's Reply:** The Response does not counter the stated fact. *See* Noronha Dep. at 96–97 ("Q: Are you aware that in vitro fertilization necessarily involves the creation of multiple embryos of which a few are implanted and many are discarded? . . . A: Yes. Q: All right. And would the process of creating an embryo and discarding it violate your religious beliefs? A: Yes. You need to deliver the punch line now. . . . Q: But you agree that IVF results in the destruction — A: Yes. Q: — of embryos? A: Yes. That's why I told you to deliver the punch line.")[2]

124.    The process of creating an embryo and discarding it violates Mr. Noronha's religious beliefs. Noronha Dep., Ex. 2 at 96.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Disputed. Mr. Noronha testified that in vitro fertilization is an unsettled question in his faith. Ex. D, Noronha Dep. at 97–98.

**Plaintiff's Reply:** The Response does not counter the stated fact. *See* Noronha Dep. at 96–

---

[2] Excerpts from the Deposition of Marian Noronha are attached as Exhibit 22 to the accompanying Second Declaration of Attorney Chris Erchull.

97 ("Q: Are you aware that in vitro fertilization necessarily involves the creation of multiple em-

bryos of which a few are implanted and many are discarded? . . . A: Yes. Q: All right. And would

the process of creating an v coverage of in vitro fertilization that destroys and embryo would vio-

late his religious beliefs, Mr. Noronha answered: "I haven't settled that question" and it might

depend on the number of spare embryos created. Noronha Dep., Ex. 2 at 96–98.

125.    **Response:** Turbocam objects on the ground of relevance and undue prejudice and

confusion. Fed. R. Evid. 402, 403. Undisputed that Mr. Noronha said that in vitro fertilization is

an unsettled question in his faith and that his position on in vitro fertilization may depend on

whether it necessarily results in the destruction of an embryo. Ex. D, Noronha Dep. at 96–98.

126.    Stem cell transplants are covered under Turbocam's self-funded health benefits

plan. Marino Dep., Ex. 7 at 75.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confu-

sion. Fed. R. Evid. 402, 403. Otherwise undisputed.

127.    Mr. Noronha's understanding is that "not all" stem cell transplants result in the de-

struction of an embryo, but "[o]nly some" do. Noronha Dep, Ex. 2 at 93–94.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confu-

sion. Fed. R. Evid. 402, 403. Undisputed.

128.    The Turbocam Health Plan does not limit coverage for stem cell transplants to only

procedures not resulting in the destruction of an embryo. Ex. 8 at 24, 40–41.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confu-

sion. Fed. R. Evid. 402, 403. Otherwise undisputed.

129.    Mr. Noronha testified that the coverage in Turbocam's self-funded health benefits

plan of stem cell transplants of the type that resulted in the destruction of an embryo would violate

his religious convictions as expressed in and informed by the Bible. Noronha Dep., <u>Ex. 2</u> at 95.

**Response:** Turbocam objects on the ground of relevance and undue prejudice and confusion. Fed. R. Evid. 402, 403. Otherwise undisputed.

## TURBOCAM'S CONCISE COUNTERSTATEMENT
## OF UNDISPUTED MATERIAL FACTS

**I.       Sex, Gender, & Gender Identity**

1.       "Biologically, humans are sexually dimorphic mammals. Sex is fixed as either male or female at conception." Ex. B, Weiss Decl. ¶ 17;  *see also id.* ¶¶ 23–26.

**Response:** Defendant's fact, as stated, is not relevant to any legal issue in this case. *See Bostock v. Clayton Cnty.*, 590 U.S. 644, 669 (2020) (describing transgender persons as "persons with one sex identified at birth and another today"). Plaintiff otherwise disputes Defendant's characterization of sex. Deposition of Randi Ettner, Ph.D. ("Ettner Dep.")[3] at 26–27; 45–46.

2.       Some individuals, however, are born with a disorder of sex development that may, in some cases, complicate categorization as male or female. Ex. B, Weiss Decl. ¶¶ 18–20; Ex. G, World Professional Association for Transgender Health ("WPATH"), *Standards of Care for the Health of Transgender and Gender Diverse People*, Version 8, 23 Int'l J. Transgender Health S93 (2022) ("WPATH 8") ("The most inclusive definitions of DSD estimate a prevalence of up to 1.7%").

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

3.       A disorder of sex development is a congenital condition in which an individual's development of chromosomal, gonadal, or anatomical sex is atypical, and includes rare genetic abnormalities such as Turner syndrome and Klinefelter syndrome. Ex. B, Weiss Decl. ¶ 18; *see* Ex. C, Ettner Dep. 39:13–25 (agreeing with this definition); *see, e.g.*, *K.C. v. Individual Members of Med. Licensing Bd. of Ind.*, 121 F.4th 604, 610 (7th Cir. 2024) (explaining Klinefelter syndrome).

---

[3] Excerpts from the Deposition of Randi Ettner, Ph.D. are attached as <u>Exhibit 23</u> to the accompanying Second Declaration of Attorney Chris Erchull.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

4.      Intersexuality is a "subcategory" of disorders of sex development. Ex. G, WPATH 8, at S95; Ex. B, Weiss Decl. ¶ 20.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

5.      Individuals with intersexuality have "markedly atypical congenital variations in the reproductive tract." Ex. C, Ettner Dep. 40:1–10. According to WPATH, "[o]bvious genital atypicality … occurs with an estimated frequency ranging from approximately 1:2000—1:4500 people," or for about 0.05% to 0.02% of the population. Ex. G, WPATH 8, at S93; *see also* Ex. B, Weiss Decl. ¶ 20.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

6.      Although in common parlance the terms are sometimes confused, in biology or medicine sex is not the same thing as "gender" or "gender identity." Ex. B, Weiss Decl. ¶¶ 21–22; *see also* Ex. H, Am. Psych. Ass'n ("APA"), *Diagnostic and Statistical Manual of Mental Disorders* 451 (5th ed. 2013) ("DSM-5") (explaining that clinicians use the term "*sex*" to refer to "biological indicators of male and female" while the term "*gender* is used to denote the public (and usually legally recognized) lived role as boy or girl, man or woman.").

**Response:** Undisputed.

7.      Although definitions vary, WPATH defines "gender" as follows:

Depending on the context, gender may reference gender identity, gender expression, and/or social gender role, including understandings and expectations culturally tied to people who were assigned male or female at birth. Gender identities other than those of men and women (who can be either cisgender or transgender) include transgender, nonbinary, genderqueer, gender neutral, agender, gender fluid, and "third" gender, among others; many other genders are recognized around the world.

Ex. G, WPATH 8, at S252.

**Response:** Undisputed.

8.      Sex, in biological terms, may be reliably determined by inspecting an individual's sexual organs or by performing genetic testing in nearly all cases. Ex. B, Weiss Decl. ¶ 23.

**Response:** Plaintiff objects on the grounds of lack of clarity and confusion. *See* Ettner Dep., Ex. 23 at 26–28. Undisputed that sex may be reliably determined in this way "in nearly all cases." *But see* Ettner Dep., Ex. 23 at 26–28 for clarity.

9.       By contrast, there is no observational method to reliably determine an individual's professed "internal" sense of gender identity; you must instead "ask" the individual or perform "psychological tests." Ex. C, Ettner Dep. 29:9–17; *see* Ex. B, Weiss Decl. ¶ 24.

**Response:** Disputed that psychological tests are not "observational." Otherwise undisputed.

10.      There is no "genetic testing," "blood work," "X-rays," "CT scan" or other medical device or test that can be used to objectively verify an individual's professed "gender identity" for clinical purposes. Ex. C, Ettner Dep. 29:10–32:8; *see* Ex. B, Weiss Decl. ¶ 24.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

11.      According to WPATH, the term "detransition" is used when an individual decides to "retransition to the gender stereotypically associated with their sex assigned at birth." Ex. C, Ettner Dep. 39:4–12.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

12.      Detransitioners exist. Ex. C, Ettner Dep. 43:20–21 ("Q. Are you aware of any detransitioners? A. Yes.").

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

13.      Unlike biological sex, an individual's self-reported gender identity may change over time. Ex. B, Weiss Decl. ¶ 26; Ex. C, Ettner Dep. 43:20–21.

**Response:** Plaintiff objects on the grounds of relevance, confusion, and lack of context. It is undisputed in this case that Lillian Bernier is a transgender woman who has been diagnosed with gender dysphoria. Further, disputed to the extent that it seeks to imply that gender identity is not fixed. The statement that an individual's "self-reported" gender identity may change does not mean that their gender identity is not fixed, even if their understanding of that gender identity may change over time.

14.    Not "all transgender individuals suffer from an intersex condition." Ex. C, Ettner Dep. 41:4–6.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

15.    Not "all transgender individuals have disorders of sex development." Ex. C, Ettner Dep. 41:7–8.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

## II.    Gender Identity Disorders

16.    Transgender individuals may suffer from psychological disorders and distress because of the incongruence between their sex and their gender identity. Ex. B, Weiss Decl. ¶¶ 35, 37, 40.

**Response:** Undisputed.

17.    The terminology and diagnostic criteria to describe this family of psychological conditions has evolved over time. *See* Ex. C, Ettner Dep. 48; Ex. B, Weiss Decl. ¶¶ 27–38.

**Response:** Plaintiff objects to the characterization of different diagnoses with different diagnostic criteria as a "family" of psychological conditions. Further, the citation to Ettner's Deposition does not support the fact asserted. Otherwise undisputed.

18.     In 1987, the American Psychological Association published a revision of the *Diagnostic and Statistical Manual*. Ex. I, APA, *Diagnostic and Statistical Manual of Mental Disorders* (3d ed. rev. 1987) ("DSM-III-R").

**Response:** Undisputed.

19.     Under DSM-III-R, the "essential feature" of the subclass of "gender identity disorders" "is an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Ex. I, DSM-III-R at 71.

**Response:** Undisputed.

20.     Under DSM-III-R, "transsexualism" was classified as a gender identity disorder. The diagnostic criteria for "transsexualism" were:

    a.   "Persistent discomfort and sense of inappropriateness about one's assigned sex."

    b.   "Persistent preoccupation for at least two years with getting rid of one's primary and secondary sex characteristics and acquiring the sex characteristics of the other sex."

    c.   "The person has reached puberty."

Ex. I, DSM-III-R at 76.

**Response:** Undisputed.

21.     Bernier has a persistent discomfort and sense of inappropriateness about her assigned sex. Bernier Decl. ¶¶ 1, 3, 5, 8, 12, 32.

**Response:** Undisputed.

22.     For at least two years, Bernier has persistently wanted to get rid of her male primary and secondary sex characteristics and acquire the sex characteristics of the female sex. Bernier Decl. ¶¶ 8, 10–13, 15–21, 25–27, 30, 33.

**Response:** Undisputed.

23.    For at least two years, Bernier has wanted to get a male-to-female vaginoplasty, which includes removal of the penis and testicles. Bernier Decl. ¶¶ 15–20, 30, 33; Ex. A, Bernier Dep. 149:6–23, 186:12–187:4; Ex. C, Ettner Dep. 46:8–17, 107:11–19; Ex. B, Weiss Decl. ¶ 63.

**Response:** Undisputed.

24.    Bernier is past puberty because Bernier is at least 32 years old. Bernier Decl. ¶ 1.

**Response:** Undisputed.

25.    Bernier's medical records reflect a diagnosis of "Transsexualism." Ex. J, Bernier 0530.

**Response:** Plaintiff objects on the basis of relevance, confusion, and lack of foundation. It is undisputed that Lillian Bernier has a diagnosis of gender dysphoria. It is further undisputed that "transsexualism" is not a current diagnosis. There is no evidentiary foundation related to the creation of the cited document, who created the document, the age of the electronic medical record system used, or why a healthcare facility might use a system with an outdated diagnostic code.

26.    In the 1994 edition of the DSM, DSM-IV updated its terminology and criteria. DSM-IV made the subclass of "sexual and gender identity disorders" its own class and used the term "gender identity disorder" rather than the term "transsexualism." Ex. K, APA, *Diagnostic and Statistical Manual of Mental Disorders* 493, 532–33 (4th ed. 1994) ("DSM-IV").

**Response:** Plaintiff objects on the grounds of confusion and lack of clarity to the extent this paragraph purports to explain the reasons for the changes in diagnostic classifications. Otherwise undisputed.

27.    Under DSM-IV, the "two components" of "gender identity disorder" were a "persistent discomfort about one's assigned sex or a sense of inappropriateness in the gender role of

that sex" and "a strong and persistent cross-gender identification, which is the desire to be, or the insistence that one is, of the other sex." Ex. K, DSM-IV at 532–33.

    **Response:** Undisputed.

    28.    DSM-IV defined the diagnostic criteria for "gender identity disorder" to require:

    a.   "A strong and persistent cross-gender identification."

    b.   "Persistent discomfort with his or her sex or sense of inappropriateness in the gender role of that sex," manifested in adults "by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that he or she was born the wrong sex."

    c.   "The disturbance is not concurrent with a physical intersex condition."

    d.   "The disturbance causes clinically significant distress or impairment in social, occupational, or other important areas of functioning."

Ex. K, DSM-IV at 537–38.

    **Response:** Undisputed.

    29.    Other gender identity disorders, such as gender identity disorders resulting from physical "[i]ntersex conditions (e.g., androgen insensitivity syndrome or congenital adrenal hyperplasia)" were labeled as a "gender identity disorder not otherwise specified." Ex. K, DSM-IV at 538.

    **Response:** Plaintiff objects on the ground of confusion to the extent this paragraph seeks to imply that the "gender identity disorders not otherwise specified" category consisted only of conditions resulting from physical impairments or that other conditions did not have a physical component.

30. Bernier asserts a strong and persistent cross-gender identification. Bernier Decl. ¶¶ 1, 3, 5, 8–10, 27–28, 32.

**Response:** Undisputed.

31. Bernier asserts a persistent discomfort with … her sex or sense of inappropriateness in the gender role of that sex manifested "by symptoms such as preoccupation with getting rid of primary and secondary sex characteristics (e.g., request for hormones, surgery, or other procedures to physically alter sexual characteristics to simulate the other sex) or belief that … she was born the wrong sex." Bernier Decl. ¶¶ 1, 3, 5, 8, 10–13, 15–21, 25–27, 30, 32–33.

**Response:** Undisputed.

32. Bernier does not have a disorder of sex development. Ex. C, Ettner Dep. 39:13–40:10, 46:18–21.

**Response:** Undisputed.

33. Bernier does not have an intersex condition. Ex. A, Bernier Dep. 148:14–24; Ex. C, Ettner Dep. 46:5–7.

**Response:** Undisputed.

34. Bernier claims to suffer clinically significant distress or impairment in social, occupational, or other important areas of functioning. Bernier Decl. ¶¶ 1, 3, 8, 12, 26–27, 32; Ex. A, Bernier Decl. 178:6–15.

**Response:** It is undisputed that Lillian Bernier has been diagnosed with gender dysphoria. Otherwise undisputed.

35. Bernier's medical records reflect a diagnosis of "[g]ender identity disorder" in adulthood. Ex. L, Bernier 0515.

**Response:** Plaintiff objects on the basis of relevance, confusion, and lack of foundation. It is undisputed that Lillian Bernier has a diagnosis of gender dysphoria. It is further undisputed that "gender identity disorder" is not a current diagnosis. There is no evidentiary foundation related to the creation of the cited document, who created the document, the age of the electronic medical record system used, or why a healthcare facility might use a system with an outdated diagnostic code.

36.    In 2013, the American Psychological Association dropped the term "gender identity disorder" and replaced it with the term "gender dysphoria," while changing the diagnostic criteria. Ex. H, DSM-5 at 451–53.

**Response:** Plaintiff objects on the grounds of confusion and lack of clarity to the extent this paragraph purports to explain the reasons for the changes in diagnostic classifications. Plaintiff further objects to the characterization of the elimination of one diagnosis and the recognition of a new diagnosis with different diagnostic criteria as merely a "replacement." The undisputed facts show that gender identity disorder and gender dysphoria are separate diagnoses with separate diagnostic criteria. Ettner Decl. ¶¶ 22–25; Ettner 2d Decl. ¶¶ 26–30.

37.    As with transsexualism and gender identity disorder, a diagnosis of gender dysphoria requires "[a] marked incongruence between one's experienced/expressed gender and assigned gender." Ex. H, DSM-5 at 452. DSM-5 specifies that the incongruence must be "of at least 6 months' duration," and diagnosis also requires "clinically significant distress or impairment in social, occupational, or other important areas of functioning." *Id.* at 452–53. For adolescents and adults, the determination of marked incongruence is based on manifestation at least two of:

    a.    "A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics."

   b.  "A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender."

   c.  "A strong desire for the primary and/or secondary sex characteristics of the other gender."

   d.  "A strong desire to be of the other gender."

   e.  "A strong desire to be treated as the other gender."

   f.  "A strong conviction that one has the typical feelings and reactions of the other gender."

*Id*. at 452. The characterization and diagnosis of "gender dysphoria" remains essentially the same in the 2022 update to the DSM. Ex. M, APA, *Diagnostic and Statistical Manual of Mental Disorders* 512–13 (5th ed. text rev. 2022) ("DSM-5-TR").

   **Response:** Plaintiff objects to the accuracy of the description of the diagnostic criteria of "transsexualism." The diagnosis of transsexualism in DSM-III-R does not include the language "marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics." See Def.'s Ex. I. Plaintiff further objects on the grounds of confusion and lack of clarity and context. Disputed to the extent that this paragraph seeks to imply that a limited overlap of some diagnostic criteria indicates that these diagnoses are the same.

   38.  Not "all transgender individuals suffer from gender dysphoria." Ex. C, Ettner Dep. 41:10–12.

   **Response:** Undisputed.

## III.    Turbocam's Religious Mission

   39.  Turbocam, Inc. is a New Hampshire business that manufactures core turbomachinery flow path components and assemblies. Declaration of Marian Noronha ¶ 2 ("Noronha Decl."), Dkt. No. 42-3.

**Response:** Undisputed.

40.    Turbocam is a private, closely held family business owned and controlled by Marian Noronha and his wife Suzie Noronha. Noronha Decl. ¶ 2; Ex. D, Noronha Dep. 24:5–25:14, 149:16–19.

**Response:** Undisputed.

41.    Mr. Noronha owns all of the voting shares in the trust that controls Turbocam, while his wife Suzie Noronha owns all of the non-voting shares. Ex. D, Noronha Dep. 24:17–25:8.

**Response:** Undisputed.

42.    The Noronhas "are committed evangelical Christians and Members of New Frontiers Church." Noronha Decl. ¶ 2.

**Response:** Undisputed.

43.    Mr. Noronha is also the President of Turbocam Inc. and a director of Turbocam's board. Noronha Decl. ¶ 1; Ex. D, Noronha Dep. 25:9–14.

**Response:** Undisputed.

44.    The Noronhas seek to operate Turbocam "consistently with [their] religious convictions as expressed in and informed by the Bible." Noronha Decl. ¶ 3.

**Response:** Undisputed.

45.    According to its mission statement, first published in 1994 and available through Turbocam's website,

> Turbocam exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting Christian service to God and people.… As we interact with our customers, suppliers, and employees we hold ourselves accountable to God's law expressed in the Bible.

Noronha Decl. ¶ 3; Ex. N, *Turbocam Mission Statement*, Turbocam 0634; *see also* Turbocam Int'l, *About*, https://www.turbocam.com/about/ (last visited Aug. 22, 2025); Turbocam Int'l, *TURBO-CAM's Mission*, YouTube, at 00:50 (Jan. 8, 2021), https://www.youtube.com/watch?v=gsum58o-ch4 (similar).

**Response:** Undisputed.

46.    Since 1994, every new hire at Turbocam signs a statement committing to support Turbocam's mission, including Bernier. Noronha Decl. ¶ 3; Ex. A, Bernier Dep. 34:6–20, 189:21–190:4.

**Response:** Undisputed.

47.    The Noronhas and Turbocam's senior management receive training in Christian leadership from the Fellowship of Companies for Christ International, which equips Turbocam's management to make decisions through the lens of Christian principles. Noronha Decl. ¶ 7.

**Response:** Undisputed.

48.    Turbocam carries out these Christian principles in a number of concrete ways. For example,

   a.   "Due to its religious mission and its love for its employees grounded in its religious convictions, Turbocam has usually refused to lay off any of its employees during [hard economic] times, absorbing the loss through reduced profit margins," including during the Covid-19 pandemic. Noronha Decl. ¶ 5.

   b.   Turbocam's employes "are not expected to work on Sundays," even if "equipment breaks down." Noronha Decl. ¶ 6.

   c.   "Turbocam provides (or supports) an education for about 2000 school children in three countries. It also supports private Christian education for over 100 New

Hampshire children. It also helps provide food for children in local New Hampshire communities who are not usually provided for, typically from Friday noon to Monday mornings, through an organization called End 68 Hours of Hunger." Noronha Decl. ¶ 8.

d.  "At the 15th year of employment, employees are offered an overseas vacation to experience poorer nations." Noronha Decl. ¶ 8.

e.  "[F]or over 25 years," Turbocam has funded a Christian mission to rescue families from indentured slavery in Nepal, purchasing their freedom, establishing villages for them, and funding "schools, water treatment systems, teaching and transferring technology and equipment, and teaching in the churches." Noronha Decl. ¶ 9.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

49.    "There's usually prayer at every company meeting." Ex. F, Marino Dep. 40:15–16.

**Response:** Undisputed.

50.    As part of their Christian faith, the Noronhas "believe that one's sex is ordained by God and should not be erased or obscured by medical treatment or in any other way." Noronha Decl. ¶ 14.

**Response:** Undisputed.

51.    The Noronhas believe that they must operate Turbocam in accordance with their faith, and that it would be sinful to use Turbocam's resources to assist employees in denying, erasing, or obscuring their sex. Noronha Decl. ¶ 14; Ex. D, Noronha Dep. 62:1–8, 13–17; 130:13–19; 135:8–15; 137:6–18, 138:7–14, 139:20–140:2, 141:1–23.

**Response:** Undisputed.

**IV.        Turbocam's Employee Health-Benefits Plan**

52.     Effective as of January 1, 2021, Turbocam offers a "self-funded" high-deductible

healthcare coverage plan to its employees. Ex. E, Hanson Dep. 32–33; Ex. F, Marino Dep. 19:2–

4; *see also* Ex. O, *PPO Plan*, Turbocam 0021.

**Response:** Undisputed.

53.     Turbocam switched to a self-funded plan to avoid a large increase in the cost of

insurance premiums, Ex. F, Marino Dep. 20:22–25, and for the ability to exclude coverage of

treatments that do not align with its beliefs and mission. Ex. D, Noronha Dep. 126–29.

**Response:** Plaintiff disputes to this paragraph to the extent that the cited deposition testi-

mony of Mr. Noronha states that Turbocam requested the exclusion of gender dysphoria treatment

in its self-funded health benefits plan, which is inconsistent with his Turbocam's interrogatory

responses (signed by Mr. Noronha). *See* Def.'s Response to Interrogatory 13.[4] Otherwise undis-

puted.

54.     Turbocam "finalized" the decision to switch to a self-funded plan in the Fall of

2020. Ex. E, Hanson Dep. 71:13–16, 131:12–14.

**Response:** Undisputed.

55.     Turbocam's health-benefits plan contains 52 coverage exclusions. Ex. O, *PPO

Plan*, Turbocam 0072–75.

**Response:** Undisputed.

56.     For example, the plan excludes "[e]rectile dysfunction treatment," "[s]ex therapy,"

and "voluntary termination of pregnancy." Ex. O, *PPO Plan*, Turbocam 0006, 0074–75.

---

[4] Defendant Turbocam's response to interrogatory 13 is attached as <u>Exhibit 24</u> to the accompany-
ing Second Declaration of Attorney Chris Erchull.

**Response:** Undisputed.

57.     Voluntary termination of pregnancy is excluded from the plan because it violates Turbocam's religious mission. Ex. F, Marino Dep. 38–40.

**Response:** Undisputed.

58.     One plan exclusion, exclusion 31, provides:

Gender dysphoria treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy and related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications.
Ex. O, *PPO Plan*, Turbocam 0074.

**Response:** Undisputed.

59.     The exclusion for gender-affirming care did not come to the attention of Turbocam's senior benefits specialist until March or April of 2021, when Turbocam first received "full plan documents." Ex. F, Marino Dep. 83–85.

**Response:** Undisputed.

## V.    Bernier's Gender Transition

60.     Bernier is male. Ex. A, Bernier Dep. 91:1–3; *see also* Ex. B, Weiss Decl. ¶¶ 17, 23.

**Response:** Plaintiff objects on the ground of relevance because the only material fact relevant to this case is that Lillian Bernier is a transgender woman with gender dysphoria. Plaintiff otherwise disputes that Plaintiff is male. Ettner Dep., Ex. 23 at 26–28; 45–46.

61.     When Bernier was hired by Turbocam, Bernier did not publicly identify as transgender and went by the name Robert Bernier. Ex. A, Bernier Dep. 10:12–19; *see id.* at 27:24–28:3 (Bernier hired in June 2019), 121:12–14 (Bernier's social transition in February 2021).

**Response:** Undisputed.

62. Bernier first requested a legal name change to Lillian in "February of 2021." Ex. A, Bernier Dep. 10:15–19.

**Response:** Undisputed.

63. On February 22, 2021, Bernier obtained a "Certificate of Change of Name" from the State of New Hampshire. Ex. A, Bernier Dep. 52:1–11; Ex. P, *Bernier's Certificate of Name Change*, Turbocam 0627.

**Response:** Undisputed.

64. Sometime between February 22 and March 12, 2021, Bernier first informed Turbocam's personnel or human resources staff about Bernier's transgender identification and intent to "transition" to a different gender. Ex. A, Bernier Dep. 53:4–54:4, 55:7–14.

**Response:** Undisputed.

65. In March of 2021, Bernier requested that Turbocam refer to Bernier as Lillian. Ex. A, Bernier Dep. 52:14–53:13.

**Response:** Undisputed.

66. Turbocam accommodated Bernier's desired name change and used Bernier's desired female pronouns. Ex. A, Bernier Dep. 59:11–20.

**Response:** Undisputed.

67. On September 27, 2023, Bernier complained about "miss gendering" by another employee. Ex. Q, Bernier 0100–01.

**Response:** Undisputed.

68. Pete Hanson followed up with the other employee to let the employee "know that the conduct can't continue and it if [sic] does it will lead to more formal disciplinary action." Ex. Q, Bernier 0100–01.

**Response:** Undisputed.

69.     Bernier then reported that had solved the issue. Ex. Q, Bernier 0100–01.

**Response:** Undisputed.

70.     Apart from that instance, Bernier cannot recall being made to feel uncomfortable by any employees at Turbocam. Ex. A, Bernier Dep. 68:14–18 ("Have you ever been made to feel uncomfortable by any employees at Turbocam since the name change? … A. Not that I recall.").

**Response:** Disputed. *See* Second Declaration of Lillian Bernier ("2d Bernier Decl.")[5] ¶¶ 10–33.

71.     After Bernier filed this lawsuit, Turbocam's director of talent development sent a firmwide email saying: "We want to remind everyone that, as our faith-based Mission calls us to honor the unique dignity and worth of each person, our Honor Code requires all employees to treat their co-workers with civility and respect, regardless of our differences." Ex. R, Bernier 0102.

**Response:** Undisputed.

## VI.    Gender-Affirming Care

72.     Gender-affirming hormone therapy to treat gender dysphoria has a different set of risks and benefits than hormone therapy used to normalize biological hormonal blood levels. Ex. B, Weiss Decl. ¶¶ 52–55, 64–66; Ex. S, Weiss Dep. 83:19–87:24.

**Response:** Plaintiff objects on the grounds of relevance and confusion. There is no issue in this case related to the risks or complications of any treatment for gender dysphoria. Plaintiff further objects on the ground that this paragraph seeks to imply that hormone therapy used to treat

---

[5] The Second Declaration of Lillian Bernier is attached as <u>Exhibit 25</u> to the accompanying Second Declaration of Attorney Chris Erchull.

gender dysphoria has greater risks than hormone therapy treatments for other conditions. Otherwise disputed, as many risks are the same. See generally response to Defendant's paragraph 75 *infra* and paragraphs 75 and 87 *infra* specifically.

73.    Hormone levels in the blood differ markedly in the two sexes. By age 18, males have levels of testosterone in their blood that are about 10 to 20-fold higher than that in females. By age 18, females have levels of estrogen in their blood that are about 10 to 20-fold higher than that in males. Ex. B, Weiss Decl. ¶ 53.

**Response:** Plaintiff objects on the grounds of relevance and confusion. Otherwise undisputed.

74.    As part of gender-affirming hormone therapy, males with gender dysphoria may receive supraphysiologic levels of estrogen (about ten times the normal level), which induces hyperestrogenemia. Ex. B, Weiss Decl. ¶ 55; Ex. C, Ettner Dep. 101–02.

**Response:** Plaintiff objects to Dr. Weiss's characterization of estrogen therapy as inducing "hyperestrogenemia." There is no support in any medical literature that hormone therapy for gender dysphoria induces a "diseased state." Otherwise undisputed.

75.    Males treated with estrogen have a 22-fold increase in the rate of breast cancer. Ex. B, Weiss Decl. ¶ 55.

**Response:** Plaintiff objects on the ground of relevance. There is no issue in this case related to the risks or complications of any treatment for gender dysphoria. Turbocam agrees that its "mission and the religious values of the company are the only stated reasons that Turbocam objects to covering treatment for gender dysphoria in the Turbocam Health Plan." *See* Def.'s Response to Pl.'s ¶ 60, *supra*. Plaintiff further objects and disputes this fact on the ground of insufficient context in that Dr. Weiss testified that all medical treatments and surgeries have risks and that he has

regularly prescribed medications and referred patients for surgeries that have risks of adverse events "with clear informed consent of the patient," which he described as including a "balancing of the risks and benefits for the particular patient." Weiss Dep.[6] at 64–67. Dr. Weiss further testified that medications that are used in the regular practice of endocrinology have severe, even life-threatening, risks but he does not support prohibiting the use of those medications, including prednisone, Weiss Dep., <u>Ex. 26</u> at 67–72; Insulin, Weiss Dep., <u>Ex. 26</u> at 73–74; Canagliflozin, Weiss Dep., <u>Ex. 26</u> at 79–81; Testosterone for male hypogonadism and delayed onset of puberty, Weiss Dep., <u>Ex. 26</u> at 83–92; and Estrogen, Weiss Dep., <u>Ex. 26</u> at 86–90. See also discussion of risks of bariatric surgery. Weiss Dep., <u>Ex. 26</u> at 92–100. Dr. Weiss acknowledged that the Endocrine Society has never taken the position that the risks of hormone therapy for adults with gender dysphoria are such that the treatment should not be provided. Weiss Dep., <u>Ex. 26</u> at 115. It is undisputed that major medical organizations recognize and accept hormones as medical interventions for gender dysphoria. Ettner Decl., ECF No. 67-4 ¶ 11; 2d Ettner Decl., <u>Ex. 21</u> ¶¶ 37–43.

Otherwise disputed as the cited study examines breast cancer risk in transgender men receiving testosterone therapy, not transgender women receiving estrogen therapy, making it completely inapplicable to the claimed 22-fold risk. *See* Weiss. Decl., ECF No. 75-2 at 17 n.33 (citing Rakesh R. Gurrala et al., The Impact of Exogenous Testosterone on Breast Cancer Risk in Transmasculine Individuals, 90 Ann. Plastic Surg. 96 (2023)).

76.     Males treated with estrogen have a 2.3-fold higher risk of thyroid cancer. Ex. B, Weiss Decl. ¶ 55.

---

[6] Excerpts from the Deposition of Daniel Weiss, M.D., are attached as <u>Exhibit 26</u> to the accompanying Second Declaration of Chris Erchull.

**Response:** See response to paragraph 75. Otherwise disputed as the cited study acknowledges "the estrogen-driven thyroid cancer hypothesis is not universally supported" and emphasizes that gender-affirming care's benefits "should therefore be balanced with" risks rather than avoided.

77.     Males treated with estrogen have a 36-fold higher risk of strokes. Ex. B, Weiss Decl. ¶ 55.

**Response:** See response to paragraph 75. Otherwise disputed as the cited studies recommend that "physicians and transgender individuals should be aware of these risks, and risk factors should be adequately managed," not that treatment should be avoided, and did not adjust for major confounding factors including smoking.

78.     Venous thromboembolism is increased more than six times compared to males who are not given estrogen. Ex. B, Weiss Decl. ¶ 55.

**Response:** See response to paragraph 75. Otherwise disputed as the cited studies recommend that "physicians and transgender individuals should be aware of these risks, and risk factors should be adequately managed," not that treatment should be avoided, and did not adjust for major confounding factors including smoking.

79.     "Feminizing gender affirming hormone therapy" suppresses and disrupts testicular function including sperm production. Infertility would be expected as a result of these effects. Ex. B, Weiss Decl. ¶ 55.

**Response:** See Response to paragraph 75. In addition, Plaintiff objects to the phrasing that "[i]nfertility would be expected as a result of these effects" because there is no basis for the conclusion that these treatments result in permanent infertility. Otherwise undisputed.

80.    According to WPATH 8, male-to-female estrogen regimes pose a clinically signif-icant likely increased risk of "venous thromboembolism" (life-threatening blood clots) and "infer-tility." Ex. G, WPATH 8, at S254, app'x C, tbl. 2 (cleaned up); Ex. C, Ettner Dep. 102–03.

**Response:** See Response to paragraph 75. Otherwise undisputed.

81.    According to WPATH, male-to-female estrogen regimes pose a likely increased risk of "cholelithiasis" (gallstones), "hyperkalemia" (high potassium levels that cause life-threatening heartbeat abnormalities, muscle weakness, or paralysis), "meningioma" (a primary central nervous system tumor), "polyuria/dehydration" (increased urine production), "weight gain," "hypertriglyc-eridemia" (high levels of triglycerides (fats) in the blood, leading to plaque buildup in arteries (atherosclerosis) which can result in heart attacks, strokes, blood clots, and similar complications), "cardiovascular disease," "cerebrovascular disease" (affecting the blood flow and blood vessels in the brain), and a possible increased risk of "hypertension" (high blood pressure), "erectile dys-function," "type 2 diabetes," "low bone mass/osteoporosis" (leading to weak and brittle bones), and "hyperprolactinemia" (high levels of the hormone prolactin, causing infertility and other is-sues). Ex. G, WPATH 8, at S254, app'x C, tbl. 2 (cleaned up); Ex. C, Ettner Dep. 102–06.

**Response:** See Response to paragraph 75. Otherwise undisputed.

82.    A female vaginoplasty is a different surgical procedure from a male-to-female vagi-noplasty. Ex. B, Weiss Decl. ¶ 59, Ex. C, Ettner Dep. 106:23–107:25, 111:6–21, Ex. A, Bernier Dep. 186:7–187:10.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

83.    A female vaginoplasty involves correcting a congenital abnormality or damaged vaginal tissue. Ex. B, Weiss Decl. ¶ 59; Ex. C, Ettner Dep. 111:6–18.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed as to the definition of a reconstructive female vaginoplasty.

84.    There is currently "no standard of care by which surgeons operate to perform" a male-to-female vaginoplasty. Ex. B, Weiss Decl. ¶ 63.

**Response:** Plaintiff objects on the ground of relevance. The standard of care of any treatment for gender dysphoria is not relevant to any issue in this case. Also disputed. The article cited by Dr. Weiss does not support his stated opinion. The article states, in pertinent part:

> Several vaginoplasty techniques exist and there is a lot of nuance to the surgery as surgeons each have their own modifications to the procedure. While the consensus is that patients should undergo safe surgery with favorable cosmetic and functional outcomes, there remains no standard of care by which surgeons operate to perform the procedure.

In other words, in context, the statement that there is "no standard of care" means that there is no single standard technique as multiple techniques and modifications may be employed. It does not mean that the surgery is unsafe or not recommended as treatment for gender dysphoria in appropriate cases.

85.    The most common procedure performed for a male-to-female vaginoplasty is penile inversion, which involves a penectomy (surgical removal of the penis), orchiectomy (surgical removal of the testicles), and shortening of the urethra, and uses tissue available from the penis and scrotum. A cavity is created near the rectum and then the skin of the penis and scrotum are inverted into the cavity to create a pseudovagina. Ex. B, Weiss Decl. ¶ 63; Ex. C, Ettner Dep. 107:11–19.

**Response:** Plaintiff objects on the ground of relevance. Otherwise undisputed.

86.    Ettner admits that she "wouldn't be able to opine on anything that pertains directly to the Plaintiff in this case"—which would include whether any medical interventions, such as augmentation surgery, counseling, or hormone therapy are necessary for Bernier—because she has never spoken Bernier with nor read her medical records, and has no medical training. Ex. C, Ettner

Dep. 17:5–10, 23:23–24:11, 95:4–96:2, 96:13–98:24; *see also id.* at 17:5–10 (admitting that she is not a medical doctor, does not practice medicine, and has no medical training).

**Response:** Plaintiff objects on the ground of relevance. The medical necessity of any treatment for plaintiff is not at issue in this case. Further, plaintiff disputes that Ettner has "no medical training." *See* Ettner 2d Decl., Ex. 21 ¶¶ 8–9; *see also generally* Plaintiff's Opposition to Defendant's Motion to Exclude the Testimony of Randi Ettner, Ph.D. Plaintiff does not dispute that Ettner has not spoken to Plaintiff and has not read Plaintiff's medical records.

87.    Mr. Noronha believes that gender-affirming care is dangerous. Ex. D, Noronha Dep. 137:10–13. ("Q. You would object to that [paying for a hysterectomy in a woman as treatment for gender dysphoria] because of your religious views? A. Yes, but also the last person I know who did it also jumped off a skyscraper in Boston.").

**Response:** Plaintiff objects on the grounds of lack of foundation, relevance, undue prejudice, and inadmissible lay opinion. Plaintiff does not otherwise dispute Mr. Noronha's personal beliefs about gender dysphoria care.

## VII.    Bernier's Equal Coverage

88.    Bernier was offered the same health-benefits plan as other full-time Turbocam employees and currently is enrolled in Turbocam's self-funded employee-benefits plan. Ex. A, Bernier Dep. 122, 137:24–138:5; Bernier Decl. ¶ 31.

**Response:** Plaintiff objects on the grounds of confusion and lack of clarity. Paragraph 88 calls for a legal conclusion. Plaintiff admits that she is enrolled in Turbocam's self-funded employee benefits plan. Otherwise disputed. Plaintiff denies that being enrolled in the same plan means that she was offered the same benefits as other employees. *See* Bernier Decl., ECF No. 67-2 ¶ 19.

89.     Under the plan, Bernier has coverage for mental health counseling, but not for the specific diagnosis of gender dysphoria. Ex. 19; Ex. A, Bernier 158–59; Ex. O, *PPO Plan*, Turbocam 0062–63, 0074.

**Response:** Undisputed.

90.     Bernier's breast augmentation was coded as a "Cosmetic Bilateral breast augmentation for gender affirmation with silicone gel implants in subglandular plane." Ex. T, Bernier 0177.

**Response:** Plaintiff disputes the relevance of this fact and document. The terms "cosmetic" and "medically necessary" are terms related to insurance coverage. As Turbocam has denied Lillian insurance coverage for gender dysphoria, there was never any need or opportunity for any health care provider to make a determination of medical necessity. Otherwise undisputed that the document speaks for itself.

91.     No doctor determined that Bernier's breast augmentation was medically necessary. Ex. A, Bernier Dep. 169:12–17.

**Response:** Plaintiff objects on the ground of relevance. The terms "cosmetic" and "medically necessary" are terms related to insurance coverage. As Turbocam has denied Lillian insurance coverage for gender dysphoria, there was never any need or opportunity for any health care provider to make a determination of medical necessity. Otherwise undisputed.

92.     A cosmetic bilateral breast augmentation is not covered for any Turbocam employee or dependent. Ex. O, *PPO Plan*, Turbocam 0032, 0074.

**Response:** Plaintiff objects on the ground of relevance. The terms "cosmetic" and "medically necessary" are terms related to insurance coverage. As Turbocam has denied Lillian insurance coverage for gender dysphoria, there was never any need or opportunity for any health care

provider to make a determination of medical necessity. Otherwise undisputed that the Turbocam Health Plan does not cover cosmetic procedures.

93.    A cosmetic breast augmentation to treat gender dysphoria is not covered for any Turbocam employee or dependent. Ex. O, *PPO Plan*, Turbocam 0032, 0074.

**Response:** Plaintiff objects on the ground of relevance. The terms "cosmetic" and "medically necessary" are terms related to insurance coverage. As Turbocam has denied Lillian insurance coverage for gender dysphoria, there was never any need or opportunity for any health care provider to make a determination of medical necessity. Otherwise undisputed that the Turbocam Health Plan does not cover cosmetic procedures.

94.    A male-to-female or penile-inversion vaginoplasty is not covered for any Turbocam employee or dependent. Ex. O, *PPO Plan*, Turbocam 0032, 0074.

**Response:** Plaintiff objects on the grounds of relevance and confusion. A male-to-female or penile-inversion vaginoplasty is a treatment for a transgender woman with gender dysphoria. Ettner Dep., Ex. 23 at 106–07. Otherwise undisputed that the Turbocam Health Plan excludes treatment for gender dysphoria.

95.    Hormone therapy to treat gender dysphoria is not covered for any Turbocam employee or dependent. Ex. O, *PPO Plan*, Turbocam 0032, 0074.

**Response:** Plaintiff objects on the grounds of relevance and confusion. Hormone therapy to treat gender dysphoria is a treatment for transgender persons. Otherwise undisputed that the Turbocam Health Plan excludes treatment for gender dysphoria.

96.    Bernier could not recall any medical provider stating that gender-affirming counseling, hormone therapy, and breast augmentation surgery were medically necessary for her, and

does not recall whether any medical provider or doctor stated that hormone therapy was medically necessary for her. Ex. A, Bernier Dep. 169:6–23.

**Response:** Plaintiff objects on the ground of relevance. "Medical necessity" is a concept solely relevant to insurance coverage. As Turbocam has denied Lillian insurance coverage for gender dysphoria treatment, there was never any need or opportunity for any health care provider to make a determination of medical necessity. Otherwise undisputed.

## VIII.    Turbocam's Burdens

97.    If Turbocam were forced to cover gender-affirming care, either the Noronhas' religious beliefs and Turbocam's religious mission would be violated or Turbocam would need to stop offering its employees any health insurance, which would impair its ability to hire and retain a qualified workforce, to care for its employees, and to fulfill its mission to create wealth for its employees. Noronha Decl. ¶¶ 3, 10, 16.

**Response:** Disputed that coverage of gender dysphoria treatment would burden the Noronhas' religious beliefs. See Plaintiff's ¶¶ 117–130, *supra*.

98.    Moreover, if Turbocam were to stop providing health insurance altogether and at least one full-time employee enrolls in a health plan and qualifies for a subsidy on one of the government-run Affordable Care Act exchanges, Turbocam would pay a fine of $2,000 per year for each of its fulltime employees. Norohna Decl. ¶ 16.

**Response:** Disputed. There is no foundation for Mr. Noronha's testimony on this point.

99.    Turbocam would not be able to deduct the penalty from its taxes, while Turbocam can deduct the cost of employee health-insurance benefits. Noronha Decl. ¶ 16.

**Response:** Disputed. There is no foundation for Mr. Noronha's testimony on this point.

100.    As a result, Turbocam would suffer financial harm that would make it less competitive. 26 U.S.C. § 4980H(a), (c)(1); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 720–22; Noronha Decl. ¶ 16.

**Response:** Disputed. There is no foundation for Mr. Noronha's testimony on this point.

## IX.    Bernier's Alternatives

101.    Turbocam offers employees a biweekly cash bonus to opt out of Turbocam's health-benefits plan. Ex. E, Hanson Dep. 149:21–150:17; Ex. F, Marino Dep. 34:7–15.

**Response:** Disputed to the extent that this paragraph seeks to imply that the biweekly opt-out bonus is comparable to Turbocam's health benefits coverage.

102.    Roughly 40 percent of Turbocam employees take advantage of the opt-out bonus. Ex. E, Hanson Dep. 155:12–15; Ex. F, Marino Dep. 31:13–18.

**Response:** Undisputed.

103.    Turbocam offered such an option to Bernier and provided websites with coverage options outside Turbocam. Ex. A, Bernier Dep. 129:21–130:10.

**Response:** Undisputed.

104.    Bernier could not remember whether she would have to pay more out of pocket for health insurance if she enrolled in private insurance through the New Hampshire exchange. Ex. A, Bernier Dep. 133.

**Response:** Undisputed.

105.    Bernier has rejected the opt-out bonus. Ex. A, Bernier Dep. 138:3–5.

**Response:** Undisputed.

**PLAINTIFF LILLIAN BERNIER'S COUNTERSTATEMENT OF
ADDITIONAL UNDISPUTED FACTS IN OPPOSITION TO
DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## I.    Gender Dysphoria

131.   The diagnosis of gender dysphoria in DSM-V recognized that gender incongruence, in and of itself, does not constitute a mental disorder. 2d Ettner Decl., Ex. 21 ¶ 26.

132.   The diagnosis of gender dysphoria is based on the clinically significant distress or impairment in social or occupational functioning that some transgender people experience because of the incongruence between assigned sex and gender identity. 2d Ettner Decl., Ex. 21 ¶ 26.

133.   The DSM-V states that: "Gender dysphoria . . . refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender." 2d Ettner Decl., Ex. 21 ¶ 27.

134.   The DSM-V states that: "The current term is more descriptive than the previous DSM-IV term gender identity disorder and focuses on dysphoria as the clinical problem, not identity per se." 2d Ettner Decl., Ex. 21 ¶ 28.

135.   DSM-V states that individuals with gender dysphoria have "[a] marked incongruence between the gender to which they have been assigned . . . and their experienced/expressed gender. . . . There must also be evidence of distress about this incongruence." 2d Ettner Decl., Ex. 21 ¶ 29.

136.   The American Psychiatric Association (APA) explained that the shift in diagnostic criteria from gender identity disorder in DSM-IV to gender dysphoria in DSM-V reflects that "gender nonconformity is not itself a mental disorder. The critical element of gender dysphoria is the presence of clinically significant distress associated with the condition." 2d Ettner Decl., Ex. 21 ¶ 30.

137.   Turbocam's assertion that Lillian Bernier is not impaired in social or occupational functioning because she was married, holds a job, and lives as a woman is a misunderstanding of

the application of the DSM-V diagnostic criteria. The clinically significant distress or impairment in functioning must be interpreted in context. Only the diagnosing clinician, through direct evaluation, can assess the nature and impact of any impairment in functioning. 2d Ettner Decl., Ex. 21 ¶ 31.

138.   Transsexualism is not a current diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (DSM) of the American Psychiatric Association. 2d Ettner Decl., Ex. 21 ¶ 32.

139.   Transsexualism last appeared in the DSM-III-R, which was issued in 1987. 2d Ettner Decl. ¶ 33.

140.   In DSM-III-R, the diagnosis of transsexualism was listed as a subclass of gender identity disorders. 2d Ettner Decl., Ex. 21 ¶ 34.

141.   Transsexualism is not equivalent to the diagnosis of gender dysphoria in the current version of the DSM (DSM-V-TR). 2d Ettner Decl., Ex. 21 ¶ 35.

142.   As with the former diagnosis of gender identity disorder, the diagnosis of transsexualism pathologized having a gender identity different than one's assigned sex. 2d Ettner Decl., Ex. 21 ¶ 36.

143.   The American Medical Association recognizes hormones and various surgical treatments as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 38.

144.   The Endocrine Society recognizes hormones and various surgical treatments as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 39.

145.   The American Academy of Family Physicians recognizes hormones and various surgical treatments as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 40.

146.  The American College of Obstetricians and Gynecologists recognizes hormones and various surgical treatments as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 41.

147.  The American Psychological Association recognizes hormones and various surgical treatments as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 42.

148.  The American Psychiatric Association recognizes hormones and various surgeries as medical interventions for gender dysphoria in adults. 2d Ettner Decl., Ex. 21 ¶ 43.

## II.    Turbocam's Opt-Out Bonus

149.  Turbocam offers an opt-out cash bonus for employees who decline coverage under Turbocam's self-funded employee health plan. 2d Bernier Decl., Ex. 25 ¶ 1.

150.  Prior to initiating an administrative complaint before the New Hampshire Human Rights Commission and Equal Employment Opportunity Commission, Lillian explored whether Turbocam's opt-out bonus was a viable way to obtain adequate health insurance coverage for her and her two children outside of Turbocam's self-funded health plan. 2d Bernier Decl., Ex. 25 ¶ 2.

151.  Because of the complexity of comparing the components of her Turbocam health plan with the many and varied options on the New Hampshire exchange, Lillian's attorneys retained a consultant in October 2022 to determine whether there was a plan on the exchange that would meet her family's needs without costing more than what is taken out of her paycheck under Turbocam's self-funded health plan. 2d Bernier Decl., Ex. 25 ¶ 3.

152.  The consultant reviewed Lillian's Turbocam health plan, researched various health plans on the exchange, and had a phone call with her to discuss this information. 2d Bernier Decl., Ex. 25 ¶ 4.

153.  Even with the assistance of a consultant, comparing the many different aspects of insurance plans was confusing and overwhelming to Lillian. 2d Bernier Decl., Ex. 25 ¶ 5.

154.  For example, Lillian's Turbocam plan is a PPO. She was informed that a PPO plan allows her to see out-of-network doctors, which an HMO plan does not permit. There were no PPO plans on the exchange in her price range. There were also so many variables including not just the substantive coverages, but also differing deductible, coinsurance, and copay amounts. 2d Bernier Decl., Ex. 25 ¶ 6.

155.  In determining the cost of the plan, the consultant also had to determine whether Lillian would be eligible for a subsidy and, if so, the amount. The varying subsidy amounts also varied if Lillian were to purchase an individual plan and place her children on the State of New Hampshire's Medicaid plan or the Children's Health Insurance Program (CHIP). 2d Bernier Decl., Ex. 25 ¶ 7.

156.  In the end, there was a dizzying number of comparisons, projections and possibilities that made it impossible for Lillian to figure out whether there was a plan on the insurance exchange that would meet her family's needs and that she could afford with Turbocam's opt-out bonus. 2d Bernier Decl., Ex. 25 ¶ 8.

157.  In addition, Lillian's monthly budget for groceries, gas, and other expenses for her children is often strained. One of the advantages of Turbocam's health plan is that her premium payment comes directly out of her paycheck. Lillian does not see that money in her bank account, and she can always count on having health insurance. With the opt-out program, Lillian would be paying a substantial amount of money each month directly towards payment for her exchange plan premiums. 2d Bernier Decl., Ex. 25 ¶ 9.

158.  Even though Turbocam would be providing Lillian with a cash payment towards health insurance, this would create a lot of confusion in her monthly budgeting and cause her a lot of anxiety. It might even create a dilemma where in some tight months she would have to choose

between purchasing more food or necessities for her family or paying the health insurance premium. Lillian realized that one of the advantages of employer health insurance is that the money comes directly out of her paycheck so she does not have to worry about budgeting for health insurance. 2d Bernier Decl., Ex. 25 ¶ 9.

### III.    Marian Noronha's Remarks About This Case at Turbocam's All-Staff Meetings

159.  As a Turbocam employee, Lillian is required to attend quarterly staff meetings. 2d Bernier Decl., Ex. 25 ¶ 10.

160.  In August 2025, the mandatory quarterly staff meetings were held on August 20, 2025, for second- and third-shift employees and on August 21, 2025, for first-shift employees. 2d Bernier Decl., Ex. 25 ¶ 11.

161.  Lillian attended the August 20, 2025, meeting in person at Turbocam's Barrington, NH location. 2d Bernier Decl., Ex. 25 ¶ 12.

162.  Lillian estimates that were over 100 people attending the August 20, 2025, meeting in person, as well as many people attending virtually from Turbocam's other locations. 2d Bernier Decl., Ex. 25 ¶ 13.

163.  These meetings are typically recorded so that employees who cannot attend can view the recording. 2d Bernier Decl., Ex. 25 ¶ 14.

164.  Marian Noronha gave a presentation at the August 20, 2025, meeting. 2d Bernier Decl., Ex. 25 ¶ 15.

165.  Early in his presentation, he brought up this lawsuit and mentioned that many employees know that Turbocam is being sued. 2d Bernier Decl., Ex. 25 ¶ 16.

166.  During his discussion of the lawsuit, he projected a PowerPoint-style presentation and displayed a link to the U.S. Department of Justice's press release announcing its filing of a statement of interest in this case. 2d Bernier Decl., Ex. 25 ¶ 17.

167.   It was impossible not to understand that he was talking about Lillian and this lawsuit. 2d Bernier Decl., Ex. 25 ¶ 18.

168.   Several attendees looked directly at Lillian while Mr. Noronha discussed the lawsuit, indicating that they knew Mr. Noronha was talking about her and this lawsuit. 2d Bernier Decl., Ex. 25 ¶ 19.

169.   While the information about this lawsuit was projected on the screen, Mr. Noronha stated that people are blessed to be able to work at Turbocam, and that people give up personal freedom for the opportunity to work at Turbocam. 2d Bernier Decl., Ex. 25 ¶ 20.

170.   Mr. Noronha stated that people who sue Turbocam are ungrateful, cannot be trusted, and do not honor God. 2d Bernier Decl., Ex. 25 ¶ 21.

171.   Also in reference to the lawsuit, he stated that people who take company information to outside parties or post it on social media "sell their souls." 2d Bernier Decl., Ex. 25 ¶ 22.

172.   Mr. Noronha stated that when people sue the company, the costs of defending the suit are expensive and the money to defend the lawsuit does not come from the company but comes out of employees' pockets. 2d Bernier Decl., Ex. 25 ¶ 23.

173.   Mr. Noronha then stated that Turbocam is in the process of revising its honor code. 2d Bernier Decl., Ex. 25 ¶ 24.

174.   Mr. Noronha explained that the reason for the rewrite was that the hiring process was happening too fast and that, as a result, Turbocam had hired employees who were not truly devoted to the company and just wanted to use the company for personal gain. 2d Bernier Decl., Ex. 25 ¶ 25.

175.   Mr. Noronha's discussion of the lawsuit and honor code revision lasted approximately 45 minutes. 2d Bernier Decl., Ex. 25 ¶ 26.

176. First-shift employees who attended the August 21, 2025, meeting have told Lillian that Mr. Noronha gave a presentation with substantially the same content at that meeting. 2d Bernier Decl., <u>Ex. 25</u> ¶ 27.

177. This experience has made Lillian feel very uncomfortable at Turbocam. 2d Bernier Decl., <u>Ex. 25</u> ¶ 28.

178. Since Mr. Noronha's presentation, Lillian has noticed other employees treating her differently by avoiding her or treating her coldly. 2d Bernier Decl., <u>Ex. 25</u> ¶ 29.

179. Lillian is humiliated that Mr. Noronha told all her coworkers—including all of Turbocam's employees on other shifts and at other locations—that she is ungrateful, cannot be trusted, and does not honor God because she brought this lawsuit. 2d Bernier Decl., <u>Ex. 25</u> ¶ 30.

180. Lillian is uncomfortable because Mr. Noronha told all of her coworkers that this lawsuit is taking money out of their pockets. 2d Bernier Decl., <u>Ex. 25</u> ¶ 31.

181. Since Lillian began working at Turbocam, she has attended all of the mandatory quarterly employee meetings. 2d Bernier Decl., <u>Ex. 25</u> ¶ 32.

182. Lillian does not recall any previous mandatory quarterly employee meeting at which Mr. Noronha discussed a lawsuit against the company and accused the plaintiff of being ungrateful, dishonorable, untrustworthy, or not honoring God. 2d Bernier Decl., <u>Ex. 25</u> ¶ 33.

## IV.    Cost Was Not a Factor in Turbocam's Decision About Gender Dysphoria.

183. Cost was not a factor in Turbocam's decision not to cover treatment of gender dysphoria. *See* Hanson Dep., ECF No. 67-5 ("Q: Was cost . . . a factor in the decision of Turbocam not to cover treatment of gender dysphoria, yes or no? A: No.").

## V.    Mr. Noronha's Lack of Interest in and Attention to the Turbocam Health Plan

184. Mr. Noronha testified that he spends "one hour a year" on the Turbocam Health Plan. Noronha Dep., <u>Ex. 22</u> at 10, 94.

185. Negotiating the Turbocam Health Plan's terms and exclusions was "stuff [Mr. Noronha] keep[s] out of." Noronha Dep., Ex. 22 at 127.

186. To the extent that Mr. Noronha took any interest in the plans at all, it was to ensure that it did not cover elective abortion services. Hanson Dep.[7] 77; Marino Dep. 40–41.[8]

187. Mr. Noronha never instructed his staff to ensure that gender dysphoria care was excluded from either the Harvard Pilgrim Plan or the Turbocam Health Plan. Hanson Dep., Ex. 27 at 77; Marino Dep., Ex. 28 at 40–41.

---

[7] Excerpts from the Deposition of Peter Hanson are attached as Exhibit 27 to the accompanying Declaration of Attorney Chris Erchull.

[8] Excerpts from the Deposition of Darika Marino are attached as Exhibit 28 to the accompanying Declaration of Attorney Chris Erchull.

Respectfully submitted,
Lillian Bernier

By her attorneys,

Date: October 8, 2025

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)*
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org

* *Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

*/s/ Chris Erchull*

Date: October 8, 2025

Chris Erchull