# EXHIBIT 25
## Second Declaration of Lillian Bernier

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| LILLIAN BERNIER, <br><br> Plaintiff, <br><br> v. <br><br> TURBOCAM, INC., <br><br> Defendant. | Civil Action No. 1:23-cv-00523-LM-AJ |

**SECOND DECLARATION OF LILLIAN BERNIER**

I, Lillian Bernier, state as follows:

1. Turbocam offers an opt-out cash bonus for employees who decline coverage under Turbocam's self-funded employee health plan.

2. Prior to initiating an administrative complaint before the New Hampshire Human Rights Commission and Equal Employment Opportunity Commission, I explored whether Turbocam's opt-out bonus was a viable way to obtain adequate health insurance coverage for me and my two children outside of Turbocam's self-funded health plan.

3. Because of the complexity of comparing the components of my Turbocam health plan with the many and varied options on the New Hampshire exchange, my attorneys retained a consultant in October 2022 to determine whether there was a plan on the exchange that would meet my family's needs without costing more than what is taken out of my paycheck under Turbocam's self-funded health plan.

4. The consultant reviewed my Turbocam health plan, researched various health plans on the exchange, and had a phone call with me to discuss this information.

5. Even with the assistance of a consultant, comparing the many different aspects of

1

insurance plans was confusing and overwhelming.

6. For example, my Turbocam plan is a PPO. I was informed that a PPO plan allows me to see out-of-network doctors, which an HMO plan does not permit. There were no PPO plans on the exchange in my price range. There were also so many variables including not just the substantive coverages, but also differing deductible, coinsurance and copay amounts.

7. In determining the cost of the plan, the consultant also had to determine whether I would be eligible for a subsidy and, if so, the amount. The varying subsidy amounts also varied if I were to purchase an individual plan and place my children on the State of New Hampshire's Medicaid plan or the Children's Health Insurance Program (CHIP).

8. In the end there were a dizzying number of comparisons, projections and possibilities that made it impossible for me to figure out whether there was a plan on the insurance exchange that would meet my family's needs and that I could afford with Turbocam's opt-out bonus.

9. In addition, my monthly budget for groceries, gas, and other expenses for my children is often strained. One of the advantages of Turbocam's health plan is that my premium payment comes directly out of my paycheck. I do not see that money in my bank account, and I can always count on having health insurance. With the opt-out program I would be paying a substantial amount of money each month directly towards payment for my exchange plan premiums. Even though Turbocam would be providing me with a cash payment towards health insurance, this would create a lot of confusion in my monthly budgeting and cause me a lot of anxiety. It might even create a dilemma where in some tight months I would have to choose between purchasing more food or necessities for my family or paying the health insurance premium. I realized that one of the advantages of employer health insurance is that the money

comes directly out of my paycheck and I don't have to worry about budgeting for health insurance.

10. As a Turbocam employee, I am required to attend quarterly staff meetings.

11. In August 2025, the mandatory quarterly staff meetings were held on August 20, 2025, for second- and third-shift employees and on August 21, 2025, for first-shift employees.

12. I attended the August 20, 2025, meeting in person at Turbocam's Barrington, NH location.

13. I estimate that there were over 100 people attending the August 20, 2025, meeting in person as well as many people attending virtually from Turbocam's other locations.

14. These meetings are typically recorded so that employees who cannot attend can view the recording.

15. Marian Noronha gave a presentation at the August 20, 2025, meeting.

16. Early in his presentation, he brought up this lawsuit and mentioned that many employees know that Turbocam is being sued.

17. During his discussion of the lawsuit, he projected a PowerPoint-style presentation and displayed a link the U.S. Department of Justice's press release announcing its filing of a statement of interest in this case.

18. It was impossible not to understand that he was talking about me and this lawsuit.

19. Several attendees looked directly at me while Mr. Noronha discussed the lawsuit, indicating that they knew Mr. Noronha was talking about me and this lawsuit.

20. While the information about this lawsuit was projected on the screen, Mr. Noronha stated that people are blessed to be able to work at Turbocam, and that people give up personal freedom for the opportunity to work at Turbocam.

21. Mr. Noronha stated that people who sue Turbocam are ungrateful, cannot be trusted, and do not honor God.

22. Also in reference to the lawsuit, he stated that people who take company information to outside parties or post it on social media "sell their souls."

23. Mr. Noronha stated that when people sue the company, the costs of defending the suit are expensive and the money to defend the lawsuit does not come from the company but comes out of employees' pockets.

24. Mr. Noronha then stated that Turbocam is in the process of revising its honor code.

25. Mr. Noronha explained that the reason for the rewrite was that the hiring process was happening too fast and that, as a result, Turbocam had hired employees who were not truly devoted to the company and just wanted to use the company for personal gain.

26. Mr. Noronha's discussion of the lawsuit and honor code revision lasted approximately 45 minutes.

27. First-shift employees who attended the August 21, 2025, meeting have told me that Mr. Noronha gave a presentation with substantially the same content at that meeting.

28. This experience has made me feel very uncomfortable at Turbocam.

29. Since Mr. Noronha's presentation, I have noticed other employees treating me differently by avoiding me or treating me coldly.

30. I am humiliated that Mr. Noronha told all of my coworkers—including all of Turbocam's employees on other shifts and at other locations—that I am ungrateful, cannot be trusted, and do not honor God because I have brought this lawsuit.

31. I am uncomfortable because Mr. Noronha told all of my coworkers that this

lawsuit is taking money out of their pockets.

32. Since I began working at Turbocam, I have attended all of the mandatory quarterly employee meetings.

33. I do not recall any previous mandatory quarterly employee meeting at which Mr. Noronha discussed a lawsuit against the company and accused the plaintiff of being ungrateful, dishonorable, untrustworthy, or not honoring God.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date: __10/5/2025__                                               Lillian Bernier

6