**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

LILLIAN BERNIER,

      Plaintiff,

v.                                                                    Civil Action No. 1:23-cv-00523-LM-AJ

TURBOCAM, INC.,

      Defendant.

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Lillian Bernier is a transgender woman with gender dysphoria. Oct. 8 SOF, PSOF ¶¶ 1–2.[1] Her employer, Turbocam, Inc. ("Turbocam"), disapproves. But for that disapproval, Lillian would be able to submit a claim for gender dysphoria treatment to her employer's third-party health plan administrator. This case presents two issues: 1) whether Turbocam violated civil rights laws that safeguard individuals from discrimination based on protected characteristics; and 2) whether Turbocam can evade liability for that violation by invoking its religious defenses. To answer these questions, "different views of human sexuality and ethical medicine," Def.'s Mem. of Law in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem."), ECF No. 75 at 11, the definition of sex, Oct. 8 SOF, PSOF ¶¶ 8, 60, the medical necessity of any particular treatment for Lillian,[2] and the safety and efficacy of any medical treatment[3] are all irrelevant. Based on the undisputed material facts, this Court should grant Lillian's Motion for Summary Judgment on Count I (Title VII) and Count II (Americans with Disabilities Act ("ADA")) of her complaint and deny Defendant's Motion for Summary Judgment.

---

[1] Throughout her memorandum, Plaintiff refers to her Reply to Turbocam's Responses to Plaintiff's Concise Statement of Undisputed Material Facts, Response to Turbocam's Concise Counterstatement of Undisputed Material Facts, and Counterstatement of Undisputed Material Facts in Support of her Motion for Summary Judgment as "Oct. 8 SOF." Within that statement, Plaintiff's facts are referred to by paragraph as "PSOF," and Defendant's facts are referred to by paragraph as "DSOF."

[2] There is no issue here regarding the medical necessity of a particular treatment for Lillian Bernier or the medical necessity of treatments for gender dysphoria in general. Lillian only seeks to submit a claim for treatment of gender dysphoria and have it evaluated by HPI using its clinical criteria in the ordinary course. Oct. 8. SOF, PSOF ¶ 114.

[3] There is no issue in this case about the risks or benefits of treatments for gender dysphoria. Turbocam acknowledges that it does not have the expertise to make such an assessment and relies upon HPI in such matters. Oct. 8 SOF, PSOF ¶¶ 60, 63. Further, Turbocam disclaimed any reason for the exclusion other than its religious beliefs, including cost. Oct. 8 SOF, PSOF ¶¶ 60, 183.

<u>**ARGUMENT**</u>

**I.    DEFENDANT'S DECISION TO EXCLUDE GENDER DYSPHORIA TREATMENT FROM ITS HEALTH PLAN WAS MOTIVATED BY NEGATIVE ATTITUDES AND BELIEFS ABOUT BEING TRANSGENDER IN VIOLATION OF TITLE VII.**

**A. Lillian Bernier's Title VII Claim is Based on Undisputed Facts About Turbocam's Sex-Based Motives.**

In enacting Title VII, Congress decided that "[a]n individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Bostock v. Clayton Cnty.*, 590 U.S. 644, 660 (2020) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239 (1989) (plurality opinion)). In *Bostock*, a transgender employee informed her employer that she intended to live and work full-time as a woman, and the employer responded by terminating her employment. 590 U.S. at 653–54. The Court held that when an employer disapproves of an employee because of her transgender status and takes an adverse employment action on that basis, the employer necessarily engages in sex discrimination prohibited by Title VII. *Id.* at 651–52. Similarly, in *Price Waterhouse*, the Supreme Court plurality explained that when an employer acts on the basis of attitudes or beliefs about sex, the decision is sex-based within the meaning of Title VII. 490 U.S. at 250 ("[A]n employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender.").

Title VII asks a simple question: was sex a but-for cause of the employment decision at issue? *Bostock*, 590 U.S. at 667. In this case, based on the undisputed direct evidence of sex discrimination, the answer is yes.[4]

---

[4] Defendant ignores that this is a direct evidence case and incorrectly argues that Lillian cannot win on summary judgment because she did not introduce comparator evidence. Def.'s Mem., ECF No. 75 at 9. Courts only look to comparator evidence where the evidence of discrimination is merely circumstantial and only where an employer has proffered a non-discriminatory justification for its adverse action, which Defendant has not done here. *See Smith v. F.W. Morse & Co.*, 76 F.3d 413, 421 (1st Cir. 1996) ("Absent the evidentiary equivalent of a 'smoking gun,' the plaintiff must attempt to prove her case by resort to a burden-shifting framework."). This is a direct evidence

There is no dispute that Defendant controls the terms of its health plan and has authority to include or exclude any benefit and to make exceptions or changes to the plan. Oct. 8 SOF, PSOF ¶ 49. There is also no dispute that when Turbocam's Owner and President, Marian Noronha, learned that he has a transgender employee who requested the removal of the exclusion, Turbocam maintained the exclusion solely based on his belief that sex is immutable and it is wrong for Lillian Bernier to change her sex. That decision was motivated by sex. *See* Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 66-1 at 9–11. *See also* Oct. 8 SOF, PSOF ¶¶ 88–95. When Lillian requested that Turbocam modify the exclusion or grant an exception, Marian Noronha, and Turbocam's head of personnel, Pete Hanson, explained that the request was denied because granting it would involve "assist[ing] employees in erasing or obscuring their sex." Oct. 8 SOF, PSOF ¶¶ 51–55, 60. The request was denied for that reason alone. Oct. 8 SOF, PSOF ¶ 60. Turbocam conducted no assessment of medical necessity, costs, or administrative feasibility. Oct. 8 SOF, PSOF ¶¶ 61–62. The decision rested entirely on Mr. Noronha's belief that "male and female" are "immutable" and that employees must not "erase" their sex "in any other way"—an objection extending beyond medical treatment to transgender status itself. Oct. 8 SOF, PSOF ¶¶ 54–56.[5]

Defendant's post-hoc attempt to reframe its objection as opposition to medical procedures rather than its objection to Lillian being transgender is contradicted by this record.[6] Def.'s Mem.

---

case.

[5] He also stated flatly that "Lillian Bernier is not a woman," Oct. 8 SOF, PSOF ¶ 58, and repeatedly refused to use female pronouns, Oct. 8 SOF, PSOF ¶ 59.

[6] Defendant cites a footnote from *303 Creative v. Elenis* to support its view that a prohibition against discrimination on the status of being transgender does not prohibit discriminating based on gender transition. Def.'s Mem., ECF No. 75 at 23. Nothing in *303 Creative* pertains. The cited footnote distinguishes between expression (constitutionally protected) and status-based discrimination (not protected). *303 Creative LLC v. Elenis*, 600 U.S. 570, 595 n.3 (2023). That distinction

of Law in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Mem."), ECF No. 75 at 13. The objection is to Lillian being transgender and living as a woman, which under *Bostock* is inextricably bound up with sex. A transgender woman is "a person who was identified as a male at birth but who now identifies as a female." *Bostock*, 590 U.S. at 660. Defendant's objection to Lillian "erasing or obscuring sex" is an objection to her being transgender.

Finally, Defendant devotes substantial argument to defending the facial validity of its health plan exclusion, invoking *United States v. Skrmetti* and arguing that the exclusion applies equally to all employees. Def.'s Mem., ECF No. 75 at 5–15. This argument misconstrues Lillian's claim. She does not argue that the health benefits plan violates Title VII on its face.

*Skrmetti* addressed a facial challenge to Tennessee's categorical prohibition on certain medical treatments for transgender minors. 145 S. Ct. 1816, 1826 (2025). The Supreme Court held that the prohibition did not classify minors based on sex or transgender status, and applying rational basis review found that Tennessee offered neutral justifications for its law. The plaintiffs in *Skrmetti* presented no evidence of discriminatory animus motivating the legislation.

This case presents fundamentally different facts. Unlike the defendant in *Skrmetti*, Turbocam offers no neutral explanation for its decision. The sole stated reason is its objection to employees "erasing or obscuring their sex." Oct. 8 SOF, PSOF ¶¶ 51–56, 60, 183. Defendant admits that it insists on excluding transgender health care from its health benefits plan, Def.'s Mem., ECF No. 75 at 38, because "it would be sinful to assist employees in denying, erasing, or obscuring their God-given sex." Oct. 8 SOF, DSOF ¶¶ 50–51; Oct. 8 SOF, PSOF ¶¶ 53–55.

Lillian does not argue Defendant's plan exclusion, on its face, necessarily discriminates based on sex. Rather, she challenges a discretionary employment decision: the refusal to modify

---

is legally irrelevant here.

the plan in response to her specific request, which Defendant admits was motivated by sex-based beliefs. Oct. 8 SOF, PSOF ¶¶ 51–56, 60. This is direct evidence of sex-based motivation that was entirely absent in *Skrmetti*.

**B. It is Immaterial that the Direct Evidence of Turbocam's Sex-Based Motivation Stems from Its Owner's Religious Beliefs.**

Defendant argues that its stated motives cannot be used as evidence of discrimination simply because those motives emanate from Mr. Noronha's religious beliefs. Def.'s Mem., ECF No. 75 at 12–15. This argument conflates two distinct issues: (1) whether discrimination occurred; and (2) whether the Defendant has a religious freedom defense to that discrimination. Defendant has asserted religious freedom defenses in this case, but those are affirmative defenses that assume discrimination has occurred. The religious basis for an employer's actions does not negate the existence of discrimination in the first instance.

It is axiomatic that a defendant's statements can be used as evidence of a plaintiff's claim. *Wisconsin v. Mitchell*, 508 U.S. 476, 489–90 (1993) (The First Amendment "does not prohibit the evidentiary use of speech to establish . . . motive or intent."). This cannot change just because the statements at issue reflect a religious belief.

The Supreme Court has repeatedly pointed to the expression of religious beliefs as evidence of discrimination and has never held that such beliefs insulate parties against liability. In *Newman v. Piggie Park Enterprises, Inc.*, the defendant denied having discriminated based on race in its restaurants, arguing that allowing people of color inside its restaurants "contravenes the will of God." 390 U.S. 400, 402 n.5 (1968) (per curiam). The Court dismissed this defense to a violation of Title II of the Civil Rights Act of 1964 as "patently frivolous." *Id*. In *Bob Jones University v. United States*, a religious university denied enrollment to students in interracial marriages "based upon a sincerely held religious belief," but the Supreme Court upheld the IRS's finding that

5

"maintaining racially discriminatory admissions policies clearly violated federal policy." 461 U.S. 574, 584 (1983).

More recently, in *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, the Court reaffirmed that "religious and philosophical objections . . . do not allow business owners and other actors" to engage in unlawful conduct. 584 U.S. 617, 637 (2018) (regarding "religious opposition to same-sex marriage" as evidence of discrimination but ruling animus in conduct of administrative proceedings below violated Free Exercise). *See City of Fulton v. Philadelphia*, 593 U.S. 522, 530 (2021) (regarding Catholic Social Services' "religious views" as evidence that "it will not certify . . . same-sex married couples" alleged to be in violation of local non-discrimination ordinance and contract provisions, but reversing liability on other grounds).

**C. Even if this Court were to conclude that there is no direct evidence of discrimination, the Court must deny summary judgment to Defendant because the record contains ample evidence to establish an inference of discrimination.**

Under the *McDonnell Douglas* framework, a plaintiff may defeat summary judgment by producing evidence that would permit a reasonable juror to infer that the employer's stated reasons were a pretext for unlawful discrimination. If the plaintiff's showing is sufficient to support a reasonable inference that a discriminatory motive played a role in the challenged decision, summary judgment for the employer must be denied. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804–05 (1973); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The facts here support, at a minimum, a reasonable inference that Defendant was motivated by the employer's sex and transgender status. *See* Pl.'s Mem., ECF No. 66-1 at 8–9. A factfinder may reasonably infer that Mr. Noronha's disapproval of Lillian changing her sex is transgender status discrimination. Further, a factfinder may infer that the fact the exclusion only affects transgender plan members is evidence that it is motivated by transgender status discrimination. Finally, Mr. Noronha admits to maintaining a health plan that is inconsistent with many of his

6

religious beliefs, Oct. 8 SOF, PSOF ¶¶ 116–30, yet he cannot abide treatment for gender dysphoria based on an asserted religious belief. A factfinder may reasonably believe that Defendant's motivation goes beyond just its religious beliefs and infer transgender status discrimination. *See supra* at n.3; *Skrmetti*, 145 S. Ct. at 1833 (noting prohibition on gender transition medical care triggers heightened scrutiny if "the regulation is a mere pretext for invidious sex discrimination").

This Court should grant summary judgment for Plaintiff and deny summary judgment to Defendant on Plaintiff's Title VII claim.

## II.    THE EXCLUSION OF ALL TREATMENT FOR GENDER DYSPHORIA IN TURBOCAM'S SELF-FUNDED HEALTH BENEFITS PLAN VIOLATES THE ADA.

### A.  Lillian Bernier's Gender Dysphoria is a Disability.

The undisputed facts demonstrate that Lillian Bernier's gender dysphoria is a "physical or mental impairment that substantially limits one or more of [her] major life activities." 42 U.S.C. § 12102(1)(A). Turbocam does not contest that Lillian's gender dysphoria meets the statutory definition of "impairment."[7]

In addition, Lillian's gender dysphoria is a serious health condition that substantially limits multiple major life activities. First, Lillian's gender dysphoria substantially limits the major life activities of "caring for oneself" and reproduction. Gender dysphoria is always substantially limiting by virtue of its diagnostic criteria. Gender dysphoria is always substantially limiting by virtue

---

[7] For undisputed facts pertaining to "mental impairment" (29 C.F.R. § 1630.2(h)(2)), *see* Oct. 8 SOF, PSOF ¶¶ 2, 23 (Lillian has been diagnosed with gender dysphoria which is a diagnosis set forth in the Diagnostic and Statistical Manual of the American Psychiatric Association ("DSM"); Weiss Dep. 24–25, Ex. 26 to 2d Erchull Decl. (stating that gender dysphoria is a "mental health disorder" and should be recognized as a psychiatric diagnosis). For undisputed facts pertaining to "physiological impairment" (29 C.F.R. § 1630.2(h)(2)), *see* Oct. 8 SOF PSOF ¶¶ 27–30 (feminizing hormone therapy for a transgender woman with gender dysphoria is a medical treatment intended to correct a "hormonal inconsistency" in the endocrine system; "feminizing hormone therapy affects the endocrine system by suppressing testosterone production and increasing levels of estrogen").

of its diagnostic criteria. Lillian's diagnosis of gender dysphoria means that a clinician has determined that she experienced either distress that rose to a "clinically significant" level or "impairment in social, occupational or other important areas of functioning" (or both) as a result of living in her birth sex. Ettner Decl., ECF 67-4 ¶ 9. Turbocam does not dispute that in its unmitigated state prior to treatment, 42 U.S.C. § 12102(4)(E)(i)(I), Lillian's gender dysphoria caused "distress [that] reached a point where she realized that she had to live as a woman." Oct. 8 SOF, PSOF ¶ 71. That level of distress and the accompanying decision to make such a profound life transformation meets the "substantial limitation" requirement which does not "demand extensive analysis" or require medical evidence. *See* 29 C.F.R. §§ 1630.1(c)(4), 1630.2(j)(1)(v), (4)(iv).

Nor does Turbocam dispute the lifelong impact of Lillian's gender dysphoria, including her permanent medical treatment and protocol, and the limitation and restriction that a vaginoplasty will impose on her reproductive decision-making. *See* Oct. 8 SOF, PSOF ¶¶ 22–35, 31–32, 71–78, 112. Turbocam's sole response that "the *condition*, not the *treatment*, must be the source of the limitation," Def.'s Mem., ECF No. 75 at 30 (emphasis in original), is flatly incorrect.[8] Congress's use of the word "ameliorative" was intentional, as courts and the EEOC have determined. *See* 29 C.F.R. § 1630.2(j)(4)(ii) ("The non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity."); *see also, e.g., Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 186 n.3 (3d Cir. 2020) (statutory provision "only prohibits the consideration of ameliorative mitigatory measures, and does not address potentially negative side effects of medical treatment."); *Fraser v. Goodale*, 342

---

[8] *Id.* ("If the 'ameliorative effects of treatments cannot be considered when assessing limitations, *id.* § 12102(4)(E)(i), the detrimental effects cannot be either.").

F. 3d 1032, 1039 (9th Cir. 2003) ("We must also consider the burden of the mitigating measure, as this bears directly upon the impact of the underlying physical impairment.").

Second, Lillian's gender dysphoria substantially limits the "operation of a major bodily function," specifically her "endocrine . . . function[]." *See* 42 U.S.C. § 12102(2)(B). Gender dysphoria is both an impairment that affects the circulation of essential hormones needed by a woman with gender dysphoria, *see supra*, and absent mitigating measures like hormone therapy, substantially limits the circulation of essential gender-congruent hormones. *See* Oct. 8 SOF, PSOF ¶¶ 28–30, 34, 74. Turbocam's retort that Lillian's endocrine function is "that of a healthy male," Def.'s Mem., ECF No. 75 at 30, is incorrect and irrelevant. *See* Oct. 8 SOF, PSOF ¶¶ 27–30. It is undisputed that Lillian is a transgender woman with a diagnosis of gender dysphoria who as a result has been prescribed female hormones by a medical professional to alter the hormones otherwise produced by her endocrine system.

**B. Gender Dysphoria is not Excluded From the ADA.**

Turbocam does not counter the sound reasoning in *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), *cert. denied*, 143 S. Ct. 2414 (2023), and a substantial number of district courts,[9] that gender dysphoria is not within the ADA's exclusion of "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1) (the "GIDs Exclusion"). Turbocam asserts that gender dysphoria is a "*subset* of all gender identity disorders" because gender dysphoria and the former diagnosis gender identity disorder both require an incongruence between gender identity and assigned sex. Def.'s Mem., ECF No. 75 at 20 (emphasis in original). As the *Williams* court correctly noted, however, the essential feature of gender identity disorders was having a disordered identity. *See Williams*, 45 F.4th at 767, 769. The category of gender identity disorders was removed

---

[9] *See* Pl.'s Mem., ECF No. 66-1, at 18 n.11.

from the DSM in 2013 when gender dysphoria—a new and different diagnosis based on an updated view that gender incongruence was not a mental disorder—was added. A person cannot be diagnosed with gender dysphoria based solely on gender incongruence. The defining feature of gender dysphoria is clinically significant distress or impairment in functioning which some people may experience as a result of gender incongruence. *Id.*; s*ee also* Oct. 8 SOF, PSOF ¶¶ 131–36; Ex. A to 2d Ettner Decl., Ex. 21 (explanation by American Psychiatric Association that "gender nonconformity is not itself a mental disorder" and describing new diagnostic criteria).[10]

Defendant's focus on the ADA's exclusion of "transsexualism," 42 U.S.C. § 12211(b)(1), does not change the analysis. Transsexualism last appeared in the DSM-III-R issued in 1987 and is not a current diagnosis. *See* Oct. 8 SOF, PSOF ¶¶ 138–39. Defendant concedes that when Congress passed the ADA transsexualism was "classified as one of several 'gender identity disorders.'" Def.'s Mem., ECF No. 75 at 16. As such, the analysis of gender identity disorders in *Williams* applies equally to transsexualism. *See also* Oct. 8 SOF, PSOF ¶¶ 138–42 (explaining that "the diagnosis of transsexualism pathologized having a gender identity different than one's assigned sex . . . . This critical distinction between gender dysphoria and the former diagnosis of gender identity disorder is as true for the diagnosis of transsexualism.").[11] Nor do references to antiquated

---

[10] Defendant points out that courts must interpret a statute consistent with its ordinary meaning at the time Congress enacted it. *See* Def.'s Mem., ECF No. 75 at 16 (citing *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018)). Applying this canon, gender dysphoria was not among the four specific gender identity disorders in DSM-III-R at the time Congress passed the ADA. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (3d. ed. rev. 1987) 77, Ex. I to Def.'s Mem., ECF No. 75-9 at 11.

[11] Defendant's assertion that the diagnostic criteria for transsexualism and gender dysphoria "substantially overlap," Def.'s Mem., ECF No. 75 at 17, is not persuasive because the argument concedes the diagnoses are different. Transsexualism and gender identity disorder required "persistent discomfort and sense of inappropriateness about one's assigned sex," DSM-III-R at 77, Ex. I to Def.'s Mem., ECF No. 75-9 at 11; Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 1994) 597, Ex. K to Def.'s Mem., ECF No. 75-11 at 16, but a gender dysphoria diagnosis requires clinically significant distress or impairment in functioning. Am.

diagnostic codes in Lillian's medical and billing records have any bearing on the facts of this case. Whether or why some electronic medical record or billing systems maintain antiquated codes is immaterial. *See also* Oct. 8 SOF, DSOF ¶¶ 25, 35. It is undisputed that Lillian has gender dysphoria and is challenging an exclusion of coverage for that diagnosis.

If this Court determines, as it should, that gender dysphoria is not within the GIDs Exclusion, then it need not address whether gender dysphoria comes within the safe harbor for gender identity disorders "resulting from physical impairments." As *Williams* reasoned, "the need for hormone therapy may well indicate that [plaintiff's] gender dysphoria has some physical basis." *Williams*, 45 F.4th at 771. The undisputed facts here bear that out. Whether analyzed based on the plain meaning of the statutory language or the regulatory definition of "physical impairment," *see supra*, it is undisputed that Lillian's endocrine system does not produce the hormones she needs to function as a transgender woman with gender dysphoria requiring an alteration of her endocrine system.[12] That qualifies as a physical impairment, especially in light of the requirement to read the ADA's exclusions narrowly, *see id.* at 766, and the Court's obligation to determine whether there is a "fairly possible" construction of the statute to avoid a serious constitutional question. *Id*. at 772 (citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).[13]

---

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) 452–53, Ex. H to Turbocam Mem., ECF No. 75-13 at 11–12.

[12] There is no support either in the plain language of the term "physical impairment" or the regulatory definition that Defendant relies upon, Def.'s Mem., ECF No. 75 at 21, for the assertion that this language is limited to certain disorders of sex development. *See id.* at 21–23.

[13] Defendant misconstrues the scope of the constitutional infirmity. *See* Def.'s Mem., ECF No. 75 at 27–28 (discussing suspect class). *See Williams*, 45 F.4th at 773 (discussing *Lawrence v. Texas*, 539 U.S. 558 (2003) and *Romer v. Evans*, 517 U.S. 620 (1996), both cases decided on rational basis grounds). *See also Doe v. Mass. Dep't of Corr.*, Civ. No. 17-12255-RGS, 2018 U.S. Dist. LEXIS 99925, at *20–21 (D. Mass. June 14, 2018) ("It is virtually impossible to square the exclusion of otherwise bona fide disabilities with the remedial purpose of the ADA, which is to redress discrimination against individuals with disabilities based on antiquated or prejudicial conceptions

**C. The ADA Prohibits Discrimination in an Employer Health Plan that Arises Solely from the Employer's Negative Attitudes and Objection to a Particular Disability.**

The text and purpose of the ADA plainly prohibit adverse employment actions solely motivated by the employer's negative attitudes about a specific disability. *See* Pl.'s Mem., ECF No. 66-1 at 15. This is as true when such overt discrimination arises in the provision of health benefits as it is for an any other employer action.[14] The ADA's "safe harbor" provision, 42 U.S.C. § 12201(c)(1), protects *legitimate* underwriting and classification of risks in health plans subject to Title I. At the same time, it prohibits the "safe harbor" from being "used as a subterfuge to evade the purposes" of Title I.[15] Defendant does not engage with the facts of this case. Instead, it contends that the ADA's only requirement regarding its self-funded health benefits plan is that an employer make the same health insurance available to employees with disabilities as it does to employees without disabilities. Def.'s Mem, ECF No. 75 at 31–32. Defendant's sole support for that proposition is a line of inapposite cases which all address the question whether a long-term disability insurance plan's disparity in coverage between groupings of disabilities—physical and mental disabilities—violates the ADA. Those cases address distinctions between *groupings* of disabilities, not the lawfulness of an exclusion from a health plan based solely on hostility to a *specific* disability. Those decisions are also based on considerations not relevant here, including legislative

---

of how they came to their station in life.").

[14] Title I of the ADA prohibits an employer from discriminating on the basis of disability against a qualified individual "in regard to … employee compensation, job training, and other terms, conditions, and privileges of employment," 42 U.S.C. § 12112(a), which defendant does not contest includes its health insurance plan.

[15] 42 U.S.C. § 12201(c) provides in relevant part: "Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict … (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with state law … Paragraph[] … 2 … shall not be used as a subterfuge to evade the purposes of [Title I and III]."

history related to the ADA's treatment of mental disabilities and the ADA's safe harbor provision for legitimate underwriting. Although, as Defendant noted, the First Circuit has left open the question whether purportedly neutral distinctions based on groupings of disability violate the ADA,[16] that issue is not relevant to this case and is not before the Court.

A review of the reasoning in the cases cited by Defendant demonstrates that they are inapplicable to this case. First, those decisions frame a different issue with respect to distinctions between classes or types of disabilities. *See, e.g.*, *Sirva Relocation v. Richie*, 794 F.3d 185, 198 (1st Cir. 2015) (addressing "whether the ADA conclusively permits an employer to offer disparate benefits based solely on type of disability" or "offering disparate benefits to different classes of the disabled"); *Ford v. Schering-Plough Corp.*, 145 F.3d 601, 603 (3d Cir. 1998) (explaining that long-term disability plan treating mental and physical disabilities differently "is a far cry from a specific disabled employee facing differential treatment due to her disability"). In addition, the cases pointed to specific provisions in the ADA's legislative history related to coverage of mental disabilities. *See*, *e.g.*, *Ford*, 145 F.3d at 610 (defeat of provision in HIPAA mandating parity would have been "unnecessary altogether if the ADA already required such parity"); *Witham v. Brigham & Women's Hosp., Inc.*, No. Civ. 00-268-M, 2001 WL 586717, at *1 (D.N.H. May 31, 2001) ("[T]he legislative history. . .support[s] the view that Congress did not intend to prevent employers from offering long-term disability plans with special coverage limitations for mental disabilities when it enacted the ADA. . . .") (quoting *Pelletier v. Fleet Fin. Grp., Inc.*, Nos. Civ. 99-245-B & 99-CV-146-PH, 2000 WL 1513711, at *11 (D.N.H. Sept. 19, 2000)). Finally, unlike this case, which involves an employer-sponsored self-funded plan, these courts emphasized the relevance of

---

[16] *See Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 199 (1st Cir. 2015) (describing factors to resolve such a situation and noting varying decisions among the district courts in the First Circuit).

the ADA's safe harbor provisions and insurance industry practices. *See*, *e.g., Ford*, 145 F.3d at 608 ("The ADA does not require equal coverage for every *type* of disability; such a requirement, if it existed, would destabilize the insurance industry in a manner definitely not intended by Congress when passing the ADA") (emphasis added); *Weyer v. Twentieth Century Fox Film Corp*., 198 F.3d 1104, 1115 (9th Cir. 2000) (insurer's decision to classify "the risks of mental illness, alcoholism, and drug abuse differently from physical disabilities falls within the safe harbor provision . . . .").

On the facts of this case, Defendant's argument is inconsistent with the text and purpose of the ADA. The contrast between broad decisions about the structure and coverage of a plan and singling out a particular disability for adverse treatment, especially when it is based on direct evidence of negative beliefs, is rooted in the ADA itself.[17] The ADA's definition of "discrimination" is wide ranging, *see id.* § 12112(b), and includes discrimination among people with disabilities, not just between people with and without disabilities." *See also Olmstead v. L.C ex rel. Zimring*, 527 U.S. 581, 598 n.10 (1999) (rejecting argument that "a plaintiff cannot prove 'discrimination' by demonstrating that one member of a particular protected group has been favored over another member of that same group" as "incorrect as a matter of precedent and logic").

Further textual evidence for the breadth of the ADA's coverage is reflected in the ADA's safe harbor authorizing employers to establish and/or observe the "terms of a bona fide benefit plan," such as a self-funded health plan, that is not used as a "subterfuge to evade the purposes" of the ADA's employment provisions. 42 U.S.C. § 12201(c)(2). Indeed, for benefit plans that are

---

[17] The EEOC has explained that "[a] term or provision is "disability-based" if it singles out a particular disability (e.g., deafness, AIDS, schizophrenia), a discrete group of disabilities (e.g., cancers, muscular dystrophies, kidney diseases), or disability in general (e.g., non-coverage of all conditions that substantially limit a major life activity)." Equal Emp. Opportunity Comm'n, Notice No. 915.002, *Interim Enforcement Guidance on the Application of the ADA to Disability-Based Distinctions in Employer-Provided Health Insurance* (1993), https://www.eeoc.gov/laws/guidance/interim-enforcement-guidance-application-ada-disability-based-distinctions-employer.

not self-funded, an employer must show that "the terms of [the] bona fide benefit plan" are "based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law." *Id.* That requirement regarding the terms of the plan being based on objective determination of risks would make no sense if, as Defendant claims, the ADA was unconcerned with the content of a plan so long as it was applied equally to all employees. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 537–38 (2015) (affirmative defenses included by Congress relevant to determining meaning of law's prohibition on discrimination).

Virtually all decided cases on health benefits are based on findings of neutral policies or legitimate underwriting classification of risks. Even the Supreme Court, however, in the seminal case *Alexander v. Choate*, 469 U.S. 287, 302, 309 (1985), was mindful of the difference between such policies and cases where there is evidence of a discriminatory motive. In *Alexander*, the Court upheld under the Rehabilitation Act a 14-day cap on Medicaid coverage of inpatient care because "both handicapped and nonhandicapped Medicaid users" were "subject to the same durational limitation." *Id.* at 302. The Court, however, concluded its decision by noting that "[t]he 14-day rule challenged in this case is neutral on its face, [and] is not alleged to rest on a discriminatory motive.").[18] *Id.* at 309.

---

[18] *See also Doukas v. Metro. Life Ins. Co.*, 950 F. Supp. 422, 429–30 (D.N.H. 1996) (finding that plaintiff stated a claim under ADA when mortgage insurance was denied based on a policy not to insure applicants who had more than one occurrence of bipolar disorder symptoms in their lifetime); *Reid v. BCBSM, Inc.*, 984 F. Supp. 2d 949, 955 (D. Minn. 2013) (finding that plaintiff stated a claim under ADA when insurance plan's exclusion of behavioral therapy for autism spectrum disorder "is narrow and applies to the treatment of only one condition," "affects only disabled persons because non-disabled persons would not require such intensive treatment" and the plan "covers the same behavioral therapy for the treatment of other 'directly comparable' conditions"); *Iwata v. Intel Corp.,* 349 F. Supp. 2d 135, 155 (D. Mass. 2004) (holding that allegation that disability plan's requirement that individuals with psychiatric conditions be confined in mental hospital in order to receive benefits was "motivated by stereotypes about mental disability, rather than by

The undisputed direct evidence in this case demonstrates that the only reason that Defendant has chosen to exclude treatment for gender dysphoria is its negative attitudes and beliefs about treatment for gender dysphoria—specifically its objection to an employee altering their sex. The evidence is devoid of any hint of legitimate underwriting. Defendant agrees that its decision to exclude gender dysphoria in its health plan was solely based on its objection to treatment for that condition and its personnel director specifically disclaimed cost as any basis for the decision. *See* Oct. 8 SOF, PSOF ¶ 183. In other words, Turbocam's decision was because of Lillian Bernier's disability. This violates the ADA.

This Court should grant summary judgment for Plaintiff and deny summary judgment to Defendant on Plaintiff's ADA claim.

## III.  TURBOCAM'S RELIGIOUS DEFENSES FAIL.

Turbocam seeks to evade liability for its discrimination by invoking the Religious Freedom Restoration Act ("RFRA") and the Free Exercise Clause to the First Amendment. Such arguments have been raised before, and courts have repeatedly rejected them. *E.g.*, *Piggie Park*, 390 U.S. at 402 n.5 (rejecting a litigant's argument that an antidiscrimination law was invalid because its application to his business would "contraven[e] the will of God" as "patently frivolous"); *Runyon v. McCrary*, 427 U.S. 160, 176 (1976) (rejecting religious school's right to exclude Black children on First Amendment grounds because "the Constitution places no value on discrimination"). This court should do the same.

---

actuarial considerations . . . stated a claim under the ADA").

### A. Turbocam has no defense under RFRA.

#### 1. RFRA does not apply to suits between private parties.

RFRA cannot be raised as a defense to Lillian's Title VII or ADA claims. Defendant offers no binding authority supporting its position and instead leans entirely on the divergent Second Circuit decision *Hankins v. Lyght*, 441 F.3d 96, 103 (2d Cir. 2006), which has been expressly questioned by a later Second Circuit opinion. *Rweyemamu v. Cote*, 520 F.3d 198, 203–04 (2d Cir. 2008); *id.* at 203 n.2 ("[W]e do not understand how [RFRA] can apply to a suit between private parties . . . ."). No other circuit has adopted *Hankins*'s approach. *See Listecki v. Official Comm. of Unsecured Creditors*, 780 F.3d 731, 736–37 (7th Cir. 2015) ("RFRA is not applicable in cases where the government is not a party . . . ."); *Gen. Conf. Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 410 (6th Cir. 2010) (same).

Defendant's textual arguments are unavailing.[19] While RFRA defines "government" broadly, 42 U.S.C. § 2000bb-2(1), and allows parties to "obtain appropriate relief against a government," *id.* § 2000bb-1(c), that provision is properly read as limiting remedies to government defendants, not expanding RFRA into private litigation. *Listecki* emphasized that RFRA's "appropriate relief against a government" language constrains the statute's scope: "[T]he government is not a party; the Committee . . . is not the 'government' for RFRA purposes." 780 F.3d at 736 (internal citation omitted). Congress knows how to convey its intended scope of relief when drafting legislation, and its choice to confine relief to the "government" expresses that intent.

---

[19] Defendant relies heavily on legislative history and purported purpose in its argument, Def.'s Mem., ECF No. 75 at 34, 36, which underscores that their position cannot be supported by the statute's actual language. *See Succar v. Ashcroft*, 394 F.3d 8, 31 (1st Cir. 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 481 (1999)) ("Where the plain text of the statute is unmistakably clear on its face, there is no need to discuss legislative history."). Here, the text of RFRA clearly limits relief to government defendants.

Defendant also posits without support that a private plaintiff steps into the shoes of the EEOC after a right-to-sue letter is issued (i.e., acts "under color of law"). But the color-of-law doctrine does not convert every party enforcing a statute with a private right of action into a government actor. *See Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982) (party acts under color of law only when the party's conduct is fairly attributable to state); *see also Tanzin v. Tanvir*, 592 U.S. 43, 48–51 (2020) (explaining that RFRA's "officials … acting under color of law" language allows individuals to assert RFRA claims against government officials in their private capacity, including for money damages). Lillian is not within RFRA's definition of "government."

### 2. Even if RFRA were to apply, Turbocam cannot prove a substantial burden on its sincerely held religious beliefs.

The undisputed facts negate Turbocam's assertion that covering gender dysphoria treatment substantially burdens its sincerely held religious beliefs. Marian Noronha[20] testified that various aspects of the coverage provided by the health plan conflict with his religious beliefs in numerous other ways, and yet he tolerates and allows that coverage. For example, Mr. Noronha testified that providing spousal health benefits to the same-sex spouses of Turbocam's employees would violate his religious beliefs to such an extent that he "might shut down the company." Oct. 8 SOF, PSOF ¶¶ 117–20. Turbocam does, in fact, provide spousal benefits for the same-sex spouses of its employees under the Turbocam Health Plan. Oct. 8 SOF, PSOF ¶ 121.

In addition, Mr. Noronha testified that it violates his religious beliefs to destroy a fertilized embryo. Oct. 8 SOF, PSOF ¶ 124. But the Turbocam Health Plan covers in-vitro fertilization ("IVF"), even though IVF necessarily requires the creation and destruction of fertilized embryos.

---

[20] As the President and a Director of Turbocam, Oct. 8 SOF, PSOF ¶ 15, Mr. Noronha's personal religious beliefs form the basis of Turbocam's objection to removing the Exclusion from the Turbocam Health Plan.

Oct. 8 SOF, PSOF ¶¶ 122–23. Similarly, Mr. Noronha is aware that some stem cell transplants require the creation and destruction of fertilized embryos. Oct. 8 SOF, PSOF ¶ 128. But the Turbocam Health Plan covers stem cell transplants and does not distinguish between transplants that require the destruction of an embryo and those that do not. Oct. 8 SOF, PSOF ¶ 129.

The lack of attention that Mr. Noronha has paid to his company's health plan's coverage of gender dysphoria treatment also undercuts any argument that covering the care would create a substantial burden on his religion. Mr. Noronha spends "one hour a year" on the Turbocam Health Plan. Oct. 8 SOF, PSOF ¶ 184. Negotiating the Turbocam Health Plan's terms and exclusions was "stuff [he] keep[s] out of." Oct. 8 SOF, PSOF ¶ 185. Mr. Noronha demonstrated the actions he takes when a treatment covered by the Turbocam Health Plan burden his religious beliefs when he instructed his staff more than once to ensure the plan does not cover elective abortion services. Oct. 8 SOF, PSOF ¶ 186. By contrast, he never instructed his staff to ensure that gender dysphoria care was excluded from either the Harvard Pilgrim Plan or the Turbocam Health Plan before Lillian began her gender transition. Oct. 8 SOF, PSOF ¶ 187.

Thus, Mr. Noronha's inconsistent treatment of health care coverage in the Turbocam Health Plan that violates his religious beliefs and general lack of interest and attention to the matter preclude any finding that covering gender dysphoria treatment for Lillian would substantially burden his religion.

### 3. Title VII and the ADA are the least restrictive means to achieve a compelling government interest in eradicating employment discrimination.

Even assuming, for the sake of argument, that Turbocam has demonstrated a burden on its religion, any such burden is justified by the compelling interest in eradicating employment discrimination. Antidiscrimination statutes "protect[] the State's citizenry from a number of serious social and personal harms," including the removal of barriers to "social integration that have

19

historically plagued certain disadvantaged groups." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625–26 (1984). Title VII enables members of disadvantaged groups—such as Lillian—who might otherwise be excluded from employment opportunities to participate more fully in society and provide for their families. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971) ("The objective of Congress in the enactment of Title VII . . . was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees; *see also* 29 C.F.R. § 1608.1(b) ("Congress enacted [T]itle VII in order to improve the economic and social conditions of minorities and women by providing equality of opportunity in the work place."). The ADA, like Title VII,[21] is an anti-discrimination law that expands federal protections to also prohibit disability discrimination. In passing and amending the ADA, Congress "provide[d] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), because "discrimination against individuals with disabilities persists in such critical areas as employment" and "individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination," 42 U.S.C. § 12101(a)(3)–(4).

There is broad agreement among Circuit Courts of Appeals that the eradication of employment discrimination is a compelling government interest. *See, e.g., West v. Radtke*, 48 F.4th 836, 848 (7th Cir. 2022) (holding, in RLUIPA case, that "[e]veryone agrees that complying with Title VII is a compelling governmental interest"); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 595 (6th Cir. 2018), *aff'd sub nom. Bostock v. Clayton Cty.*, 590 U.S. 644 (2020) (acknowledging government's compelling interest in providing an equal opportunity to participate

---

[21] The ADA, for example, expressly incorporates Title VII's powers, remedies, and procedures. 42 U.S.C. § 12117.

in the workforce without facing discrimination); *Werft v. Desert Sw. Annual Conference*, 377 F.3d 1099, 1102 (9th Cir. 2004) ("There is no question that elimination of discrimination—the goal of Title VII—is a compelling state interest of the highest order.") (internal quotation marks omitted); *Rayburn v. Gen. Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (same).[22]

Defendant relies on *Fulton and Lukumi*, but no authority holds that the government's interest in eradicating employment discrimination is not compelling. To the contrary, in *Fulton*, the Supreme Court acknowledged the city's "weighty" nondiscrimination interest in its foster child placement contracts. 593 U.S. at 542. It narrowed the interest to the question of whether the city had an interest in denying an exception to a religious placement agency because its placement system included a system of discretionary exceptions for secular reasons. *Id.* at 537–38, 542. Title VII, by contrast, was enacted for the express purpose of eradicating discrimination and no system of individualized, discretionary exceptions exists.

*Lukumi* is similarly inapplicable here. That case held that the city of Hialeah's asserted interests in prohibiting religious animal sacrifice were not compelling because it permitted the killing of animals for myriad secular reasons under similar conditions. 508 U.S. at 543–45. But Title VII treats all employment discrimination equally, regardless of whether the discrimination is motivated by a religious belief or a secular one. Turbocam confuses this test by arguing that it should be treated the same as the employers with fewer than 15 employees that are not covered by Title VII. But the appropriate comparison is that Turbocam, a 600-employee company with a

---

[22] The only Circuit Court case that Defendant cites to support the argument requiring a narrower interest than the eradication of discrimination, *Braidwood Management v. EEOC*, faulted the EEOC for not demonstrating a compelling interest in denying a religious employer an "exemption," something Lillian has no authority to grant. *See* 70 F.4th 914 (5th Cir. 2023).

religious owner, is treated the same under Title VII as a 600-employee company with a secular owner.

Beyond serving a compelling state interest, "[a]nti-discrimination laws are 'precisely tailored' to achieving" this interest. The only way to prohibit discrimination is to prohibit discrimination. *See, e.g.*, *R.G. & G.R. Harris*, 884 F.3d at 595 ("Title VII constitutes the least restrictive means for eradicating discrimination in the workforce."); *EEOC v. Preferred Mgmt. Corp.*, 216 F. Supp. 2d 763, 810–11 (S.D. Ind. 2002) (concluding that Title VII's "intrusion is the least restrictive means that Congress could have used to effectuate its purpose" due to its uniform approach and various provisions accommodating religious beliefs and practices).

*Hobby Lobby* helps to illustrate why anti-discrimination statutes are narrowly tailored. *Hobby Lobby* dealt with rules promulgated under the Affordable Care Act that required employer group health benefits plans to cover certain contraceptive methods. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 697 (2014). The court found that the government had not met its burden to show that requiring employers to pay for this coverage was the least restrictive means to achieve its goal of ensuring access to the contraceptive methods. *Id.* at 728. This was because the government had an alternative means of achieving its interest: an existing government program that could cover the costs of the challenged contraceptive methods. *Id.* at 728–29.

Defendant's suggestions for a more narrowly tailored approach, by contrast, have no basis in law or practicality. Def.'s Mem., ECF No. 75 at 43–46. There is no government program available to cover the costs of Lillian's care, nor could this court compel the creation of such a program. Defendant's suggestion that Lillian avail herself of its "opt out bonus" neither addresses the underlying discrimination nor is it feasible. Even if Lillian were able to find an alternative means of paying for her care, that would leave in place the very discrimination that Title VII and the ADA

seek to eradicate. Turbocam cites no authority supporting a contrary conclusion. And even if alternative coverage could redress the discrimination—and it cannot—Lillian has already researched her available options for using the opt-out bonus and concluded that no equivalent plans exist that address her and her family's healthcare needs. Oct. 8 SPF, PSOF ¶¶ 149–58.

### B. The Free Exercise Clause of the First Amendment does not excuse Turbocam's refusal to remove the Exclusion.

"The right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Swartz v. Sylvester*, 53 F.4th 693, 699–700 (1st Cir. 2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (internal quotation omitted)).

### 1. Title VII and the ADA are neutral laws of general applicability.

Title VII and the ADA are neutral laws of general applicability that govern the employment actions of employers with religious owners. *EEOC. v. Roman Catholic Diocese of Raleigh*, 213 F.3d 795, 801 (4th Cir. 2000); *see also, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C*, 565 U.S. 171, 190 (2012) ("It is true that the ADA's prohibition on retaliation . . . is a valid and neutral law of general applicability."); *EEOC v. Roman Catholic Diocese*, 48 F. Supp. 2d 505, 512 (E.D.N.C. 1999) ("The court agrees with plaintiff that Title VII is a neutral law of general applicability"). Title VII's various carveouts for religious employers afford them more favorable—not less favorable treatment. Other exemptions in the statute apply equally to religious and non-religious employers and are, therefore, not the type of exemptions that render a statute not generally applicable.[23] *See, e.g.*, *McMahon v. World Vision, Inc.*, 704 F. Supp. 3d 1121, 1142 (W.D.

---

[23] All statutes have language limiting the entities they regulate or the circumstances under which they apply. The statute at issue in *Smith*, itself, did not criminalize the possession of controlled substances that had "been prescribed by a medical practitioner," but it was still held generally

Wash. 2023) (holding that Title VII is neutral for purposes of the Free Exercise Clause), *rev'd on other grounds*, 147 F.4th 959 (9th Cir. 2025), *Doe v. Catholic Relief Servs.*, 618 F. Supp. 3d 244, 254–55 (D. Md. 2022) (rejecting argument that Title VII is not neutral and generally applicable), *reh'g granted on other grounds*, 2023 U.S. Dist. LEXIS 5889 (D. Md. Jan. 11, 2023), *appeal docketed,* No. 25-1569 (4th Cir. May 21, 2025); *cf. St. Mary's Cath. Par. in Littleton v. Roy*, No. 24-1267, 2025 U.S. App. LEXIS 25393, at *24–38 (10th Cir. Sept. 30, 2025) (explaining why Colorado's antidiscrimination law survives review under *Smith*).

Turbocam's citation to *Fulton* is unavailing because the types of individualized, discretionary exceptions available under the City of Philadelphia's foster placement agency contract are wholly different from the categorical lines drawn in Title VII. Under Philadelphia's contract, a placement agency that would otherwise by law be required to comply with the city's anti-discrimination protections could be excused from compliance at the "sole discretion" of the city's Health and Human Services Commissioner. *Fulton*, 593 U.S. at 535. The court found that it was this "inclusion of a formal system of entirely discretionary exceptions [that] render[ed] the . . . non-discrimination provision not generally applicable." *Id.* at 536. By contrast, Title VII applies to any employer that satisfies the statutory criteria (*e.g.*, employing 15 or more employees, etc.). No system of discretionary exceptions exists.

*Tandon*, similarly, does nothing to undermine the neutrality and general applicability of Title VII or the ADA. *Tandon* held likely invalid a prohibition on religious gatherings of more than three households during the Covid-19 pandemic because California permitted some equally sized secular gatherings. *Tandon v. Newsom*, 593 U.S. 61, 63–64 (2021). Title VII and the ADA are not comparable because they make workplace discrimination unlawful regardless of whether the

---

applicable. 494 U.S. at 874.

employer's motivation is religious or secular. Under these statutes, there is no secular discrimination that is treated more favorably than religiously motivated discrimination. *Cf. Tandon*, 593 U.S. at 63–64. Defendant's cited exceptions that a secular employer might use to deny such coverage are equally available to religious and secular employers. Here, however, Turbocam has disavowed any reason for its decision other than its disapproval of Lillian's transgender status and gender dysphoria.

Because RFRA does not apply to disputes between private parties, and because neither RFRA nor the First Amendment excuses Turbocam from complying with the requirements of Title VII and the ADA, this court should reject Turbocam's religious defenses.

## IV.   TURBOCAM'S FREE SPEECH DEFENSE FAILS.

Turbocam cursorily argues that covering mental health treatment for gender dysphoria would violate its rights under the Free Speech clause of the First Amendment. Turbocam identifies no case holding that paying for mental health counseling equates to compelled speech or that a therapist's speech is attributable to the entity paying the therapist's bill. Nor is there anything in the record suggesting that Turbocam monitors the content of its employees' therapy sessions to ensure their compliance with Marian Noronha's religious beliefs. This court should reject Turbocam's undeveloped and unsupported free speech defense.

## <u>CONCLUSION</u>

For the foregoing reasons, this court should grant Plaintiff Lillian Bernier's Motion for Summary Judgment on Count I (Title VII) and Count II (ADA) of her complaint and deny Defendant's Motion for Summary Judgment.

Respectfully submitted,
Lillian Bernier

By her attorneys,

Date: October 8, 2025

*/s/ Chris Erchull*
Chris Erchull (N.H. Bar No. 266733)
Bennett Klein (Mass. Bar No. 550702)*
Michael Haley (N.H. Bar No. 270236)
GLBTQ Legal Advocates & Defenders
18 Tremont St. Ste. 950
Boston, MA 02108
(617) 426-1350
cerchull@gladlaw.org
bklein@gladlaw.org
mhaley@gladlaw.org

* *Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing document using CM/ECF system, which will send notification of such filing(s) to all those registered with the ECF system.

Date: October 8, 2025

*/s/ Chris Erchull*
Chris Erchull

26