**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

LILLIAN BERNIER

　　　　　　*Plaintiff*,

　v.

TURBOCAM, INC.,

　　　　　　*Defendant*.

Civil Action No. 1:23-cv-00523-LM-AJ

---

**TURBOCAM, INC.'S REPLY IN SUPPORT OF ITS**
**CROSS-MOTION FOR SUMMARY JUDGMENT**

---

James R. Conde*
D.C. Bar No. 1031694
Laura B. Ruppalt*
D.C. Bar No. 90033927
BOYDEN GRAY PLLC
800 Connecticut Avenue NW,
Suite 900
Washington, DC 20006
Telephone: (202) 955-0620
jconde@boydengray.com
lruppalt@boydengray.com

Bethany P. Minich
N.H. Bar No. 265413
LITCHFIELD CAVO LLP
6 Kimball Lane, Suite 200
Lynnfield, MA 01940
Telephone: (781) 309-1500
minich@litchfieldcavo.com

Roger L. Byron*
Texas State Bar No. 24062643
E. Cliff Martin*
Texas State Bar No. 24127208
FIRST LIBERTY INSTITUTE
2001 West Plano Parkway, Suite 1600
Plano, Texas 75075
Telephone: (972) 941-4444
rbyron@firstliberty.org
cmartin@firstliberty.org

* *Pro hac vice*

***Counsel for Defendant***
*Turbocam, Inc.*

November 5, 2025

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 1

I.      Bernier's Title VII Claim Fails as a Matter of Law ............................................... 1

II.     Bernier's ADA Claim Fails as a Matter of Law .................................................... 6

        A.      Bernier's Gender Dysphoria Is Expressly Excluded from the ADA ..................... 6

        B.      Turbocam's Health Plan Does Not Discriminate Based on Disability ................. 9

        C.      Bernier Has Not Shown That Her Gender Dysphoria Is a Disability ................. 12

III.    The Religious Freedom Restoration Act (RFRA) Bars Bernier's Claims ....................... 13

        A.      RFRA Applies ........................................................................................ 13

        B.      Bernier's Requested Relief Would Substantially Burden Free Exercise ............. 15

        C.      Bernier Does Not Satisfy Strict Scrutiny .............................................. 16

IV.     Bernier's Claims Are Barred by the Free Exercise Clause ............................... 19

CONCLUSION ................................................................................................................. 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023).................................................................................................19

*Alkhawaldeh v. Dow Chem. Co.*,
  851 F.3d 422 (5th Cir. 2017) ...............................................................................2, 3

*Ames v. Ohio Dep't of Youth Servs.*,
  605 U.S. 303 (2025)..................................................................................................2

*Bear Creek Bible Church v. EEOC*,
  571 F. Supp. 3d 571 (N.D. Tex. 2021) ...................................................................20

*Bob Jones Univ. v. United States*,
  461 U.S. 574 (1983)...................................................................................................6

*Bostock v. Clayton County*,
  590 U.S. 644 (2020)..........................................................................................2, 3, 4

*Braidwood Mgmt., Inc. v. EEOC*,
  70 F.4th 914 (5th Cir. 2023) .............................................................................16, 17

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014)......................................................................15, 16, 17, 18

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1993)................................................................................................17

*Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*,
  322 U.S. 102 (1944)................................................................................................12

*Collier v. City of Chicopee*,
  158 F.3d 601 (1st Cir. 1998)....................................................................................9

*EEOC v. Cath. Univ. of Am.*,
  83 F.3d 455 (D.C. Cir. 1996)...................................................................................15

*EEOC v. CNA Ins. Cos.*,
  96 F.3d 1039 (7th Cir. 1996) .............................................................................10, 11

*Escribano-Reyes v. Pro. Hepa Certificate Corp.*,
  817 F.3d 380 (1st Cir. 2016)....................................................................................18

*Ford v. Schering-Plough Corp.*,
    145 F.3d 601 (3d Cir. 1998)..................................................................10, 11

*Frontiero v. Richardson*,
    411 U.S. 677 (1973).................................................................................3

*Fulton v. City of Philadelphia*,
    593 U.S. 522 (2021).........................................................................17, 20

*Gonzales v. O Centro Espirita Beneficente Uniao*
    *do Vegetal*, 546 U.S. 418 (2006)......................................................16, 17

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009).................................................................................3

*Gundy v. United States*,
    588 U.S. 128 (2019)...............................................................................14

*INS v. Chadha*,
    462 U.S. 919 (1983).................................................................................7

*Kimber v. Thiokol Corp.*,
    196 F.3d 1092 (10th Cir. 1999) ........................................................10, 11

*Krauel v. Iowa Methodist Med. Ctr.*,
    95 F.3d 674 (8th Cir. 1996) ..............................................................10, 11

*Landell v. Sorrell*,
    406 F.3d 159 (2d Cir. 2005)..................................................................13

*Lange v. Houston County*,
    152 F.4th 1245 (11th Cir. 2025) .......................................................1, 2, 4

*Lewis v. Kmart Corp.*,
    180 F.3d 166 (4th Cir. 1999) ............................................................10, 11

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*,
    591 U.S. 657 (2020)..........................................................................16, 18

*Masterpiece Cakeshop v. Colo. C.R. Comm'n*,
    584 U.S. 617 (2018)............................................................................6, 19

*McCreight v. AuburnBank*,
    117 F.4th 1322 (11th Cir. 2024) .............................................................3

*Modderno v. King*,
    82 F.3d 1059 (D.C. Cir. 1996) ...............................................................10

*Muldrow v. City of St. Louis*,
   601 U.S. 346 (2024) ............................................................................................2

*Newman v. Piggie Park Enters., Inc.*,
   390 U.S. 400 (1968) ............................................................................................6

*Parker v. Metro. Life Ins. Co.*,
   121 F.3d 1006 (6th Cir. 1997) ....................................................................10, 11

*Ramirez v. Collier*,
   595 U.S. 411 (2022) ..........................................................................................16

*Rogers v. Dep't of Health & Env't Control*,
   174 F.3d 431 (4th Cir. 1999) ............................................................................11

*St. Mary's Honor Ctr. v. Hicks*,
   509 U.S. 502 (1993) ............................................................................................5

*Succar v. Ashcroft*,
   394 F.3d 8 (1st Cir. 2005) .................................................................................11

*Tandon v. Newsom*,
   593 U.S. 61 (2021) ............................................................................................20

*Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*,
   450 U.S. 707 (1981) ..........................................................................................16

*United States v. Skrmetti*,
   145 S. Ct. 1816 (2025) ...................................................................................1, 5

*Weyer v. Twentieth Century Fox Film Corp.*,
   198 F.3d 1104 (9th Cir. 2000) ...........................................................9, 10, 11, 12

*Williams v. Kincaid*,
   45 F.4th 759 (4th Cir. 2022) .........................................................................9, 12

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ............................................................................................7

*In re Young*,
   141 F.3d 854 (8th Cir. 1998) ............................................................................15

*In re Young*,
   82 F.3d 1407 (8th Cir. 1996) ......................................................................14, 15

**Statutes**

42 U.S.C. § 1396r-3 ....................................................................................................7

42 U.S.C. § 2000bb ........................................................................................................14

42 U.S.C. § 2000bb-1(c) ...........................................................................................13, 14

42 U.S.C. § 2000bb-2 ...................................................................................................14

42 U.S.C. § 2000bb-2(1) ...............................................................................................14

42 U.S.C. § 2000bb-3(a) ...............................................................................................13

42 U.S.C. § 2000bb(b) ..................................................................................................14

42 U.S.C. § 2000cc-3(g) ...............................................................................................13

42 U.S.C. § 2000cc-5(7)(A) ..........................................................................................16

42 U.S.C. § 2000e-2(a)(1) ...............................................................................................2

42 U.S.C. § 2000e-2(m) ..................................................................................................3

42 U.S.C. § 2000e-5(g)(2)(B)(ii) ...................................................................................3, 6

42 U.S.C. § 2000e(b) .....................................................................................................20

42 U.S.C. § 12102(1) .....................................................................................................12

42 U.S.C. § 12102(1)(A) ...........................................................................................12, 13

42 U.S.C. § 12111(5)(A) ................................................................................................20

42 U.S.C. § 12112 ..........................................................................................................11

42 U.S.C. § 12112(a) .......................................................................................................9

42 U.S.C. § 12201(c) .....................................................................................................10

42 U.S.C. § 12211(b) ................................................................................................11, 12

42 U.S.C. § 12211(b)(1) ........................................................................................6, 7, 8, 9

**Other Authorities**

29 C.F.R. § 1630.2(j)(4)(ii) ...........................................................................................13

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ..............................................................................................................14

Am. Psych. Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. text rev. 2022) .................................................................................................12

CMS, *Health Insurance Exchanges 2025 Open Enrollment Report*,
https://tinyurl.com/3sa4z445.................................................................................................18

*Facts & Data on Small Business and Entrepreneurship*, Small Bus. &
Entrepreneurship Council, https://perma.cc/MU32-NZ44 ......................................................20

## INTRODUCTION

Bernier's opposition proves Turbocam's point: Bernier seeks to enlist this Court to oversee non-discriminatory health plans and punish Christian beliefs. But Title VII and the Americans with Disabilities Act ("ADA") are anti-discrimination laws. They are not gender-affirming care mandates, nor do they single out religious beliefs for punishment. Rather, they prohibit worse treatment because of an employee's sex (as relevant here) or disability. Because Turbocam offers Bernier the same health-benefits plan it offers every other employee, there is no worse treatment, so Bernier's Title VII and ADA claims fail as a matter of law. Bernier's ADA claim also fails because her gender dysphoria is indisputably excluded as a "disability." And regardless, Bernier's claims are barred by the Religious Freedom Restoration Act ("RFRA") and the First Amendment, which protect Turbocam's right to operate consistent with its owner's sincerely held religious beliefs. This Court should therefore grant summary judgment for Turbocam.

## ARGUMENT

### I.    Bernier's Title VII Claim Fails as a Matter of Law

Bernier concedes, as she must after *United States v. Skrmetti*, that Turbocam's health-benefits plan doesn't facially discriminate based on sex. Bernier's Opp. to Turbocam's Cross-Mot. for Summ. J. at 4 ("Bernier's Opp."), Dkt. 88; *see United States v. Skrmetti*, 145 S. Ct. 1816 (2025). Under Title VII, an employer's health-benefits plan doesn't facially discriminate when, as here, the "policy does not pay for a sex change operation for anyone regardless of their biological sex." *Lange v. Houston County*, 152 F.4th 1245, 1252 (11th Cir. 2025) (en banc); *see id.* at 1257 (Rosenbaum, J., concurring in the judgment) (agreeing with "deep regret" that *Skrmetti* "binds us").

Bernier instead purports to "challenge[] a discretionary employment decision: the refusal to modify the plan in response to her specific request." Bernier's Opp. at 4–5. In other words, Bernier argues that Turbocam's failure to treat Bernier *differently* by allowing Bernier a variance

from the plan violates Title VII. But of course, Turbocam's equal treatment of Bernier is the op-posite of discrimination. *Cf. Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 309 (2025) ("Title VII's disparate-treatment provision draws no distinctions between majority-group plaintiffs and minority-group plaintiffs.").

To get around this problem, Bernier now claims she doesn't need to show differential (i.e., worse) treatment to prove "but-for" causation. Bernier's Opp. at 2 & n.4. Instead, Bernier argues that Turbocam violated Title VII because it was motivated by the Noronhas' religious opposition to erasing or obscuring an individual's sex. *Id.* at 2–5. In other words, Bernier argues Title VII punishes "sex-based *beliefs*," not just worse treatment. *Id.* at 5 (emphasis added).

That is not the law. "It is well-established that a Title VII claimant can only prove disparate treatment by presenting evidence that he was treated less favorably than others outside of his pro-tected class." *Alkhawaldeh v. Dow Chem. Co.*, 851 F.3d 422, 427 (5th Cir. 2017) (emphasis omit-ted). That well-established rule follows from the text. Title VII prohibits "discriminat[ing] against any individual with respect to … terms … of employment" because of sex. 42 U.S.C. § 2000e-2(a)(1) (emphasis added). "'Discriminate against' means treat worse, here based on sex." *Muldrow v. City of St. Louis*, 601 U.S. 346, 355 (2024). In other words, Turbocam may not penalize Bernier in the terms of employment for being male. *Bostock v. Clayton County*, 590 U.S. 644, 667 (2020).

Here, Turbocam doesn't treat Bernier "worse" in the terms of employment, but the same. *Muldrow*, 601 U.S. at 355. Turbocam's refusal to cover Bernier's gender-affirming care "is not a penalty in any sense of the word. The plan does not, for example, impose a surcharge on employees who have undergone a sex change. Instead, the plan declines to extend a benefit—namely, cover-age for a sex change operation. And that benefit is declined to everyone." *Lange*, 152 F.4th at 1254. Bernier "has failed to produce any evidence that [Bernier] was treated less favorably than

others 'similarly situated' outside of h[er] protected class. Therefore, h[er] Title VII discrimination claim fails as a matter of law." *Alkhawaldeh*, 851 F.3d at 426.

Bernier argues that Turbocam's refusal to cover Bernier's gender-affirming care was "motivated by [Bernier's] sex." Bernier's Opp. at 3. But a "motive" doesn't establish "but-for" causation, as Bernier erroneously claims. *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175–78 (2009); Bernier's Opp. at 2 (arguing that sex was "a but-for cause" because of Turbocam's motives). To be sure, under Title VII's provision for mixed-motive cases, 42 U.S.C. § 2000e-2(m), "liability can sometimes follow even if sex wasn't a but-for cause of the employer's challenged decision." *Bostock*, 590 U.S. at 657. But Bernier has *never* raised such a theory. *See* Compl. ¶ 61, Dkt. 1; Bernier's Opp. at 2. A mixed-motives theory proceeds under a different framework, and Title VII allows an employer to raise special defenses to damages liability. 42 U.S.C. § 2000e-5(g)(2)(B)(ii). "It was up to [Bernier] to define the contours of her claim—and she chose single-motive," requiring her to show that a reasonable jury could find but-for causation. *McCreight v. AuburnBank*, 117 F.4th 1322, 1333 (11th Cir. 2024). She has not met that standard. But in any event, Turbocam's decision was not motivated by Bernier's sex even in part. Turbocam would refuse to cover gender-affirming care for a female employee, so sex is irrelevant. What Bernier is really after is Turbocam's "beliefs." Bernier's Opp. at 5. But Title VII doesn't prohibit believing that "sex … is an immutable characteristic," *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973), or that it is ordained by God.

Bernier is also wrong that Title VII forbids discriminating because of "transgender status" as a separate category apart from sex. Bernier's Opp. at 6–7. "Neither the Supreme Court nor this Court has held that transgender status is separately protected under Title VII apart from sex. And *Bostock* did not add transgender status, as a category, to the list of classes protected by Title VII."

*Lange*, 152 F.4th at 1252. "The only question" resolved in *Bostock* is that when an employer "fires someone simply for being … transgender" the employer necessarily discriminates because of sex. *Bostock*, 590 U.S. at 681. Bernier points to language in *Bostock* claiming that transgender status is "inextricably bound up with sex." *Id.* at 660–61. But that was because in the only situation addressed in *Bostock*, changing the transgender employee's sex would necessarily yield a different decision by the employer. *Id.* at 660. No such reasoning applies here, as *Skrmetti* confirms. *Lange*, 152 F.4th at 1251–52.

"[E]ven if this [transgender-status] theory were viable under Title VII," Turbocam was not motivated by Bernier's "transgender status," but by its owner's opposition to gender-affirming care. *Id.* at 1252. Bernier asserts that Turbocam is engaged in a "post-hoc attempt to reframe its objection as opposition to medical procedures rather than its objection to [Bernier] being transgender." Bernier's Opp. at 3. But the only thing that is post-hoc is Bernier's pivot following *Skrmetti*. This case is about coverage for gender-affirming care. Bernier's new strained characterization of Turbocam as motivated by Bernier "being transgender" rings hollow given that Turbocam accommodated Bernier's new name and accepted her pronouns, reprimanded an employee for bothering Bernier about her gender transition, and gave Bernier a new role at Turbocam. Plaintiff's Reply to Turbocam's Resp. to Bernier's Concise Statement of Undisputed Material Facts ¶ 9, Dkt. 87; Bernier's Resp. to Turbocam's Concise Counterstatement of Undisputed Material Facts ¶¶ 65–70 ("Bernier's Resp. to DSOF"), Dkt. 87. Mr. Noronha objects not to employing Bernier but to using Turbocam's financial resources to pay for gender-affirming care he believes is sinful, just like he objects to paying for an elective abortion. Bernier's Resp. to DSOF ¶ 57. No reasonable jury could therefore find that Turbocam's religious justification is "a pretext for unlawful discrimination." Bernier's Opp. at 6.

4

Bernier also contends that a jury could reasonably infer that Turbocam was "motivated by transgender status discrimination" because "the exclusion only affects transgender plan members." *Id.* But *Skrmetti* forecloses that kind of inference: "although only transgender individuals seek treatment for gender dysphoria," "there is a 'lack of identity' between transgender status and the excluded medical [treatments]." *Skrmetti*, 145 S. Ct. at 1833. As Bernier concedes, not all transgender individuals have gender dysphoria or seek counseling, hormones, or surgery. Bernier's Resp. to DSOF ¶ 38. This "lack of identity" dooms Bernier's argument. *Skrmetti*, 145 S. Ct. at 1833. Nor does the plan's exclusion affect only transgender plan members. Individuals seeking to *de*transition could also have detransition surgeries excluded from coverage as "related complications." Bernier's Resp. to DSOF ¶ 58. In any event, Bernier doesn't dispute that Mr. Noronha's opposition to using financial resources to erase sex is a sincerely held tenant of his Christian faith, foreclosing any claim of pretext. Bernier's Resp. to DSOF ¶ 51. Regardless, an assertion of pretext in any event doesn't "establish that the plaintiff's proffered reason of [sex] is correct." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993). Here, we know that sex was *not* the reason because Turbocam doesn't cover gender-affirming care for any employee regardless of the employee's sex or gender identity.

Bernier also mischaracterizes Turbocam's argument. Turbocam *does not* argue that "its stated motives cannot be used as evidence of discrimination because those motives emanate from Mr. Noronha's religious beliefs." Bernier's Opp. at 5. Rather, Turbocam argues that it is unlawful for religious "sex-based beliefs" to be singled out for disapproval. *Id.* Bernier agrees that Turbocam's plan is facially lawful and that Turbocam could legitimately refuse to cover gender-affirming care based on "medical necessity, costs, or administrative feasibility." *Id.* at 3. Thus, Bernier's claim specifically targets Turbocam's Christian beliefs about human sexuality as not "legitimate,"

asking this Court to "signal … disapproval" of those beliefs. *Masterpiece Cakeshop v. Colo. C.R. Comm'n*, 584 U.S. 617, 638 (2018). Bernier's citations to *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968) (per curiam), and *Bob Jones University v. United States*, 461 U.S. 574 (1983), are misplaced and offensive. *See* Bernier's Opp. at 5–6. Those cases concerned facially discriminatory (and racist) policies. This case doesn't, as Bernier concedes. Bernier's inapt comparisons and suggestion that Mr. Noronha's religious beliefs are "insubstantial and even insincere," despite overwhelming evidence to the contrary, show "hostility to religion." *Masterpiece Cakeshop*, 584 U.S. at 635, 639.

Regardless, even if Turbocam's religious beliefs could be singled out for punishment under Title VII, Bernier agrees that Turbocam's views based on medical necessity would justify denying Bernier's desired variance from the plan. Bernier's Opp. at 3. Based on Turbocam's internal review of the declaration of Turbocam's expert, Dr. Weiss, Turbocam doesn't believe that gender-affirming care is safe and effective and would deny Bernier's requested variance going forward for that separate and independent reason. *See* Ex. V, Hanson Decl. ¶ 6. Therefore, even if Bernier prevails on the Title VII claim, the Court should deny Bernier forward-looking relief. Furthermore, to the extent Bernier is even raising a motivating-factor theory, the Court must deny "damages" because Turbocam would take "the same action in the absence of the impermissible motivating factor." 42 U.S.C. § 2000e-5(g)(2)(B)(ii). Turbocam would refuse to pay for Bernier's gender-affirming care independently of Mr. Noronha's religious beliefs.

## II.    Bernier's ADA Claim Fails as a Matter of Law

### A.  Bernier's Gender Dysphoria Is Expressly Excluded from the ADA

Bernier's gender dysphoria is expressly excluded from the ADA twice-over: because it is "transsexualism" and because it is a "gender identity disorder[] not resulting from physical impairments," as those terms were understood when the ADA was enacted in 1990. 42 U.S.C.

§ 12211(b)(1).

Bernier does not dispute that her gender dysphoria is "transsexualism," as that term was understood in 1990. Turbocam's Mem. in Support of Summ. J. at 16–19 ("Turbocam's MSJ"), Dkt. 75. Bernier concedes that she meets *all* of the diagnostic criteria for "transsexualism" as specified by the American Psychiatric Association ("APA")'s Diagnostic and Statistical Manual of Mental Disorders, Third Edition-Revised ("DSM III-R"), which was the current version when the ADA was enacted. Bernier's Resp. to DSOF ¶¶ 20–24. Even Bernier's medical records reflect a diagnosis of "[t]ranssexualism." *Id.* ¶ 25; Turbocam's MSJ, Ex. J, Dkt. 75-10. Because Bernier's gender dysphoria is "transsexualism," it is not a disability covered by the Act. 42 U.S.C. § 12211(b)(1). This disposes of Bernier's ADA claim in its entirety.

It does not matter that Bernier thinks that the term "transsexualism" is "antiquated." Bernier's Opp. at 10. This Court must "interpret the words [of the ADA] consistent with their ordinary meaning at the time Congress enacted" it. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (cleaned up). And at the time the ADA was enacted, Bernier's gender dysphoria was denoted "transsexualism" and so is expressly excluded. To conclude otherwise, as Bernier proposes, would grant the APA—an unelected, non-governmental body—the authority to repeal federal law, merely by changing its terminology. That would fly in the face of the Constitution. *INS v. Chadha*, 462 U.S. 919, 953 (1983) ("[R]epeal of statutes, no less than enactment, must conform with Art. I."). Courts, for example, must continue enforcing provisions that protect the "mentally retarded" even though that term has undergone pejoration and refers to a range of intellectual disabilities. *See, e.g.*, 42 U.S.C. § 1396r-3.

Because Bernier's gender dysphoria is not eligible for ADA coverage under the exclusion for "transsexualism," the Court need go no further. But Bernier's gender dysphoria is also type of

"gender identity disorder," as that term was understood when the ADA was enacted, which means it is excluded from the ADA unless it "result[s] from physical impairments." 42 U.S.C. § 12211(b)(1); Turbocam's MSJ at 19–23. Bernier's attempt to obscure the straightforward relationship between the diagnoses gets it backwards. Although "[a] person cannot be diagnosed with gender dysphoria based solely on gender incongruence," Bernier's Opp. at 10, a person would have been diagnosed with a gender identity disorder on that basis. *See* Bernier's Resp. to DSOF ¶ 19 (the "essential feature" of "gender identity disorders" "is an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity"). As Bernier explains, a person with gender dysphoria today experiences "clinically significant distress or impairment … *as a result of gender incongruence*." Bernier's Opp. at 10 (emphasis added). A person with gender dysphoria therefore necessarily experiences gender incongruence and so has a "gender identity disorder." This includes Bernier, who concedes that she meets *all* the diagnostic criteria for gender identity disorder, Bernier's Resp. to DSOF ¶¶ 27–28, 30–34, and whose medical records reflect a diagnosis of "[g]ender identity disorder," *id.* ¶ 35. Even Bernier's expert concedes that Bernier satisfies the criteria for a gender identity disorder, as that term was understood when the ADA was enacted. Turbocam's MSJ, Ex. C at 53:6–18, Dkt. 75-3.

Bernier has not shown that her gender identity disorder (gender dysphoria) "result[s] from physical impairments," such that it is eligible for ADA coverage. 42 U.S.C. § 12211(b)(1); *see* Turbocam's MSJ at 21–23. Bernier concedes that she is not intersex and does not have another disorder of sex development, which are the prototypical physical conditions that could give rise to gender dysphoria. Bernier's Resp. to DSOF ¶¶ 32–33. Her assertion that the inability of her healthy "endocrine system [to] not produce the hormones she needs to function as a transgender woman with gender dysphoria … qualifies as a physical impairment," Bernier's Opp. at 11, cannot be

right, as that would read the limitation out of the exclusion: an incongruence between the physiologically normal level of hormones the body produces and the hormones an individual believes she needs to function as the other sex is a *sine qua non* of *all* gender identity disorders, Bernier's Resp. to DSOF ¶ 19 (DSM III-R's definition of "gender identity disorders").

Nor does *Williams v. Kincaid*, 45 F.4th 759 (4th Cir. 2022), which was decided in the context of a motion to dismiss, help. Bernier's Opp. at 11 (quoting *Kincaid*, 45 F.4th at 771). Summary judgment imposes a "considerably more stringent" standard. *Collier v. City of Chicopee*, 158 F.3d 601, 603 (1st Cir. 1998). Bernier must show more than that her gender dysphoria "*may well … ha*[*ve*] *some physical basis.*" *Kincaid*, 45 F.4th at 771 (emphasis added). She must show no "authentic dispute," *Collier*, 158 F.3d at 604 (internal quotation marks omitted), that her gender dysphoria "result[s] from physical impairments," 42 U.S.C. § 12211(b)(1). Bernier hasn't done so.

### B.  Turbocam's Health Plan Does Not Discriminate Based on Disability

Bernier's ADA claim also fails for a more fundamental reason: even if Bernier has a protected disability, Turbocam has not discriminated based on it. Turbocam's MSJ at 31–32. Turbocam offered Bernier the same health-benefits plan it offers to other employees. There was no discrimination, much less "on the basis of disability." 42 U.S.C. § 12112(a).

Bernier's theory of liability would transmogrify the ADA, turning an ordinary non-discrimination statute into an insurance-coverage mandate in which employees dictate coverage of employer-sponsored plans. But the ADA is not the Affordable Care Act. As eight federal courts of appeals have recognized, the ADA does not "prohibit [an employer] from offering … an insurance policy that gives different levels of benefits to those with different types of disabilities." *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1116 (9th Cir. 2000). These courts have expressly held that "there is no discrimination under the [ADA] where disabled individuals are given the same opportunity as everyone else, so insurance distinctions that apply equally to all

employees cannot be discriminatory." *Id.*[1]

Bernier fails to distinguish this overwhelming precedent. She artificially differentiates excluding "*groupings* of disabilities" and excluding "a *specific* disability," and suggests these cases are "inapposite" because they largely involve exclusions for mental disabilities. Bernier's Opp. at 12–13 (emphases in original). But nothing in those courts' reasoning hinged on the number of diagnoses affected or the nature of the disability.[2] At least one case involved a health plan exclusion for a single, physical condition. *Krauel*, 95 F.3d at 678 (infertility coverage), *abrogated in part on other grounds by Bragdon v. Abbott*, 524 U.S. 624 (1998). Bernier is also wrong that "these courts emphasized the relevance of the ADA's safe harbor provisions," 42 U.S.C. § 12201(c), or involved "findings of neutral policies." Bernier's Opp. at 13–15.[3] The Third Circuit case Bernier

---

[1] *See also, e.g.*, *Parker v. Metro. Life Ins. Co.*, 121 F.3d 1006, 1015–16 (6th Cir. 1997) ("[T]he ADA does not mandate equality between individuals with different disabilities. Rather, the ADA prohibits discrimination between the disabled and the non-disabled.… Because all employees …, whether disabled or not, received the same access to the long-term disability plan, neither the defendants nor the plan discriminated between the disabled and the able bodied."); *Krauel v. Iowa Methodist Med. Ctr.*, 95 F.3d 674, 678 (8th Cir. 1996) ("Insurance distinctions that apply equally to all insured employees, that is, to individuals with disabilities and to those who are not disabled, do not discriminate on the basis of disability."); *accord Ford v. Schering-Plough Corp.*, 145 F.3d 601, 608 (3d Cir. 1998); *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1101–02 (10th Cir. 1999); *Lewis v. Kmart Corp.*, 180 F.3d 166, 170 (4th Cir. 1999); *EEOC v. CNA Ins. Cos.*, 96 F.3d 1039, 1044 (7th Cir. 1996); *cf. Modderno v. King*, 82 F.3d 1059, 1061 (D.C. Cir. 1996) (rejecting argument under the Rehabilitation Act).

[2] In any event, Turbocam's health-benefits plan doesn't "single[] out" treatment for gender dysphoria. Bernier's Opp. at 14 n.17. The plan excludes dozens of treatments. Bernier's Resp. to DSOF ¶¶ 55–56; Turbocam's MSJ, Ex. O at 17–20, Dkt. 75-15 (Turbocam's health-benefits plan excerpt).

[3] Bernier's reliance on the ADA's safe harbor provision, 42 U.S.C. § 12201(c), elsewhere is also misplaced. *See* Bernier's Opp. at 12 & n.15, 14–15. That provision merely ensures that insurers and others are not penalized for using risk underwriting standards consistent with state law; it doesn't speak to what conduct is discriminatory in the first place.

cites expressly rejected the argument that the safe harbor requires an employer or insurer to "justify[] the actuarial basis for [a] disparity in benefits." *Ford*, 145 F.3d at 611. The Ninth Circuit case Bernier cites mentioned the safe harbor only in passing in its relevant analysis. *Weyer*, 198 F.3d at 1118.[4]

This makes sense, since the question before those courts—and the one before this Court—is whether an employer-sponsored benefits plan results in *differential treatment* of employees, which doesn't require inquiring into motive. Like Title VII, the ADA proscribes certain employer *conduct*, not *beliefs*. 42 U.S.C. § 12112; *see also supra* Part I. "So long as every employee is offered the same plan regardless of that employee's contemporary or future disability status, then no discrimination has occurred even if the plan offers different coverage for various disabilities." *Ford*, 145 F.3d at 608.

Nor does it matter that some courts cited the ADA's legislative history. Bernier's Opp. at 13. Turbocam can point to stronger indications of congressional intent: the statutory exclusion for transsexualism and certain gender identity disorders, 42 U.S.C. § 12211(b). *See Succar v. Ashcroft*, 394 F.3d 8, 31 (1st Cir. 2005) ("[W]here the plain text of the statute is unmistakably clear on its face, there is no need to discuss legislative history."). In any event, legislative history supports Turbocam's position: "each House and Senate committee working on the ADA explicitly adopted the Supreme Court's interpretation of the Rehabilitation Act … that benefit programs are not required to provide precisely the same benefits to all classes of disabled persons." *Rogers v. Dep't*

---

[4] Other cases are similar. *See Parker*, 121 F.3d at 1017 n.14 (mentioning safe harbor provision in Title I analysis in a footnote, and there only to note another case concluded disparate coverage would not violate it); *Krauel*, 95 F.3d at 677–79 (not addressing safe harbor provision when concluding health plan exclusion didn't discriminate on the basis of disability, then separately rejecting plaintiff's claim that the health plan violated the safe harbor provision); *Lewis*, 180 F.3d at 170 (referencing safe harbor provision once and only for context); *CNA Ins. Co.*, 96 F.3d at 1044 (not mentioning safe harbor provision); *Kimber*, 196 F.3d at 1101–02 (same).

*of Health & Env't Control*, 174 F.3d 431, 434–35 (4th Cir. 1999) (citing S. Rep. No. 101-116, at 29, 85 (1990) and H.R. Rep. No. 101-485, at 137 (1990)).

Bernier's reliance on the "purpose" and "breadth" of the ADA fares no better. *See* Bernier's Opp. at 14–15. This Court "cannot disregard the limitations … which Congress … impos[ed]" in the statutory exclusions, no matter how "inclusive may be the general language" of the ADA. *Clifford F. MacEvoy Co. v. United States ex rel. Calvin Tomkins Co.*, 322 U.S. 102, 107 (1944); *see also Kincaid*, 45 F.4th at 785–86 (Quattlebaum, J., concurring in part and dissenting in part). Those exclusions make clear that the ADA does not apply to individuals on the basis of their transsexualism or qualifying gender identity disorder, much less require employers to provide coverage for treatment of those conditions. 42 U.S.C. § 12211(b).

This Court should follow the overwhelming weight of authority, "decline the invitation to be a super-actuary" of employer-sponsored health-benefit plans, and grant summary judgment to Turbocam. *Weyer*, 198 F.3d at 1117 (cleaned up).

### C.  Bernier Has Not Shown That Her Gender Dysphoria Is a Disability

Finally, Bernier is not entitled to summary judgment because she has not shown that her gender dysphoria qualifies as a "disability" under the ADA. 42 U.S.C. § 12102(1); Turbocam's MSJ at 29–31. A disability must "*substantially limit[]* one or more major life activities" of an individual. 42 U.S.C. § 12102(1)(A) (emphasis added). A *diagnosis* of gender dysphoria, alone, is not enough. *Contra* Bernier's Opp. at 7–8 ("Gender dysphoria is always substantially limiting by virtue of its diagnostic criteria."). "[D]istress," even if "clinically significant," *id.* at 8, does not necessarily limit life activities, much less substantially. As the most recent version of APA's diagnostic manual explains, "in adolescents and adults, the distress resulting from gender incongruence *often*"—but not always—"interferes with daily activities." APA, *Diagnostic and Statistical Manual of Mental Disorders* 520 (5th ed. text rev. 2022) (emphasis added). Although Bernier

claims that her distress led her "to make … a profound life transformation," she does not explain how that substantially limits her ability to "care for [her]self." Bernier's Opp. at 8.

Nor can Bernier point to the reproductive consequences of the treatment she seeks—a vaginoplasty—as the *sole source* of disability. *Id.* at 8–9. Although a regulation permits "consider[ation]" of the "negative side effects" of treatments, 29 C.F.R. § 1630.2(j)(4)(ii); *see* Bernier's Opp. at 8, neither the regulations nor the ADA suggest that side effects, alone, can give rise to disability. That would conflict with the ADA's text, which unambiguously requires that the "impairment" itself cause the limitation. 42 U.S.C. § 12102(1)(A). It would also turn the ADA on its head, allowing individuals to manufacture a disability by selecting disabling treatments for a condition that otherwise would not qualify. Claiming a disability induced entirely by the side effects of a treatment "makes about as much sense as Baron von Munchausen's boast that he pulled himself up out of a swamp by his own hair." *Landell v. Sorrell*, 406 F.3d 159, 173 (2d Cir. 2005) (Walker Jr., J., dissenting from the denial of rehearing en banc) (citing *The Adventures of Baron Munchausen* (Columbia Pictures 1989)).

## III. The Religious Freedom Restoration Act (RFRA) Bars Bernier's Claims

Turbocam is also entitled to summary judgment because Bernier's claims are barred by RFRA and the First Amendment.

### A. RFRA Applies

Bernier continues to dispute that RFRA applies, but has no response to Turbocam's textual arguments. *See* Bernier's Opp. at 17–18. Bernier ignores RFRA's application "to all Federal law, and the implementation of that law." 42 U.S.C. § 2000bb-3(a). Bernier ignores that a defendant may "assert" RFRA as a "defense in a judicial proceeding"—no matter the plaintiff. *Id.* § 2000bb-1(c). Bernier ignores RFRA's express instruction that RFRA must "be construed in favor of a

broad protection of religious exercise," not against it. *Id.* § 2000cc-3(g). Bernier ignores the express statutory purpose of RFRA—to "restore the compelling interest test" of "*Sherbert v. Verner* … and *Wisconsin v. Yoder* and to guarantee its application in all cases where free exercise of religion is substantially burdened," *id.* § 2000bb(b), a purpose that would be defeated if RFRA did not apply here. And Bernier doesn't dispute that "government" includes both Congress and courts, not just executive agencies. *Id.* § 2000bb-2; *see* Turbocam's MSJ at 33–36. This case involves Congress and courts, so the Court need not decide whether Bernier is a "person acting under color of law." 42 U.S.C. § 2000bb-2(1).

Rather than respond on the merits, Bernier mischaracterizes Turbocam's argument as relying "heavily on legislative history and purported purpose." Bernier's Opp. at 17 n.19. But Turbocam cites *no* legislative history and relies not on a "purported" purpose, but an express purpose in the statute. 42 U.S.C. § 2000bb. Considering a purpose derived from text is necessary to understand words in context. *Gundy v. United States*, 588 U.S. 128, 142 (2019). "[W]ords are given meaning by their context, and context includes the purpose of the text." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012).

When Bernier engages with text, it is only to misread a provision expanding the *relief* ordinarily available against government entities—one that allows parties to seek "appropriate relief against a government," 42 U.S.C. § 2000bb-1(c), such as money damages—as a provision limiting RFRA *defenses* to cases where a government entity or official is a party. *See* Bernier's Opp. at 17. But Bernier, again, ignores Turbocam's argument that this negative implication makes no sense in context. *See* Turbocam's MSJ at 37. The very *same* provision also authorizes Turbocam to "assert" RFRA as a "defense in a judicial proceeding" without limitation. 42 U.S.C. § 2000bb-1(c). That's all that Turbocam seeks to do here.

Bernier dismisses *Hankins v. Lyght*, as "divergent," claiming that "[n]o other circuit has adopted *Hankins*'s approach." Bernier's Opp. 17. But *Hankins* is not alone. In *In re Young*, 82 F.3d 1407 (8th Cir. 1996), a bankruptcy case involving a private trustee's attempt to collect tithes paid to a Church as fraudulent transfers, the Eighth Circuit applied RFRA because the "bankruptcy code is federal law, the federal courts are a branch of the United States, and our decision in the present case would involve the implementation of federal bankruptcy law," *id.* at 1417–18.[5] And in *EEOC v. Catholic University of America*, 83 F.3d 455 (D.C. Cir. 1996), the D.C. Circuit applied RFRA to allow a defense to sex discrimination claims raised by an employee, not just the EEOC, *id.* at 470 ("For the foregoing reasons, we find that the EEOC's *and Sister McDonough's* claims are barred by … RFRA." (emphasis added)). The only thing that would be "divergent" would be for RFRA's defenses to apply only to those matters the EEOC deems weighty enough to prosecute. That makes no sense.

### B.  Bernier's Requested Relief Would Substantially Burden Free Exercise

Bernier claims that ordering Turbocam to cover Bernier's gender-affirming care wouldn't "substantially burden" the beliefs of the Noronhas because in Bernier's view, Mr. Noronha does not pay sufficient "attention" to the minute details of Turbocam's plan and Turbocam's staff is not flawlessly consistent in how it applies Mr. Noronha's religious beliefs. Bernier's Opp. at 19.

Bernier, in essence, suggests that Mr. Noronha's religious beliefs are insubstantial. But this "dodges the question." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 724 (2014). The "substantial burden" question does *not* ask whether a person's religious belief is substantial, but

---

[5] Although the Supreme Court vacated the decision in light of *City of Boerne v. Flores*, the Eighth Circuit on remand concluded that "RFRA is constitutional as applied to *federal law*" and "reinstate[d]" its prior decision. *In re Young*, 141 F.3d 854, 856 (8th Cir. 1998). Although the United States intervened on appeal, the Court's reasoning didn't turn on the presence of the United States.

whether a burden pressures a person to abandon a sincerely held religious belief. *Id.* at 725. It is not for courts to say that "religious beliefs are … insubstantial," so long as they are honestly held. *Id.* And Mr. Noronha's "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981). The Noronhas "drew a line, and it is not for [courts] to say that the line [they] drew was an unreasonable one." *Id.* at 715; *cf.* 42 U.S.C. § 2000cc-5(7)(A). Further, any inconsistency is outweighed by "the ample evidence that [Mr. Noronha's] beliefs are sincere." *Ramirez v. Collier*, 595 U.S. 411, 426 (2022). And Bernier doesn't dispute that Mr. Noronha's opposition to using financial resources to erase sex is a sincerely held tenant of his Christian faith. Bernier's Resp. to DSOF ¶ 51.

Bernier dodges the substantial-burden question because the answer here "is indisputable." *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657, 692 (2020) (Alito, J., concurring). "[A] law that operates so as to make the practice of … religious beliefs more expensive in the context of business activities imposes a burden on the exercise of religion." *Hobby Lobby*, 573 U.S. at 710 (internal quotation marks omitted). The Supreme Court thus had "little trouble" concluding that forcing an employer to pay penalties or cover contraceptives an employer believes are sinful is a substantial burden. *Id.* at 719. Forcing Turbocam to cover Bernier's gender-affirming care on pain of damages would similarly "substantially burden" the Noronhas' religious beliefs. *Braidwood Mgmt., Inc. v. EEOC*, 70 F.4th 914, 937 (5th Cir. 2023).

### C.  Bernier Does Not Satisfy Strict Scrutiny

*No compelling interest*. Bernier asserts only a generalized interest in rooting out "discrimination." Bernier's Opp. at 22. By framing the issue at a high level of generality, Bernier seeks to revive the "categorical approach" the Supreme Court rejected in *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 430 (2006), a case Bernier ignores. In *O Centro*, the

16

government, like Bernier here, argued that the "Controlled Substances Act serves a compelling purpose and simply admits of no exceptions." *Id.* But the Supreme Court rejected this "categorical approach," holding that RFRA requires looking "beyond broadly formulated interests justifying the general applicability of government mandates and scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 430–31. Even though "Schedule I substances such as [the hallucinogen contained in the religious sect's sacramental tea] are exceptionally dangerous," what mattered was "the particular use at issue," not the government's general interest in deterring drugs. *Id.* at 432. The same was true in *Hobby Lobby*, which applied *O Centro*: the government could not couch its interest in the contraceptive-coverage mandate "in very broad terms," such as ensuring "'gender equality,'" but had "to look to the marginal interest in enforcing the contraceptive mandate in these cases," for these employers. 573 U.S. at 726. Bernier never even attempts to show that forcing Turbocam to cover Bernier's gender-affirming care—the marginal interest at issue here—is compelling, so Bernier "fails to carry [her] burden." *Braidwood*, 70 F.4th at 939.[6]

In any event, Bernier's attempt to distinguish *Fulton v. City of Philadelphia*, 593 U.S. 522 (2021), and *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), fails. *See* Bernier's Opp. at 21–22. It is not the nature of the exemptions in those cases that matters, but that the exemptions exist at all. Where a statute exempts 80% of all employers, the government cannot have a compelling interest in burdening those who object to the same conduct on religious grounds. *See* Turbocam MSJ at 41–42.

***Not the least restrictive means***. Bernier also fails to show that forcing Turbocam to cover

---

[6] Nor does it matter that Bernier has "no authority to grant" an exemption. Bernier's Opp. at 21 n.22. RFRA authorizes "*judicially crafted* exceptions," and "plainly contemplates that courts would recognize exceptions—that is how the law works." *O Centro*, 546 U.S. at 434.

gender-affirming care is the least restrictive means of advancing Bernier's interest. First, Bernier argues that having the government cover Bernier's gender-affirming care is not a less restrictive means because there is "no government program available to cover the costs of [Bernier]'s care." Bernier's Opp. at 22. But the government's failure to adopt a less restrictive alternative doesn't mean that religious liberty loses, but that it wins. "Certainly, Congress could create such a program if it thought that providing cost-free [gender-affirming care] was a matter of 'paramount' concern." *Little Sisters of the Poor*, 591 U.S. at 701 (Alito, J., concurring).

Second, Bernier claims that taking Turbocam's opt-out bonus and purchasing coverage in the individual market is not a "feasible" alternative. Bernier's Opp. at 22–23. But Bernier doesn't *prove* that this alternative isn't "feasible." Rather, Bernier claims that buying insurance is "confusing and overwhelming," and that she would have difficulty "budgeting." *See* Second Bernier Decl. ¶¶ 5–9, Dkt. 87-6. Nobody likes shopping for insurance or budgeting, to be sure. But that inconvenience doesn't come close to meeting Bernier's "exceptionally demanding" burden of showing "that this is not a viable alternative." *Hobby Lobby*, 573 U.S. at 728. Bernier hasn't provided an "estimate of the average cost" she would have to pay out of pocket, or any actual cost assessment that would allow this Court to make an informed comparison. *Id.* And Bernier's argument that "even [the] small" inconvenience of shopping for insurance defeats a RFRA defense "reflects a judgment about the importance of religious liberty that was not shared by the Congress that enacted that law." *Id.* at 730. Tens of millions of Americans enroll in an individual plan, so doing so is manifestly viable. CMS, *Health Insurance Exchanges 2025 Open Enrollment Report*, https://tinyurl.com/3sa4z445.

In any event, Bernier's latest declaration is inconsistent with her earlier testimony and so should be disregarded. *Escribano-Reyes v. Pro. Hepa Certificate Corp.*, 817 F.3d 380, 386 (1st

Cir. 2016). During Bernier's deposition, she at first couldn't remember consulting with anyone. Turbocam's MSJ, Ex. A at 130:5–131:15, Dkt. 75-1. After a break called by her attorney, Bernier "clarif[ied]" that she talked with a GLAAD-facilitated consultant "over the phone." *Id.* at 131:19–133:3. But Bernier couldn't "recall" anything about the consultation. *Id.* at 132:6–133:24. She couldn't "even remember [the consultant's] name," *id.* at 133:2–3, let alone whether the plans identified would require her to "pay more out of pocket," *id.* at 133:14–18. Bernier now purports to remember several details about the conversation. *See* Second Bernier Decl. ¶¶ 5–9 (conversation included discussion of PPO vs. HMO plans; differing deductible, coinsurance, and copay amounts; and subsidy eligibility). But that is inconsistent with Bernier's testimony that she couldn't "recall" anything, and thus should be disregarded.

Last, Bernier claims that other alternatives would not end the "discrimination." Bernier's Opp. at 22. By this, Bernier apparently means that punishing Turbocam's religious objection is the only thing that would satisfy the asserted interest here. But targeting religious objections, like targeting speech, is far from a compelling interest—it is unconstitutional. *See Masterpiece Cakeshop*, 584 U.S. at 638; *303 Creative LLC v. Elenis*, 600 U.S. 570, 592 (2023). And as Turbocam has already explained, *actual* discrimination may end by leveling down, not just leveling up. Turbocam's MSJ at 44. Bernier entirely fails to grapple with the alternative of allowing Turbocam to design a less generous health-benefits plan. *Id.*

## IV.    Bernier's Claims Are Barred by the Free Exercise Clause

Because Title VII and the ADA are not neutral and generally applicable, they must survive strict scrutiny to apply as Bernier demands, which they fail to do. *See* Turbocam's MSJ at 46–48.

Bernier gets the controlling test wrong when she suggests that Title VII and the ADA are neutral and generally applicable because their exemptions apply to secular and religious employers alike, *see* Bernier's Opp. at 23, and include no "system of discretionary exceptions," *id.* at 24. The

test is *not* whether a law "treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue," but whether the law "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam). A secular activity is "comparable" if the risk it poses to the asserted government interest is similar to the risk posed by the religious exercise burdened by the law. *Id.* at 62–64; *see also Fulton*, 593 U.S. at 534 ("A law also lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.").

Title VII and the ADA include myriad exemptions, including one for employers with fewer than fifteen employees, which alone waives Title VII and the ADA entirely for some 80% of employers nationwide. 42 U.S.C. §§ 2000e(b), 12111(5)(A); *Facts & Data on Small Business and Entrepreneurship*, Small Bus. & Entrepreneurship Council, https://perma.cc/MU32-NZ44 (visited July 31, 2024). To show that these employers' activities are not comparable, Bernier must show that all of the exempted activities in which these employers may freely engage "pose a lesser risk" to the government's asserted interest than the "proposed religious exercise" here—a narrow health plan exclusion of gender-affirming care applied on religious grounds. *Tandon*, 593 U.S. at 63. Bernier doesn't even attempt to make that showing. Nor could she, as allowing Turbocam an exemption to exclude coverage of gender-affirming care cannot possibly undermine the government's interest more than exempting all discrimination by 80% of employers. Because Title VII and the ADA "treat … comparable secular activity more favorably than religious exercise," they are "not neutral and generally applicable." *Id.* at 62; *see also Bear Creek Bible Church v. EEOC*, 571 F. Supp. 3d 571, 613 (N.D. Tex. 2021), *aff'd in part and rev'd in part on other grounds*, *Braidwood*, 70 F.4th 914. And because they do not advance a compelling government interest and

are not narrowly tailored, they fail strict scrutiny. *See* Turbocam's MSJ at 44–46.

## CONCLUSION

For the foregoing reasons, this Court should grant summary judgment to Turbocam.

Respectfully Submitted,

Defendant, Turbocam, Inc.
By its attorneys

James R. Conde*
D.C. Bar No. 1031694
Laura B. Ruppalt*
D.C. Bar No. 90033927
BOYDEN GRAY PLLC
800 Connecticut Avenue NW,
Suite 900
Washington, DC 20006
Telephone: (202) 955-0620
jconde@boydengray.com
lruppalt@boydengray.com

*/s/ Bethany P. Minich*
 Bethany P. Minich
 N.H. Bar # 265413
 LITCHFIELD CAVO LLP
 6 Kimball Lane,
 Suite 200
 Lynnfield, MA 01940
 Telephone: (781) 309-1500
 minich@litchfieldcavo.com

 Roger L. Byron*
 Texas State Bar No. 24062643
 E. Cliff Martin*
 Texas State Bar No. 24127208
 First Liberty Institute
 2001 West Plano Parkway, Suite 1600
 Plano, Texas 75075
 Telephone: (972) 941-4444
 rbyron@firstliberty.org
 cmartin@firstliberty.org

 * *Pro hac vice*

**Counsel for Defendant**
*Turbocam, Inc.*

Dated: November 5, 2025

22

**CERTIFICATE OF SERVICE**

I, Bethany P. Minich, hereby certify that on November 5, 2025, the foregoing document, filed through the CM/ECF System, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

/s/ Bethany P. Minich
Bethany P. Minich