UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Lillian Bernier

    v.                                              Civil No. 23-cv-523-LM-AJ
                                                        Opinion No. 2026 DNH 001 P

Turbocam, Inc.

**O R D E R**

Plaintiff Lillian Bernier brings this action against her employer, Turbocam, Inc. ("Turbocam"), alleging claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1), and Title I of the Americans with Disabilities Act ("ADA"), id. § 12112(a). Bernier, a transgender woman,[1] claims that Turbocam discriminated against her by refusing to provide her with health insurance coverage for gender-affirming care. Presently before the court is Turbocam's motion to exclude certain testimony of Bernier's expert pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and its progeny. Doc. no. 71. Bernier objects. Doc. no. 86. For the following reasons, Turbocam's motion (doc. no. 71) is denied.[2]

---

[1] A transgender woman is a person who was born with a male sexual anatomy but whose gender identity is female.

[2] Neither party requested a hearing on Turbocam's motion. For that reason, and because the motion presents no novel issues, the court did not deem a hearing necessary. See Collision Commc'ns, Inc. v. Nokia Sols. & Networks OY, 691 F. Supp. 3d 360, 365 n.2 (D.N.H. 2023).

## STANDARD OF REVIEW

Federal Rule of Evidence 702 is "[t]he touchstone for the admission of expert testimony in federal court litigation." Crowe v. Marchand, 506 F.3d 13, 17 (1st Cir. 2007). Under that rule, an expert witness may offer opinion testimony if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Where a challenge to expert testimony is lodged, the proponent must "demonstrate[ ] to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. To meet this burden, the proponent need not prove that her expert's conclusions are correct. Milward v. Acuity Specialty Prods. Grp., Inc., 639 F.3d 11, 15 (1st Cir. 2011). "The proponent of the evidence must only show that 'the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.'" Id. (quoting Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998)). "So long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversarial process . . . ." Id. (citation omitted) (quoting Daubert, 509 U.S. at 590).

2

## BACKGROUND

I.     <u>Factual Background</u>[3]

Bernier has worked for Turbocam since June 2019. Although she was born with a male sexual anatomy, Bernier has long known she is a woman. In the fall of 2020, Bernier began presenting herself as a woman in public, changed her legal name to Lillian, began hormone therapy, and updated her driver's license to reflect her new name and her gender identity.

Turbocam is a manufacturer of flow path components for the aerospace and turbo machinery industries. Its mission statement provides in part that it "exists as a business for the purpose of honoring God, creating wealth for its employees, and supporting Christian service to God and people." Doc. no. 96 at 6. It further provides that "we hold ourselves accountable to God's law expressed in the Bible." <u>Id.</u>

Turbocam offers a health insurance plan to employees like Bernier who work twenty-five hours or more per week. As of the time Bernier began receiving hormone therapy in late 2020, Turbocam's health insurance plan covered "Transgender Health Services." <u>Id.</u> at 13. However, beginning in January 2021, Turbocam switched to a self-funded health insurance plan. Because the new plan was self-funded, Turbocam had authority over the coverage offered by the plan and exclusions from coverage. Turbocam also had authority to make exceptions to exclusions from coverage on an individual basis. In deciding on the scope of

---

[3] The following factual summary is based upon the parties' statements of material facts submitted in support of their cross-motions for summary judgment, which remain pending. <u>See</u> doc. no. 96. The facts summarized herein are not in genuine dispute for purposes of Turbocam's <u>Daubert</u> motion.

coverage, it was important to Turbocam that its self-funded plan align with its mission statement and the religious conviction associated with it.

Since its inception in January 2021, Turbocam's self-funded plan has contained an exclusion from coverage for: "Gender dysphoria[4] treatment, including but not limited to, counseling, gender reassignment surgery or hormone therapy and related preoporerative and postoperative procedures, which, as their objective, change the person's sex and any related complications." Id. at 15. According to Turbocam's owner, Marian Noronha, the reason for the exclusion is because of Noronha's view that "male and female" are "immutable" and that "God will not allow the use of Turbocam's resources, including its health plan, to assist employees in erasing or obscuring their sex." Id. at 15-16.

Bernier first learned of this exclusion in October 2021 when she called Turbocam's claims administrator regarding a consultation she had scheduled for a vaginoplasty. After learning of the exclusion, she made several requests to Turbocam's personnel department that she be granted an exception from the exclusion so that she could receive coverage for gender transition surgery.

---

[4] Gender dysphoria is a condition experienced by transgender people and recognized as an established diagnosis in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders (more commonly known as the "DSM-5"). A person may be diagnosed with gender dysphoria when they experience (1) "[a] marked incongruence between one's experienced/expressed gender and assigned gender" as manifested by two or more specified criteria, along with (2) "clinically significant distress or impairment in social, occupational, or other important areas of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 512-13 (5th ed., text rev. 2022).

Turbocam declined to grant her an exception, and Bernier canceled her consultation.

Subsequently, in March 2022, Bernier sought mental health counseling for gender dysphoria. She asked Turbocam's personnel department whether her therapy would be covered under Turbocam's health insurance plan. Turbocam's benefits specialist informed her that her therapy would not be covered because it was subject to the gender-dysphoria-treatment exclusion.

After receiving a right-to-sue letter from the Equal Employment Opportunity Commission, Bernier brought this civil action on November 21, 2023. She brings claims against Turbocam under Title VII and the ADA. The parties' cross-motions for summary judgment are currently pending.

II. Bernier's Expert

Each party has retained the services of an expert. Bernier's expert is Randi Ettner, Ph.D. Dr. Ettner is a licensed clinical and forensic psychologist who specializes in the diagnosis, treatment, and management of people with gender dysphoria. Over the last forty-five years, she has evaluated, diagnosed, and treated more than 3,000 people with gender dysphoria. She has published four books related to the treatment of people with gender dysphoria, including a medical text. See, e.g., Principles of Transgender Medicine & Surgery (Randi Ettner et al., eds., 2d ed. 2016).[5] She previously served as Secretary, as well as a member of the Board of Directors, for the World Professional Association of Transgender Health

---

[5] Dr. Ettner is under contract to produce the third edition of this text.

(WPATH). She was with WPATH for twelve years. Dr. Ettner also authored the eighth version of the WPATH Standards of Care for the Health of Transsexual, Transgender and Gender-Nonconforming People, which was published in 2022. She has also authored numerous articles in peer-reviewed journals regarding the provision of health care to the transgender population.

Dr. Ettner received a commendation from Congress in February 2019 in recognition of her contributions to WPATH. Previously, in 2017, she was invited to address the Director of the Office of Civil Rights for the United States Department of Health and Human Services regarding the medical treatment of gender dysphoria. The University of Minnesota has named Dr. Ettner the honoree of the Randi and Fred Ettner Fellowship in Transgender Health. She has lectured across the world on topics related to gender dysphoria and has given grand rounds on gender dysphoria at university hospitals. Over the last four years, Dr. Ettner has testified as an expert at trial or by deposition in at least twenty-two civil actions brought in federal district courts.

Bernier has provided Turbocam with an expert report from Dr. Ettner as part of its discovery obligations. See doc. no. 71-2. In her report, Dr. Ettner opines that gender dysphoria has a physiological and biological basis. For example, she points to evidence that transgender women have brain compositions that differ from cisgender men and women. These differences, Dr. Ettner says, primarily involve the right hemisphere of the brain, which is the area of the brain that relates to attitudes about human bodies in general, one's own body, and the link between the

6

physical body and the biological self. Dr. Ettner also notes scientific studies showing a co-occurrence of gender dysphoria in families, with an especially high rate of co-occurrence among identical twins, "even when reared apart." Id. at 8. Dr. Ettner states the scientific and medical community now believes that gender dysphoria is caused by hormonal discrepancies during the intrauterine sexualization periods of the brain and genitals, which occur at different developmental stages and can be influenced independently of each other. In other words, if a fetus experiences a surge of testosterone during the developmental period in which the brain is sexualizing, this may result in a male gender identity even if the fetus's genitals have already sexualized as female. While Dr. Ettner states that, in most cases, a person's genital and brain morphology develop in parallel, the rare cases in which they do not may result in incongruence between a person's sexual anatomy and gender identity.

In addition to articulating a physiological or biological basis for gender dysphoria, Dr. Ettner's report discusses the necessity of various medical and surgical treatments for gender dysphoria. Without treatment, Dr. Ettner states, gender dysphoric individuals may experience a range of potentially debilitating psychological symptoms, including suicidality. While counseling or psychiatric medications may relieve some of these symptoms, they do not treat the underlying dysphoria, and there is no recognized or effective psychiatric treatment for gender dysphoria. Rather, Dr. Ettner's report states that treatment for persons with gender dysphoria typically proceeds according to WPATH's Standards of Care, which

7

indicate medical interventions that permit an individual to live more consistently with their gender identity. The Standards of Care recommend an individualized approach to treatment, typically involving one or more of the following: changes in outward gender expression or role (e.g., changing one's pronoun or name, or manner of dress); hormone therapy to masculinize or feminize the body; and surgery to change primary or secondary sex characteristics. This individualized course of treatment, often referred to as a gender transition, is undertaken with the goal of eliminating the incongruence between one's body and gender identity, and reducing the dysphoria associated with that incongruence. Dr. Ettner highlights that medical treatments for gender dysphoria are not cosmetic; they operate to relieve the often-debilitating effects of gender dysphoria and, in some cases, can be lifesaving.

With respect to Bernier, Dr. Ettner's report states her understanding that Bernier is currently being treated with estrogen therapy, and that she intends to undergo vaginoplasty, which includes orchiectomy (the surgical removal of the testes). Although she does not offer any conclusions or opinions as to the necessity of these treatments for Bernier specifically, Dr. Ettner states that estrogen plays a critical role for transgender women in stabilizing brain chemistry and that, because the continued maintenance of adequate estrogen levels is essential to various biological functions, transgender women require lifelong hormonal support. As for Bernier's planned surgical intervention, Dr. Ettner notes that orchiectomy halts the secretion of testosterone, a hormone that may cause and sustain gender dysphoria in transgender women.

## DISCUSSION

Turbocam moves to exclude Dr. Ettner's opinions that (A) Bernier's gender dysphoria "is a physiological condition that results from a physical impairment";[6] and (B) "hormonal and surgical treatments, including those treatments Bernier has received or wants to receive, are medically necessary to treat Bernier's gender dysphoria."[7] Doc. no. 71 at 1. Turbocam asserts that Dr. Ettner's opinions on these topics should be excluded pursuant to Federal Rule of Evidence 702 and Daubert because (1) she is unqualified to offer them, (2) her opinions are unreliable, and (3) her opinions are irrelevant. The court will consider each of Turbocam's assertions in turn.

---

[6] The ADA defines "disability" in pertinent part as "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(1). And the ADA's regulations further define "[p]hysical or mental impairment" in pertinent part as "[a]ny physiological disorder or condition . . . affecting one or more body systems." 29 C.F.R. § 1630.2(h)(1).

[7] Pending before the court are the parties' cross-motions for summary judgment. Bernier notes that her motion for summary judgment does not rely upon Dr. Ettner's opinions regarding the biological basis of gender dysphoria or the medical necessity of various treatments to gender dysphoric persons. Unlike the expert report disclosed to Turbocam in discovery, the declaration from Dr. Ettner that Bernier submitted in support of her motion for summary judgment omits any discussion of these topics. See doc. no. 67-4 (declaration). Although Bernier disclaims reliance upon Dr. Ettner's expert report, this court may (but need not) consider it in ruling upon the parties' cross-motions. Fed. R. Civ. P. 56(c)(3); Bank of N.Y. Mellon v. Lezdey, Civ. No. 13-11118-MLW, 2016 WL 5660408, at *2 (D. Mass. Sept. 28, 2016). The court has not yet determined whether to consider Dr. Ettner's expert report in ruling on the parties' summary judgment motions.

9

I.        Dr. Ettner Is Qualified

Rule 702 requires that an expert be "qualified . . . by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. In measuring an expert's qualifications, "the trial court [must] determine, given the proffered expert's background, whether the scientific, technical, or other specialized knowledge he offers 'will assist the trier better to understand a fact in issue.'" Gaydar v. Sociedad Instituto Gineco-Quirurgico y Planificacion, 345 F.3d 15, 24 (1st Cir. 2003) (quoting United States v. Alzanki, 54 F.3d 994, 1005 (1st Cir. 1995)). A proffered expert "need not be a specialist in a particular medical discipline to render expert testimony related to that discipline." Pagés-Ramírez v. Ramírez-González, 605 F.3d 109, 114 (1st Cir. 2010) (quoting Gaydar, 345 F.3d at 24). "Indeed, . . . it would be an abuse of discretion to exclude testimony that would otherwise 'assist the trier better to understand a fact in issue,' simply because the expert does not have the specialization that the court considers most appropriate." Id. (quoting Gaydar, 345 F.3d at 24-25). Thus, "an expert with appropriate credentials and an appropriate foundation for the opinion at issue must be permitted to present testimony as long as the testimony" is otherwise admissible. Id. at 115.

Dr. Ettner is qualified to offer her opinion regarding the biological basis of gender dysphoria and the necessity of medical treatment for gender dysphoria. She has written portions of medical texts that are addressed to the etiology of gender dysphoria, and has participated in research regarding the same. She also has substantial experience and familiarity with the research methodology underlying the studies supporting the existence of gender dysphoria's physiological etiology.

With respect to her opinions on the necessity of medical treatment on gender dysphoria, Dr. Ettner helped author WPATH's Standards of Care for the treatment of gender dysphoria, and she has personally treated over 3,000 transgender patients. Although she is not a medical doctor, her care for her patients requires a multidisciplinary approach and extensive participation with her patients' physicians to care for and manage their gender dysphoria. She is required to understand the medical aspects of hormone therapy and surgery so that she can work effectively with her patients and collaborate with their other providers to recommend a treatment plan, evaluate the patient's response to treatment, and modify treatments as needed.

Despite Dr. Ettner's extensive experience, Turbocam asserts her qualifications are insufficient because she is "not a medical doctor" and lacks "a bachelor's degree in biology." Doc. no. 71-1 at 4-5. Turbocam is incorrect. A court evaluating an expert's qualifications should "consider an expert's 'full range of practical experience as well as academic or technical training.'" Cohen v. Bos. Sci. Corp., Civ. No. 20-cv-943-PB, 2024 WL 1287648, at *6 (D.N.H. Mar. 26, 2024) (quoting Anderson v. Raymond Corp., 61 F.4th 505, 509 (7th Cir. 2023)). Thus, in some circumstances, a medical degree may not be a prerequisite for offering medical testimony. See, e.g., Wood v. Medtronic Xomed Inc., Civ. No. 13-cv-90-LM, 2015 WL 2342799, at *5 (D.N.H. May 14, 2015) (declining to exclude testimony regarding surgical implantation of catheters on the ground that the witness lacked a medical degree where the witness had "spent several decades studying and designing

11

medical devices"); Allen v. Martin Surfacing, 263 F.R.D. 47, 58 (D. Mass. 2009) ("Although [the witness] may lack a medical degree, the record demonstrates that she has sufficient knowledge, skill, experience, and training to qualify her as an expert [regarding the etiology of ALS]."). Here, as discussed above, Dr. Ettner has substantial experience, training, and knowledge with respect to the etiology and treatment of gender dysphoria, and her lack of a medical degree, or a bachelor's in biology, does not preclude her from offering opinion testimony on these subjects.

II.     Dr. Ettner's Opinions Are Reliable

The reliability inquiry under Daubert and Rule 702 is a "flexible" one, "allowing for consideration of factors like whether the expert's methodology has been objectively tested; whether it has been subjected to peer review and publication; the technique's known or potential error rate; and whether the expert's technique has been generally accepted within the relevant industry." Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 98 (1st Cir. 2020). The court must find it is more likely than not "that the expert's findings are based on sound science," which necessitates "some objective, independent validation of the expert's methodology." Id. (quoting Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1316 (9th Cir. 1995), on remand, 509 U.S. 579 (1993)). In other words, the district court may not simply rely on "an expert's self-serving assertion that his conclusions were derived by the scientific method." Id. (quoting Daubert, 43 F.3d at 1316). At the same time, the court "must stop short of weighing the evidence, evaluating credibility, or unnecessarily picking sides in a battle between experts." Id. And, while the court

12

may also "evaluate the data offered to support an expert's bottom-line opinions" in considering her opinions' reliability, Ruiz-Troche, 161 F.3d at 81, the court should not "'unduly scrutinize the quality of the expert's data,' because such scrutiny 'usurps the role of the jury.'" Lawes, 963 F.3d at 99 (brackets omitted) (quoting Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796, 806 (7th Cir. 2013)). At bottom, a court evaluating reliability must take care not to "cross[ ] the boundary between gatekeeper and trier of fact." Milward, 639 F.3d at 22.

    Here, Bernier asserts that Dr. Ettner's opinion regarding the physiological etiology of gender dysphoria is based upon her own participation in brain imaging studies, which involved review of the technical protocols of such studies, review of brain image datasets, and the analysis of differences in brain composition. Her opinion is also based upon her synthesis and understanding of peer-reviewed medical and scientific brain imaging studies, as well as twin studies, neuroanatomical studies, genetic studies, and endocrinological studies. In short, Dr. Ettner's opinion as to the basis of gender dysphoria is based on a robust analysis of peer-reviewed literature and is supported by substantial research. Bernier has carried her burden of demonstrating that Dr. Ettner's opinions are more likely than not based on her application of a sound methodology.

    Turbocam disagrees. Turbocam claims that Dr. Ettner relies on a "cherry-picked" selection of "outdated and weak" studies with small sample sizes while ignoring newer studies using more reliable methods that arrive at conclusions undermining hers. Doc. no. 71-1 at 7. This critique, however, goes to the weight of

13

Dr. Ettner's testimony, not its admissibility. "Rule 702 does not demand that experts rely on all data that could be deemed relevant," nor does it "require the expert to seek out the best possible source of relevant information." Lawes, 963 F.3d at 101. Rather, Rule 702 requires that the expert's opinion stem from "sufficient facts or data." Fed. R. Evid. 702(b). This requirement "calls for a quantitative rather than a qualitative analysis." Id., advisory committee note to 2000 amendments. "The question is whether the expert considered enough information to make the proffered opinion reliable," not whether the expert "base[d] her opinion on something less than all the pertinent facts or data." 29 Wright & Miller's Federal Practice & Procedure § 6268 (2d ed.). In performing its gatekeeping role, the court is satisfied that Dr. Ettner's opinion on the etiology of gender dysphoria is based on a principled review, understanding, and synthesis of a sufficient quantity of peer-reviewed medical and scientific studies and publications.[8]

Turbocam also claims that Dr. Ettner mischaracterizes and exaggerates the studies that she does rely upon. For example, Turbocam states that Dr. Ettner, in characterizing one twin study, claimed that the study found a 33% likelihood of both twins being transgender even when reared apart while failing to note that this 33% figure related only to male identical twins. For female identical twins, the likelihood

---

[8] Nor does the court find that Dr. Ettner "ignored a significant portion of seemingly important data." Wright & Miller, supra. Turbocam identifies only a handful of sources that it claims Dr. Ettner overlooked. See doc. no. 71-1 at 9-10 (identifying one study, a critique of several other studies, and a report from the Endocrine Society). These sources can be understood as consistent with Dr. Ettner's opinion that gender dysphoria has a biological basis. See doc. no. 86-1 at 10-13.

14

of both twins being transgender was 23%, which Dr. Ettner did not acknowledge in her expert report. The court has reviewed each of Turbocam's critiques of Dr. Ettner's characterizations of the research and finds that such critiques go to Dr. Ettner's "preciseness" and "credibility," and hence the weight rather than the admissibility of her testimony. Lawes, 963 F.3d at 109.

Finally, Turbocam claims that Dr. Ettner may not reliably opine on the necessity of medical treatment for Bernier specifically because, among other things, she has never examined or met with Bernier. The court does not understand Dr. Ettner's expert report to opine on the necessity of any medical treatments for Bernier specifically. Rather, Dr. Ettner's report states her understanding that Bernier is receiving specified treatments and explains what these treatments generally accomplish for gender dysphoric individuals. Bernier agrees that it would be improper for Dr. Ettner to opine on the necessity of any medical treatment for Bernier specifically. Accordingly, Turbocam's argument on this score is moot.

III.    Dr. Ettner's Opinions Are Relevant

Finally, Turbocam claims that Dr. Ettner's opinions on the etiology and treatment of gender dysphoria are irrelevant to any issue in this case and are therefore subject to exclusion under Rule 702. According to Turbocam, Dr. Ettner's opinion on the physiological or biological basis for gender dysphoria is irrelevant to whether Bernier's gender dysphoria is a "physical . . . impairment" as that phrase is used in the ADA and its regulations. 42 U.S.C. § 12102(1); 29 C.F.R. § 1630.2(h)(1). Turbocam further claims that Dr. Ettner's opinion on the proper treatment of

15

gender dysphoria generally is irrelevant because she cannot opine on whether Bernier requires any particular medical treatment.

The court is not persuaded. Dr. Ettner's testimony on how various medications and procedures treat gender dysphoria may help the jury to understand Bernier's specific course of treatment even if Dr. Ettner offers no opinion as to whether Bernier's providers were correct in setting up Bernier's specific treatment regime. And her opinion on the cause of gender dysphoria can certainly help the jury better understand gender dysphoria—a complex medical diagnosis—even if her opinion does not definitively prove that Bernier's gender dysphoria is a physical impairment within the meaning of the ADA (a matter on which the court offers no opinion). On this record, the court cannot conclude that Dr. Ettner's testimony would be of no assistance to the jury in "understand[ing] the evidence or . . . determin[ing] a fact in issue." Fed. R. Evid. 702(a).

## CONCLUSION

For these reasons, Turbocam's Daubert motion (doc. no. 71) is denied.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

January 7, 2026

cc: Counsel of Record