UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Lillian Bernier

v.

Civil No. 23-cv-523-LM-AJ
Opinion No. 2026 DNH 136 P

Turbocam, Inc.

**O R D E R**

Plaintiff Lillian Bernier brings this action against her employer, Turbocam, Inc., alleging claims under Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112(a), and Title VII of the Civil Rights Act of 1964, id. § 2000e-2(a)(1). Bernier, a transgender woman, claims that Turbocam discriminated against her by refusing to provide her with health insurance coverage for gender-affirming care. Presently before the court are the parties' cross-motions for summary judgment (doc. nos. 66 & 74). For the following reasons, Turbocam's cross-motion (doc. no. 74) is granted in part and denied in part, and Bernier's cross-motion (doc. no. 66) is denied.

**STANDARD OF REVIEW**

A movant is entitled to summary judgment where she "shows that there is no genuine dispute as to any material fact and [that she] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if "the evidence is such 'that a reasonable jury could resolve the point in favor of the nonmoving party.'" Quintana-Dieppa v. Dep't of Army, 130 F.4th 1, 7 (1st Cir. 2025)

(quoting Doe v. Trs. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). A fact is "material" if it has the "potential to affect the outcome of the suit under the applicable law." Id. (quoting Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017)). In reviewing the record, the court construes all facts and reasonable inferences in the light most favorable to the nonmovant. Minturn v. Monrad, 64 F.4th 9, 14 (1st Cir. 2023).

This standard of review is unaffected by cross-motions for summary judgment. Dixon-Tribou v. McDonough, 86 F.4th 453, 458 (1st Cir. 2023). The court considers each motion separately and "determine[s] whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." In re Fin. Oversight & Mgmt. Bd. for P.R., 37 F.4th 746, 759 (1st Cir. 2022) (quoting Wells Real Est. Inv. Tr. II, Inc. v. Chardon/Hato Tey P'Ship, S.E., 615 F.3d 45, 51 (1st Cir. 2010)). All reasonable inferences are construed in the light most favorable to the respective non-moving party. Motorists Com. Mut. Ins. Co. v. Hartwell, 53 F.4th 730, 734 (1st Cir. 2022).

**BACKGROUND**[1]

Bernier is a lifelong New Hampshire resident in her thirties. Although she was born with a male sexual anatomy, she has known she is transgender since she was eleven or twelve years old. She tried to explain her feelings to her parents, but they told her that she was going through a "phase" and would grow out of it. For

[1] The following facts are not in genuine dispute except where otherwise indicated.

most of her life, Bernier kept her gender identity a secret, which led to deep feelings of distress, depression, and despair.

Turbocam is a manufacturer of flow path components for the aerospace and turbo machinery industries. Headquartered in Barrington, New Hampshire, Turbocam also has United States locations in South Carolina and Arizona. Turbocam has approximately 600 employees in the United States. Despite its size, Turbocam is a closely held family business owned and controlled by its President, Marian Noronha, and his wife Suzie Noronha. The Noronhas are devout evangelical Christians. It is important to the Noronhas that they operate Turbocam consistent with their religious convictions. For example, most company meetings at Turbocam begin with a prayer, and Turbocam's senior management team receives training in Christian leadership from an organization known as Fellowship of Companies for Christ International. Turbocam also engages in various charitable and philanthropic endeavors, including by funding a Christian mission to rescue families from indentured slavery in Nepal.

Bernier has worked for Turbocam since 2019. At that time, Bernier was still living in the world and presenting as a man. In the fall of 2020 (approximately one-and-a-half years after starting work at Turbocam), Bernier's mental health symptoms reached a point where she realized she had to begin living as a woman. As of that time, Turbocam offered health insurance to its employees through a fully-insured plan provided by Harvard Pilgrim Healthcare Insurance Company (Harvard Pilgrim Plan). The Harvard Pilgrim Plan for 2020 included coverage for

"Transgender Health Services," including medically necessary surgery, related physician and behavioral health visits, and outpatient prescription drugs. Bernier took advantage of the coverage afforded to her under the Harvard Pilgrim Plan in late 2020 to seek medical treatment to aid her gender transition. She was prescribed feminizing hormones and androgen-suppressing medication, which reduced her feelings of distress.

The Noronhas believe that one's sex "is ordained by God and should not be erased or obscured," either through "medical treatment or in any other way." Doc. no. 42-3 at 8. They believe that the two sexes are immutable and that it would violate their religion to allow any of Turbocam's resources, including its health insurance plan, "to assist employees in erasing or obscuring their sex." Id. The Harvard Pilgrim Plan's coverage of Bernier's hormone therapy in late 2020 was the first time in Turbocam's history that its health insurance coverage had been used to facilitate a gender transition.

Around the same time Bernier began hormone therapy in late 2020, Turbocam decided to switch from the Harvard Pilgrim Plan to a self-funded plan (Turbocam Health Plan). Turbocam made this decision in part because operating a self-funded plan would give Turbocam the ability to exclude coverage for medical treatments that do not align with the Noronhas' Christian beliefs and Turbocam's religious mission.

The Turbocam Health Plan took effect in January 2021. Since its inception, the Turbocam Health Plan has contained an exclusion for "[g]ender dysphoria

treatment,[2] including but not limited to, counseling, gender reassignment surgery or hormone therapy and related preoperative and postoperative procedures, which, as their objective, change the person's sex and any related complications." Doc. no. 75-15 at 19. Turbocam's stated reason for the gender dysphoria exclusion in the Turbocam Health Plan is the Noronhas' belief that sex is immutable and that it is a sin to obscure one's sex. Concerns about the medical efficacy, costs, or safety risks pertaining to gender-affirming care played no role in Turbocam's adoption of the gender dysphoria exclusion.

At or around the same time Bernier began receiving hormone therapy in the fall of 2020, she began presenting in public as a woman and going by the first name Lillian. In or around March of 2021, Bernier provided Turbocam with a certificate documenting that she had changed her legal name to Lillian Bernier. Bernier worked with an employee in Turbocam's personnel department to update her name and sex in Turbocam's internal records.

Bernier learned of the gender dysphoria exclusion for the first time in October 2021 when she called the claims administrator for the Turbocam Health Plan regarding an upcoming consultation she had scheduled for a vaginoplasty.

---

[2] As discussed more fully below, gender dysphoria is a condition experienced by transgender people and recognized as an established diagnosis in the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders. A person may be diagnosed with gender dysphoria when they experience (1) "[a] marked incongruence between one's experienced/expressed gender and assigned gender, of at least six months' duration," as manifested by two or more specified criteria, along with (2) "clinically significant distress or impairment in social, occupational, or other important areas of functioning." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 512-13 (5th ed., text. rev. 2022).

Bernier thereafter submitted several requests in October and November 2021 to Turbocam's personnel department that the Turbocam Plan either be modified to permit coverage for her surgery or that she be granted an exception from application of the gender dysphoria exclusion. Because the Turbocam Plan is self-funded, Turbocam has discretion to grant its employees exceptions from a coverage exclusion on an individual basis. Turbocam informed Bernier in December 2021 that it would not alter the Turbocam Health Plan or grant Bernier an exception that would provide coverage for her surgery. It is undisputed that Turbocam's refusals were not based on any beliefs regarding the medical risks, efficacy, or costs of the procedure Bernier wished to obtain.

After learning that Turbocam would not cover her surgery and having been unable to obtain insurance coverage for the procedure elsewhere, Bernier canceled her consultation. In March 2022, Bernier sought mental health counseling for gender dysphoria with a licensed clinical social worker. She asked Turbocam's personnel department whether her therapy would be covered under the Turbocam Plan. The personnel department responded that Bernier's therapy would not be covered in light of the gender dysphoria exclusion.

Although Turbocam has refused to cover Bernier's gender dysphoria treatment, Turbocam did accommodate Bernier's desired name change and has used her preferred pronouns. In September 2023, Bernier submitted a complaint that another employee was misgendering her. A supervisor in Turbocam's personnel department followed up with the employee and communicated that the employee's

conduct was not acceptable and would lead to formal discipline if continued. Bernier reported that the supervisor's intervention solved the issue. Bernier has been promoted twice since beginning work at Turbocam in 2019.[3]

At the same time, there is evidence that Marian Noronha himself—who has ultimate authority over the Turbocam Health Plan—has been less accepting of Bernier. Throughout his deposition, Noronha repeatedly referred to Bernier using male pronouns. When Bernier's attorneys informed Noronha that Bernier uses female pronouns and requests that others address her accordingly, Noronha refused to honor Bernier's request and continued to refer to Bernier as "him." See, e.g., doc. no. 67-3 at 10-11. Noronha testified that Bernier is not a woman and that he does not regard her as a woman. Noronha said that he would "not use the word 'health'" when describing treatments for gender dysphoria. Id. at 34. He further testified that Bernier changed her name to Lillian because she is "in denial." Id. at 26.

## DISCUSSION

Two claims are currently pending before the court: an ADA claim and a Title VII claim.[4] Turbocam and Bernier respectively move for summary judgment as to each claim. The court will first address Turbocam's motion, then Bernier's.

---

[3] The dates of these promotions are unclear.

[4] Although Bernier's complaint also brought claims arising under New Hampshire's Law Against Discrimination, RSA ch. 354-A, and the Affordable Care Act, 42 U.S.C. § 18116, Bernier has voluntarily dismissed these claims. See doc. nos. 51 & 68.

I. Turbocam's Cross-Motion

A. Turbocam Is Entitled to Judgment As a Matter of Law on Bernier's ADA Claim Because Her Gender Dysphoria Is Excluded from the Definition of "Disability" Under the ADA

Title I of the ADA prohibits employers with fifteen or more employees from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[5] 42 U.S.C. § 12112(a); see id. § 12111(2), (5). To succeed on a claim of discrimination under the ADA, the plaintiff must show that she: "(1) has a disability within the meaning of the ADA; (2) is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) was subject to an adverse employment action based in whole or part on [her] disability." Sutherland v. Peterson's Oil Serv., Inc., 126 F.4th 728, 738 (1st Cir. 2025) (quoting Ramos-Echevarría v. Pichis, Inc., 659 F.3d 182, 186 (1st Cir. 2011)).

Under the ADA, an individual is disabled if she has "a physical or mental impairment that substantially limits one or more major life activities," "a record of such an impairment," or if she is "regarded as having such an impairment." 42 U.S.C. § 12102(1). In addition to this broad statutory definition of disability, the ADA contains express exclusions from that definition. See id. § 12211. At issue in this case is § 12211(b)(1), which provides that "the term 'disability' shall not

[5] There is no dispute that Turbocam is subject to the ADA.

include," among other things, "gender identity disorders not resulting from physical impairments." Id.

In this case, Bernier has been diagnosed with gender dysphoria and contends that Turbocam's denial of coverage constitutes discrimination under the ADA. Turbocam contends that § 12211(b)(1) excludes Berner's diagnosis of gender dysphoria from the ADA's definition of disability. Although § 12211(b)(1) does not explicitly carve gender dysphoria out from the ADA's definition of disability, Turbocam contends that gender dysphoria comes within § 12211's bar on coverage for individuals with "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211(b)(1).

The question of whether § 12211 excludes gender dysphoria from the ADA's statutory definition of disability "has been thoroughly debated in many courts." Guthrie v. Noel, Civ. No. 1:20-CV-02351, 2023 WL 8115928, at *7 (M.D. Pa. Sept. 11, 2023) (collecting cases), report and recommendation adopted, 2023 WL 8116864, at *1 (M.D. Pa. Sept. 29, 2023). The First Circuit has not yet weighed in, however, and few district courts from within the circuit have offered their opinions. See Doe v. Mass. Dep't of Corr., Civ. No. 17-12255-RGS, 2018 WL 2994403, at *6-8 (D. Mass. June 14, 2018); cf. Alon v. N.H. Dep't of Corrs., Civ. No. 25-cv-505-SM-TSM, 2026 WL 2031428, at *7 (D.N.H. July 14, 2026) (denying motion to dismiss ADA claim where defendants did "not address, or attempt to distinguish, cases that have found gender dysphoria to be a disability under the ADA").

The issue is one of statutory interpretation. Because the ADA does not define "gender identity disorders," the court discerns the meaning of this statutory phrase by looking to its ordinary meaning at the time of the statute's enactment in 1990. United States v. Abreu, 106 F.4th 1, 12 (1st Cir. 2024). As of that time, "gender identity disorders" was a subclass of psychiatric diagnoses within the then-current revised third edition of the Diagnostic and Statistical Manual of Mental Disorders. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 71 (3d ed., rev. 1987) (DSM-III-R).[6] Although four specific diagnoses were grouped under this subclass, the "essential feature" of all gender identity disorders was "an incongruence between assigned sex (i.e., the sex that is recorded on the birth certificate) and gender identity." Id. Moreover, while gender identity disorders existed "on a continuum," even "mild" instances presented with "discomfort and a sense of inappropriateness about the assigned sex." Id.

The DSM is periodically revised. With the publication of the fifth edition in 2013, the American Psychiatric Association (APA), which authors the DSM, "replace[d]" gender identity disorders with a new, umbrella diagnosis: gender

[6] The parties agree that the DSM-III-R sheds light on the meaning of § 12211. See McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 342 (1991) ("In the absence of contrary indication, we assume that when a statute uses [a term of art], Congress intended it to have its established meaning."). The DSM is "the authoritative reference used in diagnosing mental disorders." Young v. Murphy, 615 F.3d 59, 61 n.1 (1st Cir. 2010); see also Kevin M. Barry, Disabilityqueer: Federal Disability Rights Protection for Transgender People, 16 Yale Hum. Rts. & Developmental L.J. 1, 23-25 (2013) (explaining legislative history of § 12211 and demonstrating that the statute's inclusion of gender identity disorders was "literally copied from the pages of the DSM-III-R" (quotation omitted)).

dysphoria. Am. Psychiatric Ass'n, Gender Dysphoria 1 (2013).[7] Gender dysphoria continues to be included in the current version of the DSM, which is a revised version of the fifth edition. See Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 511 (5th ed., text rev. 2022) (DSM-V-TR). The current diagnostic criteria for gender dysphoria in adults are as follows:

> A. A marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration, as manifested by at least two of the following:
>
> 1. A marked incongruence between one's experienced/expressed gender and primary and/or secondary sex characteristics (or in young adolescents, the anticipated secondary sex characteristics).
>
> 2. A strong desire to be rid of one's primary and/or secondary sex characteristics because of a marked incongruence with one's experienced/expressed gender (or in young adolescents, a desire to prevent the development of the anticipated secondary sex characteristics).
>
> 3. A strong desire for the primary and/or secondary sex characteristics of the other gender.
>
> 4. A strong desire to be of the other gender (or some alternative gender different from one's assigned gender).
>
> 5. A strong desire to be treated as the other gender (or some alternative gender different from one's assigned gender).

---

[7] Available at: https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf.

> 6. A strong conviction that one has the typical feelings and reactions of the other gender (or some alternative gender different from one's assigned gender).
>
> B. The condition is associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning.

Id. at 512-13. According to the DSM-V-TR, the "core component" of the diagnosis is incongruence between a person's assigned gender and gender identity, though "[t]here must also be evidence of distress about this incongruence." Id. at 513.

Against this backdrop, the court must determine whether gender dysphoria constitutes a "gender identity disorder[ ] not resulting from physical impairments" as that phrase appears in § 12211(b)(1). As discussed, the "essential feature" of gender identity disorders under the DSM-III-R "is an incongruence between assigned sex . . . and gender identity." DSM-III-R at 71. Although gender incongruence is the hallmark of the diagnosis, in even "mild" cases the person will experience "discomfort and a sense of inappropriateness about the assigned sex." Id. To be diagnosed with gender dysphoria, one must experience the same symptoms: incongruence between one's gender identity and assigned sex, along with discomfort and distress associated with that incongruence. Thus, even when § 12211(b)(1) is narrowly construed, "gender dysphoria is a 'gender identity disorder' as that phrase was understood at the time Congress passed the ADA." Williams v. Kincaid, 45 F.4th 759, 780 (4th Cir. 2022) (Quattlebaum, J., dissenting in part).

The APA itself confirms this. When the fifth edition of the DSM was published in 2013, the APA "replace[d] the diagnostic name 'gender identity

disorder' with 'gender dysphoria'" and made "clarifications" in diagnostic criteria. Am. Psychiatric Ass'n, Gender Dysphoria 1 (2013).[8] The APA explained that the DSM "not only determines how mental disorders are defined and diagnosed, it also impacts how people see themselves and how we see each other." Id. Labeling a patient's condition as a gender identity "disorder" connoted that it is a disorder to have a gender identity that differs from one's assigned sex; in other words, that it is a disorder to be transgender. Id. This had a stigmatizing effect. Id. At the same time, a medical or psychiatric diagnosis is generally necessary to obtain insurance coverage for needed medical treatment, so the APA wanted to retain an appropriate diagnosis in the DSM so as to avoid "jeopardiz[ing] access to care." Id. at 2. The APA therefore decided to replace the diagnosis of gender identity disorder with the diagnosis of "gender dysphoria," which clarifies that the dysphoria one may feel from gender incongruence is the clinically significant condition, not the incongruence itself.

"Reducing stigmas and preserving insurance coverage may be good reasons to change the name of the diagnosis from gender identity disorder to gender dysphoria." Williams, 45 F.4th at 785 (Quattlebaum, J., dissenting in part). But the ADA's meaning was fixed at the time of its enactment, and the Constitution does not give private associations like the APA the power to amend legislation by revising their own definitions of statutory terms. Id.

---

[8] Available at: https://www.psychiatry.org/File%20Library/Psychiatrists/Practice/DSM/APA_DSM-5-Gender-Dysphoria.pdf.

Citing the majority opinion in Williams, Bernier contends that § 12211 does not encompass gender dysphoria because gender identity disorders pathologized gender incongruence itself, whereas gender dysphoria "takes as a given that being transgender is not a disability" and instead "focuses on dysphoria as the clinical problem, not identity per se." Id. at 769 (majority opinion) (quotation omitted). The court agrees with Bernier that the shift in focus accomplishes what the APA set out to do: it removes the stigma associated with labeling gender incongruence a disorder and instead seeks to clarify that the condition subject to treatment is the dysphoria one may experience as a result of that incongruence.

But this shift in focus does nothing to alter the fact that one of the two diagnostic criteria for gender dysphoria is a marked incongruence between one's gender identity and birth sex—which is also the "essential feature" of gender identity disorder. While not all people whose gender identity differs from their assigned sex will experience discomfort, distress, or dysphoria as a result of that incongruence, by definition all persons who experience clinically significant distress from gender incongruence have a gender identity that does not align with their assigned sex. Phrased differently, while not all persons who would have met the diagnostic criteria for a gender identity disorder will meet the criteria for gender dysphoria, all persons who are properly diagnosed with gender dysphoria under the DSM-V-TR would have been diagnosed with gender identity disorder under the DSM-III-R at the time of the ADA's passage in 1990. Although the court is mindful of its obligation to construe the ADA's terms in favor of broad coverage, that

obligation "does not permit [the court] to override the clear text of the statute." Alexander v. Brigham & Women's Physicians Org., Inc., 513 F.3d 37, 46 (1st Cir. 2008).

Nor would symptoms of distress preclude a gender identity disorder diagnosis under the DSM-III-R. As noted, the DSM-III-R groups several diagnoses in the gender identity disorders subclass. Significant distress characterizes all three primary diagnoses.[9] A diagnosis of "Gender Identity Disorder of Childhood," for example, requires "[p]ersistent and intense distress" about one's assigned sex. DSM-III-R at 73. "Transsexualism" requires "[p]ersistent discomfort and sense of inappropriateness about one's assigned sex." Id. at 76. And "Gender Identity Disorder of Adolescence or Adulthood, Nontranssexual Type" likewise requires "[p]ersistent or recurrent discomfort and sense of inappropriateness about one's assigned sex." Id. at 77. Thus, gender dysphoria's focus on the individual's distress as the treatable condition does not preclude gender dysphoria from being considered a gender identity disorder as that phrase is used in the ADA.

Multiple canons of statutory interpretation support the court's conclusion. For example, it is "a cardinal principle of statutory construction" that a statute should be construed such that "no clause, sentence, or word [is] superfluous, void, or insignificant." TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (quoting Duncan v.

[9] The subclass contains a fourth, catchall diagnosis entitled "Gender Identity Disorder Not Otherwise Specified." DSM-III-R at 77. This diagnosis pertains to "[d]isorders in gender identity that are not classifiable as a specific Gender Identity Disorder." Id.

Walker, 533 U.S. 167, 174 (2001)); see also King v. Burwell, 576 U.S. 473, 502 (2015) (Scalia, J., dissenting) ("[T]he rule against treating [a statutory term] as a nullity is as close to absolute as interpretive principles get."). "Proper respect for Congress cautions courts against lightly assuming that any of the statutory terms it has chosen to employ are 'superfluous' or 'void' of significance." Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 53 (2024) (quoting TRW, 534 U.S. at 31). Bernier's construction would read the gender identity disorders exclusion out of the statute. Since "gender identity disorder" is now an obsolete diagnosis, Bernier's reasoning "effectively invalidate[s]" the exclusion; no one is diagnosed with gender identity disorder anymore. Kincaid v. Williams, 143 S. Ct. 2414, 2415 (2023) (Alito, J., dissenting from denial of certiorari). Not only does Bernier's approach nullify statutory language, it cedes power to the APA "to effectively modify statutes passed by Congress and signed into law by the President" simply by changing its terminology. Williams, 45 F.4th at 785 (Quattlebaum, J., dissenting in part). "That cannot be right." Id.

A contrary interpretation of the statute would also violate the general-terms canon. That canon "holds that general terms should be interpreted generally," United States v. Weiss, 52 F.4th 546, 552 (3d Cir. 2022), in recognition of the fact that "it is possible and useful to formulate categories without knowing all the items that may fit—or may later, once invented, come to fit—within those categories," Duncan v. Jack Henry & Assocs., Inc., 617 F. Supp. 3d 1011, 1056 (W.D. Mo. 2022) (ellipsis omitted) (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The

Interpretation of Legal Texts 101 (Thomson/West 2012)). It is significant that § 12211 excludes both one specific gender identity disorder contained in the DSM-III-TR ("transsexualism") as well as the broader category of "gender identity disorders not resulting from physical impairments." 42 U.S.C. § 12211. "The plural use of the term should not be overlooked. This language indicates that Congress considered this class to include more than one diagnosis." Williams, 45 F.4th at 784 (Quattlebaum, J., dissenting in part). The general-terms canon supports construing § 12211 to embrace conditions that, but for a modification in the APA's terminology, would come within the category of "gender identity disorders" as that phrase was enacted into law in 1990.

Bernier submits that the canon of constitutional avoidance supports her interpretation of the exclusion. She contends that interpreting the ADA as lacking protection for persons with gender dysphoria would raise serious constitutional issues. The court does not agree that the constitutional avoidance canon aids Bernier. The canon of constitutional avoidance provides that, when a court is faced with two plausible constructions of statutory language, but one interpretation would raise serious constitutional issues, the interpretation which renders the statute constitutional is preferred. Clark v. Martinez, 543 U.S. 371, 380-81 (2005). "It is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." Id. at 381. However, the constitutional avoidance canon "comes into play only when, after the application of

ordinary textual analysis, the statute is found to be susceptible of more than one construction." Nielsen v. Preap, 586 U.S. 392, 419 (2019) (quoting Jennings v. Rodriguez, 583 U.S. 281, 296 (2018). "In the absence of more than one plausible construction, the canon simply 'has no application.'" Jennings, 583 U.S. at 296 (quoting Warger v. Shauers, 574 U.S. 40, 50 (2014)). Here, because Bernier has not shown that the gender-identity-disorders exclusion is subject to more than one plausible interpretation, the canon does not apply.

In light of the foregoing, the only way Bernier's gender dysphoria could constitute a disability for purposes of the ADA is if Bernier's diagnosis "result[s] from [a] physical impairment[ ]." 42 U.S.C. § 12211(b)(1). Although the ADA does not define the phrase "physical impairment," its implementing regulations define it as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as" the "reproductive" system or "endocrine" system. 29 C.F.R. § 1630.2(h)(1).[10]

Bernier contends that her gender dysphoria results from a physical impairment because her endocrine system cannot produce the estrogen she needs, such that she requires hormone therapy to reduce her feelings of distress. She further contends that her gender dysphoria is a physical impairment because she has undergone surgical treatment (and plans to undergo further surgical treatment) with the purpose of feminizing her body in order to relieve the distress she

[10] The parties agree that this definition applies.

experiences from the incongruence between her gender identity and her body's sex characteristics.

The court is not persuaded. The fact that Bernier's endocrine system cannot produce sufficient levels of estrogen to relieve the significant distress she experiences does not mean that her gender dysphoria itself results from an independent physical impairment. "Many common mental impairments, such as depression and anxiety disorders, cause real and sometimes powerful physical distress and are treated by chemical interventions. That does not mean, however, that those mental impairments are caused by an independent physical trait that itself qualifies as an impairment." Kincaid, 143 S. Ct. at 2418 (Alito, J., dissenting from denial of certiorari).

For similar reasons, the fact that Bernier will undergo surgery to alter her physical features does not mean that her gender dysphoria results from a physical impairment, as § 12211 requires. Bernier does not argue, for example, that her gender dysphoria stems from a bodily "disfigurement, anatomical loss," or a discrete "physiological disorder or condition."[11] 29 C.F.R. § 1630.2(h)(1). Nor does she contend that the surgical interventions she seeks are necessary to treat some

[11] Bernier has expressly declined to argue that gender dysphoria results from a physical impairment because it is caused by intrauterine physiological abnormalities during fetal development, as one of her experts suggests. Doc. no. 86 at 2 & n.1; see also Bernier v. Turbocam, Inc., 814 F. Supp. 3d 229, 235 (D.N.H. 2026) (noting report from Bernier's expert discussing potential physiological etiology of gender dysphoria and denying motion to exclude); Doe v. Mass. Dep't of Corr., 2018 WL 2994403, at *6-7. She has therefore waived this argument, and the court does not consider it.

independent bodily impairment. At bottom, Bernier contends that she requires surgery to alter her body in order to relieve her clinically significant distress. But that argument "does not meaningfully distinguish physical impairments from mental impairments, which the ADA recognizes as a distinct category." Kincaid, 143 S. Ct. at 2418 (Alito, J., dissenting from denial of certiorari) (brackets and quotation omitted). It would also render the "not resulting from physical impairments" requirement superfluous. "If having the physical characteristics of a gender different from the gender with which they identify is a physical impairment under § 12211(b)(1), then all gender identity disorders must result from physical impairments since, by definition, gender identity disorders involve such gender incongruence." Williams, 45 F.4th at 788 (Quattlebaum, J., dissenting in part). That a surgical intervention may be needed to treat a psychiatric condition does not mean that the psychiatric condition results from a physical impairment.

For these reasons, the court concludes that § 12211(b)(1) bars Bernier's ADA claim, and that there is no genuine dispute of material fact with respect to that claim such that Turbocam is entitled to judgment as a matter of law.

B. Turbocam Is Not Entitled to Judgment as a Matter of Law on Bernier's Title VII Claim

Turbocam argues that it is entitled to summary judgment on Bernier's Title VII claim for three primary reasons. First, Turbocam contends that Bernier cannot show she was discriminated against because of sex. Second, Turbocam asserts that the Religious Freedom Restoration Act of 1993 (RFRA) bars her claim. Finally,

Turbocam contends that Bernier's claim is precluded by the Free Exercise Clause of the First Amendment. The court addresses each contention in turn.

1. A Factfinder Could Reasonably Conclude that Turbocam's Denial of Health Insurance Coverage for Gender-Affirming Care Discriminates Against Bernier Because of Her Sex

Title VII provides that it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to . . . compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "In passing Title VII, Congress made the simple but momentous announcement that sex, race, religion, and national origin are not relevant to the selection, evaluation, or compensation of employees." Price Waterhouse v. Hopkins, 490 U.S. 228, 239 (1989) (plurality opinion), superseded by statute in part on other grounds, Civil Rights Act of 1991, Pub. L. No. 102-166, § 107, 105 Stat. 1071, 1075-76. The Supreme Court has held that "[h]ealth insurance and other fringe benefits are 'compensation, terms, conditions, or privileges of employment'" within the meaning of Title VII. Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U.S. 669, 682 (1983) (quoting 42 U.S.C. § 2000e-2(a)). Thus, to resolve Turbocam's motion with respect to Bernier's Title VII claim, the court must determine whether a reasonable jury could find that Turbocam's refusal to cover Bernier's gender-affirming care constitutes discrimination because of sex.

In Bostock v. Clayton County, 590 U.S. 644 (2020), the Supreme Court analyzed how transgender-based discrimination relates to sex-based discrimination for purposes of Title VII. The Court explained that, when an employer takes a

particular action towards an individual employee because they are transgender, the employer necessarily intends to take a sex-based action against that employee. Bostock, 590 U.S. at 660-61. This is so not because transgender status "relate[s] to sex in some vague sense," but because transgender status is "inextricably bound up with sex"; being transgender means having a gender identity that differs from one's biological sex. Id. at 660-61. To take a particular action toward an employee because they are transgender is to take that action because the employee's assigned sex does not align with their gender identity or with the employer's conception of what persons of that assigned sex ought to be like. For example, where an employer confers a benefit upon a cisgender employee that it denies to an otherwise similarly situated transgender employee because of their transgender status, "the employer intentionally penalizes a person identified as [a sex other than their gender identity] at birth for traits or actions that it tolerates in an employee" whose birth-assigned sex matches their gender identity. Id. at 660. Actions taken on the basis of transgender status "are inextricably bound up with sex . . . because to discriminate on these grounds requires an employer to intentionally treat individual employees differently because of their sex." Id. at 660-61.

It does not matter that the employee's transgender status is only one factor that may have contributed to the decision. Id. at 661. Nor can the employer escape liability by arguing that it affords differential treatment to "male and female employees who are . . . transgender." Id. at 662. "Title VII liability is not limited to employers who, through the sum of all of their employment actions, treat the class

of men differently than the class of women." Id. at 662. The law instead "makes each instance of discriminating against an individual employee because of that individual's sex an independent violation of Title VII." Id. So, if an employer fires a transgender man and a transgender woman on the basis of their transgender status, the employer "doubles rather than eliminates Title VII liability." Id. It does not matter if the employer's policy is to fire all employees who come out as transgender, regardless of their birth-assigned sex. Id.

In this case, it is undisputed that the Turbocam Health Plan is a self-funded plan and that Turbocam therefore has autonomy over the scope of the Plan's coverage, its exclusions, and whether to grant an individual employee an exception from a coverage exclusion. Among other things, the Turbocam Health Plan excludes coverage for "gender reassignment surgery or hormone therapy and related preoperative and postoperative procedures, which, as their objective, change the person's sex." Doc. no. 67-9 at 24. Turbocam states that the reasons for this exclusion are its owners' belief that sex is ordained by God and should not be erased or obscured in any way, as well as their conviction that they must run their business in accordance with their religious beliefs.

When Bernier learned that the Turbocam Health Plan would not cover a surgery that was intended to alter her sex characteristics to more closely align with her gender identity, she requested that Turbocam modify this exclusion or grant her an exception from it. Turbocam denied her requests. Turbocam maintains that the sole reason for these denials was its owners' belief that "one's sex . . . should not be

erased or obscured by medical treatment or in any other way." Doc. no. 42-3 at 8; see also doc. no. 96 at 15-16. Moreover, as discussed above, there is evidence in the record that one of Turbocam's owners, Marian Noronha (who has ultimate authority over the Turbocam Health Plan), harbors transgender-based animus against Bernier. A jury could infer from Noronha's deposition testimony that he believes not only that gender-affirming care is wrong, but also that it is objectionable to be transgender. Construing the evidence in the light most favorable to Bernier, a jury could reasonably infer that Turbocam denied coverage to Bernier because she is transgender, which, under Bostock, renders Bernier's sex a but-for cause of that coverage denial.

Resisting this conclusion, Turbocam contends that Bernier's Title VII claim is foreclosed by United States v. Skrmetti, 605 U.S. 495 (2025). Skrmetti involved an equal protection challenge to a Tennessee law that barred healthcare providers from performing surgical procedures on minors, or administering hormone therapy or puberty blockers to minors, when the goal of the surgery or treatment was to facilitate a gender transition or alleviate distress resulting from gender incongruence. 605 U.S. at 506-07. The primary question before the Supreme Court was whether the terms of the Tennessee law facially classified on the basis of sex and therefore triggered heightened scrutiny under the Court's Equal Protection Clause jurisprudence. Id. at 510-11. The Court held that the Tennessee law did not, "[o]n its face," classify by sex. Id. at 511. Instead, the law included two facial classifications: (1) it contained an age classification, insofar as it prohibited certain

medical treatments to minors but not adults; and (2) it contained a classification "on the basis of medical use," insofar as it permitted certain medical treatments intended to treat some conditions "but not to treat . . . gender incongruence." Id.

Importantly, the Skrmetti plaintiffs did not argue that, even if the Tennessee law contained no facial sex classification, it was motivated by sex-based stereotypes and triggered heightened scrutiny on that basis. Id. at 516. However, in considering the persuasiveness of that argument (which the Court acknowledged was not before it), the Court looked to the Tennessee legislature's statutory findings that gender transition procedures and treatment are often irreversible, and that minors who undergo those procedures come to regret their decisions with some frequency and suffer physical and emotional harm as a result. Id. at 516-17. The Court found that the Tennessee legislature's stated reasons for adopting the at-issue law did not evince sex stereotyping. Id.

The Skrmetti plaintiffs also argued that, even if the Tennessee law did not classify by sex, it classified by transgender status and triggered heightened scrutiny for that independent reason. Id. at 517. The court declined to resolve whether transgender individuals constitute a quasi-suspect class, instead finding that the law, insofar as it prohibited various treatments for "gender dysphoria, gender identity disorder, or gender incongruence," did not classify by transgender status. Id. at 517-18. Applying the reasoning of Geduldig v. Aiello, 417 U.S. 484 (1974), the court held that the bar on treatment for those diagnoses was not a proxy for classifying by transgender status. Specifically, the court reiterated that the statute

"divides minors into two groups: those who might seek puberty blockers or hormones to treat the excluded diagnoses, and those who might seek puberty blockers or hormones to treat other conditions." Id. at 519. Because transgender people were included in both groups, the Court held that there was a "lack of identity" between transgender status and the diagnoses of gender dysphoria, gender identity disorder, and gender incongruence. Id. However, as with the plaintiffs' claim that the statute classified by sex, Skrmetti made sure to point out that "[t]he plaintiffs . . . have not argued that [the law's] prohibitions are mere pretexts designed to effect an invidious discrimination against transgender individuals." Id.

After careful consideration and for multiple reasons, the court finds that Skrmetti does not control Bernier's Title VII claim. First, and most important, Bernier's claim is different from the claim in Skrmetti. Skrmetti resolved whether the Tennessee law facially classified on the basis of sex or transgender status. Bernier does not bring a facial discrimination claim. That is, she does not assert that the actual terms of the gender-dysphoria exclusion in the Turbocam Health Plan discriminate based on sex or transgender status. Rather, Bernier argues that Turbocam adopted the exclusion (and decided not to modify it for her) because of Turbocam's discriminatory, sex-based animus. See Frith v. Whole Foods Mkt., Inc., 38 F.4th 263, 271 (1st Cir. 2022) (facially neutral policy may violate Title VII "where an employer uses the facially neutral policy as a pretext to engage in intentional discrimination").

All of the Courts of Appeals that have considered Skrmetti's applicability to gender-dysphoria healthcare coverage exclusions have recognized that a coverage exclusion that is neutral on its face may nevertheless be unlawful when adopted because of sex-based animus. See Anderson v. Crouch, 169 F.4th 474, 489-90 (4th Cir. 2026) (exclusion from coverage for gender dysphoria treatment did not facially classify by sex or discriminate on the basis of sex and there was no evidence that the exclusion's adoption was result of sex stereotypes or an intent to discriminate); Pritchard ex rel. C.P. v. Blue Cross Blue Shield of Ill., 159 F.4th 646, 672 (9th Cir. 2025) (holding that Skrmetti did not foreclose claim challenging health plan's exclusion for gender-affirming care where evidence of discriminatory intent renders "a discriminatory inference plausible" (quotation omitted)); Lange v. Houston Cnty., 152 F.4th 1245, 1254-55 (11th Cir. 2025) (en banc) (remanding case to district court post-Skrmetti where record contained genuine disputes of fact concerning the intent behind the policy exclusion).

For example, in Lange, a transgender deputy sheriff sued her employer (the County), alleging that the County's exclusion from coverage for "sex change[s]" violated Title VII. Lange, 152 F.4th at 1249-50. The trial court entered summary judgment for the plaintiff, finding that the sex-change exclusion "violated Title VII on its face." Id. at 1250. However, the trial court also found that there was a genuine dispute as to why the County adopted the exclusion; the County maintained it was adopted based on financial considerations, while the plaintiff asserted its adoption was driven by ideological reasons. Id. Finding the parties'

dispute genuine, the trial court did not award summary judgment to the plaintiff on this basis, instead resting its holding on the conclusion that the sex-change exclusion facially discriminated on the basis of sex. Id. Following the entry of judgment in the district court, the Supreme Court decided Skrmetti. The Eleventh Circuit, sitting en banc, "asked the parties to brief one question: whether the insurance policy at issue . . . facially violates Title VII." Id.

Applying Skrmetti, the Eleventh Circuit held that the policy "does not facially discriminate based on transgender status," but instead was a "classification based on medical use." Id. at 1253 (quoting Skrmetti, 605 U.S. at 517). And while the plaintiff argued before the en banc court that the exclusion's adoption was motivated by impermissible considerations, "that question [was] well outside the scope of this appeal. The question here is about alleged discrimination on the face of the policy." Id. at 1254 (emphasis in original); see also id. at 1251 ("Unlike other Title VII claims, a disparate treatment claim based on a facially discriminatory policy 'does not depend on why the [defendant] discriminates but rather on the explicit terms of the [policy].'" (first alteration in original) (quoting Auto. Workers v. Johnson Controls, Inc., 499 U.S. 187, 199 (1991)). The circuit stated that the district court found at summary judgment that the intent behind the exclusion was in genuine dispute, and ultimately remanded to the district court for further proceedings. Id. at 1254-55.

The Ninth Circuit applied Skrmetti in a similar procedural posture in Pritchard. There, the Ninth Circuit held that Skrmetti foreclosed the argument that

a health insurance plan's exclusion for gender-affirming care was facially discriminatory. Pritchard, 159 F.4th at 669-70. At the same time, "Skrmetti left Plaintiffs another potential opportunity" to argue that, even if the exclusion did not facially discriminate on the basis of sex, it was adopted for impermissible sex-based reasons. Id. at 671. While acknowledging that Skrmetti held that there is insufficient identicality between gender dysphoria and transgender status such that a bar on gender dysphoria treatment is not per se transgender-based discrimination, the Ninth Circuit explained that a "lack of identity . . . is not fatal" when other evidence of discriminatory intent renders "a discriminatory inference plausible." Id. at 672 (quoting Schmitt v. Kaiser Found. Health Plan of Wash., 965 F.3d 945, 959 (9th Cir. 2020)).

Post-Skrmetti, federal courts have also recognized the viability of claims challenging state laws prohibiting gender-affirming care where the plaintiff alleges sex- or transgender-based intent behind the law's adoption. See Brandt ex rel. Brandt v. Griffin, 147 F.4th 867, 880 (8th Cir. 2025) (state law that prohibited gender transition treatment for minors did not facially classify based on sex but the plaintiffs advanced no argument that a "sex-based discriminatory purpose motivated" the state legislature); Poe ex rel. Poe v. Drummond, 149 F.4th 1107, 1125-26 (10th Cir. 2025) (acknowledging that law prohibiting gender transition treatment to minors may trigger heightened scrutiny if motivated by discriminatory intent but concluding plaintiffs failed to show such an intent); cf. Sargent v. Sch. Dist. of Phila. 165 F.4th 727, 739 n.6 (3d Cir. 2026) (observing in the context of a

race-based equal protection claim involving a facially race-neutral policy that "the Supreme Court's focus in this context has been on intent . . . including quite recently" in Skrmetti, where the Court "described [the] inquiry as one about purpose"); Talbott v. United States, 176 F.4th 720, 743 (D.C. Cir. 2026) ("In Skrmetti, . . . [t]he Court strongly implied that a law that seeks to 'force conformity with sex' or 'evinc[ing] sex-based stereotyping' would be considered a classification based on sex." (alteration in original) (quoting Skrmetti, 605 U.S. at 515-16)).

In short, intentional discrimination against transgender people in the workplace remains illegal after Skrmetti. The record here is sufficient for a jury to find that Bernier's sex is a but-for cause of Turbocam's refusal to cover the care she seeks. Turbocam states that it adopted the exclusion, declined to modify it, and refused to grant Bernier an exception from it based on Turbocam's moral disapproval of Bernier's effort to obscure or change her sex. Further, there is evidence from which a jury could find that Turbocam's owner harbored personal animus toward Bernier because of her transgender status.

Turbocam's reliance on Skrmetti is misplaced for an additional reason: Skrmetti concerned an equal protection claim, not Title VII. The Supreme Court has "never held that the constitutional standard for adjudicating claims of invidious . . . discrimination is identical to the standards applicable under Title VII." Washington v. Davis, 426 U.S. 229, 239 (1976); accord, e.g., Johnson v. Transp. Agency, Santa Clara Cnty., 480 U.S. 616, 627 n.6, 632 (1987); Gaines v. Wardynski, 871 F.3d 1203, 1211 (11th Cir. 2017). Although the Equal Protection Clause and

Title VII "both prohibit sex discrimination in certain circumstances . . . they're also different in some very significant ways." Lange, 152 F.4th at 1255 (Newsom, J., concurring).

Start with the most obvious difference: the text. Title VII provides in pertinent part that "[i]t shall be an unlawful employment practice . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Bostock, a statutory interpretation case, turned on the proper meaning of several statutory phrases in Title VII: "because of," "discriminate," and "individual." Bostock, 590 U.S. at 655-59. The text of the Equal Protection Clause differs sharply. The Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "That such differently worded provisions should mean the same thing is implausible on its face." Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll., 600 U.S. 181, 302, 308 (2023) (Gorsuch, J., concurring) (contrasting the Equal Protection Clause from Title VI, while acknowledging that the pertinent text of Title VI is "materially identical" to Title VII).

Applying those textual differences, the provisions differ in their objects of protection: the Equal Protection Clause operates at the group level, whereas Title VII operates at the individual level. The Supreme Court has interpreted the Equal

Protection Clause as forbidding states from grouping its citizens by sex and then affording differential treatment to one group absent a showing from the state that grouping by sex "serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." Skrmetti, 605 U.S. at 510 (quoting United States v. Virginia, 518 U.S. 515, 533 (1996)); see also Engquist v. Or. Dep't of Agric., 553 U.S. 591, 601 (2008) ("Our equal protection jurisprudence has typically been concerned with governmental classifications that 'affect some groups of citizens differently than others.'" (quoting McGowan v. Maryland, 366 U.S. 420, 425 (1961))). "By requiring that the classification bear a [sufficient] relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law." Romer v. Evans, 517 U.S. 620, 633 (1996). Title VII's text, by contrast, "tells us . . . that our focus should be on individuals, not groups." Bostock, 590 U.S. at 658; see also 42 U.S.C. § 2000e-2(a)(1) (employer cannot fire "any individual," or discriminate against "any individual" with respect to terms of employment, "because of such individual's . . . sex"). Hence why, under Title VII, a male employer cannot escape liability for sexually harassing a female employee by arguing that, "he gives preferential treatment to female employees overall. The employer is liable for treating this woman worse in part because of her sex." Bostock, 590 U.S. at 659; see also City of L.A., Dep't of Water & Power v. Manhart, 435 U.S. 702, 709 (1978) ("[T]he statute requires that we focus on fairness to individuals rather than fairness to classes.").

The laws function differently in other ways too. "The Equal Protection Clause addresses all manner of distinctions between persons and [the Supreme] Court has held that it implies different degrees of judicial scrutiny for different kinds of classifications." Students for Fair Admissions, 600 U.S. at 308 (Gorsuch, J., concurring). Title VII, by contrast, only prohibits discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "And that law does not direct courts to subject these classifications to one degree of scrutiny or another." Students for Fair Admissions, 600 U.S. at 309 (Gorsuch, J., concurring). The objects of regulation are different too: the Equal Protection Clause applies only to states, whereas Title VII reaches private employment.

To be sure, Skrmetti's discussion of Bostock gives the court pause. In Bostock, the Court construed the but-for causation standard that stemmed from Title VII's statutory language as "direct[ing] us to change one thing at a time and see if the outcome changes." Bostock, 590 U.S. at 656. Based upon this understanding, Bostock concluded that, when an employer fires a transgender woman for being transgender, the firing decision is at least partially "because of" the employee's sex; if you "change one thing"—the employee's birth-assigned sex from male to female—they would not have been fired. Id. The Skrmetti plaintiffs "urge[d]" the Court to apply Bostock's causation analysis to their equal protection claim challenging the at-issue Tennessee law. Skrmetti, 605 U.S. at 520. They argued that, if the Court applied Bostock's but-for causation analysis to their equal protection claim, the Court would conclude that the challenged law classified by sex "because it prohibits

a minor whose biological sex is female from receiving testosterone to live as a male but allows a minor whose biological sex is male to receive testosterone for the same purposes." Id.

Skrmetti declined to resolve "whether Bostock's reasoning reaches beyond the Title VII context." Id. However, the Court also held that, even when employing Bostock's reasoning, the challenged law did not classify by sex. Id. at 520-21. "If a transgender boy seeks testosterone to treat his gender dysphoria, [the law] prevents a healthcare provider from administering it to him. If you change his biological sex from female to male, [the law] would still not permit him the hormones he seeks because he would lack a qualifying diagnosis for the testosterone—such as a congenital defect, precocious puberty, disease, or physical injury." Id. (citation omitted). The Court therefore held that, "[u]nder the reasoning of Bostock, neither his sex nor his transgender status is the but-for cause of his inability to obtain testosterone." Id. at 521.

Some courts have held that Skrmetti's application of Bostock forecloses claims that gender dysphoria coverage exclusions in health insurance plans discriminate because of sex. E.g., Lange, 152 F.4th at 1251-52. Here, however, Bernier does not allege that the Turbocam Health Plan is facially discriminatory, but rather that Turbocam adopted and continues to maintain the gender dysphoria exclusion because Turbocam disapproves of any effort to change or obscure one's sex. In other words, it is unnecessary to apply Bostock's causation analysis to determine whether Bernier's sex is a but-for cause of her inability to obtain the

coverage she seeks: Turbocam does not dispute that it denies Bernier coverage because it disapproves of any effort to live as a sex other than their birth-assigned sex. Based on this concession, as well as other evidence in the record discussed above, a jury could reasonably infer that Turbocam's denial of coverage was sex-based. While Skrmetti's discussion of Bostock may impact courts' methodological approach to conducting but-for causation analyses in Title VII cases, it does not abrogate Bostock's ultimate conclusion that transgender-based discrimination necessarily encompasses discrimination on the basis of sex under Title VII.

Bostock itself confirms this. Skrmetti held that Bostock's causation analysis did not yield the conclusion that the Tennessee law facially classified by sex because "no minor may be administered puberty blockers or hormones to treat gender dysphoria, gender identity disorder, or gender incongruence," while "minors of any sex may be administered puberty blockers or hormones for other purposes." Skrmetti, 605 U.S. at 515 (emphasis in original). In other words, in the equal protection context, Bostock's causation analysis did not show that the Tennessee law grouped citizens by sex because minors of both sexes were unable to access certain procedures or medications when used to treat gender dysphoria. Title VII, however, is concerned with discrimination against individuals rather than with disadvantaging one group over another, and "an employer cannot escape liability by demonstrating that it treats males and females comparably as groups." Bostock, 590 U.S. at 665. To the contrary, the application to an individual employee of an employment policy to intentionally withhold a specified employment benefit from all

transgender employees regardless of birth-assigned sex still results in "treating this woman worse in part because of her sex." Id. at 659. The fact that Bostock's analysis may sometimes show that a decisionmaker is affording equivalent treatment to the sexes as groups does not mean Bostock holds no continued relevance when determining whether an individual employee is being treated differently because of her sex.

The First Circuit has recently reminded lower courts that, where the Supreme Court has not overruled its own precedents, "we are required to follow [them], not treat them as but shells of their former selves." St. Dominic Acad. v. Makin, 181 F.4th 11, 51 (1st Cir. 2026) (quotation omitted). If a Supreme Court opinion has "direct application" in a given case but the opinion's reasoning has been undermined by another decision, a lower court must "follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." Agostini v. Felton, 521 U.S. 203, 237 (1997) (quoting Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989)). Bostock has direct application in this case, so it is this lower court's job to harmonize it with Skrmetti. Having done so, the court concludes, as has every Court of Appeals to have considered the question, that Skrmetti does not foreclose claims of the type Bernier advances here. Applying Bostock, a jury could reasonably conclude that Turbocam refuses to cover the treatment Bernier seeks because of her sex.

Turbocam's remaining arguments on this matter are not persuasive. First, Turbocam argues that Bernier is not being subjected to sex-based discrimination

because Turbocam's beliefs stem from its religious convictions. While Turbocam's arguments may be relevant to a potential RFRA or free exercise defense, see infra, they do not bear on whether Turbocam's stated reasons for its challenged action, whatever those reasons' source, amount to a sex-based justification for discrimination. Under Title VII, "it's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it." Bostock, 590 U.S. at 664. "Nor does it matter that, when an employer treats one employee worse because of that individual's sex, other factors may contribute to the decision." Id. at 661.

Next, Turbocam contends that Bernier's claim fails because she cannot show discrimination. That is so because, according to Turbocam, she "has access to the same health-benefits plan options on the same terms as every other Turbocam employee, male or female." Doc. no. 75 at 19. Bostock forecloses this argument. It is no defense that the denial of coverage for gender dysphoria treatment "ha[s] the same adverse consequences for men and women." Bostock, 590 U.S. at 672. Instead, a plaintiff adequately establishes discrimination because of sex by showing that her sex was a but-for cause of "some 'disadvantageous' change in an employment term or condition." Muldrow v. City of St. Louis, 601 U.S. 346, 354 (2024). Such disadvantageous changes include "significant change[s] in benefits." Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 761 (1998)). Here, a jury could reasonably conclude that

Turbocam's discontinuation of gender dysphoria treatment coverage meaningfully altered Bernier's conditions of employment.

Finally, citing First Amendment precedents, Turbocam contends that imposing Title VII liability in this case would be for "the very purpose of eliminating ideas," and that Title VII "does not compel employers' adherence to an orthodoxy about human sexuality" or gender-affirming care. Doc. no. 75 at 23-24 (quoting 303 Creative LLC v. Elenis, 600 U.S. 570, 597 (2023)). 303 Creative was a government-compelled speech case, where a graphic designer sought to prevent the State of Colorado from applying its public accommodations law in a way that would require her to engage in expression inconsistent with her beliefs. 303 Creative, 600 U.S. at 580-82. The parties in that case effectively agreed that the plaintiff's designs constituted "pure speech." Id. at 587. Turbocam has not developed an argument that the provision of health insurance coverage to its employees constitutes speech or expressive conduct as such; therefore, any such argument is waived.[12]

2. RFRA Does Not Apply to Lawsuits Between Private Parties

Turbocam contends that, even if a reasonable jury could find that Bernier carried her burden of showing a Title VII violation, Turbocam is nevertheless entitled to summary judgment on Bernier's Title VII claim because a jury would find in Turbocam's favor on its RFRA defense. Bernier responds that RFRA is

---

[12] Turbocam asserts in passing that the Free Speech Clause of the First Amendment prevents Turbocam from being forced to cover gender-affirming counseling, insofar as that would require Turbocam to subsidize speech with which it disagrees. See doc. no. 75 at 58. Turbocam's argument is insufficiently developed and is therefore waived. Rodríguez v. Mun. of San Juan, 659 F.3d 168, 175 (1st Cir. 2011).

inapplicable to lawsuits between private parties. The court agrees with Bernier, as do most of the Courts of Appeals to have considered the issue. See Pritchard, 159 F.4th at 666; Listecki v. Off. Comm. of Unsecured Creditors, 780 F.3d 731, 736 (7th Cir. 2015); Gen. Conf. Corp. of Seventh-Day Adventists v. McGill, 617 F.3d 402, 410-12 (6th Cir. 2010); see also Billard v. Charlotte Cath. High Sch., 101 F.4th 316, 324 (4th Cir. 2024) [hereinafter Billard II] (recognizing "the great weight of court authority [holding] that RFRA does not apply to suits between private parties"). But see Hankins v. Lyght, 441 F.3d 96, 103 (2d Cir. 2006).[13]

The court's analysis begins with the text. 42 U.S.C. § 2000bb-1(a) provides that "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b)." Subsection (b), in turn, sets forth that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). RFRA then provides both a cause of action and a defense: "A person whose religious exercise has been

[13] Hankins was a 2-1 opinion, with then-Judge Sotomayor dissenting. See Hankins, 441 F.3d at 109 (Sotomayor, J., dissenting). It was not long before the Second Circuit cast doubt on the Hankins majority's holding. Rweyemamu v. Cote, 520 F.3d 198, 201-04 & n.2 (2d Cir. 2008) (expressing "doubts about Hankins's determination that RFRA applies to actions between private parties when the offending federal statute is enforceable by a government agency" because "[t]he text of RFRA is plain" and "we do not understand how it can apply to a suit between private parties, regardless of whether the government is capable of enforcing the statute at issue").

burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." Id. § 2000bb-1(c).

RFRA sets forth several relevant statutory definitions. It defines "government" to "include[ ] a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States," "the District of Columbia, the Commonwealth of Puerto Rico, and each territory and possession of the United States." Id. § 2000bb-2(1)-(2). It defines "demonstrates" as "meets the burdens of going forward with the evidence and of persuasion." Id. § 2000bb-2(3). And it specifies that it "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after" RFRA. Id. § 2000bb-3(a).

As RFRA's text demonstrates, the statute's "main provisions describe a process of burden shifting between a government and a person whose religious exercise is substantially burdened." Pritchard, 159 F.4th at 667. If a "[g]overnment" substantially burdens a person's exercise of religion, that person has "a claim or defense in a judicial proceeding and [may] obtain appropriate relief against a government" unless the "[g]overnment . . . demonstrates that application of the burden" is the least restrictive means of further a compelling governmental interest. 42 U.S.C. § 2000bb-1. Because RFRA's burden-shifting process requires the government to put on evidence and meet both a burden of proof and persuasion, it applies only when the government is a party. Listecki, 780 F.3d at 736 ("It is self-

evident that the government cannot meet its burden if it is not party to the suit.”); Hankins, 441 F.3d at 114 (Sotomayor, J., dissenting) (“Where, as here, the government is not a party, it cannot ‘go[ ] forward’ with any evidence.” (alteration in original) (quoting 42 U.S.C. § 2000bb-2(3))). “A private party cannot step into the shoes of the ‘government’ . . . because the statute explicitly says that the ‘government’ must make this showing.” Listecki, 780 F.3d at 736.

What is more, RFRA’s text makes clear that a successful claim or defense thereunder allows the successful party to “obtain appropriate relief against a government.” 42 U.S.C. § 2000bb-1(c). “The relief is clearly and unequivocally limited to that from the ‘government.’” Listecki, 780 F.3d at 737. Thus, “absent a governmental party, RFRA provides no relief.” Pritchard, 159 F.4th at 667.

Turbocam attempts to mount a textual justification for its interpretation by relying upon RFRA’s applicability section, which specifies that RFRA “applies to all Federal law, and the implementation of that law, whether statutory or otherwise.” 42 U.S.C. § 2000bb-3(a). Because Title VII is federal law, Turbocam asserts that RFRA is an available defense in all Title VII actions, regardless of whether the government is a party. The court is not persuaded. “Although RFRA certainly applies to all laws, that does not mean it applies in all cases.” Pritchard, 159 F.4th at 668. When considered alongside the rest of RFRA, this section “simply requires courts to apply RFRA ‘to all Federal law’ in any lawsuit to which the government is a party.” Hankins, 441 F.3d at 115 (Sotomayor, J., dissenting).

Moving from statutory text to purpose, Turbocam points to Congress's statutory findings and declaration of purposes in enacting RFRA, which provide that RFRA was enacted "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 (1963) and Wisconsin v. Yoder, 406 U.S. 205 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." 42 U.S.C. § 2000bb(b)(1). However, those same statutory findings and purposes also make clear that Congress so acted because it disapproved of Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), where "the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." Id. § 2000bb(a)(4) (emphasis added). Because Congress found that "laws 'neutral' toward religion may burden religious exercise as surely as laws intended to interfere with religious exercise," and because "governments should not substantially burden religious exercise without compelling justification," Congress enacted RFRA "to provide a claim or defense to persons whose religious exercise is substantially burdened by government." Id. § 2000bb(a)(2)-(3), (b)(2). Thus, Congress's declared purposes in enacting RFRA support rather than undermine the court's interpretation of its text.

Even if it were otherwise, a court "cannot adopt atextual interpretations simply because they advance a statute's purpose." Pritchard, 159 F.4th at 668. As discussed above, Congress chose to advance its purposes by providing a cause of action and judicial defense "against a government." 42 U.S.C. § 2000bb-1(c). "It is

'quite mistaken to assume' . . . that any interpretation of a law that does more to advance a statute's putative goal 'must be the law.' Laws are the product of 'compromise,' and no law 'pursues its purposes at all costs.'" Luna Perez v. Sturgis Pub. Schs., 598 U.S. 142, 150 (2023) (citation, ellipsis, and brackets omitted) (quoting Henson v. Santander Consumer USA Inc., 582 U.S 79, 89 (2017)). Although RFRA's congressional purposes section indicates an intent to return to a test "which was sometimes applied to private parties . . . [i]nterpreting this clause to mean that RFRA applies to suits between private parties would practically render the majority of the statute ineffectual." Billard v. Charlotte Cath. High Sch., No. 3:17-cv-00011, 2021 WL 4037431, at *19 (W.D.N.C. Sept. 3, 2021) [hereinafter Billard I], rev'd on other grounds, Billard II, 101 F.4th at 316.[14] The requirement that the government carry the burden of demonstrating the law's justification would be reduced to surplusage at best, and nonsense at worst. See Pritchard, 159 F.4th at 667 ("[E]ven if a private party presented evidence about the government's interest, it would not be the government that demonstrated that interest." (emphasis in original)).

Turbocam next argues that, because the First Amendment may sometimes be invoked as a defense in lawsuits between private parties and because RFRA was intended to expand the First Amendment's protections, RFRA must be available

[14] Although the Fourth Circuit reversed the District Court's order in Billard I on grounds not relevant to the instant case, it indicated approval of the District Court's conclusion that RFRA does not apply to lawsuits between private parties. Billard II, 101 F.4th at 324, 328 & n.7.

against private parties. The court disagrees. It is hornbook law that a statute may not amend the Constitution or overturn the Supreme Court's interpretation of a constitutional provision; only a constitutional amendment can do that. Dickerson v. United States, 530 U.S. 428, 437 (2000). And the Supreme Court has held that RFRA is not a valid exercise of Congress's enforcement powers under § 5 of the Fourteenth Amendment. City of Boerne v. Flores, 521 U.S. 507, 532-36 (1997). Because "RFRA does not operate under the First Amendment . . . , cases in which the First Amendment has been permitted as a defense in suits between private parties are irrelevant." Billard I, 2021 WL 4037431, at *15. That Congress might have intended to expand the First Amendment's protections or overturn the Supreme Court's constitutional holding in Smith says nothing about whether it had the power to do so. City of Boerne, 521 U.S. at 534-36.

Turning to policy-based arguments, Turbocam next asserts that it would be inconsistent to permit a RFRA defense in enforcement actions brought by the government but not private parties. While Turbocam's argument has some intuitive appeal, policy concerns cannot override RFRA's plain text. "As judges we possess no special expertise or authority to declare for ourselves what a self-governing people should consider just or wise"; "[w]hen it comes to statutory interpretation, our role is limited to applying the law's demands as faithfully as we can."[15] Bostock, 590 U.S. at 681.

[15] To the extent policy-based concerns are even relevant, they cut both ways. As noted, "only one federal court of appeals has held that RFRA applies to a lawsuit

Turbocam also points to Bostock to support its RFRA defense. In Bostock, the defendants contended that construing Title VII to prohibit discrimination on the basis of transgender status may burden some employers' religious convictions. Id. at 681. The Court acknowledged this possibility, but also identified several guardrails to protect against it, one of which was RFRA. Id. at 681-82. Bostock characterized RFRA as "prohibit[ing] the federal government from substantially burdening a person's exercise of religion unless it demonstrates that doing so both furthers a compelling governmental interest and represents the least restrictive means of furthering that interest." Id. at 682 (emphasis added). The Court referred to RFRA "as a kind of super statute, displacing the normal operation of other federal laws," which "might supersede Title VII's commands in appropriate cases." Id.

As this summary makes plain, Bostock does not support Turbocam's contention. If anything, Bostock's explanation of RFRA supports this court's statutory interpretation; Bostock construes RFRA as requiring the government to demonstrate that the burden placed on an individual's religious exercise is justified. Id. The fact that Bostock agreed that RFRA could supersede Title VII's requirements "in appropriate cases" does not mean those "appropriate cases" include cases other than those in which the government is a party. Pritchard, 159

---

between private parties, while all others to consider the question disagree." Billard II, 101 F.4th at 328. The consequences of "expand[ing] RFRA's scope so dramatically is largely untested and difficult to anticipate." Id. Moreover, "[t]he United States as a nation has always been cautious of governmental overreach," and "distinguishing between private and government enforcement is not . . . absurd." Billard I, 2021 WL 4037431, at *21.

F.4th at 669 ("Even if RFRA might supersede [Title VII] in appropriate cases, this is not one of them: the plaintiff is not a governmental party . . . .").

Turbocam's final argument turns on RFRA's definition of "government." Turbocam observes that "government" is defined to include an "official (or other person acting under color of law) of the United States." 42 U.S.C. § 2000bb-2(1). Because Bernier sued only after the United States Equal Employment Opportunity Commission (EEOC) issued her a right-to-sue letter, Turbocam contends that the EEOC has effectively delegated governmental enforcement authority to Bernier such that she is for all intents and purposes the "government" under RFRA.[16] See Tanzin v. Tanvir, 592 U.S. 43, 52 (2020) (holding that RFRA provides an individual-capacity damages action against federal officials acting under color of law). The court is not persuaded. As a matter of law, the EEOC's "[m]ere approval" of Bernier's right to initiate a lawsuit does not convert Bernier into a state actor. Blum v. Yaretsky, 457 U.S. 991, 1004-05 (1982); see also Jarvis v. Vill. Gun Shop, Inc., 805 F.3d 1, 8 (1st Cir. 2015) (outlining the "rare circumstances" in which a private party acts under color of law (quoting Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d 1, 4 (1st Cir. 2005))).

For all of these reasons, the court concludes as a matter of law that RFRA provides no defense to Turbocam against Bernier's Title VII claim.

---

[16] Turbocam's argument that this court can operate as the "government" is without merit. It is not possible for this court to carry the burdens of production and persuasion contemplated by RFRA.

3. Turbocam's Free-Exercise Defense Does Not Entitle It to Summary Judgment Because Title VII Is a Neutral Law of General Applicability

Turbocam asserts that, even if it may not raise RFRA as a defense to Bernier's Title VII claim, it may raise a defense under the Free Exercise Clause of the First Amendment. Turbocam cites no case in which a court has permitted an employer (other than a church or religious institution) to raise the Free Exercise Clause as a defense in an employment discrimination suit brought by a private plaintiff.[17] Even assuming such a defense is available in this case, Turbocam agrees that it is subject to the test articulated by the Supreme Court in Smith.

Smith held "that the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability.'" Smith, 494 U.S. at 879 (quoting United States v. Lee, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)). A contrary rule "would open the prospect of constitutionally required religious exemptions from civic obligations of almost every conceivable kind—ranging from compulsory military service, to the payment

[17] The primary case Turbocam relies upon concerned the "ministerial exception," which generally requires courts to refrain from deciding "employment disputes involving those holding certain important positions with churches and other religious institutions." Our Lady of Guadalupe Sch. v. Morrissey-Berru, 591 U.S. 732, 746 (2020). Turbocam does not contend that the ministerial exception applies in this case. Turbocam also cites McDaniel v. Paty, 435 U.S. 618, 621 (1978), but that case involved a politician's action seeking a declaratory judgment that a Tennessee constitutional provision which barred ministers from holding public office applied to her opponent, who was a minister. Although the Supreme Court declared that the Tennessee provision violated the minister's free exercise rights because it conditioned his right to hold office on foregoing his "religiously impelled ministry," McDaniel, 435 U.S. at 626, the Court nowhere held that the Free Exercise Clause provided the minister with a defense against litigation or civil liability.

of taxes; to health and safety regulation such as manslaughter and child neglect laws . . . ; to social welfare legislation such as minimum wage laws [and] child labor laws, . . . and laws providing for equality of opportunity for the races." Id. at 888-89 (citations omitted). "To make an individual's obligation to obey [a neutral and generally applicable law] contingent upon the law's coincidence with his religious beliefs [would] permit[ ] him, by virtue of his beliefs, 'to become a law unto himself.'" Id. at 885 (quoting Reynolds v. United States, 98 U.S. 145, 167 (1878)). This "contradicts both constitutional tradition and common sense." Id.

Under Smith, courts "decline to find a constitutional violation when a neutral and generally applicable law or policy 'incidentally burdens free exercise rights'" so long as the law is "rationally related to a legitimate governmental interest.'" Swartz v. Sylvester, 53 F.4th 693, 700 (1st Cir. 2022) (quoting Does 1-6 v. Mills, 16 F.4th 20, 29 (1st Cir. 2021)). "To qualify as neutral, a policy must not target religious beliefs or practices 'because of their religious nature.'" Id. (quoting Fulton v. City of Phila., 593 U.S. 522, 533 (2021)). "To qualify as generally applicable, [the law] cannot selectively burden conduct motivated by religion while simultaneously exempting the conduct's secular counterpart." Id. "If a [law] permits 'individualized governmental assessment of the reasons for the relevant conduct,' it is not generally applicable." Id. (quoting Smith, 494 U.S. at 884); see also Roman Cath. Bishop of Springfield v. City of Springfield, 724 F.3d 78, 98 (1st Cir. 2013) (highlighting that the analysis turns on whether the law provides for "a discretionary system [with] the prospect that the government's discretion will be misused" to target religion).

Title VII is a neutral law of general applicability. It applies to all employers with fifteen employees or more, and prohibits all such employers from discriminating against individual employees in the terms or conditions of employment because of sex. 42 U.S.C. §§ 2000e(b), 2000e-2(a)(1). Title VII does not selectively burden employment discrimination motivated by religious belief; it prohibits employment discrimination regardless of its cause. See Bostock, 590 U.S. at 664 ("[I]t's irrelevant what an employer might call its discriminatory practice, how others might label it, or what else might motivate it."). Nor does Title VII grant individual decisionmakers authority to selectively punish discrimination when motivated by religious beliefs while permitting discrimination stemming from secular motivations.

Turbocam contends that Title VII is not neutral or generally applicable because it applies to employers with fifteen or more employers but not private clubs or employers with less than fifteen employees. This argument misapprehends the inquiry. The question is not whether the law applies to some employers but not others, but rather whether the law's application targets religion. Religious beliefs may motivate the employment practices of large and small employers alike. Restricting application of Title VII to employers with fifteen or more employees does not reflect an intent to selectively burden religious beliefs or practices.

Resisting this conclusion, Turbocam relies upon the Supreme Court's per curiam opinion in Tandon v. Newsom, 593 U.S. 61 (2021). Tandon, a COVID-era case, represented "the fifth time the Court . . . summarily rejected the Ninth

Circuit's analysis of California's COVID restrictions on religious exercises" in less than two years. Tandon, 593 U.S. at 64. The Court explained in an exasperated fashion that California's COVID restrictions were not neutral or generally applicable because they forbade at-home religious gatherings of three households or more but permitted secular gatherings that the Court considered to pose comparable health risks, such as gatherings at sporting events and indoor restaurants. Id. at 62-63.

The court does not find Tandon applicable. California's COVID restrictions prohibited at-home religious gatherings of three or more households while allowing secular, indoor gatherings involving similar numbers of persons. Unlike those restrictions, Title VII does not "selectively burden religious conduct." Gary S. v. Manchester Sch. Dist., 241 F. Supp. 2d 111, 121 (D.N.H. 2003) (Barbadoro, J.). It does not forbid religious employers from discriminating against employees while allowing secular employers to do so; it prohibits all employers with fifteen or more employees from discriminating against individual employees in the terms of their employment because of a protected characteristic, while permitting all employers with less than fifteen employees and private clubs to do so.

While Turbocam points out that Title VII contains numerous exceptions from its anti-discrimination mandate, many of these exceptions (like the private-club and small-employer exceptions) are equally available to justify an employment practice adopted for religious reasons and secular reasons. See St. Dominic Acad., 181 F.4th at 48, 50-51 (distinguishing Tandon on the same basis). Indeed, the First Circuit

has recently and expressly rejected the argument that "a party [can] challenge Title VII's employment discrimination protections on the grounds that they offend Tandon by exempting 'all small employers – religious and secular alike,' while covering some large, religious employers." Id. at 50 (quoting McMahon v. World Vision, Inc., 704 F. Supp. 3d 1121, 1142-43 (W.D. Wash. 2023), rev'd on other grounds, 147 F.4th 959 (9th Cir. 2025)).

To the extent that some of Title VII's exceptions are not available to defend a religiously motivated employment decision, Turbocam fails to appreciate the Supreme Court's admonishment that "[a]ll laws are selective to some extent." Church of Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 542 (1993). In the free-exercise context, the court must evaluate the challenged law's "categories of selection" to discern whether "the object of [the] law is to infringe upon or restrict practices because of their religious motivation." Id. at 533, 542.

The court is not persuaded by Turbocam's argument that Title VII's exceptions permitting employers near Indian reservations to grant preferential treatment to Native Americans, 42 U.S.C. § 2000e-2(i), or to hire based on a protected characteristic when that characteristic "is a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise," id. § 2000e-2(e), reflect an intent to burden religious expression. See Knights of Columbus, Council No. 94 v. Town of Lexington, 272 F.3d 25, 32 (1st Cir. 2001) (explaining that a law is not generally applicable when it is so "riddled with exceptions" that it is "effectively . . . applicable only to" religious

conduct). Nor do those exceptions suggest that Title VII affords more favorable treatment to secular employers over comparable religious employers. See Tandon, 593 U.S. at 62. To the contrary, Title VII contains several express protections for religious employers, e.g., 42 U.S.C. § 2000e-1(a), and the exceptions for small employers and private clubs that Turbocam's argument primarily relies upon are equally available to justify religious and secular employment decisions. St. Dominic Acad., 181 F.4th at 50.

Acceptance of Turbocam's argument—that a law is not neutral and generally applicable unless it permits religiously motivated conduct in precisely the same circumstances as it permits non-religiously motivated conduct—would effectively overrule Smith. One need only consider the facts of Smith and a simple hypothetical to see why. Smith concerned a provision of Oregon's criminal code that prohibited the knowing or intentional possession of certain specified controlled substances unless prescribed by a doctor. Smith, 494 U.S. 874. The Court had little trouble concluding that the law was neutral and generally applicable, and that Oregon was free to enforce its law even when doing so had the incidental effect of burdening religious practice. Id. at 882, 890.

Criminal laws like the one in Smith are the paradigmatic example of generally applicable, neutral laws. But even criminal statutes are subject to various defenses. Consider two defendants, each charged under New Hampshire law with trespassing in a public park after dark. See RSA 635:2. At trial, one defendant, who is homeless, raises a necessity defense; he claims it was the only place he could

safely sleep for the night and that he was not bothering anyone. See RSA 627:3, I ("Conduct which the actor believes to be necessary to avoid harm to himself or another is justifiable if the desirability and urgency of avoiding such harm outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the statute defining the offense charged."). The other defendant lacks a plausible necessity defense but raises a free-exercise defense: he claims he was worshipping at a time and place mandated by his religious beliefs.

Under Tandon, if the risks posed by the respective trespassers are comparable, there is a potential argument that New Hampshire's trespassing law is not neutral toward religion because it "treat[s] any comparable secular activity"—peaceful trespassing by a homeless person when reasonably necessary to avoid harm—"more favorably than religious exercise." Tandon, 593 U.S. at 62 (emphasis in original). If the availability of the necessity defense to the homeless defendant but not the religious practitioner renders the trespassing statute nonneutral, that conclusion cannot be reached without overruling Smith.

Recently, both before the First Circuit and in this case, a litigant has sought to wield Tandon "in a manner that would extinguish" Smith, "a Supreme Court precedent that the Court has regularly applied for thirty-five years." St. Dominic Acad., 181 F.4th at 51. In both cases, the litigant has noted in its briefing that it is attempting to preserve "the argument that Smith was wrongly decided for Supreme Court review." Id.; see doc. no. 75 at 56 n.13. This court is not free to overrule Smith, expressly or by implication. St. Dominic Acad., 181 F.4th at 51. Title VII

need not permit religiously motivated employment discrimination in all instances, or precisely the same circumstances as non-religiously motivated discrimination, to be considered a neutral law of general applicability. "[B]ecause 'we are a cosmopolitan nation made up of people of almost every conceivable religious preference,' and precisely because we value and protect that religious divergence, we cannot afford the luxury of deeming presumptively invalid, as applied to the religious objector, every regulation of conduct that" incidentally burdens religion. Smith, 494 U.S. at 888 (citation and emphasis omitted) (quoting Braunfeld v. Brown, 366 U.S. 599, 606 (1961) (plurality opinion)).

Having concluded that Title VII is a neutral law of general applicability, and because Turbocam does not develop an argument that Title VII is unrelated to a legitimate government interest, Turbocam fails to show that its free-exercise defense entitles it to summary judgment on Bernier's Title VII claim.

## II. Bernier's Cross-Motion

Bernier moves for summary judgment on both her ADA claim and her Title VII claim. As the court has already concluded that there is no genuine dispute of material fact with respect to Bernier's ADA claim and that Turbocam is entitled to judgment as a matter of law on that claim, it follows that Bernier is not entitled to summary judgment on her ADA claim.

The court concludes that Bernier is not entitled to summary judgment on her Title VII claim either. Bernier concedes that she is not arguing that the gender-dysphoria-exclusion facially discriminates on the basis of transgender status, and

instead argues that the application of that exclusion to her reflects a discriminatory decision-making process. "Issues of intent are particularly difficult to resolve on a motion for summary judgment," because intent must usually be proved by circumstantial evidence. Emery v. Merrimack Valley Wood Prods., Inc., 701 F.2d 985, 992 (1st Cir. 1983). While Bernier claims that Turbocam admits it has denied coverage to her because Turbocam opposes gender-affirming care, a reasonable jury could conclude that this does not reflect an intent to discriminate against Bernier because she is transgender. See Skrmetti, 605 U.S. at 519 ("[T]here is a 'lack of identity' between transgender status and the excluded medical diagnoses."). Moreover, while there is evidence of transgender-based animus in the record, it is also undisputed that Turbocam accommodated Bernier's name change and addressed another employee's harassment to Bernier's satisfaction. Construing the evidence in the light most favorable to the nonmovant, a reasonable jury could find for Turbocam on Bernier's Title VII claim.

## CONCLUSION

Turbocam's cross-motion for summary judgment (doc. no. 74) is granted with respect to Bernier's ADA claim (Count IV) but denied with respect to her Title VII claim (Count I). Bernier's cross-motion for summary judgment (doc. no. 66) is denied. Count I is the only count remaining for trial. Within fourteen days, the parties shall submit a new joint proposed scheduling order. Prior to doing so, the

parties shall consult with the court's case manager to confirm that their requested trial date is one that the court can accommodate.

SO ORDERED.

Landya McCafferty
United States District Judge

September 28, 2026

cc: Counsel of Record